1   JAMES N. FIEDLER (CA SBN 36643)
    LAW OFFICE OF JAMES N. FIEDLER
2   14942 Gault St
    Van Nuys, CA 91405-2910
3   Tel.: (818) 782-2189
    Fax: (818) 308-1134
4   jfiedlerlaw@gmail.com

5   GUSTAVO D. LAGE (Admitted *Pro Hac Vice*)
    SANCHEZ-MEDINA, GONZALEZ,
6   QUESADA, GOMEZ & MACHADO, LLP
    201 Alhambra Circ, Ste. 1205
7   Coral Gables, Florida 33134
    Tel.: (305) 377-1000
8   Fax: (786) 304-2214
    glage@smgqlaw.com
9
    DAVID S. HARRIS (Admitted *Pro Hac Vice*)
10  SQUIRE LAW GROUP, P.A.
    305 West Atlantic Avenue, Ste 5
11  Delray Beach, Florida 33444
    Tel.: (888) 788-8816
12  Fax: (786) 577-0425
    dharris@squirelawgroup.com
13
14  Attorneys for Plaintiff
    BUCK G. WOODALL
15

16              UNITED STATES DISTRICT COURT

                CENTRAL DISTRICT OF CALIFORNIA
17
18                      WESTERN DIVISION

19  | BUCK G. WOODALL, a.k.a. Buck Woodall, an individual, | Case No.: 2:20-cv-03772-CBM-E |
    |  | **SECOND AMENDED COMPLAINT FOR:** |
    |  Plaintiff,  |  |
    |  | **1) COPYRIGHT INFRINGEMENT, 17 U.S.C. § 501, *et seq.*;** |
    | vs.  |  |
    | THE WALT DISNEY COMPANY, a Delaware Corporation; WALT DISNEY PICTURES; a Division of the Walt Disney Corporation; WALT DISNEY ANIMATION STUDIOS, a Division of the Walt Disney Company; DISNEY ENTERPRISES, INC., a Delaware Corporation; DISNEY CONSUMER PRODUCTS, INC., a California | **2) VIOLATIONS OF DEFEND TRADE SECRETS ACT OF 2016, 18 U.S.C. § 1836;** |
    |  | **3) VIOLATIONS OF THE CALIFORNIA UNIFORM TRADE SECRETS ACT, CAL. CIVIL CODE §§ 3426, *et seq.*;** |

28                          0                  SECOND AMENDED COMPLAINT

Corporation; DISNEY CONSUMER
PRODUCTS & INTERACTIVE
MEDIA, INC., a California Corporation;
WALT DISNEY DIRECT-TO-
CONSUMER & INTERNATIONAL, a
Division of the Walt Disney Company;
DISNEY BOOK GROUP, LLC, a
Delaware Limited Liability Company;
DISNEY INTERACTIVE STUDIOS,
INC., a California Corporation; DISNEY
STORE USA, LLC, a Delaware Limited
Liability Company; DISNEY
SHOPPING, INC., a Delaware
Corporation; BUENA VISTA HOME
ENTERTAINMENT, INC., a California
Corporation;  BUENA VISTA BOOKS,
INC., a California Corporation;
MANDEVILLE FILMS, INC., a
California Corporation; JENNY
MARCHICK, an individual; PAMELA
RIBON, an individual; and DOES 1-10,
inclusive,

    Defendants.

**4) FRAUD**

**5) FALSE PROMISES**

**JURY TRIAL DEMANDED**

   Plaintiff Buck G. Woodall, for his complaint against Defendants The Walt Disney Company, Walt Disney Pictures, Walt Disney Animation Studios,  Disney Enterprises, Inc., Disney Consumer Products, Inc., Disney Consumer Products & Interactive Media, Inc., Walt Disney Direct-To-Consumer & International, Disney Book Group, LLC, Disney Interactive Studios, Inc., Disney Store USA, LLC, Disney Shopping, Inc., Buena Vista Home Entertainment, Inc., Buena Vista Books, Inc., Mandeville Films, Inc., Jenny Marchick, Pamela Ribon and DOES 1-10, claims and alleges as follows:

SECOND AMENDED COMPLAINT

# THE PARTIES

1.      Plaintiff Buck G. Woodall, who also goes by Buck Woodall, is a resident of Baja, Mexico, and Taos, New Mexico.  Referred to in this Complaint as "Plaintiff" or "Woodall," Plaintiff is a professional writer and member of the Writers Guild of America, as well as a producer and artist.

2.      Upon information and belief, Defendant The Walt Disney Company is, and at all times mentioned herein was, a Delaware corporation, qualified to do business in the State of California, with its principal place of business in Burbank, California.

3.      Upon information and belief, Defendant Walt Disney Pictures is, and at all times mentioned herein was, a corporation duly organized and existing under the laws of the State of California, with its principal place of business in Burbank, California. Plaintiff is informed and believes, and on that basis alleges, that Walt Disney Pictures is a subsidiary of Disney Enterprises, Inc., and that its primary business activity is the development and production of motion pictures.

4.      Upon information and belief, Defendant Walt Disney Animation Studios is, and at all times mentioned herein was, a business and juridic entity the exact nature and form of which is currently unknown to Plaintiff, with its principal place of business in Burbank, California. Plaintiff is further informed and believes, and on that basis alleges, that Walt Disney Animation Studios is referred to by the

Defendants as a division of Walt Disney Studios, which is then referred to as a division of The Walt Disney Company.  Walt Disney Animation Studios' primary business activity is the creation of animated feature films and short films.

5.     Upon information and belief, Defendant Disney Enterprises, Inc. is, and at all times mentioned herein was, a corporation duly organized and existing under the laws of the State of Delaware and qualified to do business in the State of California, with its principal place of business in Burbank, California. Plaintiff is further informed and believes, and on that basis alleges, that Disney Enterprises, Inc. is a subsidiary of The Walt Disney Company, and that its primary business activity is the licensing of intellectual property rights related to motion pictures and television programs produced by its affiliates and/or subsidiaries.

6.     Upon information and belief, Defendant Disney Consumer Products, Inc. is, and at all times mentioned herein was, a corporation duly organized and existing under the laws of the State of California, with its principal place of business in Burbank, California. Plaintiff is further informed and believes, and on that basis alleges, that Disney Consumer Products, Inc. is a subsidiary of Disney Enterprises, Inc., and that its primary business activity is the licensing of intellectual property rights for exploitation by third parties.

7.     Upon information and belief, Defendant Disney Consumer Products and Interactive Media, Inc. is, and at all times mentioned herein was, a corporation

SECOND AMENDED COMPLAINT

duly organized and existing under the laws of the State of California, with its principal place of business in Burbank, California. Plaintiff is further informed and believes, and on that basis alleges, that Disney Consumer Products and Interactive Media, Inc. is a subsidiary of Disney Enterprises, Inc., and that its primary business activity is the licensing of intellectual property rights for exploitation by third parties.

8.     Upon information and belief, Defendant Walt Disney Direct-To-Consumer & International is, and at all times mentioned herein was, a business and juridic entity the exact nature and form of which is currently unknown to Plaintiff, with its principal place of business in Burbank, California. Plaintiff is further informed and believes, and on that basis alleges, that Walt Disney Direct-To-Consumer & International is referred to by The Walt Disney Company as a division of The Walt Disney Company, and that its primary business activity is to provide streaming services and overseas media businesses.

9.     Upon information and belief, Defendant Disney Book Group, LLC is, and at all times mentioned herein was, a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in Burbank, California. Plaintiff is further informed and believes, and on that basis alleges, that Disney Book Group, LLC is a subsidiary of Disney Enterprises, Inc., and that its primary business activity is the distribution, marketing,

and selling of publications related to motion pictures produced by its affiliated entities.

10.    Upon information and belief, Defendant Disney Interactive Studios, Inc. is, and at all times mentioned herein was, a corporation duly organized and existing under the laws of the State of California, with its principal place of business in Burbank, California. Plaintiff is further informed and believes, and on that basis alleges, that Disney Interactive Studios, Inc. is a subsidiary of Disney Enterprises, Inc., and that its primary business activity is the publication and distribution of video games related to motion pictures produced by its affiliated entities.

11.    Upon information and belief, Defendant Disney Store USA, LLC is, and at all times mentioned herein was, a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in Burbank, California. Plaintiff is further informed and believes, and on that basis alleges, that Disney Store USA, LLC is a subsidiary of Disney Enterprises, Inc., and that its primary business activity is the operation of retail stores that sell merchandise related to motion pictures produced by its affiliated entities.

