1   Peter Shimamoto (Bar No. 123422)          Robert N. Klieger (Bar No. 192962)
2   pshimamoto@willenken.com                   rklieger@hueston.com
    Kenneth M. Trujillo-Jamison                HUESTON HENNIGAN LLP
3     (Bar No. 280212)                         523 W. 6th Street, Suite 400
    ktrujillo-jamison@willenken.com            Los Angeles, California 90014
4   Michelle K. Millard (Bar No. 298245)       Telephone:  (213) 788-4310
    mmillard@willenken.com                     Facsimile:   (888) 775-0898
5   WILLENKEN LLP
6   707 Wilshire Blvd., Suite 3850
    Los Angeles, California 90017
7   Telephone:  (213) 955-9240
8   Facsimile:   (213) 955-9250

9   Attorneys for Defendants

10

11                  UNITED STATES DISTRICT COURT

12                 CENTRAL DISTRICT OF CALIFORNIA

13  BUCK G. WOODALL, a.k.a. Buck          Case No.: 2:20-cv-03772-CBM-E
14  Woodall, an individual,
                                          **DEFENDANTS' NOTICE OF**
15              Plaintiff,                **MOTION AND MOTION FOR**
                                          **SUMMARY JUDGMENT;**
16  v.                                    **MEMORANDUM OF POINTS AND**
                                          **AUTHORITIES**
17
    THE WALT DISNEY COMPANY, a
18  Delaware Corporation; et al.,         Date:    July 30, 2024
19                                        Time:    10:00 a.m.
                Defendants.               Place:   Courtroom 8D
20

21                                        [Filed concurrently with Separate
22                                        Statement of Uncontroverted Facts,
                                          Declarations of Ron Clements, David
23                                        Hoberman, Jessica Julius, Todd
                                          Lieberman, Jenny Marchick, James
24                                        McDonald, John Musker, Pamela
25                                        Ribon, Jeff Rovin, Matthew Schnittker,
                                          and Peter Shimamoto; Request for
26                                        Judicial Notice; Notice of Lodging;
27                                        Application to Seal Documents;

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Proposed Judgment]

Disc. Cutoff:        October 23, 2023
Pre-Trial Conf.:    August 6, 2024
Trial Date:         October 8, 2024

Assigned to Hon. Consuelo B. Marshall
Magistrate Judge: Charles F. Eick

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 30, 2024 at 10:00 a.m. or as soon as the matter may be heard, in Courtroom 8D of the above-entitled Court, located at 350 W. 1st Street, Los Angeles, California 90012, Defendants The Walt Disney Company ("TWDC"), Walt Disney Pictures ("WDP"), Walt Disney Animation Studios ("WDAS"), Disney Enterprises, Inc. ("DEI"), Disney Consumer Products, Inc. ("DCP"), Disney Consumer Products & Interactive Media, Inc. ("DCPIM"), Walt Disney Direct-to-Consumer & International ("WDDTCI"), Disney Interactive Studios, Inc. ("Disney Interactive"), Disney Store USA, LLC ("Disney Store"), Disney Shopping, Inc. ("Disney Shopping"), Buena Vista Home Entertainment, Inc. ("BVHE"), Buena Vista Books, Inc. ("BVB"), Mandeville Films, Inc., Jenny Marchick, and Pamela Ribon (collectively, "Defendants") will, and hereby do, move for summary judgment as to each claim for relief asserted in Plaintiff Buck G. Woodall's Second Amended Complaint.

This motion is brought on the grounds that there is no genuine issue as to any material fact on any of Plaintiff's claims for relief, and Defendants are therefore entitled to judgment as a matter of law.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Separate Statement of Uncontroverted Facts, the Declarations of Ron Clements, David Hoberman, Jessica Julius, Todd Lieberman, Jenny Marchick, James McDonald, John Musker, Pamela Ribon, Jeff Rovin, Matthew Schnittker, and Peter Shimamoto, Request for Judicial Notice, Notice of Lodging, Application to Seal Documents, and Proposed Judgment filed concurrently herewith, all pleadings, records, and papers on file in this action, such matters of which this Court may take judicial notice, and such other evidence and argument as may be considered by the Court in connection with this motion.

1        This motion is made following the conference of counsel pursuant to L.R.

2   7-3 which took place on April 30, 2024.

3   Dated:  May 7, 2024                    HUESTON HENNIGAN LLP

4                                          WILLENKEN LLP

5

6                                          By: /s/ Peter Shimamoto

7                                              Peter Shimamoto
                                               Attorneys for Defendants

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

# **<u>TABLE OF CONTENTS</u>**

2

<u>Page</u>

3

I.    INTRODUCTION .................................................................................. 1

4

II.    BACKGROUND .................................................................................. 3

5

    A.    *Bucky* .......................................................................................... 3

6

    B.    *Moana* ........................................................................................ 6

7

    C.    Plaintiff's Six-Year Preparation To Litigate ......................... 7

8

    D.    Plaintiff's Falsification Of Evidence And Fraud On The Court.......... 8

9

III.    LEGAL STANDARD ........................................................................ 10

10

IV.    ARGUMENT ...................................................................................... 10

11

    A.    Plaintiff's Trade Secret Claims Fail As A Matter Of Law ................ 10

12

        1.    Plaintiff's Trade Secret Claims Are Time-Barred ................... 11

13

        2.    Plaintiff's Purported Trade Secrets Were Not Secret.............. 12

14
15

        3.    There Is No Evidence Most Defendants Acquired, Much Less Disclosed Or Used, His Purported Trade Secrets ........... 13

16

    B.    Plaintiff's Fraud Claims Fail As A Matter Of Law ........................... 14

17

        1.    Plaintiff's Fraud Claims Are Time-Barred ............................... 15

18

        2.    There Is No Evidence That Most Defendants Even Knew Of, Much Less Participated In, The Alleged Fraud ................ 15

19

    C.    Plaintiff's Copyright Claim Fails As A Matter Of Law .................... 16

20
21

        1.    There Is No Evidence That Certain Defendants Exercised Any Of The Section 106 Exclusive Rights............................... 16

22

        2.    The Copyright Claim Is Time-Barred In Whole Or In Part As To All Defendants............................................................ 17

23

        3.    Plaintiff Cannot Prove Access ................................................... 18

24

        4.    Moana Was Independently Created ........................................... 24

25

        5.    Plaintiff Cannot Establish Substantial Similarity .................... 28

26

V.    CONCLUSION ................................................................................... 35

27
28

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**Cases**

4

*Adobe Sys. Inc. v. Christenson*,
    809 F.3d 1071 (9th Cir. 2015) .................................................................. 16

5

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................. 10

6

7

*Berkic v. Crichton*,
    761 F.2d 1289 (9th Cir. 1985) .................................................................. 30

8

*Bernal v. Paradigm Talent & Literary Agency*,
    788 F. Supp. 2d 1043 (C.D. Cal. 2010) .............................................. passim

9

10

*Bernson v. Browning-Ferris Indus.*,
    7 Cal. 4th 926 (1994) ................................................................................ 15

11

*Bethea v. Burnett*,
    2005 WL 1720631 (C.D. Cal. June 28, 2005) .......................................... 24

12

13

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
    974 F.2d 1358 (3d Cir. 1992) ................................................................... 10

14

*BirdDog Tech. Ltd. v. 2082 Tech., LLC*,
    2024 WL 1142057 (C.D. Cal. Mar. 11, 2024) .......................................... 14

15

16

*Cavalier v. Random House, Inc.*,
    297 F.3d 815 (9th Cir. 2002) .................................................................... 33

17

*Chung v. Intellect Soft Grp. Corp.*,
    2022 WL 20184655 (N.D. Cal. July 13, 2022) ........................................ 11

18

19

*Corwin v. Walt Disney Co.*,
    2004 WL 5486639 (M.D. Fla. Nov. 12, 2004) ......................................... 24

20

*Counts v. Meriwether*,
    2015 WL 9594469 (C.D. Cal. Dec. 30, 2015) .................................... 29, 35

21

22

*DC Comics v. Towle*,
    802 F.3d 1012 (9th Cir. 2015) .................................................................. 31

23

*Dimmie v. Carey*,
    88 F. Supp. 2d 142 (S.D.N.Y. 2000) ....................................................... 24

24

25

*Esplanade Productions, Inc. v. Walt Disney Company*,
    2017 WL 5635027 (C.D.Cal. Nov. 8, 2017) ................................. 31, 32, 35

26

*Esplanade Productions, Inc. v. Walt Disney Company*,
    93 Cal. App. 5th 793 (2023) ............................................................... 18, 23

27

28

*Fishbaugh v. Bulgadarian,*
2021 WL 3598579 (C.D. Cal. July 8, 2021)..................................................14

*Funky Films, Inc. v. Time Warner Entm't Co.., L.P.,*
462 F.3d 1072 (9th Cir. 2006) ...................................................................28

*Gilbert v. New Line Prods., Inc.,*
2010 WL 5790628 (C.D. Cal. Aug. 13, 2010) ...........................................29

*Hobart v. Hobart Estate Co.,*
26 Cal. 2d 412 (1945) ..............................................................................15

*Invisible Dot, Inc. v. DeDecker,*
2019 WL 1718621 (C.D. Cal. Feb. 6, 2019) ..............................................16

*Jolly v. Eli Lilly & Co.,*
44 Cal. 3d 1103 (1988) .............................................................................11

*Keenan v. Allan,*
91 F.3d 1275 (9th Cir. 1996) ....................................................................10

*Kootenia Homes, Inc. v. Reliable Homes, Inc.,*
2002 WL 15594 (D. Minn. Jan. 3, 2002)...................................................24

*Maharam v. Patterson,*
2007 WL 2702195 (S.D.N.Y. Sept. 17, 2007) ...........................................24

*McFall v. Stacy & Witbeck, Inc.,*
2016 WL 6248882 (N.D. Cal. Oct. 26, 2016) ............................................15

*McGaughey v. Twentieth Century Fox Film Corp.,*
12 F.3d 62 (5th Cir. 1994) ........................................................................24

*Metcalf v. Bochco,*
294 F.3d 1069 (9th Cir. 2002) .............................................................34, 35

*Metropolitan Life Ins. Co. v. Kelley,*
890 F. Supp. 746 (N.D. Ill. 1995).............................................................22

*MGA Entm't, Inc. v. Mattel, Inc.,*
41 Cal. App. 5th 554 (2019) .....................................................................11

*Morford v. Cattelan,*
2023 WL 3971968 (S.D. Fla. June 12, 2023) ............................................24

*Narell v. Freeman,*
872 F.2d 907 (9th Cir. 1989) ....................................................................33

*Nissan Fire & Marine Ins. Co, Ltd. v. Fritz Cos., Inc.,*
210 F.3d 1099 (9th Cir. 2000) ..................................................................10

*Norgart v. Upjohn Co.,*
21 Cal. 4th 383 (1999) ..............................................................................11

iii

*Olson v. Nat'l Broad. Co., Inc.,*
  855 F.2d 1446 (9th Cir. 1988) .......................................................... 32, 33