12.    Upon information and belief, Defendant Disney Shopping, Inc. is, and at all times mentioned herein was, a corporation duly organized and existing under

the laws of the State of Delaware, with its principal place of business in Burbank, California. Plaintiff is further informed and believes, and on that basis alleges, that Disney Shopping, Inc. is a subsidiary of Disney Enterprises, Inc., and that its primary business activity is the operation of a web-based store which sells merchandise related to motion pictures produced by its affiliated entities.

13. Upon information and belief, Defendant Buena Vista Home Entertainment, Inc. is, and at all times mentioned herein was, a corporation duly organized and existing under the laws of the State of California, with its principal place of business in Burbank, California. Plaintiff is further informed and believes, and on that basis alleges, that Buena Vista Home Entertainment, Inc. is a subsidiary of Disney Enterprises, Inc., and that its primary business activity consists of distributing Digital Versatile and Blue-Ray discs of motion pictures produced by affiliated entities.

14. Upon information and belief, Defendant Buena Vista Books, Inc. is, and at all times mentioned herein was, a limited liability company duly organized and existing under the laws of the State of California, with its principal place of business in Burbank, California. Plaintiff is further informed and believes, and on that basis alleges, that Buena Vista Books, Inc. is a subsidiary of Disney Enterprises, Inc., and that its primary business activity is the distribution, marketing, and selling of publications related to motion pictures produced by its affiliated entities.

15.     The foregoing corporate and juridic entities identified in paragraphs 2 through 14 of this Complaint are hereinafter collectively referred to as "Disney."

16.     Upon information and belief, Defendant Mandeville Films, Inc. is, and at all times mentioned herein was, a California corporation with its principal place of business in Los Angeles County, California.  Plaintiff is further informed and believes, and on that basis alleges, that Mandeville Films' primary business activity is the development and production of motion pictures. Mandeville Films, Inc. is referred to hereinafter as "Mandeville."

17.     Upon information and belief, Defendant Jenny Marchick is an individual who resides in Los Angeles County, California.  She is referred to hereinafter as "Marchick."

18.     Upon information and belief, Defendant Pamela Ribon is an individual who resides in Los Angeles County, California.  She is referred to hereinafter as "Ribon."

19.     Plaintiff is ignorant of the true names and capacities of Defendants named in this complaint as DOES I through 10 and sues said Defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when they have been ascertained. Plaintiff is informed and believes and on that basis alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged in this Complaint, and that Plaintiffs

damages as alleged in this Complaint were proximately caused by their conduct, or that such Defendants ratified or participated in the conduct causing such damages.

20.   At all times material hereto, each of the Defendants named in this Complaint was acting as the agent, employee, independent contractor, representing partner, or joint-venturer of the remaining Defendants with respect to the conspiratorial scheme set forth herein.   In doing the things set forth in this Complaint, each of the Defendants was further acting within the course and scope of that relationship.  Each of the Defendants in this action willfully gave consent to, ratified, aided-and-abetted and authorized the unlawful acts of the remaining Defendants alleged in this Complaint.

21.   Defendants, and each of them, are individually sued as participants and aiders and abettors in the wrongful conduct complained of in this Complaint, and the liability of each Defendant arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein with a purpose of furthering the Defendants' overall wrongful objectives.

22.   During their engagement in the wrongful conduct alleged in this Complaint, each of the Defendants acted in concert with one another to intentionally and willfully injure Woodall as alleged herein, conducting themselves as co-conspirators and joint venturers with respect to the fraudulent theft and

extensive exploitation of Woodall's intellectual property and trade secrets as alleged in this Complaint, as well as with respect to the additional misappropriations, misrepresentations, concealments and other misconduct alleged herein. This concerted action among the Defendants, and each of them, constituted a civil conspiracy to deliberately inflict the harm identified in the eight causes of action set forth in this Complaint.

## JURISDICTION AND VENUE

23.     This Action arises under both Acts of Congress and State and Federal law relating to: (a) copyright infringement under 17 U.S.C. §§ 501, *et seq.*, (b) federal misappropriation of trade secrets under 18 U.S.C. §§ 1832 and 1836, (c) state misappropriation of trade secrets under Cal. Civ. Code. §§ 3426, *et seq.*, (d) fraud, (e) unfair competition under Cal. Bus. & P. Code §§ 17200, *et seq.*, (f) breach of confidence, and (g) tortious interference with contract.

24.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332 and 1338, as well as each of 18 U.S.C. §1836(c) and 28 U.S.C. § 1367(a). This Court has supplemental jurisdiction over Plaintiff's state law claims, because these claims arise from the same case, the same controversy and the same transactions and occurrences, as well as because the claims all derive from a common nucleus of operative facts and would ordinarily be expected to be adjudicated along with the federal statutory claims raised in this Complaint.

25.    The Court has personal jurisdiction over all Defendants and venue is proper in this Court pursuant to 28 U.S.C. § 1391 and applicable law authorizing suit in this venue because, *inter alia*, (a) all corporate Defendants named in this Complaint maintain their principal place of business in Los Angeles County, California and (b) all individual Defendants named in this Complaint reside in this district and were employed by the corporate Defendants in this district.

### NATURE OF THE CASE

26.    This case arises from a nearly two-decade-long fraud masterminded by Marchick in part to quench her thirst to gain success in her desired career in the movie industry by stealing all the components of what would eventually become one of the most unique and storied animated films in movie history, *Moana*, which Disney ultimately produced and then released, first theatrically in November 2016 and then in secondary markets toward the middle of 2017, garnering for it nearly $1 billion in profits as of the date of filing this Complaint.  The fraud included the execution of agreements induced by classic fraud and deceit, as well as repeated follow-up inducements designed to extract from Woodall as much of his intellectual property and other trade secrets as was necessary for the Defendants to succeed in their desire to secretly make *Moana* through the illegal stratagem of literally poaching from Woodall every material idea ultimately associated with the film.  In perfecting their scheme, the Defendants were even able to delay and stall

Woodall's discovery of the fraud by writing him misleading emails and otherwise duping him with communications containing even more false representations, such as their deception in feigning ignorance about whether the extensive trade secret information delivered to them by Woodall from and after 2003, used by the Defendants to make *Moana*, ever "went beyond [the] desk" of Marchick.

27.    Specifically, Disney's *Moana* was produced in the wake of Woodall's delivery to the Defendants of virtually all constituent parts necessary for its development and production after more than 17 years of inspiration and work on his animated film project with titles over the years ranging from "Bucky" to "Bucky the Wave Warrior" (hereinafter *"Bucky"*).  This project was inspired by Woodall's unique exposure to Polynesian culture -- including living on Hanalei Bay for approximately a decade -- as well as his expenditure of more than $500,000.00 in personally creating, writing and developing a theatrical motion picture package associated with *Bucky*.  Woodall's purpose in constructing the package was to gear it toward presentation to major constituents and distributors within the animated movie industry.  What Woodall ultimately developed included major and unique themes, a complete screenplay, distinctive character development and illustrations, as well as comprehensive budgets for an animated film that was extraordinarily singular in plot, sequence of events, themes, dialogue, mood and pace, settings and characters.  All of these features developed by Woodall with respect to *Bucky* were

qualitatively and quantitatively unique and distinctive, are referred to in this Complaint as the "Presentation Package" and are comprised substantially of the materials a true and correct copy of which are appended hereto as Exhibit "A."

28.     In addition to registering both *Bucky* and the Presentation Package with the Writers Guild of America, as is customary for professional writers in the motion picture industry, portions of the Presentation Package were also granted Federal Copyright protection by the United States Patent and Trademark Office in 2004 and updated in 2014, containing approximately 203 pages of materials.  A true and correct copy of these federal copyright registrations are collectively appended hereto as Exhibit "B."

## BACKGROUND

29.     Woodall initially began interactions with Marchick regarding *Bucky* in the early 2000s.  Woodall was always careful to protect his ownership over all of his intellectual property, trade secret ideas and materials developed pursuant thereto, including, but not limited to, all elements of the Presentation Package.  On October 22, 2003, Marchick executed a document entitled Confidentiality Agreement whereby Marchick confirmed that all information provided to her by Woodall -- operating at the time through a *dba* entity known as Buck Creations Multimedia -- is and shall remain confidential.  A true and correct copy of this Confidentiality Agreement is appended hereto as Exhibit "C," and is referred to

SECOND AMENDED COMPLAINT

hereinafter as the "Confidentiality Agreement."   It was only after Marchick executed the Confidentiality Agreement that Woodall provided in confidence to Marchick extremely large quantities of intellectual property and trade secrets associated with *Bucky*.  At all times thereafter, and totally ignorant of Marchick's and the Defendants' fraudulent scheme set forth in this Complaint, Woodall reasonably believed Marchick to be honoring the Confidentiality Agreement and respecting the ownership by Woodall of his intellectual property and trade secrets associated with *Bucky*.