*Quirk v. Sony Pictures Entm't Inc.,*
  2013 WL 1345075 (N.D. Cal. Apr. 2, 2013) ........................................ 34

*Rentmeester v. Nike, Inc.,*
  883 F.3d 1111 (9th Cir. 2018) ............................................................. 24

*Richards v. Combined Ins. Co.,*
  55 F.3d 247 (7th Cir. 1995) ................................................................. 10

*Roley v. New World Pictures, Ltd.,*
  19 F.3d 479 (9th Cir. 1994) ................................................................. 18

*Ruckelshaus v. Monsanto Co.,*
  467 U.S. 986 (1984) ............................................................................. 12

*See v. Durang,*
  711 F.2d 141 (9th Cir. 1983) ............................................................... 34

*Silberstein v. Fox Entm't Grp., Inc.,*
  424 F Supp. 2d 616 (S.D.N.Y. 2004) .................................................. 24

*Summers v. A. Teichert & Son, Inc.,*
  127 F.3d 1150 (9th Cir. 1997) ............................................................. 10

*Watt v. Butler,*
  744 F. Supp. 2d 1315 (N.D. Ga. 2010) .......................................... 24, 28

**Statutes**

17 U.S.C. § 106 ........................................................................................ 16, 17

17 U.S.C. § 507(b) .......................................................................................... 17

18 U.S.C. § 1836(d) ........................................................................................ 11

18 U.S.C. § 1839 ............................................................................................. 12

18 U.S.C. § 1839(5) ........................................................................................ 14

Cal. Civ. Code § 3426.6 ................................................................................. 11

Cal. Civ. Code § 3246.1(b) ............................................................................ 14

Cal. Civ. Code § 3426.1 ................................................................................. 12

Cal. Civ. Proc. Code § 338(d) ........................................................................ 15

**Rules**

Fed. R. Civ. P. 56 ........................................................................................... 10

DEFENDANTS' NOTICE AND MOTION FOR SUMMARY JUDGMENT

# I.    INTRODUCTION

Plaintiff has been litigating this case since April 2020, apparently convinced that his brother's wife's step-sister, Jenny Marchick, masterminded a nearly 15-year conspiracy to steal Plaintiff's "Bucky" project.  The parties have filed myriad motions, including several motions to dismiss and numerous motions to compel discovery.  The rulings on those motions were naturally based on Plaintiff's *allegations* and resulted in Plaintiff gaining access to *all* of WDAS' development files for *Moana*, comprised of thousands of documents contemporaneously recording the movie's conception and five-year development and production process, as well more than 2.5 million emails -- the result of searching *every* WDAS employee's emails from 2003 to 2020 -- and terabytes of concept art, storyboards, and animation files.

The time for allegations has passed.  The Court denied Defendants' prior motions to dismiss because it was required to and did accept the allegations in Plaintiff's Complaints as true. Discovery has established that Plaintiff's representations to the Court were patently false.  Now, the case is before the Court on summary judgment, and Plaintiff can no longer rely on allegations alone.  Rather, Plaintiff must submit admissible ***evidence*** to establish the elements of his claims.  Not only is Plaintiff unable to muster a shred of evidence to substantiate his claims, but the uncontroverted evidence negates them in their entirety.

All of Plaintiff claims, for alleged trade secret misappropriation, fraud, and copyright infringement, are time-barred in whole or in substantial part.  Plaintiff first suspected that *Moana* misappropriated "Bucky" and began preparing to litigate in the fall of 2014, became even more convinced that Defendants had ripped off his project over the next two years, and was certain of that when he performed a detailed side-by-side comparison of the two works using screen captures in March 2017.  Plaintiff knows these facts are fatal to his claim, and that is why he lied in every version of his complaint and said that he had not seen

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*Moana* until June or July 2017, within three years of filing suit.  That knowingly false allegation has already sustained Plaintiff's claims for far too long.  Because even a continuing misappropriation constitutes a single claim under both federal and state law, the trade secret claims are time-barred as to all Defendants.

Plaintiff's claims would fail as a matter of law even if they had timely been asserted.  Plaintiff's trade secret misappropriation claims fail because the "Bucky" trailer and script that comprise his purported trade secrets were not secret.  Those claims are premised on a sham Confidentiality Agreement that Marchick purportedly signed, but is, in fact, a brazen forgery that Plaintiff falsified just before he filed suit.  And the trailer and script were public in any event, accessible to anyone who visited Plaintiff's website and YouTube page or searched his Copyright Office filings.  Moreover, there is no evidence that any of the non-Marchick Defendants ever saw the trailer or script, much less disclosed or used them to develop *Moana*.  The uncontroverted evidence shows that they did not.

Plaintiff's fraud claims are equally infirm.  Because all of the alleged misrepresentations and false promises occurred more than three years before Plaintiff filed suit, the claims are time-barred as to all Defendants.  The claims independently fail as a matter of law as to all of the non-Marchick Defendants owing to the complete absence of evidence that the non-Marchick Defendants even had knowledge of Marchick's purported misrepresentations or false promises, much less participated in the alleged fraud.

Plaintiff's copyright claim fails as a matter of law on five independent grounds.  First, there is no evidence that Marchick, Ribon, Mandeville, or many of the Disney Defendants exercised any of the Copyright Act's exclusive rights, and the copyright claim fails as to those Defendants for that reason alone.  Second, because *all* of the alleged acts or omissions of Marchick, Ribon, and Mandeville occurred more than three years before Plaintiff filed suit, the copyright claim is time-barred as to those Defendants.  Third, there is no evidence that *Moana*'s

2

filmmakers had access to Plaintiff's copyrighted materials, and it is instead undisputed that they did not. Fourth, the overwhelming uncontroverted evidence of independent creation, supported by the testimony of the filmmakers and the complete development files for *Moana*, is fatal to Plaintiff's infringement claim even if he could create a triable issue as to access. Finally, even if Plaintiff could somehow overcome all of the foregoing, *Moana* is not substantially similar to Plaintiff's copyrighted "Bucky" materials under the extrinsic test, thus precluding infringement as a matter of law.

Plaintiff's case to date has relied entirely on falsehoods, speculation, and hyperbole. Despite nearly four years of discovery, that is *still* all Plaintiff has. This case has been aggressively litigated, with ad hominem attacks all too often substituted for cogent legal analysis. In this motion, Defendants provide a dispassionate analysis of the evidence and governing law and demonstrate that Plaintiff's claims, however vociferously he or his counsel may advance them, necessarily fail as a matter of law. Defendants respectfully request that the Court enter summary judgment in their favor on all of Plaintiff's claims for relief and finally bring this case to an end.

## II.    BACKGROUND

### A.    *Bucky*

Plaintiff began working on his "Bucky" animated project in 1997. Shimamoto Decl., Ex. 1 (Woodall Tr.) at 44:7-8, 45:3-8. Plaintiff's claims are centered on the following materials related to his "Bucky" project: (1) a 2003 treatment and associated artwork; (2) a 2008 trailer; and (3) a 2011 script.

#### 1.    2003 "Bucky" Treatment & Artwork

Plaintiff's 2003 treatment tells the story of Bucky, a quiet and sensitive blond-haired boy from present-day New Mexico who, seeking freedom from the emotional pain of losing his father, moves to Hawaii to live with his grandfather. Request for Judicial Notice ("RJN"), Ex. A (2004 Copyright Office deposit) at 4.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Bucky meets a group of friends who encourage him to surf. *Id.* Bucky and his
friends set out on a sailing journey to find perfect waves. *Id.* Along the way, they
discover a mysterious cave and are pulled into a time vortex that leads them to the
past. *Id.* While exploring old Hawaii, Bucky and his friends have a run in with
Keahe, a beautiful Hawaiian girl. *Id.* at 5. After a series of adventures, Bucky
returns to the present, where he learns that Keahe is a Hawaiian princess. *Id.* at 6.
Keahe's guardian spirit ancestors ask Bucky to marry Keahe and help her adjust to
modern day civilization. *Id.* Bucky returns to the past through a wave porthole,
marries Keahe, and returns with Keahe and his friends to modern-day Hawaii. *Id.*

In or around 2004, Plaintiff's brother, Ben Woodall, asked his wife's
stepsister, Jenny Marchick, if she would talk to Plaintiff about his project.
Marchick Decl. ¶ 3. At the time, Marchick was working as an assistant at
Mandeville, a live-action production company that had offices on the Disney lot in
Burbank.[1] *Id.* ¶¶ 2, 4. Marchick agreed to meet with Plaintiff as a family favor.
Id. ¶ 3. Plaintiff visited Marchick at Mandeville's offices in 2004 or early 2005.
*Id.* ¶ 4. Plaintiff described his "Bucky" project and gave Marchick a binder of
materials consisting of a story synopsis and artwork for the project. *Id.*

Following that meeting, Marchick called Maggie Malone, a creative
executive at WDAS, to ask whether WDAS accepted outside submissions. *Id.* ¶ 5.
Malone told Marchick it did not, and that was the end of the conversation. *Id.*
Marchick did not mention Plaintiff or his project to Malone, nor did she share
Plaintiff's ideas or materials with WDAS at that or any other time. *Id.*

Marchick also reached out to an assistant at Disney TV Animation, which is
separate from WDAS, to ask if the assistant would meet with Plaintiff and talk to

---

[1] Marchick left Mandeville in 2007 to work for 20th Century Fox. Marchick Decl.
¶ 2. In 2011, she began working for Sony Pictures Animation and is today the
Head of Development, Features at DreamWorks Animation. *Id.* ¶¶ 1, 11.

1   him about working in animation.  *Id.* ¶ 6.  Marchick does not remember who that

2   assistant was or whether she shared Plaintiff's "Bucky" materials with the

3   assistant.  *Id.*  After meeting with Plaintiff, the assistant told Marchick that they

4   had enjoyed meeting Plaintiff but there was nothing they could do for him.  *Id.*

5                   **2.      2008 "Bucky" Trailer**

6       In 2008, Plaintiff completed an approximately two-minute animated trailer

7   for "Bucky."  Shimamoto Decl., Ex. 1 (Woodall Tr.) at 215:13; *id.*, Ex. 2

8   (BUCK4842).  The trailer, narrated by a dragon, tells the story of a contemporary

9   blond-haired boy named "Bucky" who spent his whole life dreaming about surfing.

10   *Id.*, Ex. 2.  Bucky travels to Hawaii, where he meets a group of friends who teach

11   him to surf.  *Id.*  The group's surfing beach is about to be bulldozed for a new

12   development.  *Id.*  Pursued by the developer and his henchman, who shapeshift

13   into bees, Bucky and his friends set out to find a way to stop the development.  *Id.*

14   Their canoe is sucked into a whirlpool time portal, and they find themselves in

15   Hawaii's ancient past.  *Id.*  Bucky meets an island princess who knows Bucky and

16   his friends can only get home with the help of the goddess Pele.  *Id.*  Pele tells

17   Bucky a riddle, and he and his friends return to stop the development.  *Id.*

18       Plaintiff posted the full trailer on his website and YouTube.  *Id.*, Ex. 3

19   (BUCK7679); *id.*, Ex. 4 (BUCK8145); *id.*, Ex. 5 (BUCK4846) at 4:28-4:44

20   (inviting viewers to "visit the website buckcreations.com" to watch "the finished

21   trailer"); *id.*, Ex. 6 (BENPRIV0019) ("have a look at my trailer on You-Tube").