30.    In or about January of 2005, following Marchick's prodding of Woodall to deliver more material regarding *Bucky* and her repeated assurances that she could and would assist in commercializing the film*,* Woodall completed all or substantially all of the content of what is attached hereto as Exhibit A as the Presentation Package and delivered it to Marchick at Mandeville's offices located within the Disney studio facilities in Burbank, California.  Marchick was employed at the time by Mandeville, which had a "first look" deal with Disney, which is a favored and highly sought-after relationship from the standpoint of an independent producer for the possible production and distribution of a theatrical feature product by a major studio.  At the meeting, Marchick told Woodall in words or substance that she would get the Presentation Package "to the right people."

31.     After Marchick's review of the Presentation Package shortly following the January 2005 meeting, Marchick prodded Woodall to produce and provide to Mandeville an animated trailer of the Presentation Package by continuing to assure Woodall that Marchick could and would obtain successful commercialization of Woodall's ideas.  During the two years that followed this inducement, Woodall worked on and completed a comprehensive animated trailer at his own cost and expense and Woodall then provided the trailer to Marchick and Mandeville in or about the middle of 2008.

32.     Later during this period, at Marchick's prodding and inducement, Woodall also provided Mandeville and Marchick, in addition to an updated fully animated concept trailer, with storyboards on a DVD, which at the time contained background image references, story development, character illustrations, executive summary, and other constituents to develop the film.

33.     Based upon Marchick's continuing fraud, deceit and prodding him to deliver script materials, Woodall then worked on completing his script for submission to Marchick.  Because of the intimate association with Disney regarding the development of the project, Woodall was assisted by Kurt Weldon, a writer affiliated with Disney, in completing the animated trailer.  Always vigorous in protecting his intellectual property and trade secrets associated with *Bucky*, Woodall required Weldon to also sign a confidentiality agreement before providing

Weldon with access to and the right to work on the *Bucky* script.  Weldon signed the confidentiality agreement and provided it to Woodall through Buck Creations Multimedia on November 18, 2006.  After Woodall and Weldon completed the final draft script in July 2011, Woodall sent Marchick a copy of it while she was then working as a "Consultant, Original Movies" at Disney.  Unbeknownst to Woodall at the time, the script Marchick prodded Woodall to complete was virtually the final cog in the Defendants' conspiratorial machinery of stealing *Bucky* and developing *Moana.*

34.     The Disney theatrical animated feature film *Moana* was released into theatrical distribution in November 2016, depicting similarities to the trade secrets and intellectual property of the Presentation Package materials that are extraordinarily stark and greater than most every reported example of copyright infringement in U.S. history.  With incredible and often breathtaking scope and breadth, the similarities in the scripts and all materials surrounding the two stories include, but are not limited to, the following duplications which could not possibly have been accidental or innocent in derivation:

a.     Both *Bucky* and *Moana* tell the story about a teenager who defies parental warnings and embarks on a dangerous voyage across Polynesian waters to save the endangered land of a Polynesian island;

b.      Both *Bucky* and *Moana* celebrate what the *Bucky* script refers to as the Polynesian people's "unfettered access to the sea [as] a native right;"

c.      Both *Bucky* and *Moana* involve protagonists who learn about ancient Polynesian culture during a sea voyage;

d.      Both *Bucky* and *Moana* contain a recurring theme of the Polynesian belief in spiritual ancestors, *to wit*: ancient spirits manifested as animals which guide and guard the living;

e.      Both *Bucky* and *Moana* have as the backdrop an ancient Polynesian village with its inhabitants weaving baskets, fishing, pounding taro, and telling stories of ancient Polynesia;

f.      Both *Bucky* and *Moana* comprise an opening scene which is a flight into an island;

g.      Both *Bucky* and *Moana* have as a part of its opening sequence the protagonist being as a baby at the Polynesian beach facing destiny;

h.      Both *Bucky* and *Moana* involve a journey by the main character which starts with a turtle;

i.      Both *Bucky* and *Moana* involve plots where a symbolic necklace plays a special role;

SECOND AMENDED COMPLAINT

i.      Both *Bucky* and *Moana* incorporate the concept of sea navigation by the stars;

j.      Both *Bucky* and *Moana* involve a main character who specifically encounters a goddess-like creature emanating from volcanic lava;

k.      Both *Bucky* and *Moana* involve a main character who encounters a demigod with a giant hook and tattoos;

l.      Both *Bucky* and *Moana* introduce the demigod in a dark cave;

m.      Both *Bucky* and *Moana* involve the demigod turning into different creatures including a Polynesian hawk and a shark;

n.      Both *Bucky* and *Moana* involve characters shapeshifting into bugs;

o.      Both *Bucky* and *Moana* involve the main character surviving a storm on the sea;

p.      Both *Bucky* and *Moana* involve a protagonist who also faces an army of small-armored warrior characters;

q.      Both *Bucky* and *Moana* involve the protagonist encountering a whirlpool in the ocean;

r.      Both *Bucky* and *Moana* involve a giant creature that is

SECOND AMENDED COMPLAINT

concealed within a mountain and actually lies down and takes

the mountain's shape;

s.    Both *Bucky* and *Moana* conclude with the teenager returning

as a hero to the parents on the island, having saved it from

destruction; and

t.    Both *Bucky* and *Moana* contain striking similarities in the

animated visual depictions used in the productions, including,

by way of example, the face of the goddess of creation/lava

creature and the location and surroundings of the island.

35.    According to its director, Disney authorized work on a script for

*Moana* to be commenced in 2011 and this coincides with the Marchick-prodded

script that Woodall completed at about the same time.  At all times material hereto,

Woodall was totally ignorant of this fact or of any desire on the part of the

Defendants named in this Complaint to take and pirate for themselves all of his

trade secret materials delivered from and after 2003 under the auspices of the

Confidentiality Agreement, including the Presentation Package, and to then

develop for profit a competing story with virtually endless similarities and

duplications.

36.    Pursuant to the conspiracy described in this Complaint, the

Defendants pirated, stole and otherwise purloined the registered, copyright and

trade secret protected and previously submitted Presentation Package and other materials, as fully set forth in this Complaint, belonging to Woodall in order for them to be able to produce the animated film, *Moana*. According to the best reports currently publicly available, *Moana* is one of highest grossing animated films in movie history, already earning worldwide theatrical box office receipts for Disney in excess of $690,000,000. Disney has further used the *Moana* feature as the basis for the normal DVD and Blue Ray worldwide release of the title in March 2017, generating an additional amount of receipts in excess of $103,000,000. As Woodall was not resident in the United States at the time of its theatrical release, he could not and did not see the *Moana* film until its release on DVD at the place of his then current foreign residence in or about late June of 2017. He thereafter undertook comparisons not only of the two projects but also of other materials subsequently released to the public by the Defendants regarding how *Moana* was made. Only through the late June 2017 viewing of *Moana* on DVD, and examining the subsequent explanation by the Defendants of how they made *Moana* as well as studying public record information disseminated by persons associated with *Moana's* production and release, was Woodall able to discover the actual violations of law complained of herein through comparing these materials of the Defendants, on the one hand, with the Presentation Package and other materials he had provided to the Defendants since 2003, on the other hand.

37.     Disney is well known for its exploitation of all markets relating to its theatrical products, turning each theatrical title into a "franchise" of its own. A prime example is with respect to the immensely popular and profitable Disney stores worldwide, as well as online stores and marketing activities through licensing third party retailers of countless types and categories of products. *Moana* is no exception. As a further example of Disney's exploitation of the *Moana* franchise, in late 2019, Disney introduced its subscription based online streaming portal called Disney+, at which *Moana* is prominently displayed as being available to online subscribers. The current and ultimate financial results of all such massive marketing efforts by Disney of the full array of all *Moana* products is currently unknown to Woodall but will be the subject of discovery and evidence presented at trial or in connection with summary judgment proceedings as applicable.