22   Nearly two-thirds of the trailer was also broadcast on public television in Hawaii.

23   *Id.*, Ex. 5 (BUCK4846); *id.*, Ex. 7 (Pltf.'s Resp. to RFA No. 21).

24                   **3.      2011 "Bucky" Script**

25       Plaintiff engaged a writer to prepare a June 2011 script for his "Bucky"

26   project.  Shimamoto Decl., Ex. 9 (BUCK5301-87).  The script tells the story of a

27   contemporary blond-haired teenage boy on summer vacation in Kauai with his

28   overprotective parents who meets up with three local Hawaiian teenagers who

1    teach him to surf.  A local developer has teamed up with Kamapua'a, the Hawaiian

2    pig-god, to bulldoze the group's surfing spot for a new resort.  Bucky joins his

3    friends on what they anticipate to be a quick sail to the town hall to search public

4    records, but they end up getting pulled into a wave portal and find themselves on

5    the Big Island several hundred years in the past.  Bucky journeys with a native

6    princess to visit Pele, who tells Bucky a riddle, after which he and his friends

7    return to the present to stop the development.  *See generally, id.*

8         Plaintiff asked Marchick to read his script in November 2011, about a month

9    after she had joined Sony Pictures Animation as a creative executive.  Marchick

10   Decl. ¶ 11.  Marchick received and reviewed the script in January 2012.  *Id.* ¶¶ 12-

11   13 & Ex. B.  She did not think the script was good and recommended to Plaintiff

12   that he not spend any additional time or money on the project.  *Id.* ¶ 13 & Ex. C.

13   Marchick did not share the script with anyone outside of Sony.  *Id.* ¶ 14.

14        **B.    *Moana***

15        *Moana* is a 2016 animated musical movie developed and produced by

16   WDAS.  Shimamoto Decl., Ex. 30 (*Moana* DVD); Julius Decl. ¶ 23.  The movie

17   was conceived of and directed by John Musker and Ron Clements, the team behind

18   such animated classics as *The Little Mermaid*, *Aladdin*, *Hercules*, and *The Princess*

19   *and the Frog*.  Musker Decl. ¶¶ 2, 7; Clements Decl. ¶¶ 2, 6.

20        The movie, which is set 2,000 years in the past, tells the story of Moana, the

21   daughter of the chief of the fictional island of Motunui, whose people had once

22   been expert navigators but no longer venture beyond the island's reef.  Shimamoto

23   Decl., Ex. 30 (*Moana* DVD).  When Motunui's crops fail and fish disappear,

24   Moana learns that the demigod Maui had caused the blight by stealing the heart of

25   the land spirit Te Fiti.  *Id.*  Moana sets out on an epic journey across the Pacific to

26   find Maui and persuade him to return the heart of Te Fiti, thereby saving the island

27   from destruction and restoring her people's voyaging spirit.  *Id.*

28

*Moana* incorporates the efforts of hundreds of people who devoted more
than a million hours in the aggregate working on the movie over a five-year period.
Julius Decl. ¶ 10.  Prior to this lawsuit, the filmmakers had never heard of Plaintiff
or his project.  Musker Decl. ¶ 3; Clements Decl. ¶ 3.  They had never met or
communicated with Marchick.  Musker Decl. ¶ 5; Clements Decl. ¶ 5; Marchick
Decl. ¶ 17.  And they had never seen any "Bucky" materials.  Musker Decl. ¶ 3;
Clements Decl. ¶ 3.  In short, *Moana* was not inspired by or based in any way on
Woodall or "Bucky."  Musker Decl. ¶¶ 3, 70; Clements Decl. ¶¶ 3, 30.

### C.    Plaintiff's Six-Year Preparation To Litigate

When *Moana* was announced in October 2014, Plaintiff "became concerned
. . . that Disney had stolen my Bucky project" and "immediately began contacting
counsel to advise about what should be done."  Shimamoto Decl., Ex. 10 (draft
Woodall Decl.) ¶ 3; *id.*, Ex. 7 (Pltf.'s Resp. to RFA No. 34 (attesting to truth of
statements in draft declaration)).  Plaintiff was committed to ensuring that "Disney
did not get away with what appeared to be its theft of Bucky."  *Id.*, Ex. 10 (draft
Woodall Decl.) ¶ 4; *id.*, Ex. 7 (Pltf.'s Resp. to RFA No. 36).

Plaintiff began reaching out to potential counsel in November 2014.  *Id.*, Ex.
11 (Ben Woodall Priv. Log at 1).  The more Plaintiff learned about *Moana*, the
more convinced he became that the movie misappropriated "Bucky."  Plaintiff
wrote in an October 26, 2015 email to his brother, "It's so obvious bro!  I'm going
after them man!!!!  For sure!!!"  *Id.*, Ex. 12 (BENPRIV0017).  Four days later,
Plaintiff wrote to an attorney regarding a "Potential BIG case" based on Disney
purportedly having "ripped off" his ideas, characters, and setting.  *Id.*, Ex. 6
(BENPRIV0019).  Plaintiff asserted work product protection in communications
dating back to November 2014, confirming that he anticipated litigation more than
five years before he filed suit.  *Id.*, Ex. 11 (Ben Woodall Priv. Log).

Plaintiff confronted Marchick on April 1, 2016, still more than *four years*
before he filed suit, telling her that "it is very, very obvious that [*Moana*] is an

1    adaptation of my film" and that WDAS was "ripping off my material."  Marchick

2    Decl., Ex. D.  When Marchick told Plaintiff that she did not recall whether his

3    "Bucky" materials had gone beyond her desk more than ten years earlier, Plaintiff

4    decided that she was lying and became all the more convinced that he had been

5    "ripped off and deceived."  *Id.*, Ex. 1 (Woodall Tr.) at 165:16-166:17.

6        Plaintiff saw *Moana* in the theater in December 2016.  *Id.* at 243:6-22.  He

7    acquired a DVD of the movie by no later than March 15, 2017 and used screen

8    captures to perform a detailed side-by-side comparison of the movie to his

9    "Bucky" materials.  *Id.*, Ex. 8 (Pltf.'s Resp. to RFA No. 119); *id.*, Ex. 13

10    (BUCKPRIV0003-0017).  Plaintiff emailed his brother to further "strategiz[e]

11    about the *Moana* case" the following week and then contacted several more

12    attorneys regarding his contemplated lawsuit.  *Id.*, Ex. 11 (Ben Woodall Priv. Log

13    at 2); *id.*, Ex. 29 (Pltf.'s Resp. to Marchick Interrogatory No. 22).

14        Plaintiff researched and *knew* that he had to file his claims by the fall of

15    2019, within three years of *Moana*'s November 2016 release, to meet the statute of

16    limitations on his purported claims.  *Id.*, Ex. 14 (BENPRIV0009).  However, he

17    did not file his initial complaint until April 2020.  Dkt. No. 1.  In a brazen fraud on

18    Defendants and the Court, he falsely stated that he had not seen *Moana* until June

19    or July 2020, within three years of filing suit.  *Id.* ¶ 5.

20        **D.    Plaintiff's Falsification Of Evidence And Fraud On The Court**

21        Plaintiff filed his original complaint *pro per*, asserting claims for copyright

22    infringement and accounting.  Dkt. No. 1.  Plaintiff thereafter engaged counsel,

23    including current lead counsel Gustavo Lage, and filed a First Amended Complaint

24    in July 2020 adding claims for alleged trade secret misappropriation and fraud and

25    repeating the same lie as to when he had first seen *Moana*.  Dkt. No. 18; *see id.* ¶

26    36.  The centerpiece of that First Amended Complaint was a Confidentiality

27    Agreement that Marchick had allegedly signed in October 2003, before Plaintiff

28    had shared with her any of his "Bucky" materials.  *Id.* ¶¶ 29, 35, 61, 73, 83, 87, 92,

100, 101, 107-110, 112-113.  The First Amended Complaint attached as an exhibit

"[a] true and correct copy" of that Confidentiality Agreement purportedly bearing

Marchick's handwritten name, date, and signature:



*Id.* ¶ 29 & Ex. C.  Plaintiff repeated largely the same allegations, both as to when

he had first seen *Moana* and as to the purported Confidentiality Agreement, in the

operative Second Amended Complaint that he filed on May 28, 2021.  Dkt. No. 94

¶¶ 29, 35, 36, 56, 58, 67, 79, 95, 101-102 & Ex. C.

In reality, Marchick had not signed that or any other confidentiality

agreement with Plaintiff.  Marchick Decl. ¶ 8.  As Plaintiff eventually admitted at

deposition, he had located the Confidentiality Agreement in his files in 2020

without a name or date.  *Id.*, Ex. 1 (Woodall Tr.) at 161:1-23.  Plaintiff, with the

apparent knowledge if not encouragement of his counsel, added Marchick's name

and the October 2003 date to the Confidentiality Agreement and filed it with the

Court as an authentic copy of an agreement Marchick had signed.  *Id.* at 169:7-24.

Although Plaintiff still feigns ignorance as to whose signature actually appears on

the document, Defendants eventually uncovered the truth—the signature is that of

Pearl Young, a Hawaiian teenager Plaintiff had sketched for one of his characters.

Shimamoto Decl., Ex. 15 (Young Tr.) at 8:18-9:4; *id.*, Ex. 16 (Young Tr. Ex. 2).

Plaintiff also admitted when grilled under oath that his statements about

when he had first seen *Moana* were false, and that he had actually seen *Moana* in

the theater in December 2016 and on DVD no later than March 15, 2017, leaving

no doubt that his claims are time-barred in whole or substantial part.  Shimamoto

Decl., Ex. 1 (Woodall Tr.) at 243:6-22; 249:13-251:1; *see id.*, Ex. 8 (Pltf.'s Resp.

to RFA No. 119).

9

## III.    LEGAL STANDARD

On a motion for summary judgment, the Court must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact.  Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, the party must produce evidence "either negating an essential element of the nonmoving party's claim[s] . . . or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co, Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Once the moving party meets its initial burden, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (*quoting Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).

"[A]n opponent may not prevail merely by discrediting the credibility of the movant's evidence; it must produce some affirmative evidence." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).  Nor will a mere scintilla of evidence defeat a properly supported motion for summary judgment; "rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint." *Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (cleaned up).