38.     Beginning in at least 2011 and continuing to the date of this Complaint, Defendants knowingly conspired with each other to develop, produce, distribute, sell and license products associated with both Disney and *Moana* that both infringe upon the copyrights of Plaintiff and otherwise violate Plaintiff's rights as alleged herein.  These violations took numerous forms, including, but not limited to:

a. Defendant Mandeville and its officers and directors were able to bind Disney and induce action and inaction by Disney to further the conspiracy, both through their relationships with officials at Disney and their co-venturing

creative relationships in other ventures with Disney.  They used this ability to assure that Disney affected their and Marchick's plan to steal *Bucky* for the sole objectives of profit and self-aggrandizement;

b. Ribon, who received a *Moana* screen credit "Story By," assisted the Defendants in morphing the *Bucky* screenplay into the *Moana* screenplay knowing that by doing so she was assisting in the ultimate theft in protection and furtherance of Marchick's fraud and in pursuing her own business interests;

c. In order to assure that Woodall continued to deliver <u>all</u> of his *Bucky*-related ideas to and into the Defendant's fraudulent scheme, Marchick repeatedly and systematically concealed the scheme and lied to Woodall in order to both induce him to transfer his intellectual property and trade secrets to her as well as to assure that Woodall wouldn't find out the truth until after *Moana* was released and the fraudulent object of the conspiracy, i.e., the development and realization of more than a billion dollars in profit, was realized;

d. The Disney defendants operated as motion picture conglomerates usually do in cases of intellectual property theft, with (i) the film related entities of the conglomerate (in this case The Walt Disney Company, Walt Disney Pictures and Walt Disney Animation Studios) assuring the exploitation, development

and release of the movie into theatrical and secondary markets, and (b) then the commercialization entities (in this case Disney Enterprises, Inc., Disney Consumer Products, Inc., Disney Consumer Products & Interactive Media, Inc., Walt Disney Direct-To-Consumer & International, Disney Book Group, LLC, Disney Interactive Studios, Inc., Disney Store USA, LLC, Disney Shopping, Inc., Buena Vista Home Entertainment, Inc. and Buena Vista Books, Inc.) assuring and implementing the production and distribution of products derived from the motion picture on a national and worldwide basis.   All of the foregoing Disney defendants intentionally affected these specific activities with classic wrongful intentions of making off with and profiting from the stolen assets, which they have done as of the date of filing this Complaint in the sum of nearly $1 billion.

## **FIRST CAUSE OF ACTION**

**(Copyright Infringement, 17 U.S.C. § 501, *et seq*. - Against All Defendants)**

39.    Plaintiff incorporates paragraphs 1 through 38 of this Complaint as though fully set forth at length.

40.    Plaintiff has duly complied with all statutory formalities of the Copyright Act of 1976 with respect to the registration of protectible elements of *Bucky,* of the Presentation Package and of the underlying work, all of which are the

subject of U.S. Registration No. VAu 000624809 and PAu 003749546, collectively Exhibit "B" hereto.

41.     The foregoing acts by Defendants and each of them constitute unauthorized copying, reproduction, distribution, display, licensing, sale and commercial exploitation of Plaintiff's copyrighted work, as reflected in U.S. registration no. VAu 000624809 and PAu 003749546, which infringe Plaintiff's exclusive rights in violation of the Copyright Act of 1976, 17 U.S.C. § I01 et seq.

42.     Defendants' infringing works copy quantitatively and qualitatively distinct, important, and recognizable portions of Plaintiff's copyrighted work.

43.     Such infringement of Plaintiff's copyrighted work includes Defendants' copying of the literal elements of Plaintiff's copyrighted work including the major themes and ideas, script outline, character development, illustrations and budgets.

44.     Defendants and each of them did not seek or receive permission or consent from Plaintiff to copy any portion of Plaintiff's copyrighted work, and did so willfully, maliciously and intentionally.

45.     Defendants' conduct has at all times been knowing, willful, and with complete disregard for Plaintiff's rights.

46.    As a proximate and foreseeable result of Defendants' wrongful conduct, Plaintiff has been irreparably harmed and will continue to sustain injury and damage unless Defendants and each of them are enjoined.

47.    The inclusion of signature elements of Plaintiff's copyrighted work greatly enhances the financial value of Defendants' infringing products.

48.    As a result of Defendants' copyright infringement, Plaintiff is entitled to his actual damages and profits in the sum of more than $100 million, according to proof either upon entry of summary judgment in Woodall's favor or at trial before a duly empaneled jury.    Alternatively, Plaintiff is entitled to statutory damages, pursuant to 17 U.S.C. §504.

49.    From the date of first production of Defendants' infringing works, the Defendants have infringed Plaintiff's copyright interests in its copyrighted work, including by: (a) authorizing the reproduction, distribution and sale of the infringing and/or distributing Defendants' infringing works through various sources; (b) copying and displaying the infringing works in related marketing and promotional materials for the sale of the infringing works; and (c) participating in and furthering the aforementioned infringing acts, and/or sharing in the proceeds therefrom, all through substantial illegal use of Plaintiff's copyrighted work alleged in this Complaint.

50.     With knowledge of the aforementioned infringement, each Defendant has induced, caused or materially contributed to the infringing conduct of each other, such that each and all should be found to be contributorily liable for the acts of the others.

51.     Defendants and each of them had the right and ability to control other infringers and have derived a direct financial benefit from that infringement such that Defendants and each of them also should be found to be vicariously liable.

52.     The infringement is continuing as the infringing products continue to be produced and sold or licensed by Defendants, while unwitting customers continue to purchase or license from Defendants the stolen and infringed work and related products.

53.     Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause to Plaintiff, as well as the innocent buyers or licensees of Defendants' infringing products, irreparable injury that cannot fully be compensated for or measured in monetary terms; Plaintiff has no adequate remedy at law.

54.     As a result of the aforesaid infringement, Plaintiff has suffered and will continue to suffer substantial injury, loss and damages to its ownership rights in Plaintiff's copyrighted work. Defendants have unlawfully derived and will continue to derive income and profits from the infringing acts thereby unjustly

enriching themselves to the detriment of Plaintiff. As a direct and proximate result of the conduct of Defendants, and each of them, Plaintiff has suffered actual damages including lost profits, lost opportunities, and loss of goodwill, in an amount well in excess of two-point-five percent (2.5%) of all gross revenue earned by Disney from *Moana* the feature film and all products derived thereof, an exact amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Violations of Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 - Against All Defendants)

55. Plaintiff incorporates paragraphs 1 through 38 of this Complaint as though fully set forth at length.

56. Using what they always intended to be the ruse of the Confidentiality Agreement (Exhibit "C"), Defendants Disney, Mandeville, Marchick and Ribon engaged in a civil conspiracy to assure themselves that they would be able not only to infringe on the materials expressly copyrighted by Plaintiff but also to misappropriate Plaintiff's trade secret information related to *Bucky* not expressed in the copyrighted materials. Indeed, the entire fraudulent purpose of the Confidentiality Agreement was (a) to gain access to copyrighted materials early (years before those materials were filed with the Copyright Office) in order to obtain a head-start against anybody else intending to exploit Plaintiff's motion

picture project (including Plaintiff, for that matter) and (b) to literally pull out of Plaintiff Buck Woodall's head all of his ideas not reflected in the copyrighted materials that were (in the Defendants' view) necessary in order to assure a very successful and timely motion picture project for the Defendants based upon what they always viewed as a potentially multi-billion-dollar animated motion picture release.

57. At all times following the January 2005 meeting referenced in paragraphs 30 and 31 of this Complaint, Marchick knew that the only way to assure her and her conspirators (including Mandeville and Disney) of a Disney film project with unprecedented profit potential arising out of their planned theft of Plaintiff's *Bucky* project was for the conspirators to extract from Plaintiff Buck Woodall's mind all possible information and ideas that might "bring to life" all of the experiences and story developments that Mr. Woodall had and was continuing to envision with respect to his intensely passionate focus on the story of Bucky.  Though the vast majority of copyright theft cases do not involve the defendants being able to actually see an example of what the motion picture might look like on the screen, the Defendants here knew full well that the animated nature of Mr. Woodall's motion picture story permitted them to reach deeper into their bag of tricks and artifices in order to gain even more access to Mr. Woodall's deep creativity than they had already acquired.  Because of this, the Defendants incessantly prodded

SECOND AMENDED COMPLAINT

Plaintiff following the January 2005 meeting to deliver to them not only a trailer, but also every surrounding idea that the trailer depicted (including, for example, draft scripts of *Bucky*), so that they could witness firsthand exactly how Plaintiff envisioned his unique copyrighted story to play out in full development on the movie screen.

58. For more than two years following the January 2005 meeting, the Defendants repeatedly prodded Plaintiff. This included innumerable conversations during which Plaintiff expressed in confidence to the Defendants all of his trade secret ideas not expressed in the copyrighted materials. Ultimately in or about the middle of 2008, intending that his ideas were fully and completely confidential pursuant to the Confidentiality Agreement (Exhibit "C"), Plaintiff delivered to the Defendants (through Marchick and Mandeville) the comprehensive and trade secret-protected trailer that literally "brought to life" not only certain key elements of the *Bucky* story but, of equal importance, embarked on a deeper dive into other important portions of the copyrighted story that were not expressed in the copyrighted materials or anywhere else. The Defendants unique and exclusive access to the trailer allowed them to have a special perspective on important aspects of Plaintiff's creative ideas surrounding the *Bucky* project well in excess of merely the copyrighted materials, providing the Defendants with the kind of additional information necessary to be able to duplicate Plaintiff's creative vision in a manner

that has shown to be either totally or substantially unprecedented in the history of the motion picture industry.