## IV.    ARGUMENT

### A.    Plaintiff's Trade Secret Claims Fail As A Matter Of Law

Plaintiff claims trade secret misappropriation under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq.* ("DTSA"), and California Uniform Trade Secrets Act, Cal. Civ. Code  §§ 3426, *et seq.* ("CUTSA").  Those claims fail as a matter of law for three independent reasons: (1) they are time-barred; (2) Plaintiff did not take reasonable steps to protect the secrecy of his alleged trade

10

secrets; and (3) as to all Defendants other than Marchick, there is no evidence that Defendants even acquired, much less used or disclosed, the alleged trade secrets.

### 1.    Plaintiff's Trade Secret Claims Are Time-Barred

The statute of limitations under the DTSA and CUTSA is three years from the date on which the misappropriation was or could have been discovered by reasonable diligence.  18 U.S.C. § 1836(d); Cal. Civ. Code § 3426.6.  "[W]here a plaintiff suspects or has reason to suspect misappropriation, the plaintiff is said to be 'on notice' of a potential claim for misappropriation, the plaintiff is charged with a duty [to] exercise reasonable diligence to discover facts essential to that claim, and the statute of limitations on the claim begins to run."  *Chung v. Intellect Soft Grp. Corp.*, 2022 WL 20184655, at *13 (N.D. Cal. July 13, 2022) (citing *MGA Entm't, Inc. v. Mattel, Inc.*, 41 Cal. App. 5th 554, 562-64 (2019)).

A plaintiff "discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof—when, simply put, he at least 'suspects . . . that someone has done something wrong' to him, 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding.'"  *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397-98 (1999) (quoting *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 & fn.7 (1988)).  Because "a continuing misappropriation constitutes a single claim" under both the DTSA and CUTSA, a plaintiff's suspicion of misappropriation more than three years before filing suit bars the claims in their entirety.  18 U.S.C. § 1836(d); Cal. Civ. Code § 3426.6.

Here, the evidence is undisputed that Plaintiff believed Defendants had misappropriated his "Bucky" project well over three years before he filed suit.  As discussed in detail in Part II.C, *supra*, Plaintiff suspected that *Moana* was stolen from "Bucky" and began contacting counsel in the fall of 2014, became even more convinced that Defendants had copied his project over the next two years, and was certain of that when he performed a detailed side-by-side comparison of the two

1  works in March 2017.  *Id.*  He researched and knew that the statute of limitations

2  was fatal to his claims and therefore lied in his original and amended pleadings,

3  asserting that he had never seen *Moana* until June or July 2017, within three years

4  of filing suit.  Dkt. No. 1 ¶ 5; Dkt. No. 18 ¶ 36; Dkt. No. 94 ¶ 36.  Plaintiff's claims

5  under the DTSA and CUTSA are therefore time-barred as a matter of law.

### 2.    Plaintiff's Purported Trade Secrets Were Not Secret

7        Even if Plaintiff had timely filed suit, his claims under the DTSA and

8  CUTSA would still fail as a matter of law based on the absence of any trade

9  secrets.  Information can constitute a trade secret for purposes of those statutes

10 *only* if the owner thereof takes reasonable measures to keep the information secret.

11 18 U.S.C. § 1839; Cal. Civ. Code § 3426.1.  Once "an individual discloses his

12 trade secret to others who are under no obligation to protect the confidentiality of

13 the information, or otherwise publicly discloses the secret, his property right is

14 extinguished."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984).

15       Plaintiff identifies his 2008 trailer and 2011 script as purported trade secrets.

16 Shimamoto Decl., Ex. 1 (Woodall Tr.) at 199:13-18.  Plaintiff alleges that he took

17 reasonable steps to protect the secrecy of those materials by requiring Marchick to

18 execute the Confidentiality Agreement that is attached as Exhibit C to his operative

19 Second Amended Complaint.  Dkt. No. 94 at ¶¶ 56, 58, 67, 79.  However, as

20 discussed above, that Confidentiality Agreement is a complete sham.  It was signed

21 not by Marchick but instead by Pearl Young, a Hawaiian teenager who Plaintiff

22 had sketched as the basis for one of the characters in "Bucky."  Shimamoto Decl.,

23 Ex. 15 (Young Tr.) at 8:18-9:4; *Id.*, Ex. 16 (Young Tr. Ex. 2).  Plaintiff has

24 admitted that he falsified the document by adding Marchick's name and the

25 October 2003 date *in 2020*, nearly 17 years after he attested Marchick had signed it

26 and mere weeks before he filed suit.  *Id.*, Ex. 8 (Pltf.'s Resp. to RFA Nos. 122,

27 123).  Yet, Plaintiff and his counsel nevertheless filed the Confidentiality

28 Agreement with the Court, repeatedly attesting to its authenticity.  Dkt. No. 94 ¶ 29

1   & Ex. C.  Whether or not that conduct is deserving of terminating sanctions, *see*

2   Dkt. No. 213, it surely eviscerates Plaintiff's argument that he took reasonable

3   steps to protect the secrecy of his purported trade secrets.

4        Nor would Plaintiff fare any better even if Marchick had agreed to maintain

5   his "Bucky" materials in confidence.  The 2011 script is nearly identical to the

6   2014 script Plaintiff registered with the Copyright Office, with the only differences

7   being in formatting and minor line edits to one page of the script.  RJN, Ex. B

8   (2014 script); *see* Shimamoto Decl., Ex. 17 (redline).  As this Court has already

9   held, registration of materials with the Copyright Office extinguishes any claim for

10  trade secret misappropriation.  Dkt. No. 101 at 5-6 (citing cases).

11       The 2008 trailer was even more public.  Plaintiff posted the full trailer on his

12  website and on YouTube.  *Id.*, Ex. 3 (BUCK7679); *id.*, Ex. 4 (BUCK8145); *see id.*,

13  Ex. 5 (BUCK4846) at 4:28-4:44 (encouraging viewers to "visit the website

14  buckcreations.com" to view "the finished trailer"); *id.*, Ex. 6 (BENPRIV0019)

15  (directing prospective counsel to "have a look at my trailer on You-Tube").  And

16  nearly two-thirds of the trailer was broadcast on public television in Hawaii.  *Id.*,

17  Ex. 5 (BUCK4846); *id.*, Ex. 7 (Pltf.'s Resp. to RFA No. 23). [2]

18       In short, Plaintiff's purported trade secrets were not secret in the least, and

19  his claims under the DTSA and CUTSA therefore fail as a matter of law.

20       **3.    There Is No Evidence Most Defendants Acquired, Much**

21           **Less Disclosed Or Used, His Purported Trade Secrets**

22       Even if Plaintiff had timely filed suit and had taken reasonable steps to

23  protect the secrecy of his purported trade secrets, his trade secret claims would still

24  fail as a matter of law as to all Defendants but Marchick.  Under both the DTSA

25

26  _____

27  [2] In ruling on Defendants' prior motion to dismiss, the Court stated that it was
    required to accept as true Plaintiff's allegation that the 2008 trailer and 2011 script
    had not been publicly disclosed.  Dkt. 101 at 8:12-15.  Discovery has established

28  that Plaintiff's representations to the Court were false.

1  and CUTSA, a defendant cannot be liable for trade secret misappropriation unless

2  it actually acquires -- and, in some instances, thereafter discloses or uses -- the

3  plaintiff's purported trade secret.  18 U.S.C. § 1839(5); Cal. Civ. Code § 3246.1(b).

4       Plaintiff has not adduced evidence that any Defendant other than Marchick

5  received his 2008 trailer,[3] his 2011 script, or any other "Bucky" materials in which

6  Plaintiff may assert trade secret protection.  Indeed, the evidence is uncontroverted

7  that they did not.  Shimamoto Decl., Ex. 18 (WDAS & WDP Resp. to 1st Set of

8  Interrogatories, Resp. to Interrogatory No. 8); *id.*, Ex. 19 (Certain Defs.' Resp. to

9  1st Set of Interrogatories, Resp. to Interrogatory Nos. 6, 15, 16); *id.*, Ex. 20

10  (Mandeville's Resp. to 1st Set of Interrogatories, Resp. to Interrogatory Nos. 8, 9,

11  23); Lieberman Decl. ¶ 3; Hoberman Decl. ¶ 3; Ribon Decl. ¶¶ 5, 7.[4]

12      **B.**    **Plaintiff's Fraud Claims Fail As A Matter Of Law**

13       Two of Plaintiff's claims for relief sound in fraud.  One, for false promise, is

14  asserted against Marchick alone and is based on the sham Confidentiality

15  Agreement and other promises that Marchick purportedly made to Plaintiff.  Dkt.

16  No. 94 ¶¶ 100-107.  The other is a fraud claim asserted against all Defendants

17  based on their alleged "authorization," "ratification," and "approval" of Marchick's

18  purported false promises.  *Id.* ¶¶ 88-99.  These claims fail as a matter of law for

19  two independent reasons: (1) they are time-barred; and (2) there is no evidence that

20  any of the non-Marchick Defendants even had knowledge of, much less

21  authorized, ratified, or approved, Marchick's purported false promises.

22  _____

23  [3] Plaintiff does not have any evidence, other than his bare allegation, that Marchick
24  ever received the 2008 trailer.

25  [4] Plaintiff cannot avoid this reality by invoking a purported conspiracy to
    misappropriate his trade secrets.  *See BirdDog Tech. Ltd. v. 2082 Tech., LLC*, 2024
26  WL 1142057, at *7 n.6 (C.D. Cal. Mar. 11, 2024) ("defendants . . . may not be held
    liable for violations of the DTSA or the CUTSA based on their participation in a
27  conspiracy."); *Fishbaugh v. Bulgadarian*, 2021 WL 3598579, at *4 (C.D. Cal. July
28  8, 2021) ("conspiracy liability is not available under the DTSA").

1                **1.     Plaintiff's Fraud Claims Are Time-Barred**

2        Plaintiff's false promise and fraud claims, like his misappropriation claims,

3 are subject to a three-year statute of limitations. Cal. Civ. Proc. Code § 338(d). As

4 with the trade secret misappropriation claims, "if an action is brought more than

5 three years after commission of the fraud, plaintiff has the burden of pleading and

6 proving that he did not make the discovery until within three years prior to the

7 filing of his complaint." *McFall v. Stacy & Witbeck, Inc.*, 2016 WL 6248882, at

8 *4 (N.D. Cal. Oct. 26, 2016) (quoting *Hobart v. Hobart Estate Co.*, 26 Cal. 2d 412,

9 437 (1945)). If a plaintiff "discovered, or at least suspected, wrongdoing" more

10 than three years before filing suit, the discovery rule "does not save his claim." *Id.*

11        As set out in detail above, Plaintiff suspected wrongdoing as early as

12 October 2014, and he was convinced that he had been "ripped off and deceived" by

13 April 1, 2016. *See* Part II.C, *supra*. Because Plaintiff did not file suit until more

14 than four years later, his fraud claims are time-barred as a matter of law.