59.   In addition to the foregoing, the Defendants also obtained an unfair head-start advantage over others in the industry, and over Woodall himself with respect to Woodall's desire to develop and complete his *Bucky* motion picture, from and after the time that Woodall delivered to the Defendants his 2011 script of Bucky (then entitled *Bucky & the Hui*).  This 2011 script delivered in confidence to the Defendants was in no way available to the public until Woodall registered an updated version of the 2011 script (then entitled *Bucky the Surfer Boy*) with the Copyright Office in or about December of 2014.  This head-start advantage that was intentionally acquired and garnered by the Defendants was of enormous financial value to them and enabled them to develop, produce and release their infringing *Moana* toward the end of 2016 instead of far later on the standard motion picture industry development and release horizon.

60.   At all times during Woodall's delivery to the Defendants of his trade secret materials identified hereinabove in paragraphs 56 through 59 of the Complaint, the Defendants repeatedly accessed and interacted with Woodall so that they could then obtain the benefit of discussions and communications with Woodall regarding all of his creative thoughts and ideas surrounding the trade secret ideas and precisely how the motion picture concept the parties were discussing would in

SECOND AMENDED COMPLAINT

fact be cultivated and ultimately exploited from financial and strategic standpoints. The thoughts and ideas of Woodall expressed during this time further expanded the value of the aforementioned trade secrets -- and of the overall project under discussion -- by permitting the Defendants to gain an understanding of the balance of Woodall's go-forward plans for the continued development of his *Bucky* film project.

61. At all times material hereto, Defendants Disney, Mandeville, Marchick and Ribon engaged in a civil conspiracy to misappropriate the trade secret materials they were given confidential access to by Woodall as set forth above, including, but not limited to, (a) the trailer produced by Plaintiff, (b) the 2011 script and (c) Woodall's creative ideas surrounding these materials, all as set forth more fully throughout this Complaint, including, but not limited to, in paragraphs 30, 31, 56, 57, 58, 59 and 60 thereof.  The Defendants then utilized these trade secret assets for profit in their motion picture business activities as alleged in detail throughout this Complaint.

62. These Defendants further achieved the objects of their civil conspiracy by agreeing to mislead, and in fact misleading, Woodall at all times before the release of *Moana* and for the sole purpose of extracting more and more pieces of Woodall's trade secret intellectual property regarding *Bucky*, representing his life's work, so that it would be possible for the Defendants to actually complete *Moana*

soon enough to by definition prevent Woodall from taking evasive action to protect himself. The duping of Woodall alleged herein was done pursuant to the Defendants' carefully conceived plan to not only steal the significant and valuable intellectual property developed in conjunction with *Bucky*, but to actually induce Woodall to develop even more trade secret intellectual property for delivery to the Defendants so that Defendants could achieve the objects of their conspiracy described in this Complaint. All of the intellectual property described in this paragraph is referred to in detail throughout paragraphs 1 through 61 of this Complaint.

63. The creative, trade-secret protected ideas of Plaintiff surrounding the production of the trailer and 2011 script -- as well as all of Woodall's thoughts, ideas and creative concepts related thereto which were also purloined by the Defendants, and each of them -- represented a valuable compilation-set of trade secret ideas that were of particular importance and worth to Plaintiff when considered alongside, and in combination with, the copyrighted materials as set forth in this Complaint.

64. At all times material hereto, Woodall reasonably believed that each of these Defendants had no intention, even a remote one, to pirate and purloin his trade secret intellectual property associated with *Bucky* in the manner alleged in this Complaint.

SECOND AMENDED COMPLAINT

65. The project known as *Bucky*, including but not limited to the trailer and 2011 script, when considered alongside and in combination with the copyrighted materials and all other materials and ideas of Woodall referenced throughout this Complaint, including those at Exhibit "A" hereto, are legally classified as trade secrets pursuant to both federal and state common law and statutory law. All materials delivered by Woodall to the Defendants from and after 2003 are therefore trade secrets as a matter of law and are referred to in this Complaint as "Woodall Trade Secrets" inasmuch as they are of extraordinary combinational value regardless of the extent to which some of them were copyrighted in order to protect the overall film project known as *Bucky*.

66. At all times material hereto, these trade secrets set forth above – both the trade secrets identified in paragraphs 56 through 59 of this Complaint, as well as the Woodall Trade Secrets -- (a) were all developed and continually updated using a great expenditure of time and effort by Plaintiff over the course of more than 17 years and representing the life's work of an honorable and talented man, and (b) are comprised of financial, business, technical, economic and engineering information, including patterns, plans, compilations, program devices, formulas, designs, methods, techniques, processes, procedures, programs and codes that Woodall (i) has taken reasonable measures to keep secret including, without limitation, assuring that all persons gaining access to the trade secrets identified in

paragraphs 56 through 59 of this Complaint, and the Woodall Trade Secrets, execute confidentiality agreements or otherwise clearly articulate their covenant not to disclose any of the Woodall Trade Secrets to the general public, directly or indirectly; and (ii) derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of such information.

67. Each of the Defendants named in this Cause of Action conspired to, and did in fact, misappropriate the legally protected trade secrets identified in paragraphs 56 through 59 of this Complaint, and the Woodall Trade Secrets, knowing that she or it was committing trade secret theft through improper means for the following reasons: (a) these Defendants all acknowledged that they were bound by the Confidentiality Agreement executed in favor of Woodall, which forbade any such use of these trade secrets that the Defendants had access to from and after 2003 and (b) in the circumstances of this case, the Defendants were bound by applicable law precluding them from utilizing their confidential relationship arising out of the Confidentiality Agreement and applicable law to first gain access to the foregoing trade secrets and then take and use such proprietary assets for monetary gain knowing that by doing so they would cause devastating injury to Woodall.

SECOND AMENDED COMPLAINT

68.  Notwithstanding knowing and understanding their duties under applicable federal and state law to maintain inviolate the secrecy of the trade secrets identified in paragraphs 56 through 59 of this Complaint and the Woodall Trade Secrets, each of the Defendants named in this Cause of Action did steal these trade secrets and expropriate these proprietary assets for their own use in developing the animated film *Moana*, which the Defendants all realized could have never been made without virtually all the "guts" of that film project being delivered to the Defendants by Woodall through well over a decade of prodding and fraudulent inducements as alleged in this Complaint.  At all times material hereto, each of the Defendants named in this Cause of Action knew the foregoing trade secrets were protected from such pirating under federal and state law, were owned exclusively by Plaintiff and further that each of the Defendants had a duty of secrecy with respect to each of the aforementioned trade secrets.

69.  Each of these Defendants boarded and then engaged in the aforementioned conspiracy with the intention and knowledge that their unlawful conduct would ultimately result in serious injury to Woodall, but nevertheless these Defendants engaged in the theft and taking of these trade secrets with actual malice and for their own profit as described throughout this Complaint. The theft by these Defendants included, without limitation, duplication, downloading, uploading, replication, copying and other unlawful patterns and methodologies regularly

utilized in similar illegal activities nationally and internationally usually accompanying business-espionage activity relating to theft of valuable business and creative trade secrets.

70. As a proximate and foreseeable result of these Defendants' misappropriation of the trade secrets identified in paragraphs 56 through 59 of this Complaint and the Woodall Trade Secrets as alleged herein, Plaintiff has been damaged in the sum of at least $100 million, according to proof either upon entry of summary judgment in Woodall's favor or at trial before a duly empaneled jury.

71. The foregoing compensatory damages cannot fully compensate Woodall for the unjust enrichment inuring to the Defendants named in this Cause of Action, and Woodall is entitled to recover the full measure of these Defendants' unjust enrichment as a result of the significant benefits inuring to each of these Defendants as a result of their utilization of the purloined trade secrets over the course of at least the last period of nearly five years. Such damages based upon unjust enrichment are in a presently unknown sum according to proof either upon entry of summary judgment in Woodall's favor or at trial before a duly empaneled jury.

72. As an alternative to the foregoing damages calculation, Woodall is also entitled to recover damages measured by a reasonable royalty for each of these Defendants' unauthorized use of the aforementioned trade secrets in a sum

according to proof either upon entry of summary judgment in Woodall's favor or at trial before a duly empaneled jury.

73. In affecting their misappropriation and other unlawful activity set forth in this Cause of Action, the Defendants named in this Cause of Action acted willfully, with reckless disregard for the interests of Woodall and with actual oppression and malice, entitling Woodall to exemplary and punitive damages in a sum not greater than double the amount of damages awarded as a result of Woodall prevailing on this Cause of Action.