15        Plaintiff cannot avoid this outcome by asserting that he did not suspect the

16 participation of certain Defendants in the alleged fraud until within three years of

17 filing suit. That a plaintiff "did not know [certain defendants were] allegedly

18 aiding and abetting" a purported fraud "is immaterial" for purposes of the statute of

19 limitations. *McFall*, 2016 WL 6248882, at *4; *see Bernson v. Browning-Ferris*

20 *Indus.*, 7 Cal. 4th 926, 932 (1994) ("once the plaintiff is aware of the injury, the

21 applicable limitations period . . . normally affords sufficient opportunity to

22 discover the identity of all the wrongdoers"). Accordingly, Plaintiff's false

23 promise and fraud claims are time-barred against all Defendants as a matter of law.

24              **2.     There Is No Evidence That Most Defendants Even Knew**

25                     **Of, Much Less Participated In, The Alleged Fraud**

26        Even if Plaintiff had timely filed suit, his fraud claim would nonetheless fail

27 as a matter of law as against the non-Marchick Defendants. Plaintiff does not

28 allege that any of the non-Marchick Defendants made any misrepresentations or

1   false promises to Plaintiff, but he instead asserts that the other Defendants are

2   liable based on a purported conspiracy to defraud.  To establish a conspiracy to

3   commit fraud, however, a plaintiff must prove "facts showing that each member of

4   the conspiracy acted in concert and came to a mutual understanding to accomplish

5   a common unlawful plan, and that one or more of them committed an overt act to

6   further it."  *Invisible Dot, Inc. v. DeDecker*, 2019 WL 1718621, at *7 (C.D. Cal.

7   Feb. 6, 2019) (internal quotation marks omitted).  Plaintiff has not adduced

8   evidence that any of the non-Marchick Defendants even had knowledge of

9   Marchick's purported misrepresentations or false promises, let alone that they had

10   a mutual understanding to accomplish a common unlawful plan, and his fraud

11   claim against the non-Marchick Defendants necessarily fails for this reason alone.

12   **C.    Plaintiff's Copyright Claim Fails As A Matter Of Law**

13       Plaintiff's final cause of action, for copyright infringement, fails as a matter

14   of law for four independent reasons: (1) there is no evidence that most Defendants

15   exercised any of the exclusive rights under 17 U.S.C. § 106; (2) Plaintiff cannot

16   prove access to his "Bucky" materials by anyone involved in the development or

17   production of *Moana*; (3) the evidence of independent creation is uncontroverted;

18   and (4) Plaintiff cannot establish substantial similarity under the extrinsic test.

19       **1.    There Is No Evidence That Certain Defendants Exercised**

20   **Any Of The Section 106 Exclusive Rights**

21       "To prevail on a claim of copyright infringement, [a plaintiff] must prove

22   ownership of a valid copyright and violation by . . . the alleged infringer, of at least

23   one of the exclusive rights conferred by the Copyright Act."  *Adobe Sys. Inc. v.

24   Christenson*, 809 F.3d 1071, 1076 (9th Cir. 2015).  Those "exclusive rights" are

25   comprised of the right "to do and to authorize any of the following: (1) to

26   reproduce the copyrighted work in copies or phonorecords; (2) to prepare

27   derivative works based upon the copyrighted work; (3) to distribute copies or

28   phonorecords of the copyrighted work to the public . . . ; (4) . . . to perform the

16

copyrighted work publicly; [and] (5) . . . to display the copyrighted work publicly .
. . ." 17 U.S.C. § 106.  Consequently, unless Plaintiff can prove that a Defendant
was involved in the development or production of *Moana* or distributed, publicly
performed, or publicly displayed the movie, that Defendant cannot be held liable
for copyright infringement as a matter of law.

None of TWDC, DEI, DCP, DCPIM, WDDTCI, Disney Interactive, Disney
Store, Disney Shopping, BVHE, BVB, Mandeville, or Marchick had any
involvement in the development or production of *Moana*.  *Id.*, Ex. 19 (Certain
Defs.' Resp. to 1st Set of Interrogatories, Resp. to Interrogatory Nos. 2); *id.*, Ex. 20
(Mandeville's Resp. to 1st Set of Interrogatories, Resp. to Interrogatory Nos. 2, 4,
10, 15, 17); Marchick Decl. ¶ 17.  And, with the exception of Disney Store, Disney
Shopping, and BVHE, there is no evidence that those Defendants distributed or
publicly performed or displayed the movie.  Accordingly, Plaintiff's copyright
infringement claims fail out of the gate with respect to TWDC, DEI, DCP,
DCPIM, WDDTCI, Disney Interactive, BVB, Mandeville, and Marchick.

## 2. The Copyright Claim Is Time-Barred In Whole Or In Part As To All Defendants

Assuming *arguendo* that Plaintiff could establish both that Marchick,
Mandeville, or Ribon engaged in any of the acts or omissions alleged against them
*and* that those acts or omissions constituted violations of the section 106 exclusive
rights, his copyright claim would be time-barred in its entirety as to them under the
Copyright Act's three-year statute of limitations.  17 U.S.C. § 507(b).  That is
because *only* acts and omissions alleged against any of those Defendants occurred
more than three years before Plaintiff filed suit, and there are no continuing
infringements alleged as against those Defendants.

Even as to those Disney Defendants that allegedly engaged in acts of
infringement within three years of Plaintiff filing suit, the copyright claim is time-
barred as to all acts of alleged infringing acts that occurred more than three years

1  before the filing date (*i.e.*, before April 24, 2017). *See Roley v. New World*

2  *Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994).

### 3.    Plaintiff Cannot Prove Access

4      As an essential element of his copyright claim, Plaintiff must establish that

5  Defendants had access to his materials. *Bernal v. Paradigm Talent & Literary*

6  *Agency*, 788 F. Supp. 2d 1043, 1053 (C.D. Cal. 2010). "To prove access, Plaintiff

7  must show that the Defendants had a 'reasonable opportunity' or 'reasonable

8  possibility' of viewing Plaintiff's work prior to the creation of the infringing

9  work." *Id.* at 1053. "Reasonable access requires more than a 'bare possibility,'

10  and 'may not be inferred through mere speculation or conjecture.'" *Id.* at 1053-54.

11      A "[p]laintiff cannot create a triable issue of access merely by showing 'bare

12  corporate receipt' of her work by an individual who shares a common employer

13  with the alleged copier." *Id.* at 1056. "Instead, to avoid summary judgment, a

14  plaintiff must show that he submitted his work to an intermediary *who is in a*

15  *position to transmit the plaintiff's work to the creators of the infringing work*." *Id.*

16  (emphasis in original). "The intermediary can be a person who (1) has supervisory

17  responsibility for the allegedly infringing [product], (2) contributed ideas and

18  materials to it, or (3) worked in the same unit as the creators." *Id.*

19      The recent California Court of Appeal decision in *Esplanade Productions,*

20  *Inc. v. Walt Disney Company*, 93 Cal. App. 5th 793 (2023), which applied that

21  same standard in the context of an idea submission claim, is instructive. The

22  plaintiff in that case claimed that, in 2009, its principal (Gary Goldman) had

23  pitched Brigham Taylor, a production and development executive at WDP, a

24  movie involving various animal characters living in "Zootopia." *Id.* at 798. The

25  plaintiff further alleged that Taylor agreed to show the pitch materials to Disney's

26  feature animation department, and that Taylor had subsequently informed him that

27  the department was not interested in the project. *Id.* WDAS subsequently

28  developed and produced the animated movie *Zootopia*, which was released in 2016

18

are earned more than $1 billion in box office revenue. *Id.* The trial court granted summary judgment for the defendants, finding that the plaintiff's allegations regarding his interactions with Taylor—even if proven—were insufficient as a matter of law to establish access, and the Court of Appeal affirmed:

> [Plaintiff] argues it sufficiently created a triable issue of material fact regarding access because the evidence showed Goldman submitted his materials to Taylor and Taylor said he would forward them to the animation department. However, that evidence establishes nothing more than bare corporate receipt of the materials. Even if Taylor did submit Goldman's pitch materials to an unknown individual within Disney's animation department, there is no evidence any creator of Disney's Zootopia ever saw the pitch materials or discussed the project with Taylor. To the contrary, [Zootopia's filmmakers] each testified he had never seen the pitch materials or had any conversations with Taylor regarding Zootopia. Nor is there any evidence Taylor regularly contributed ideas or material to [the filmmakers] such that it would be natural for him to share the pitch materials.

*Id.* at 807.

Plaintiff here has articulated five shifting theories of access, all of which are legally inadequate, and none of which is capable of raising a triable issue on this essential element of his infringement claim.

### a. Marchick → Mandeville → WDP → WDAS → Filmmakers

Plaintiff's first theory of access has the following alleged steps:

1) after Plaintiff's early 2000s meeting with Marchick, Marchick provided his "Bucky" materials to her then-bosses at Mandeville, Todd Lieberman and David Hoberman;

2) Lieberman and Hoberman were obligated under a "first look" deal with WDP to submit, and did submit, the "Bucky" materials to some unknown person at WDP;

3) the unknown person at WDP passed along Plaintiff's "Bucky" materials to another unknown person at WDAS; and

4) the unknown person at WDAS passed along Plaintiff's "Bucky" materials to John Musker and Ron Clements, who used those materials to conceive of and develop *Moana*.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1   This is the original theory forwarded by Plaintiff and is not supported by any

2   evidence.  Indeed, the evidence is uncontroverted that Marchick did *not* provide

3   Plaintiff's "Bucky" materials to Lieberman or Hoberman.  Marchick Decl. ¶ 7.

4   Prior to this lawsuit, Lieberman and Hoberman had never even heard of Plaintiff or

5   "Bucky."  Lieberman Decl. ¶ 3; Hoberman Decl. ¶ 3.  Moreover, Mandeville's

6   first-look deal with WDP required them to submit to WDP only projects they were

7   interested in developing and producing.  Lieberman Decl. ¶ 4; Hoberman Decl. ¶ 4.

8   Because Lieberman and Hoberman never received the "Bucky" materials, they

9   never formed an interest in developing or producing "Bucky," much less submitted

10  the project to WDP.  Lieberman Decl. ¶  5; Hoberman Decl. ¶ 5.

11      Mandeville did not have any "first look" or other agreement with WDAS,

12  had never produced a movie with or for WDAS, and had never shared any ideas or

13  materials related to *any* actual or prospective project with anyone at WDAS.

14  Lieberman Dec. ¶ 6; Hoberman Decl. ¶ 6.  Mandeville had no involvement

15  whatsoever with *Moana*.  Lieberman Decl. ¶ 7; Hoberman Decl. ¶ 7.  Indeed,

16  neither Lieberman nor Hoberman has ever even spoken to or communicated with

17  Musker, Clements, or anyone else about the creation, development, or production

18  of *Moana*.  *Id*.  And, before this action was filed, neither of *Moana*'s creators had

19  ever heard of Plaintiff or "Bucky," much less received any "Bucky" materials.