74. The wrongful conduct of Defendants named in this Cause of Action with respect to their misappropriation of the referenced trade secrets, unless and until enjoined by order of this Court, will cause great and irreparable damage to Woodall insofar as Woodall is in grave danger of being injured in the following ways: (a) Woodall will lose the ability to complete his life's work involving the commercialization of *Bucky*, (b) Woodall will have even more of his trade secrets stolen, pirated and/or expropriated and exploited by the Defendants over time and indeed the Defendants have announced sequel and television expansion of *Moana* in a manner at once threatening such harm and (c) Woodall will suffer other irreparable injury according to proof at either pre-trial hearings or at trial before a duly empaneled jury. Accordingly, Woodall is entitled to temporary, preliminary and permanent injunctive relief pursuant to 18 U.S.C. § 1836 (b)(3)(A)(i).

SECOND AMENDED COMPLAINT

75. In addition to the monetary and injunctive remedies identified in paragraphs 70 through 74 of this Complaint, Woodall also is entitled to a Court order providing for the seizure of all property possessed or controlled by the Defendants named in this Count to the extent such seizure is necessary or legally justified to prevent the propagation or further theft, pirating or other dissemination of the trade secrets that are the subject of this Complaint. According to proof, this will likely include seizure of significant juridic portions of those specific affiliates of Defendants being utilized to exploit the extraordinary and unprecedented value associated with and derived from the theft of *Bucky*, including, but not limited to, of the entity commonly known and referred to as "Disney+" to the extent that "Disney+" has built its business or its revenue base and revenue stream substantially around what is now appropriately referred to as the *Moana* franchise.

## THIRD CAUSE OF ACTION

**(Violations of the California Uniform Trade Secrets Act, Cal. Civil Code §§ 3426, *et seq.* - Against All Defendants)**

76. Plaintiff incorporates paragraphs 1 through 75 of this Complaint as though fully set forth at length.

77. In connection with his business, Woodall has developed, maintained and used proprietary and confidential material for application in and with respect to the entertainment industry, including, but not limited to, the trade secrets identified in

paragraphs 56 through 59 of the Complaint, and the Woodall Trade Secrets, that are specifically described in the incorporated paragraphs of this Complaint. Prior to the acts complained of herein and continuing up to the date of filing this Complaint, these proprietary trade secrets had, and continue to have, substantial economic value deriving from the fact that such proprietary and confidential information and other non-public aspects of *Bucky* and the Presentation Package and the trailer and the 2011 script -- and the combinational value of all elements thereof -- have not been generally known to the public or to Woodall's competitors who could obtain substantial economic value from their use or disclosure.

78. Plaintiff has undertaken reasonable efforts to ensure that the foregoing trade secrets remain secret, confidential and proprietary to Woodall by: (a) limiting disclosure of the combinational portion of the Woodall Trade Secrets -- *viz.*, the information surrounding the trailer and the trailer itself as well as the 2011 script during the head-start period referenced at paragraphs 56 through 59 of this Complaint -- only to agents and associates of Woodall who need to know the information and who agree in advance to keep the information confidential and non-public; (b) emphasizing to each such person and others associated with Woodall the need to keep all such information secret; (c) requiring, as a condition to allowing others to have access to the foregoing trade secrets, that either confidentiality agreements be executed or the persons having access to the trade

secrets otherwise expressly acknowledge or agree that these trade secrets are proprietary and confidential and that all of these properties of Woodall will not be used or disclosed in any manner except for the benefit of Woodall, unless Woodall consents or authorizes otherwise in writing.

79. By and through the specific misconduct recited in the paragraphs incorporated by reference (*e.g.,* paragraphs 56 through 69 of this Complaint), each of the Defendants named in this Cause of Action, without permission or authorization from Woodall, knowingly misappropriated the foregoing trade secrets for their own personal gain and with malice. This unlawful misappropriation occurred in several ways identified in this Complaint, all made possible by the confidential relationship created by the original 2003 Confidentiality Agreement executed by Marchick through and by reason of which each of the Defendants had both access to the trade secrets as well as a resulting legal obligation to maintain the secrecy of the trade secrets.

80. Through the conspiracy described in detail within this Complaint, each of the Defendants named in this Cause of Action knowingly misappropriated and pirated the foregoing trade secrets for their own personal gain and continue to do so up to and including on the very date of filing of this Complaint.

81. By and through the specific factual misconduct recited in the paragraphs incorporated into this Cause of Action (e.g., paragraphs 56 through 69 of this

SECOND AMENDED COMPLAINT

Complaint) Defendants' knowing and intentional acts violate Cal. Civ. Code §§ 3426, et seq.

82. As a proximate and foreseeable result of these Defendants' misappropriation of the above-described trade secrets, Plaintiff has been damaged in the sum of at least $100 million, according to proof either upon entry of summary judgment in Woodall's favor or at trial before a duly empaneled jury.

83. As a further proximate result of the foregoing misappropriation, Defendants named in this Cause of Action have been unjustly enriched, thus entitling Woodall to an additional award of damages resulting therefrom in a presently unknown sum according to proof either upon entry of summary judgment in Woodall's favor or at trial before a duly empaneled jury.

84. In the alternative, Woodall is entitled to a reasonable royalty from transactions entered into by these Defendants as a result of the use of the trade secrets in a sum according to proof either upon entry of summary judgment in Woodall's favor or at trial before a duly empaneled jury.

85. The aforementioned acts of Defendants were willful and malicious insofar as Defendants committed such acts with the intent to injure Woodall's business interests and to increase their own success in the same competing business involving their commercialization of the *Bucky* story, with conscious disregard for Woodall's legal rights, thereby warranting an award of punitive damages not to

exceed twice any amount of actual damages proven pursuant to Cal. Civ. Code § 3426.3, to punish these Defendants and to deter others from engaging in similar misconduct.

86. The wrongful conduct of Defendants in misappropriating the trade secrets, unless and until enjoined by order of this Court, will cause great and irreparable injury to Woodall business insofar as Woodall is in grave danger of losing all rights and opportunities to successfully commercialize *Bucky* to an extent that if Defendants' misconduct is not enjoined and restrained, Woodall's business interests will be irreparably harmed as alleged herein. Accordingly, Woodall is entitled to temporary, preliminary and permanent injunctive relief pursuant to Cal. Civ. Code § 3426.2.

87. These Defendants' misappropriation of the aforementioned trade secrets has been conducted willfully and maliciously, thereby entitling Woodall to a recovery of reasonable attorneys' fees as the prevailing party pursuant to Cal. Civ. Code § 3426.

## FOURTH CAUSE OF ACTION

### (Fraud - Against All Defendants)

88. Plaintiff incorporates paragraphs 1 through 87 of this Complaint as though fully set forth at length.

SECOND AMENDED COMPLAINT

89. Beginning on October 22, 2003 and continuing repeatedly until Disney's release of *Moana* in November of 2016, Defendant Marchick, operating in conjunction and with the express ratification and approval of all other Defendants named in this Complaint, represented to Woodall orally and in writing that the confidentiality of all materials provided her by Woodall relative to *Bucky* would be honorably maintained and not violated by her in any manner. These representations were initially made by Marchick in person at the Mandeville office located inside Disney Animation Studios in Burbank, California, and thereafter the representations were reiterated and ratified by Marchick telephonically on at least four occasions; the representations were made first in the period surrounding October 22, 2003 and thereafter as alleged more specifically in this Complaint. The October 22, 2003 date is of significance, for it was not only on that date but on several dates thereafter that Marchick expressly represented in conversations with Woodall that the materials provided by Woodall would not only be kept confidential but that they would be utilized only for exploitation of Woodall's motion picture project *Bucky* in conjunction with Woodall (as opposed to the exploitation of *Moana*, which was in fact done to the exclusion of Woodall).

90. Beginning on October 22, 2003 and continuing repeatedly until the Defendants' release of *Moana* in November of 2016, Defendant Marchick, operating in conjunction and with the express ratification and approval of all other

SECOND AMENDED COMPLAINT

Defendants named in this Complaint, represented to Woodall that his accelerated delivery of materials to the Defendants relative to the film project *Bucky*, including for example the trailer and the 2011 script prepared by Woodall, were being delivered so that the Defendants could evaluate and then assist Woodall in commercializing *Bucky* in a successful manner for the benefit of *both* the Defendants *and* Woodall.   These representations by Marchick (and by all Defendants named in this Complaint through their express ratification and approval) were made to induce action by Woodall and they did induce the action of Woodall repeatedly and continuously delivering all of his ideas related to *Bucky* to the Defendants after, and as a consequence of, the Defendants' repeated prodding and insistence.   These representations were made both on the Mandeville office located inside Disney Animation Studios and telephonically, including, but not limited to, in a telephone conversation in the middle of 2007 where Marchick – acting and operating with the express ratification and approval of all other Defendants named in this Complaint – told Woodall that his delivery of all materials before and after the date of this conversation was being done in strict confidence and only to assure what Marchick referred to as "immediate" development and completion of the *Bucky* motion picture.