20  Musker Decl. ¶ 3, 70; Clements Decl. ¶ 3, 31.

21      Nor is there a shred of documentary evidence that anyone at WDP received

22  any "Bucky" materials or provided them to WDAS.  WDAS' submission log,

23  which records all scripts, treatments, or other creative materials that it requests and

24  receives, contains no reference to Plaintiff or his "Bucky" project.  Julius Decl. ¶¶

25  5, 9.  But Defendants did not stop there.  WDAS produced the entirety of its

26  development files for *Moana*, which contain thousands of documents that reflect

27  the origin and development of most every element of *Moana*'s story.  *Id.* ¶¶ 12-21.

28  At Plaintiff's insistence, WDAS collected and made available for inspection by

20

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's counsel more than 2.5 million emails from every single WDAS employee from January 1, 2003 through the filing date of this action containing any one of more than 105 requested search terms. Schnittker Decl. ¶ 5 & Ex. A. It produced the storyboards and concept art for *Moana*. *Id.* ¶ 2. And it made available for inspection all files from its proprietary dPix, EVO, and Shotgun systems related to the development and production of *Moana*. *Id.* ¶ 6. Plaintiff cannot identify a single reference to Plaintiff or "Bucky," or any trace of his "Bucky" project, anywhere in those materials. There is no triable issue with respect to Plaintiff's first theory of access.

### b.    Marchick → Ribon

Plaintiff's second theory of access is premised on Marchick having been friends with Pamela Ribon, who was one of the writers on *Moana*, and having passed along Plaintiff's "Bucky" materials to her for use in writing *Moana*. This theory of access was concocted by Mike Bauman, a real estate broker Plaintiff contacted in 2017 to help him find an attorney willing to take his case, following a quick Google search. Shimamoto Decl., Ex. 21 (BUCKPRIV0066).

This theory is not only based on speculation, but it cannot be reconciled with actual facts. Specifically, Marchick and Ribon did not even meet until *after* Ribon had completed her writing assignment on *Moana*. Marchick Decl. ¶ 16; Ribon Decl. ¶ 6. And the two had never discussed Plaintiff or "Bucky" until after this lawsuit was filed. *Id.* Remarkably, Plaintiff has refused to dismiss Ribon from the case after learning of the true facts, or abandon this time-warped theory of access.

### c.    Marchick → Maggie Malone

Plaintiff's third theory of access is of more recent vintage. Plaintiff learned in discovery that, after his meeting with Marchick in 2004 or early 2005, Marchick called Maggie Malone at WDAS to ask whether the studio accepted outside submissions. Marchick Decl. ¶ 5. Malone told her it did not, and that was the end of the conversation. *Id.* Marchick did not even mention Plaintiff or "Bucky" to

1   Malone, much less describe the project or pass along any of Plaintiff's materials.

2   *Id.*; Shimamoto Decl., Ex. 22 (Malone Tr.) at 120:23-121:1, 127:13-128:9.

3       Plaintiff has simply decided, without any supporting evidence whatsoever,

4   that Marchick and Malone are lying, that Malone in fact agreed to receive -- and

5   did receive -- the "Bucky" materials from Marchick, which she then passed along

6   to Musker and Clements for use in developing *Moana* nearly eight years later.

7   That is pure speculation, is contrary to uncontroverted testimony and evidence

8   (including WDAS' submission log), and fails to create a triable issue as to access.

9   *See Metropolitan Life Ins. Co. v. Kelley*, 890 F. Supp. 746, 748 (N.D. Ill. 1995)

10  ("The allegation that a jury may not believe the moving party's witnesses is not

11  enough to avoid summary judgment.").

12      **d.    Marchick → Disney TV Animation → Filmmakers**

13      Plaintiff's fourth access theory takes aim at the assistant at Disney TV

14  Animation who met with Plaintiff as a favor to Marchick in 2004 or early 2005.

15  As discussed above, Marchick does not remember who that assistant was or

16  whether she shared Plaintiff's "Bucky" materials with them.  Marchick Decl. ¶ 6.

17  Indeed, the meeting was so unremarkable that Plaintiff does not recall it at all.

18      Even assuming Marchick had shared Plaintiff's "Bucky" materials with that

19  assistant at Disney TV Animation, there still would be no triable issue as to access.

20  WDAS, which developed and produced *Moana*, is separate from Disney TV

21  Animation.  Julius Decl. ¶ 4.  WDAS is geographically distinct from, and operates

22  independently of, Disney TV Animation.  *Id.*  WDAS' development and

23  production staff do not receive input from producers or development executives at

24  Disney TV Animation.  *Id.*  And WDAS maintains its own files and is on entirely

25  different email server than Disney TV Animation.  *Id.*  The fact that an assistant

26  Disney TV Animation may have received "Bucky" materials does not establish

27  even bare corporate receipt by WDAS, much less support a finding that the

28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1   creators of *Moana* ever saw them.  *Esplanade*, 93 Cal. App. 5th at 807.  Indeed,

2   they did not.  Musker Decl. ¶ 3, 70; Clements Decl. ¶ 3, 31.

3              **e.     Katie Speirs → Doc Kane → Filmmakers**

4        Plaintiff's final theory of access is that his girlfriend, Katie Speirs, sent

5   "Bucky" materials to Doc Kane, a sound engineer, after a 2003 recording session

6   for the movie *The Incredibles*, and that Kane passed those materials along to

7   Musker and Clements for use in developing *Moana*.  This theory, like the others, is

8   unsupported by admissible evidence.  Speirs testified that she has no idea who

9   Kane is and has no recollection of sending him anything.  Shimamoto Decl., Ex. 23

10  (Speirs Tr.) 48:16-17, 49:4-9.  Kane testified that he never received any materials

11  related to "Bucky."  *Id.*, Ex. 24 (Kane Tr. 67:15-19, 69:8-12, 70:5-7).  As a sound

12  engineer, Kane had no involvement whatsoever in *Moana*'s development; indeed,

13  his only work on the movie consisted of three recording sessions in 2016, the year

14  of *Moana*'s release.  *Id.* at 82:9-14, 82:23-25, 83:18-84:9, 85:15-21; Shimamoto

15  Decl., Ex. 25 (Kane Tr. Ex. 9).  And even if Kane had received any "Bucky"

16  materials, there is no evidence that he provided them to *Moana*'s creators.  Instead,

17  the evidence is precisely to the contrary.  Musker Decl. ¶ 4; Clements Decl. ¶ 4.

18       In sum, Plaintiff has nothing, beyond pure speculation, to support his

19  contention that his "Bucky" materials somehow made their way to *Moana*'s

20  creators or could possibly have been the basis for *Moana*.  His copyright

21  infringement claim fails as a matter of law based on the absence of access alone.[5]

22

23  _____

24  [5] It is also worth noting that all of Plaintiff's theories posit access in the 2003 to
25  2005 time period, and thus cover only the 2003 "Bucky" treatment and associated
    artwork that Plaintiff deposited with the Copyright Office as part of his 2004
26  registration (Reg. No. VAu 624-809).  *See* RJN., Ex. A (2004 deposit materials).
    Plaintiff does not even have a theory, much less evidence, of access to the script
27  and other materials that are the subject of his 2014 registration (Reg. No. Pau 3-
28  749-546).  *Id.*, Ex. B (2014 deposit materials).

### 4.    Moana Was Independently Created

Independent creation "is a complete defense to copyright infringement." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018). "No matter how similar the plaintiff's and the defendant's works are, if the defendant created his independently, without knowledge of or exposure to the plaintiff's work, the defendant is not liable for infringement." *Id.* Consequently, "[e]ven where a plaintiff is successful in creating a triable issue of fact with respect to actual copying, a defendant may defeat a copyright infringement claim by demonstrating independent creation of the allegedly infringing work." *Silberstein v. Fox Entm't Grp., Inc.*, 424 F Supp. 2d 616, 628 (S.D.N.Y. 2004).

Where "the plaintiff ha[s] offered no evidence to contradict the defendant's testimony of independent creation," summary judgment is proper. *Watt v. Butler*, 744 F. Supp. 2d 1315, 1323 (N.D. Ga. 2010). Indeed, courts regularly grant summary judgment based on uncontroverted evidence of independent creation. *See, e.g.*, *McGaughey v. Twentieth Century Fox Film Corp.*, 12 F.3d 62, 65 (5th Cir. 1994); *Morford v. Cattelan*, 2023 WL 3971968, at *11 (S.D. Fla. June 12, 2023); *Maharam v. Patterson*, 2007 WL 2702195, at *2 (S.D.N.Y. Sept. 17, 2007); *Bethea v. Burnett*, 2005 WL 1720631, at *15-16 (C.D. Cal. June 28, 2005); *Kootenia Homes, Inc. v. Reliable Homes, Inc.*, 2002 WL 15594, at *7 (D. Minn. Jan. 3, 2002); *Dimmie v. Carey*, 88 F. Supp. 2d 142, 150-51 (S.D.N.Y. 2000).

*Corwin v. Walt Disney Co.*, 2004 WL 5486639 (M.D. Fla. Nov. 12, 2004), is instructive. The plaintiff in that case alleged that his painting was the basis for the design of Disney's EPCOT theme park. On summary judgment, the defendant introduced an affidavit from the creative executive responsible for overseeing the design and planning of EPCOT, in which he explained the "long and painstaking creative process" that went into the design. *Id.* at *21. The plaintiff "attempt[ed] to counter Defendant's evidence by arguing that the Epcot rendering was developed with unusual speed and there is evidence that Disney was sorely lacking

24

1  in good ideas for the design of Epcot." *Id.* at *22.  The court rejected those

2  arguments as "mere speculation, unsupported by the record, [that] do not create a

3  genuine issue of material fact on whether Defendant independently created the

4  Epcot rendering," and granted summary judgment for the defendant.  *Id.*

5      The evidence of independent creation is even more robust in the instant case.

6  John Musker, who had written and directed *The Little Mermaid*, *Aladdin*, *Hercules*,

7  and *The Princess and the Frog*, among other movies, was long fascinated by

8  Polynesia and interested in developing a story set in the region.  Musker Decl. ¶ 9.

9  In early 2011, WDAS' Chief Creative Officer, John Lasseter, requested that

10 Musker and his longtime collaborator, Ron Clements, pitch three different story

11 ideas.  Clements Decl. ¶ 8.  Musker began researching Polynesian history and

12 culture and found that there was a rich vein of Polynesian mythology, with many

13 larger-than-life stories and characters.  Musker Decl. ¶ 10.  He became particularly

14 interested in a shape-shifting demigod named Maui who had a magical fishhook,

15 which was a very visual concept that lent itself to animation.  *Id.*  Musker shared

16 with Clements what he had learned about Maui, and they began working on a pitch

17 centered on the character of Maui, entitled "Polynesian Fantasy."  *Id.*

18     That pitch was loosely based on a Hawaiian myth Musker had read about a

19 woman (Lehua) whose lover (Ohi'a) was kidnapped and imprisoned by the

20 goddess Pele.  *Id.* ¶ 11 & Ex. A.  Musker and Clements decided to graft a kind of