91. The Defendants' conspiracy and quest to steal the extraordinarily unique *Bucky* project included within it the unique and perhaps unprecedented fraud of

lying to Woodall in order to induce him to literally develop all of the ideas the Defendants felt they needed in order to ultimately make and release the movie *Moana*.  The more than singular fraud perpetrated against Woodall included a series of meetings and conversations between Marchick and Woodall beginning in January of 2005 where Marchick told Woodall that it was necessary for Woodall to "bring to life" his characters and his ideas in a trailer.  The first conversation was in January of 2005 and the balance encompassed approximately six conversations between Marchick and Woodall between January of 2005 and the middle of 2008.  In each of these conversations, which all occurred telephonically, Marchick repeatedly represented that the production of the trailer to her and the Defendants would be utilized by her in order to "vigorously" work on the exploitation of the *Bucky* project.  Thereafter, for some two-plus years, Woodall tirelessly worked on the production of the trailer as expressly alleged in paragraphs 31 through 33 and 57 through 63 of this Complaint.  In the middle of 2008 Woodall delivered the trailer to Marchick because of her representations and prodding.

92. At the time of Marchick making the foregoing representations and committing the foregoing acts and omissions *vis a vis* Woodall as aforesaid in paragraphs 89 through 91, Marchick was acting at the express authorization of the rest of the Defendants named in this Complaint.

93. At all times material hereto, including when Marchick made the representations to Woodall as aforesaid, Marchick and the Defendants knew Marchick's representations were false.  Marchick and all Defendants knew that Marchick was lying to Woodall; knew that the true facts were that none of them had any intention whatsoever to develop and exploit Woodall's *Bucky* motion picture project in conjunction with and in cooperation with Woodall; knew that the true facts were that they all intended to steal *Bucky* from Woodall in order to develop what ultimately became their motion picture project called *Moana*.

94. The Defendants actively and intentionally concealed from Woodall all of their fraudulent intentions as set forth above, thereby concealing their actual intention which was to defraud Woodall into delivering very extensive materials over a number of years so that the Defendants could actually make the film *Moana* and reap more than a billion of dollars of profits without involving Woodall and without compensating Woodall fairly or at all. Marchick and the Defendants actively realized that they could not complete *Moana* without Woodall doing it for them by delivering virtually everything needed to complete and monetize the story Woodall had been so inspired to develop through his years of access to and interest in Polynesia.

95. At all times material hereto, Woodall was totally ignorant of the hidden intention of the Defendants to defraud him and literally pirate his intellectual

property relating to *Bucky,* the Presentation Materials, the trailer and the advance versions of the script. Rather, Woodall trusted the words in the Confidentiality Agreement and Defendants' representations surrounding the parties' business dealings, and believed them to be true.  Woodall never realized the Defendants were actively duping him not only to steal the materials identified in this Complaint but actually to induce Woodall to work *for* the Defendants in completing tasks for them with no intention of ever compensating Woodall in any way, shape or form for his substantial efforts.

96. In these ways, Woodall relied on the statements and inducements of Marchick and the Defendants and his reliance was reasonable under all circumstances existing during the time he was delivering valuable intellectual property to the defendants and at all times up to the production and release of *Moana*, all as alleged throughout this Complaint.

97. The Defendants conspiracy to defraud Woodall was brazen not only for the reasons set forth in this Complaint and not only because of the unprecedented identicality between *Moana* and *Bucky* set forth in paragraphs 34a through 34u of this Complaint.  As set forth in the punitive damages claim presented in paragraph 99 of this Complaint, the Defendants operated with the express intention and agreement amongst themselves that this particular fraud had to carry with it the total financial and emotional destruction of Woodall to prevent him from being

able to fight Disney and with full recognition not only that Woodall had acted with unrivaled dedication in developing his *Bucky* project but in fact that project was literally Woodall's "life's work" that had depleted his resources in such a way that the Defendants could easily get away with even the most shameless fraud. The Defendants, and each of them, intended to have so many striking similarities as to also emotionally devastate Woodall for the reason that only with such an emotional result (along with financial hardship to Woodall from working the better part of 20 years for the Defendants without payment) could the Defendants be sure to gain the desired "blow up" effect and therefore get away with their fraud. This made sense to the Defendants, and each of them, because the Defendants knew that the only way their secret movie project would be roundly successful was if they took the maximum amount of creative ideas of Woodall's brilliant adaptations and conceptual applications related to his film project. As a result of such intentions and circumstances, the striking similarities between *Bucky* and *Moana* go further than even those set forth in paragraphs 34a through 34u and also include the following:

> a.     The overarching messages in both *Bucky* and *Moana* are: (i) that one must follow one's heart to find one's destiny, no matter the doubts and fears induced by extrinsic influences; and (ii) the importance of preserving nature for its indigenous people.

b.      Both Bucky and Moana embark on a journey to save a Polynesian island, after defying parental warnings not to venture out on the dangerous ocean.

c.      A narrator at the beginning in both *Bucky* and *Moana* tells the story of a demigod breaking/stealing the heart of a Polynesian goddess.

d.      Both *Bucky* and *Moana* have an opening scene of a flight into a Polynesian island. The aerial scene in *Moana* is the first scene of the film following the short "sterilized" intro.

e.      Both Bucky and Moana have a special symbolic encounter with a turtle at the beginning of the story. The scene in both works has the same message: that the protagonist is connected with nature and the animal kingdom in a special way and destined to save the island.

f.      Both Bucky and Moana's first attempt to venture out on the ocean alone leads to them crashing at the beach prior to their ocean voyage.

g.      Both Bucky and Moana are given a necklace before they depart. The necklace plays a special role in both works.

h.      Both Bucky and Moana are guided by animal spirits.

i.      Both Bucky and Moana learn of ancient Polynesian mythologies and history.

SECOND AMENDED COMPLAINT

j.      Bucky is taught that storytelling has been a tradition since ancient Polynesia, and he is told stories on his journey. Moana features lyrics about the importance of Polynesian storytelling.

k.      Both Bucky and Moana battle a storm at sea. The storm in both works turns into a mysterious oceanic event that leads the way to destiny.

l.      Both Bucky and Moana meet a tattooed demigod who becomes part of the plot.

m. *Moana's* demigod repeatedly shapeshifts into a tiny bug, just like characters do in Bucky.

n.      *Moana's* demigod repeatedly shapeshifts into a shark, just like characters do in Bucky, including in the battle of "good" and "evil."

o.      The demigod in both *Bucky* and *Moana* repeatedly shapeshifts into a Polynesian hawk.

p.      Both Bucky and Moana battle bizarre looking, round, armored miniature warriors. There is humor in both elements—in Bucky one of them is named "Stink," and Moana calls them "cute."

q.      Both Bucky and Moana encounter an oceanic whirlpool. Both whirlpools are a portal into a different world.

r.      Both Bucky and Moana climb a tall mountain.

SECOND AMENDED COMPLAINT

s.      Both Bucky and Moana encounter a fiery goddess that plays an extensive role in both works, including in climactic scenes.

t.      In both *Bucky* and *Moana*, the goddess has her heart stolen/broken by the demigod.

u.      *Bucky's* Pele and *Moana's* Te Fiti are visually similar, with large eyes, a strong nose, a kind face, very long hair, and a flower crown and garland. When Te Fiti takes on the shape of Te Ka, she is a body of glowing lava, just like *Bucky's* Pele.

v.      The gestures of Bucky's Pele and Moana's Te Fiti are substantially similar when she towers over the protagonist and holds up the palms of her hands.

w.      Towards the end of *Bucky* and *Moana*, a giant creature lies down in the ocean and becomes a mountain.

x.      At the end of the journey, both Bucky and Moana return to their parents as a hero, having saved the island.

y.      *Bucky* and *Moana* take place in Polynesia, on Polynesian waters, islands and mountains. Bucky's key destination is ancient Polynesia through time travel, where most of his adventure takes place. *Moana* takes place in ancient Polynesia.