21 "True Grit" story onto that myth, with Lehua enlisting the aid of the demigod

22 Maui, as a kind of John Wayne character, who would mentor her and help her

23 rescue Ohi'a.  *Id.*  They pitched the story idea, which they renamed "Mighty

24 Maui," along with two unrelated story ideas, to Lasseter in June 2011.  *Id.* ¶ 12 &

25 Ex. B.  Lasseter liked the idea and suggested that Musker and Clements travel to

26 Polynesia to learn more about its culture and history.  *Id.*; Clements Decl. ¶ 11.

27     From September 25 to October 13, 2011, Musker and Clements, joined by

28 several other WDAS employees, visited Fiji, Samoa, and French Polynesia (Tahiti,

Mo'orea, Huahine-Iti).  Musker Decl. ¶ 16.  They spent a great deal of time with elders and chiefs and their families, listening to their stories and songs, as well as teachers, craftspeople, farmers, fishermen, and navigators.  *Id.*  They also consulted with experts in archeology, anthropology, history, culture, music, dance, carving, and more.  *Id.*; *see id.* ¶¶ 17-19.  Musker and Clements learned about the ancient voyaging that had led to the discovery of the islands that comprise Oceania.  *Id.* ¶ 21.  They learned that, for some unknown reason, that voyaging had stopped 3,000 years ago and did not resume until approximately 1,000 years later.  *Id.*  That gap intrigued the pair and ultimately became an integral element of *Moana*.  *Id.*

Based on their research trip and follow-on presentations to other WDAS personnel, Musker and Clements developed four potential story ideas that contained many of the themes they had learned about during their trip, especially wayfinding and interconnectedness with one's ancestors.  Clements Decl. ¶ 25. They pitched those stories to Lasseter in January 2012.  *Id.*; Musker Decl. ¶ 27 & Ex. F.  The story that Musker and Clements liked best, and that Lasseter selected for further development, was initially called "Spirt of Oceania" and later renamed "Moana."  Clements Decl. ¶ 26; Musker Decl. ¶ 28 & Ex. Q.  The story was set 2,000 years ago, at a time when Oceania was in crisis because all migration had stopped.  *Id.*  The protagonist was the teenage daughter of an island chief named Moana (which means "ocean" in many Oceanic languages), who teams up with the demigod Maui on a journey to rescue her family.  *Id.*

The story and characters evolved over time.  Clements Decl. ¶ 27; Musker Decl. ¶ 30.  For example, in the initial version, Moana had many older brothers, and the goal of her ocean journey with Maui was to rescue her father and brothers. Clements Decl. ¶ 27.  The filmmakers eventually eliminated the brothers, and the goal of her journey became to restore something sacred to Te Fiti, the spirit of all islands.  *Id.*; Musker Decl. ¶¶ 36-40, 50-51.  Throughout the development process, the filmmakers regularly consulted with a group of advisors, referred to as the

1    Oceanic Story Trust, that included anthropologists, educators, linguists, expert
2    tattooists, choreographers, haka specialists, master navigators, and cultural
3    advisors. Musker Decl. ¶ 31. The Trust helped ensure that *Moana* was culturally
4    accurate and authentic and deeply influenced the look and feel of the movie. *Id.*

5         The genesis of the Polynesian-inspired story is shown in Musker's and
6    Clements' personal notes and research materials. Musker Decl., Exs. A-G, Q;
7    Clements Decl., Exs. A, B. *Moana*'s more than five-year development process is
8    exhaustively documented in WDAS' development files for the movie. Julius Decl.
9    ¶ 12. The development files contain thousands of documents reflecting the origin
10   and evolution of most every element of *Moana*'s story, including story ideas, pitch
11   materials, written research, travel journals, scripts, and script revisions. *Id.* ¶¶ 12-
12   21. The files also include more than 400 sets of contemporaneous notes of creative
13   meetings, including notes from practice pitches, pitches to Lasseter, story sessions,
14   and table reads. *Id.*; *see* Musker Decl., Exs. A-UUU. These notes, which identify
15   meeting attendees and the specific contributions of each person, were created and
16   maintained in the usual course of business, including for the purpose of
17   determining writing credits on the movie. Julius Decl. ¶ 20.

18        In or about April 2016, WDAS provided a copy of the development files to
19   James McDonald, an outside consultant with three decades of analyzing film
20   projects to determine writers' contributions, to make determinations regarding
21   creative credits. *Id.* ¶ 22; McDonald Decl. ¶ 5. McDonald spent more than 400
22   hours reviewing and analyzing the *Moana* development files and prepared an 89-
23   page written analysis of the conception and development of the movie's story,
24   themes, and characters. *Id.* ¶ 6 & Ex. A. He found no mention of Plaintiff or
25   "Bucky" anywhere in the development files and no indication that Plaintiff's
26   "Bucky" materials had been received or used in connection with *Moana*. *Id.* ¶ 7.

27        As discussed above, WDAS produced not only the entirety of the *Moana*
28   development files in the course of this litigation, but it also made available for

27

inspection more than 2.5 million emails collected, at Plaintiff's insistence, from every single WDAS employee and the proprietary dPix, EVO, and Shotgun systems related to the development and production of *Moana*.  Schnittker Decl. ¶¶ 5-6.  Yet, Plaintiff cannot identify a single reference to Plaintiff or "Bucky," or any trace of his "Bucky" project.  The reason is simple: *Moana* was not inspired by or based in any way on Plaintiff or his "Bucky" project, which the filmmakers learned of for the first time after this lawsuit was filed.  Musker Decl. ¶¶ 3, 70; Clements Decl. ¶¶ 3, 31.  The uncontroverted evidence of independent creation, standing alone, requires summary judgment for Defendants on Plaintiff's copyright claim. *Watt,* 744 F. Supp. 2d at 1323.

### 5.       Plaintiff Cannot Establish Substantial Similarity

Even if Plaintiff could somehow create triable issues as to both access and independent creation, Plaintiff's infringement claim still fails as a matter of law because *Moana* is not substantially similar to his copyrighted "Bucky" materials under the extrinsic test.  Under that test, the works are broken down into their constituent elements—*i.e.*, plot, themes, dialogue, mood, setting, pace, characters, and sequence of events—and those elements are then compared in terms of protectable expression.  "In applying the test, the Court must distinguish between protectable and unprotectable material, because a party claiming infringement may not rely on unprotected elements." *Bernal*, 788 F. Supp. 2d at 1059; *see Funky Films, Inc. v. Time Warner Entm't Co.., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (courts "must take care to inquire only whether 'the *protectable elements, standing alone*, are substantially similar'") (emphasis in original).

Plaintiff and Defendants have submitted dueling expert reports on the issue of substantial similarity and, not surprisingly, their experts reach different conclusions.  However, Plaintiff's expert, David Román, performed the wrong analysis.  Specifically, Román did not compare *Moana* to the 2003 "Bucky" treatment or 2014 "Bucky" script that Plaintiff registered with the Copyright

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1   Office.  Instead, he compared *Moana* to an amalgam of various synopses, story

2   outlines, treatments, character descriptions, and scripts that Plaintiff created or

3   commissioned over a more than 13-year period.  Shimamoto Decl., Ex. 26 (Román

4   Tr.) at 18:19-21, 25:11-27:3; *id.*, Ex. 27 (Ex. 2 to Román Tr.).  Because Román

5   treated 13 years' worth of "Bucky" materials -- some registered in 2004, some

6   registered in 2014, and many never registered at all -- as a single work, his analysis

7   is properly disregarded on summary judgment.  Shimamoto Decl., Ex. 26 (Román

8   Tr.) at 51:10-68:22; *see Gilbert v. New Line Prods., Inc.*, 2010 WL 5790628 at *3

9   (C.D. Cal. Aug. 13, 2010) ("[t]he works must be assessed individually and not

10  manipulated for any parties' own benefit").

11      Even if Román's opinions were considered, "the existence of dueling expert

12  reports does not necessarily present a triable issue of fact for the jury." *Bernal*,

13  788 F. Supp. 2d at 1062.  "Numerous cases have found in favor of defendants on

14  the issue of substantial similarity despite the existence of expert testimony offered

15  by plaintiffs." *Id.* (citing cases). This is especially true "in a case such as this,

16  where the works are targeted at a general audience and deal with subject matter

17  readily understandable by any ordinary person." *Counts v. Meriwether*, 2015 WL

18  9594469, at *10 (C.D. Cal. Dec. 30, 2015).  Filtering out non-protectable elements

19  and disregarding characterizations of "Bucky" and *Moana* that are not fairly

20  supported by the evidence, there are no commonalities of expression from which a

21  reasonable factfinder could find that "Bucky" and *Moana* are substantially similar.

22      ***Plot.***  Plaintiff argues that the plots of "Bucky" and *Moana* are substantially

23  similar in that they both tell the story of "a teenager living in the contemporary

24  moment [who] is chosen to time travel across time to an ancient indigenous island

25  in order to save it from imminent destruction."  Shimamoto Decl., Ex. 28 (Román

26  Report) at 20.  In truth, that describes *neither* "Bucky" nor *Moana*.  Bucky does

27  time-travel in some iterations of "Bucky," from modern-day Kauai to the Big

28  Island of several hundred years ago, but not to save an island from imminent

destruction, but instead to prevent his friends' favorite surfing beach from being paved over for a new resort.  Declaration of Jeff Rovin ("Rovin Decl.")., Ex. B (Rovin rebuttal) at 17-22.  *Moana* is set thousands of years in the past, and Moana travels not across time, but instead the ocean, to save not only an island but all life from imminent destruction.  *Id.*

Even if Plaintiff's general plot description did fit both "Bucky" and *Moana*, it still would not support a finding of substantial similarity.  "[G]eneral plot ideas are not protectable and cannot give rise to a copyright infringement claim."  *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985).  *Berkic* is instructive.  The plaintiff in that case alleged that the film *Coma* infringed his copyright in a treatment he had submitted years earlier.  The Ninth Circuit affirmed summary judgment for the defendants, explaining:

> At a very high level of generality, the works do show a certain gruesome similarity.  Both deal with criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants.  To some extent, both works take their general story from the adventures of a young professional who courageously investigates, and finally exposes, the criminal organization.  But this degree of similarity between the basic plots of two works cannot sustain a plaintiff's claim that the works are "substantially similar."  No one can own the basic idea for a story.  General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind.

*Id.* at 1293.  As in *Berkic*, the idea of teenager traveling across time to save an island from imminent destruction (which, again, describes neither "Bucky" nor *Moana*) is a basic plot idea that must be filtered out for purposes of the extrinsic test and therefore cannot support a finding that the works are substantially similar.

**Characters.**  Plaintiff's various iterations of "Bucky" contain more than 60 characters.  *See, e.g.,* RJN, Ex. A (2004 Copyright Office deposit).  Plaintiff alleges that four of the characters (or character pairs) -- Bucky, Bucky's parents, Makani (a local elder), and the goddess Pele -- are copied in *Moana*.  At the outset, "[g]eneralized character types are not protected by copyright law."  *Bernal*, 788 F.