SECOND AMENDED COMPLAINT

z.     Extensive parts of Bucky and Moana's trip take place on Polynesian waters, in addition to events that take place on land. Though *Moana* mostly plays on water, Moana's voyage starts 31 minutes into the film and she also spends time on land during the trip.

aa.     Moana's island, Motunui, substantially resembles Hanalei Bay, Kauai, the island Bucky saves and where Woodall lived and created Bucky. Both Hanalei Bay and Motunui's bay are markedly crescent shaped. Both bays have an estuary at the same spot of the crescent bay—a river that runs into the ocean.

bb.     Both *Bucky* and *Moana* are a celebration of Polynesians' "unfettered access to the sea [as] a native right." The core of both works involves voyages at sea to save a Polynesian island.

cc.     Moana alone as a baby on the beach is an "integral part of the movie." An image of Bucky as a baby alone at the beach was an integral part of Woodall's *Bucky* story as delivered to the Defendants.

dd.     The concept of navigation by the stars appears in both works.

ee.     The dialogue portions of both *Bucky* and *Moana* contain innumerable similarities including, by way of example, (I) the dangerousness of the ocean, (II) the importance of saving the island, (III) the calls of nature toward man,

(IV) animals guiding humans and (V) the Polynesian people's tradition of telling stories.

ff.     The striking visual comparisons inherent in both *Bucky* and *Moana*, as set forth in Exhibit "D" attached hereto, are the further result of the Defendants fraud as well as the Defendants' intention to be brash and immodest in the extent of their theft.

98. The foregoing represent in retrospect an almost comical number of identicalities that were done pursuant to a specific plan of fraud by all Defendants set forth herein, including the conspiratorial misrepresentations and intentions by the Defendants on the dates and with the content expressly set forth above.  The Defendants' fraud had as its core the reality -- discussed and planned for by all of the Defendants pursuant to their conspiracy -- that a man like Buck Woodall can be devastated financially and emotionally to such an extent as to be unable to fight back.  As a proximate and foreseeable result of the conspiracy to defraud by the Defendants named in this Complaint as set forth herein, Woodall has been damaged in the sum of at least $100 million according to proof either upon entry of summary judgment in Woodall's favor or at trial before a duly empaneled jury.

99. In doing the things alleged in this Cause of Action, the Defendants each acted not only with oppression, fraud and malice but in reality and in fact acted with the express intention of causing serious financial and emotional injury to

Woodall knowing that only with very serious injury could Woodall be "weakened" to the point of never being able to expose the truth about the Defendants' fraudulent intentions to pirate his movie project for their own self-aggrandizement. Accordingly, Woodall is entitled to an award of exemplary and punitive damages in a sum according to proof.

## FIFTH CAUSE OF ACTION

### (False Promises - Against Marchick)

100. Plaintiff incorporates paragraphs 1 through 99 of this Complaint as though fully set forth at length.

101. As alleged in this Complaint, on October 22, 2003, Marchick executed the Confidentiality Agreement, Exhibit "C," stipulating in connection therewith that all materials provided to her by Woodall are confidential and that any disclosure or use of these materials could cause serious harm or damage to Woodall. The representations were made in person on the Mandeville office located inside Disney Animation Studios and orally in a single telephone call, both during the period surrounding in or about October 22, 2003.

102. At the time of the October 22, 2003 Confidentiality Agreement, Marchick orally made promises to Woodall related to that agreement including most importantly that she would abide by and honor the strict confidentiality of all materials submitted to her appertaining or relating in any manner to *Bucky*. These

SECOND AMENDED COMPLAINT

representations occurred initially at the Mandeville office located inside Disney Animation Studios in the period surrounding October 22, 2003 and also by telephone in or about the same time.

103. In addition to these promises, Marchick -- at the express direction of the Defendants, and each of them -- made the other promises and representations, and engaged in the surrounding misconduct, as set forth in paragraphs 89 through 99 of this Complaint.

104. On October 22, 2003, and at all times thereafter leading up to the release of *Moana*, Marchick not only had no intention of fulfilling her promises and representations set forth above, but actually Marchick intended to steal and pirate Woodall's materials and ideas and utilize them to the exclusion of Woodall.

105. Woodall actually and in fact relied on the promises set forth in this Cause of Action and reasonably believed that Marchick, and the Defendants, would honor the strict confidentiality of all materials provided to them and would abide by each and every one of the promises set forth herein.

106. As a proximate and foreseeable result of the fraud set forth in this Cause of Action, Woodall has been damaged in the sum of at least $100 million according to proof either upon entry of summary judgment in Woodall's favor or at trial before a duly empaneled jury.

107. In doing the things alleged in this Cause of Action, Marchick acted not only with oppression, fraud and malice but in reality and in fact acted with the express intention of causing serious financial injury to Woodall knowing that only with very serious injury could Woodall be "weakened" to the point of never being able to expose the truth about the Defendants' fraudulent intentions to pirate his movie project for their own self-aggrandizement. Accordingly, Woodall is entitled to an award of exemplary and punitive damages in a sum according to proof.

## PRAYER

**WHEREFORE**, Plaintiff prays for the following relief:

A. For injunctive relief as follows:

  i. A temporary, preliminary and permanent injunction enjoining and restraining all Defendants named in this Complaint, as well as their officers, agents, employees, and those persons in active concert or participation with each or any of them from directly or indirectly infringing Plaintiff's copyrights, by reason of the First Cause of Action;

  ii. A temporary, preliminary and permanent injunction enjoining and restraining all Defendants named in this Complaint, as well as their officers, agents, employees, and those persons in active concert or participation with each or any of them from utilizing or possessing

the Woodall Trade Secrets in any manner, directly or indirectly, by reason of the Second Cause of Action; and

iii.     A temporary, preliminary and permanent injunction enjoining and restraining all Defendants named in this Complaint, as well as their officers, agents, employees, and those persons in active concert or participation with each or any of them from utilizing or possessing the Woodall Trade Secrets in any manner, directly or indirectly, by reason of the Third Cause of Action.

B.     For an order of seizure under the Second Cause of Action directing the Defendants, and each of them, to immediately provide to Woodall all written materials, whether in digital or analogue, appertaining or relating to the film *Moana* and all products related in any manner to the film, including but not limited to, the original and all duplicates and copies of the elements of *Moana* including all tracks comprising those elements including but not limited to the visual track, the dialogue track and the sound track of or relating to the elements of the film and all other materials appertaining or relating to *Moana*, as well as all other assets relating to *Moana* including those concerning bank accounts, juridic entities and other depository and inter-corporate activities related to the film and all of its derived franchises according to proof.

C.      For an award to Woodall of compensatory damages against all Defendants, jointly and severally, in an amount exceeding two-point-five percent (2.5%) of the gross revenues appertaining or relating to *Moana* in the sum of at least $100 million under the First Cause of Action and (i) the statutory amount of damages pursuant to the First Cause of Action, (ii) the sum of at least $100 million pursuant to the Second, Third and Fourth Causes of Action, (iii) a sum to be proven at trial or summary judgment for the unjust enrichment flowing to the Defendants pursuant to the Second and Third Causes of Action, and/or (iv) a reasonable royalty determined by the Court pursuant to the Second and Third causes of Action.

D.      For an award to Woodall of compensatory damages against Defendant Marchick in the sum of more than $100 million according to proof, by reason of the Fifth Cause of Action.

E.      For an award to Woodall of punitive damages against all Defendants in a sum not exceeding twice the damages recovered for the Defendants' trade secrets violations pursuant to the Second and Third Causes of Action.

F.      For an award to Woodall of punitive damages against all Defendants in a sum according to proof pursuant to the Fourth Cause of Action.

G.      For an award to Woodall of punitive damages against Defendant Marchick in a sum according to proof pursuant to the Fifth Cause of Action.

H.      For an order of this Court pursuant to the First Cause of Action directing Defendants and each of them to account for all revenue derived by them from their infringement of Plaintiff's copyrights and directing that Defendants pay over to Plaintiff the total amount of such revenues or a reasonable alternative amount awarded within the Court's discretion.

I.      An award of Plaintiff's reasonable attorneys' fees.

J.      An award of Plaintiff's costs of suit.

K.      For such other and further relief as the Court may award in the interests of justice.

///

///

///

///

///

SECOND AMENDED COMPLAINT

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable in this action.

DATED: May 28, 2021                    Respectfully Submitted,

**SQUIRE LAW GROUP,**
**A Professional Association**

**SANCHEZ-MEDINA, GONZALEZ,**
**QUESADA, GOMEZ & MACHADO,**
**A Limited Liability Partnership**

_/s/Gustavo D. Lage_
GUSTAVO D. LAGE,
Lead Counsel
(Admitted _Pro Hac Vice_)
201 Alhambra Circle,
Suite 1205
Coral Gables, Florida 33134
Tel.: (305) 377-1000
Fax: (786) 304-2214
glage@smgqlaw.com

Attorneys for Plaintiff
Buck G. Woodall

SECOND AMENDED COMPLAINT

**Certificate of Service**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Electronic Service List for this Case.

Dated: May 28, 2021

By: _____ */s/Gustavo D. Lage*
                                Gustavo D. Lage