1   Supp. 2d at 1069.  "To be deemed protectable in the Ninth Circuit, characters must

2   meet a three-part test, including a requirement that they be 'especially distinctive.'"

3   *Esplanade Prods., Inc. v. Walt Disney Co.*, 2017 WL 5635027, at *12 (C.D. Cal.

4   Nov. 8, 2017) (citing *DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015)).

5   None of Bucky, his parents, or Makani are sufficiently distinctive for copyright

6   protection, and Pele is a public domain goddess who long predated "Bucky."

7   　　　Moreover, none of Bucky, Bucky's parents, Makani, or Pele, even if

8   protectable, is substantially similar to any characters in *Moana*.  Plaintiff alleges

9   that Moana is a carbon copy of Bucky because they are both "free spirits,"

10  "impatient and impulsive," and "rebellious."  Shimamoto Decl., Ex. 28 (Román

11  report) at 10-11.  These are stereotypical representations of teenagers, including

12  most every Disney princess that came before and after Moana.  In terms of actual

13  expression, Bucky and Moana are markedly *dissimilar*.  Bucky is white; Moana is

14  Oceanian.  Bucky is from the mainland U.S.; Moana is indigenous to the fictional

15  island of Motunui.  Bucky lives in the modern day; Moana lives millennia in the

16  past.  Bucky is an ordinary teen; Moana is the future chief of her people.  Rovin

17  Decl., Ex. B (Rovin rebuttal) at 7-10.  Bucky wants to learn to surf, while Moana

18  wants to continue her people's proud history as the greatest ocean voyagers the

19  world has ever known.  *Id.*

20  　　　Plaintiff argues that Moana's parents are substantially similar to Bucky's

21  parents because both sets of parents are "risk adverse and monitor the whereabouts

22  of their children."  *Id.*, Ex. 28 (Román report) at 15.  That is an idea, not

23  expression, and is perhaps as generic and stereotypical a description of parents as

24  one could imagine.  Rovin Decl., Ex. B (Rovin rebuttal) at 10.  Bucky's and

25  Moana's parents are otherwise nothing alike.  Bucky's parents are white, from the

26  mainland U.S., live in the modern day, and have no backstory whatsoever.  *Id.* at

27  10-11.  Bucky's parents do not want him to engage in a popular sport (surfing)

28  because he might injure himself or "get a rash."  *Id* at 25-26.  Moana's parents are

31

1    Oceanian, indigenous to the fictional island of Motunui, live millennia in the past,

2    are the island chief and his wife, and have a backstory that explains their insistence

3    that Moana not venture beyond the reef. *Id.* at 10-11. Moana's father does not

4    want Moana to engage in an activity (sailing beyond the reef) that is forbidden to

5    everyone on the island and threatens certain death. *Id.*, Ex. B (Rovin rebuttal) at

6    10-11; *see Olson v. Nat'l Broad. Co., Inc.*, 855 F.2d 1446, 1453 (9th Cir. 1988)

7    (finding no substantial similarity where characters were "thinly" drawn and

8    "differed in significant ways" from those in allegedly infringing work).

9       Plaintiff argues that Makani in "Bucky" and Gramma Tala in *Moana* are

10   substantially similar because they are both elders to whom the teenage protagonists

11   turn for guidance. Shimamoto Decl., Ex. 28 (Román report) at 15-16. That is a

12   generic idea, not expression. In their expressive particulars, the characters are

13   nothing alike. Makani is male; Gramma Tala is female. Bucky is not related to

14   Makani; Gramma Tala is Moana's grandmother. Rovin Decl., Ex. B (Rovin

15   rebuttal) at 11. They do not look alike, and they play entirely different roles in the

16   stories. *Id.*

17      Finally, Plaintiff claims that *Moana*'s land spirit Te Fiti is a copy of the

18   goddess Pele from "Bucky." *Id.*, Ex. 28 (Román report) at 17-19. Setting aside

19   the fact that Plaintiff has no proprietary rights in Pele, Te Fiti is markedly different

20   from the Hawaiian volcano goddess. Te Fiti is lush green and is composed entirely

21   of flora, and her Te Ka counterpart, although fiery, looks and behaves nothing like

22   Pele. Rovin Decl., Ex. B (Rovin rebuttal) at 15. Te Fiti/Te Ka also plays an

23   entirely different role in *Moana* than Pele in "Bucky." *Id.*

24      **Themes.** Plaintiff claims that *Moana* "echoes the main theme in *Bucky*:

25   Moana must be true to herself to find her destiny." Shimamoto Decl., Ex. 28

26   (Román report) at 34. That theme, which is common to most every Disney

27   princess movie and countless other movies involving a hero's journey, is not

28   remotely protectable. Rovin Decl., Ex. B (Rovin rebuttal) at 29; *see Esplanade*,

2017 WL 5635027, at *11 (themes about whether characters can become anything they set out to be, can overcome prejudices inherent in a diverse society, and can achieve success while upholding moral and ethical behavior are "abstract, generic and well-trodden, and thus unprotectable"); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 828 (9th Cir. 2002) ("The themes of teaching children to have confidence, to overcome their fears, and to try are not only too general to be protected but are also standard topics in children's literature.").

**Pace and Mood.**  Plaintiff argues that "Bucky" and *Moana* are substantially similar in pace and mood in that both are "fun and friendly," "high-spirited," and "highly entertaining," with the audience "confident that [the protagonist] will persevere."  Shimamoto Decl., Ex. 28 (Román report) at 33-34.  These generic descriptors are not protectable in the least.  Rovin Decl., Ex. B (Rovin rebuttal) at 29; *see Olson*, 855 F.2d at 1451 ("Both shows [*The A-Team* and *Cargo*] may be broadly described as comic, and they therefore have similar moods.  Both works are quickly paced.  However, these similarities are common to the genre of action-adventure television series and movies and therefore do not demonstrate substantial similarity.").  And the pacing of the two works is actually quite different, owing in part to the fact that *Moana*, unlike "Bucky," is a musical.

**Dialogue.**  Plaintiff claims that the dialogue in "Bucky" and *Moana* are substantially similar because the parents in both works warn their children that the ocean is "dangerous," the protagonists in both works are told to follow their hearts, and both works refer to the importance of storytelling.  Shimamoto Decl., Ex. 28 (Román report) at 31-32.  To support a claim of substantial similarity based on dialogue, a plaintiff must demonstrate "extended similarity of dialogue."  *Olson*, 855 F.2d at 1450.  Ordinary words and phrases and "[p]hrases [or] expressions conveying an idea typically expressed in a limited number of stereotyped fashions" are not protected.  *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989).  The instances of dialogue cited by Plaintiff are not extended and pertain to common

1  phrases or expressions, and therefore cannot support a finding of substantial

2  similarity.  Rovin Decl., Ex. B (Rovin rebuttal) at 25-29.

3      ***Sequence of Events.***  Although Plaintiff argues that "Bucky" and *Moana*

4  have the same sequence of events, Plaintiff does not substantiate that claim, and

5  instead points to random plot points or scenes that "Bucky" allegedly shares with

6  early storyboards for *Moana* or Musker and Clements' idea for a *different*

7  Polynesian-themed movie that would have incorporated a time-travel element.

8  Shimamoto Decl., Ex. 28 (Román report) at 36-37.  Those drafts and other works

9  are irrelevant to the copyright analysis.  "[T]he only relevant question . . . is

10  whether the final movie as filmed, edited, and released contains matter

11  substantially similar to protectable elements" of Plaintiff's work.  *Quirk v. Sony*

12  *Pictures Entm't Inc.*, 2013 WL 1345075, at *6 (N.D. Cal. Apr. 2, 2013); *see See v.*

13  *Durang*, 711 F.2d 141, 142 (9th Cir. 1983) ("Copying deleted or so disguised as to

14  be unrecognizable is not copying.").  In any event, "[t]he sequence of events refers

15  to the actual sequence of the scenes, not just having similar scenes out of

16  sequence," which is what Plaintiff alleges here.  *Bernal*, 788 F. Supp. 2d at 1072;

17  *see* Rovin Decl. Ex. A (Rovin report) at 138-154.

18      ***Combination of Unprotectable Elements.***  Plaintiff has also suggested,

19  drawing on *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002), that even if "Bucky"

20  and *Moana* are not substantially similar in any protectable expression, they are

21  nonetheless so similar in their combination of unprotectable elements as to create a

22  triable issue on infringement.  In *Metcalf*, the Ninth Circuit concluded that,

23  although the similarities between the works were not individually protectable, the

24  overall selection and arrangement of generic elements were so "striking" in their

25  similarities as to create a triable issue under the extrinsic test:

26      Both the Metcalf and Bochco works are set in overburdened county
        hospitals in inner-city Los Angeles with mostly black staffs.  Both deal
27      with issues of poverty, race relations and urban blight.  The works'
        main characters are both young, good-looking, muscular black
28      surgeons who grew up in the neighborhood where the hospital is

34

located.  Both surgeons struggle to choose between the financial
benefits of private practice and the emotional rewards of working in
the inner city.  Both are romantically involved with young professional
women when they arrive at the hospital, but develop strong attractions
to hospital administrators.  Both new relationships flourish and
culminate in a kiss, but are later strained when the administrator
observes a display of physical intimacy between the main character
and his original love interest.  Both administrators are in their thirties,
were once married but are now single, without children and devoted to
their careers and to the hospital.  In both works, the hospital's bid for
reaccreditation is vehemently opposed by a Hispanic politician.

*Id.* at 1073-74.  "Since *Metcalf* … courts within this circuit have been reluctant to
expand the concept of finding copyright protection for a pattern of unprotected
elements in literary works beyond the clear-cut case in *Metcalf.*"  *Counts*, 2015
WL 9594469, at *11; *see Esplanade*, 2017 WL 5635027, at *16 ("Courts routinely
decline to apply *Metcalf* when two works' unprotected elements are not arranged
in a strikingly similar fashion.") (collecting cases).

At the outset, any "selection and arrangement" theory by Plaintiff ignores
the fact that he is mixing and matching isolated elements from different versions of
"Bucky" prepared over a more than 13-year period.  There is no single version of
"Bucky" that contains the same selection and arrangement of elements that
Plaintiff contends *Moana* copied.  Moreover, even if the Court were to treat all
versions of "Bucky" as one, "Bucky" and *Moana* do not share nearly as many
generic similarities as the two works in *Metcalf*, and their generic similarities *"are,
in fact, markedly different when viewed in context."*  *Bernal*, 788 F. Supp. 2d at
1068.  The differences between the works "are vastly more substantial than the
similarities" and negate any claim of substantial similarity under *Metcalf*.  *Id.*; *see*
Rovin Decl., Ex. B (Rovin rebuttal) at 24.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court
grant their motion for summary judgment on all claims for relief.

1    Dated:  May 7, 2024                          HUESTON HENNIGAN LLP

2                                                 WILLENKEN LLP

3

4                                                 By: _/s/ Peter Shimamoto_____

5                                                     Peter Shimamoto
                                                      Attorneys for Defendants
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT