GERARD P. FOX (SBN 151649)
GERARD FOX LAW, P.C.
1880 Century Park E, Suite 1410
GERARD FOX LAW P.C.
Los Angeles, CA 90067
Tel: (310) 441-0500
Fax:(310) 441-4447
gfox@gerardfoxlaw.com

JAMES WES CHRISTIAN
(Admitted *Pro Hac Vice*)
CHRISTIAN ATTAR, LLC
2302 Fannin, Suite 500
Houston, Texas 77002
Tel.: (877) 710-5170
Fax: (713) 659-7641
jchristian@christianlevinelaw.com

GUSTAVO D. LAGE
EL'AD D. BOTWIN
(Admitted *Pro Hac Vice*)
SANCHEZ-MEDINA, GONZALEZ,
QUESADA, LAGE, GOMEZ &
MACHADO, LLP
1200 Brickell Avenue, Ste 950
Miami, Florida 33131
Tel.: (305) 377-1000
Fax: (786) 304-2214
glage@smgqlaw.com
ebotwin@smgqlaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BUCK G. WOODALL,<br><br>    Plaintiff,<br><br>vs.<br><br>THE WALT DISNEY COMPANY, et al.,<br><br>    Defendants. | **Case No.: 2:20-cv-03772-CBM-E**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [REDACTED VERSION]**<br>[Statement of Genuine Dispute, Declarations of Buck Woodall and Elad Botwin, Request for Judicial Notice, Application to Seal, and Notice of Manual Lodging filed concurrently herewith]<br><br>Hearing Date: July 30, 2024<br>Time: 10:00 a.m.<br>Courtroom: 8D<br><br>Discovery Cutoff: October 23, 2023<br>Pre-Trial Conference: August 6, 2024 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Trial Date: October 8, 2024

Assigned to Hon. Consuelo B. Marshall
Magistrate: Judge Charles F. Eick

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

Table of Authorities ................................................................................ ii

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 1

INTRODUCTION .................................................................................... 1

STATEMENT OF FACTS .......................................................................... 4

I.    THIS CASE IS NOT BARRED BY THE STATUTES OF
      LIMITATIONS. ............................................................................. 4

      A.    The Copyright Claims Are Not Time-Barred. ...................... 4

      B.    The Trade Secrets Claims Are Not Time-Barred. ............... 8

      C.    The Fraud Claims Are Not Time-Barred. .......................... 10

II.   THE EVIDENCE SUPPORTS PLAINTIFF'S TRADE SECRETS
      CLAIMS. ................................................................................. 11

III.  PLAINTIFF PRESENTS SUFFICIENT EVIDENCE OF FRAUD ............. 14

IV.   PLAINTIFF PRESENTS AN OVERWHELMING CASE OF
      COPYRIGHT INFRINGEMENT. ..................................................... 15

      A.    All Defendants Are Subject to Liability Under the Copyright
            Act………………………………………………………........... 15

      B.    Plaintiff's Access Theories Are Well-Supported. ............... 18

      C.    Defendants' "Independent Creation" Defense Is Refuted. ... 23

      D.    Defendants Fail to Rebut the Evidence of Substantial
            Similarity………………………………………………………30

      E.    Defendants' Thin Analysis Under the Extrinsic Test .......... 31

CONCLUSION ..................................................................................... 36

# **TABLE OF AUTHORITIES**

1

2

**Cases**

3

4

*A&M Records, Inc. v. Napster, Inc.*,
      239 F.3d 1004 (9th Cir. 2001) ......................................................... 16, 17

5

6

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
      722 F.2d 988 (2d Cir. 1983) ................................................................ 28

7

8

*AK Futures LLC v. LCF Labs Inc.*, 821CV02121JVSADS,
      2022 WL 17883832 (C.D. Cal. Dec. 7, 2022)...................................... 17

9

10

*Alfred v. Walt Disney Co.*,
      821 F. App'x 727 (9th Cir. 2020) ....................................................... 33

11

12

*Alfred v. Walt Disney Pictures*, CV 18-8074-CBM-ASX,
      2021 WL 6882322 (C.D. Cal. Dec. 16, 2021)...................................... 33

13

14

*Apple Computer, Inc. v. Microsoft Corp.*,
      35 F.3d 1435 (9th Cir. 1994) .............................................................. 32

15

16

*Arica Inst., Inc. v. Palmer*,
      761 F. Supp. 1056 (S.D.N.Y. 1991) .................................................... 29

17

18

*Baxter v. MCA, Inc.*,
      812 F.2d 421 (9th Cir. 1987) .............................................................. 33

19

20

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
      620 F.2d 1360 (9th Cir. 1980) ............................................................ 15

21

22

*Benay v. Warner Bros. Entm't*, CV058508PSGFMOX,
      2007 WL 9706129 (C.D. Cal. Apr. 25, 2007)........................................ 6

23

24

*Berkla v. Corel Corp.*,
      66 F. Supp. 2d 1129 (E.D. Cal. 1999) ................................................ 12

25

26

*Bethea v. Burnett*, CV04-7690JFWPLAX,
      2005 WL 1720631 (C.D. Cal. June 28, 2005)...................................... 29

27

28

*Bouchat v. Baltimore Ravens, Inc.*,
    241 F.3d 350 (4th Cir. 2001) ............................................................. 23

*Bradford v. State of Washington*, 3:12-CV-05366-KLS,
    2015 WL 8208016 (W.D. Wash. Dec. 7, 2015) ....................................... 8

*Britz Fertilizers, Inc. v. Bayer Corp.*,
    665 F. Supp. 2d 1142 (E.D. Cal. 2009) ................................................ 20

*Choate v. Cnty. of Orange*,
    103 Cal. Rptr. 2d 339 (Ct. App. 2000) ................................................ 15

*Corp. v. Apple Inc.*, SACV2000048JVSJDEX,
    2022 WL 2177451 (C.D. Cal. Feb. 17, 2022) ..................................... 8, 9

*Corwin v. Walt Disney Co.*, 602CV1377ORL19KRS,
    2004 WL 5486639 (M.D. Fla. Nov. 12, 2004) ...................................... 29

*Cypress Semiconductor Corp. v. Superior Ct.*,
    163 Cal. App. 4th 575 (Cal. App. 2008) ................................................ 9

*Data E. USA, Inc. v. Epyx, Inc.*,
    862 F.2d 204 (9th Cir. 1988) .............................................................. 31

*Dimmie v. Carey*,
    88 F. Supp. 2d 142 (S.D.N.Y. 2000) .................................................... 29

*DocuSign, Inc. v. Clark*, 21-CV-04785-WHO,
    2022 WL 18956601 (N.D. Cal. Sept. 27, 2022) .................................... 12

*Donahue v. United Artists Corp.*,
    2 Cal.App.3d 794 (1969) ...................................................................... 8

*Eidson v. Medtronic, Inc.*,
    40 F. Supp. 3d 1202 (N.D. Cal. 2014) ................................................. 10

*Esplanade Prods., Inc. v. The Walt Disney Co.*,
    93 Cal. App. 5th 793 (2023) ......................................................... 18, 30

*Esplanade Prods., Inc. v. Walt Disney Co.*, No. CV1702185MWFJCX,
    2017 WL 5635024 (C.D. Cal. July 11, 2017) ....................................... 33

*Factory Mut. Ins. Co. v. One Source Logistics, LLC,* LACV1606385JAKJPRX,
    2017 WL 2608867 (C.D. Cal. May 5, 2017) ........................................... 20

*Finney v. Ford Motor Co.*, 17-CV-06183-JST,
    2018 WL 2552266 (N.D. Cal. June 4, 2018) ...................................... 10

*Fox v. Ethicon Endo-Surgery, Inc.,*
    35 Cal. 4th 797 (Cal. 2005) ................................................... 9

*Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.,*
    886 F.2d 1545 (9th Cir. 1989) ................................................ 24

*Garrett v. City & Cnty. of San Francisco,*
    818 F.2d 1515 (9th Cir. 1987) ................................................ 17

*Gessele v. Jack in the Box Inc.*, 3:10-CV-00960-BR,
    2013 WL 4542033 (D. Or. Aug. 27, 2013) .................................... 8

*Gilbert v. New Line Productions, Inc.*, CV 09-02231 RGK,
    2010 WL 5790628 (C.D. Cal. Aug. 13, 2010) ................................ 30

*Gray v. Perry*, 215CV05642CASJCX,
    2018 WL 3954008 (C.D. Cal. Aug. 13, 2018) ................................ 28

*Grisham v. Philip Morris U.S.A., Inc.,*
    40 Cal. 4th 623 (2007) ....................................................... 10

*Herbert Rosenthal Jewelry Corp. v. Kalpakian,*
    446 F.2d 738 (9th Cir. 1971) ................................................. 28

*In re Animation Workers Antitrust Litig.,*
    123 F. Supp. 3d 1175 (N.D. Cal. 2015) .................................. 14, 15

*Intermedics, Inc. v. Ventritex, Inc.,*
    822 F. Supp. 634 (N.D. Cal. 1993) ........................................... 13

*Invisible Dot, Inc. v. DeDecker*, 218CV08168RGKRAO,
    2019 WL 1718621 (C.D. Cal. Feb. 6, 2019) ................................. 15

*Jolly v. Eli Lilly & Co.,*
    44 Cal. 3d 1103 (1988) ..................................................... 8, 9

---

*Jorgensen v. Epic/Sony Records*,
    351 F.3d 46 (2d Cir. 2003) ..................................................................... 23

*Kaseberg v. Conaco, LLC*,
    260 F. Supp. 3d 1229 (S.D. Cal. 2017) .......................................... 24, 27

*Kennedy v. Allied Mut. Ins. Co.*,
    952 F.2d 262 (9th Cir. 1991) ................................................................ 22

*Kittrich Corp. v. Chilewich Sultan, LLC*, No. CV1210079GHKARGX,
    2013 WL 12131376 (C.D. Cal. Feb. 20, 2013) ................................... 13

*Kootenia Homes, Inc. v. Reliable Homes, Inc.*, CIV. 00-1117ADMAJB,
    2002 WL 15594 (D. Minn. Jan. 3, 2002) ............................................ 29

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991) ................................................................ 12

*Long v. Walt Disney Co.*,
    116 Cal. App. 4th 868 (2004) ................................................................ 7

*Luvdarts, LLC v. AT&T Mobility, LLC*,
    710 F.3d 1068 (9th Cir. 2013) .............................................................. 17

*Maharam v. Patterson*, 04 CV 9569KMW,
    2007 WL 2702195 (S.D.N.Y. Sept. 17, 2007) ................................... 29

*Masimo Corp. v. Apple Inc.*, No. SACV2048JVSJDEX,
    2021 WL 925885 (C.D. Cal. Jan. 6, 2021) ......................................... 14

*McGaughey v. Twentieth Century Fox Film Corp.*,
    12 F.3d 62 (5th Cir. 1994) .................................................................... 29

*McIntyre v. BP Expl. & Prod., Inc.*, No. 3:13-CV-149 RRB,
    2015 WL 999092 (D. Alaska Mar. 5, 2015) ...................................... 12

*Meta-Film Associates, Inc. v. MCA, Inc.*,
    586 F. Supp. 1346 (C.D. Cal. 1984) .................................................... 19

*Metcalf v. Bochco*,
    294 F.3d 1069 (9th Cir. 2002) ......................................... 3, 33, 34, 35

*Morford v. Cattelan*, 21-20039-CIV,
    2023 WL 3971968 (S.D. Fla. June 12, 2023)........................................................ 29

*NBCUniversal Media, LLC v. Superior Ct.*,
    225 Cal. App. 4th 1222 (2014)................................................................................ 8

*Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.*, 223CV02147SVWAGR,
    2023 WL 8948288 (C.D. Cal. Dec. 7, 2023)........................................................ 32

*Norgart v. Upjohn Co.*,
    21 Cal. 4th 383 (1999)............................................................................................ 9

*Shaw v. Lindheim*,
    919 F.2d 1353 (9th Cir. 1990)............................................................................. 35

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
    81 F.2d 49 (2d Cir. 1936)..................................................................................... 28

*Smart Inventions, Inc. v. Allied Communications Corp.*,
    94 F. Supp. 2d 1060 (C.D. Cal. 2000)................................................................. 32

*Stabile v. Paul Smith Ltd.*,
    137 F. Supp. 3d 1173 (C.D. Cal. 2015)............................................................... 25

*Swirsky v. Carey*,
    376 F.3d 841 (9th Cir. 2004)............................................................................... 31

*UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*,
    617 F. Supp. 2d 938 (N.D. Cal. 2007)................................................................. 14

*United Fabrics Int'l, Inc. v. J. C. Penney Corp., Inc.*, CV 08-1936-VBF(PJWX),
    2009 WL 10674938 (C.D. Cal. Apr. 10, 2009).................................................. 25

*Universal Pictures Co. v. Harold Lloyd Corp.*,
    162 F.2d 354 (9th Cir. 1947)............................................................................... 34

*Vint v. Universal Studios Co. LLC*, CV 20-6787-GW-MRWX,
    2021 WL 6618535 (C.D. Cal. Apr. 29, 2021)....................................................... 6

*Warner Chappell Music, Inc. v. Nealy*, No. 22-1078,
    2024 WL 2061137 (U.S. May 9, 2024)............................................................ 1, 7

*Zella v. E.W. Scripps Co.*,
   529 F. Supp. 2d 1124 (C.D. Cal. 2007) ................................................................ 30

**Rules**

Fed.R.Civ.P. 56(d) ........................................................................................... 17

**Treatises**

3 M. Nimmer, *Nimmer on Copyright* (1983) .......................................... 24, 28

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The Defendants initially attempt to sidestep the discovery accrual rule that the U.S. Supreme Court reaffirmed earlier this month in *Warner Chappell Music, Inc. v. Nealy*, No. 22-1078, 2024 WL 2061137, at *3 (U.S. May 9, 2024) by fixating on the outlandish theory that Plaintiff Buck Woodall ("Plaintiff") should have discovered his claims before *Moana* even existed as a final film. Defendants try to mount this defense by saying Plaintiff's discovery should have occurred based on public teasers about *Moana* disseminated by the Defendants well before the film was released.  The problem is that these public teasers revealed virtually nothing about the plot and ironically also contained elements that never made the final cut, thus leaving the public with a misleading impression of what the film was about, even at this most breviloquent level of publication. Defendants' strategy is no mistake, despite risking the forfeiture of the right to raise a less fantastical statute-of-limitations theory: Defendants are painfully aware of the reality that only if Plaintiff should be deemed to have purportedly been in a position to discover his claims prior to the release of *Moana* could Defendants have a chance to substantially escape liability under the discovery rule. But the law does not support such an absurd result, and the facts undisputedly establish that this action is not time-barred.

Defendants' swipe at Plaintiff's trade secrets claims is no less of a headscratcher. Focusing heavily on whether Jenny Marchick ("Marchick") signed a particular confidentiality agreement, Defendants overlook the reality that (a) Marchick does not dispute receiving the confidentiality agreement in the mail from Plaintiff and knew Plaintiff would not share his works without an understanding that his works were not to be improperly used; (b) Marchick conceded that she would never accept Plaintiff's works prior to completing the "paperwork," which paperwork incontrovertibly contained analogous promises of secrecy; (c) a written agreement is not required to support any of Plaintiff's claims; and (d) to date,

1    Defendants have presented no undisputed evidence that Marchick did not sign the
2    confidentiality agreement. As to the remaining claims of secrecy, Defendants
3    equally fail to meet their burden of proof, positing, for example, that seconds of
4    fragments from a portion of the then-unfinished *Bucky* trailer airing to a narrowly
5    defined TV audience in Hawaii somehow amounts to disclosure of trade secrets to
6    "the relevant people." Defendants' remaining evidence fails to establish what they
7    want it to establish.

8        Defendants, next, insist that only Marchick would be liable for fraud, which
9    conflicts, however, with the standard for conspiracy in the Ninth Circuit, which
10   recognizes that different parties might perform different tasks to bring about the
11   desired result, even if direct participation in the misrepresentation or omission is not
12   shown. Similarly, the facts clearly demonstrate that all of the Defendants are liable
13   for copyright infringement under well-settled theories of liability: (i) as a party to
14   the distribution chain; (ii) as a contributory infringer; (iii) as a vicarious infringer;
15   and/or (iv) as an indirect infringer of *Moana*-related goods/services which enhance
16   market recognition.

17       Though Defendants notably do not challenge access to Bucky materials
18   registered in 2004, which alone precludes summary judgment in Defendants' favor,
19   they briefly touch on Plaintiff's other access theories and mistakenly believe that a
20   copyright plaintiff must prove actual access and receipt of a plaintiff's materials,
21   though it is well-established that such evidence is rarely available and, thus, a
22   copyright plaintiff need only circumstantially establish a chain of events showing
23   that defendants had a reasonable opportunity to view plaintiff's works. Plaintiff more
24   than sufficiently met this burden in his Cross-Motion for Summary Judgment,
25   including in showing how the paths of Plaintiff's agents and key creative executives
26   working on *Moana* crossed on several occasions in connection with *Bucky*, including
27   when Walt Disney Animation Studios ("WDAS") was in turmoil, and the curious
28

1  identicalities in *Moana* and *Bucky* confirm that the similarities between the works
2  are no coincidence.

3      As expected, Defendants present solely "self-interested" declarations
4  avouching for the allegedly independent creation of *Moana*. This is not the case,
5  however, where Defendants' self-interested declarations remain unrebutted. Not
6  only is the independent creation defense refuted by competent evidence and expert
7  testimony, but virtually nothing stated in Defendants' concerted narrative ultimately
8  conflicts with the evidence of copying. To the contrary, admissions made by key
9  WDAS witnesses perfectly complete this picture and tell the true story of how it
10  came about that WDAS was rescued from its well-documented creative dry spell, by
11  a team that has never made a film not based on an existing fairytale and that

12  ████████████████████████████████████████████████████████████████

13  ████████████████████████████

14      Under the extrinsic test, Defendants urge the Court to disregard expert
15  opinions, in direct conflict with this Court's ruling on April 14, 2021 (DE90:10).[1]
16  Alternatively, Defendants protest that Plaintiff unfairly "mixes and matches" based
17  on several *Bucky* materials, but the case they cite is completely distinguishable. In
18  fact, other cases Defendants heavily rely on also involved various pitch materials, as
19  is oftentimes the case. Finally approaching the extrinsic test itself, Defendants have
20  little to offer, aside from conclusory claims that are contradicted by detailed expert
21  opinions. Defendants then try to distinguish this case from *Metcalf v. Bochco,*[2] but
22  the comparison highlights, rather, how much more profound the similarities are in
23  this case—from opening to closing scene.

24      Having woefully failed to meet their burden of proof as to their affirmative
25  defenses, Defendants' Motion for Summary Judgment should be denied.

26

27  [1] "DE" refers to docket entries in this matter, followed by page numbers of the
documents, where applicable.
28  [2] 294 F.3d 1069, 1073-75 (9th Cir. 2002).

**STATEMENT OF FACTS**

In the interest of judicial economy, and to avoid unnecessary repetition, Plaintiff respectfully refers to the Statement of Facts contained in his Cross-Motion for Partial Summary Judgment (DE432, section 2).

**ARGUMENT**

**I.    This Case Is Not Barred by the Statutes of Limitations.**

**A. The Copyright Claims Are Not Time-Barred.**

No court has ever held that a plaintiff could reasonably discover a copyright claim as to a film that *does not even exist* yet, let alone has not been released, which is what Defendants' statute-of-limitations arguments boil down to. Ironically, this case could not be a more ideal vehicle to demonstrate why Defendants' novel theory defies common sense and has never been accepted as a viable defense. Defendants, tellingly, fail to disclose to this Court what precisely was announced by Disney from late 2014 through 2016 about *Moana*, and the damning truth is not merely that almost nothing about the plot was revealed. Remarkably, WDAS was in fact still making substantive changes to *Moana* "until the last minute," Ex. 6, Declaration of Elad Botwin, filed herewith ("Botwin Decl."), at 00:21:33-00:21:37, and, as a consequence, plot elements that did not survive into the final film were referenced by Disney. For example, in the published film, *Moana* does not truly search for a "fabled island," as announced in 2014, and the "enormous sea creatures" referred to before *Moana's* release was comprised of a later-scrapped scene involving a giant 8-eyed bat that was still well and alive when these "advertisements" were published. Exhs. 1-5, 7-9, Botwin Decl. Similarly, ahead of *Moana's* release during the Defendants' purported "discovery" period, Disney published imagery presumably from the film that never in fact appeared in the film. For example, the *Moana* team was interviewed in front of a giant mural of a lava monster that does not resemble Te Kā. This scrapped rendition appears in *The Art of Moana* (2016) as a version of Te Kā that was never used in the final film. Ex. 4, Botwin Decl. At most, this

evidence unequivocally proves why Plaintiff could not possibly have discovered his claims before the full film was completely accessible to him.

The few other references to the plot before the film was released, such as that *Moana* sets sail to "complete her ancestors' quest" and encounters "enormous fiery creatures" (though only one such creature appears in *Moana*) are far too ambiguous to place Plaintiff on any reasonable notice. Similarly, though Defendants do not raise this argument, the first trailer for *Moana*, released in June of 2016, spills very little of the film, Ex. 10, Botwin Decl., and even the extended trailer later released (which Defendants lodged with the Court) is extremely fast-paced and does not give away the storyline. This makes perfect sense because a film studio tends to *tease* its target audience, rather than publish the substance of the film in promotional materials.

The fatal fallacy in Defendants' rationale is easily demonstrated via the following hypothetical scenarios: According to the Defendants, in a situation where a studio releases oblique fragments of a film in "advertisements" but then does not release the film for another four years, a plaintiff is simply down on his/her luck if that plaintiff's copyright was infringed. Alternatively, as Defendants imply, a plaintiff is forced to prepare a lawsuit based on shreds of similarities that are, unbeknownst to him/her, scrapped years later, or misconceived by plaintiff because they are taken out of context, and the complaint fails if plaintiff cannot fill the necessary gaps in the material facts that he/she was not privy to, exposing plaintiff to Rule 11 sanctions. Put differently, when not even the filmmakers themselves know what the final film will look like, a plaintiff could not be charged with such "knowledge" of facts that do not even exist yet. Thus, Defendants' irrational reading of the "suspicion" discovery rule has no place in this context and finds no judicial support whatsoever. No court has ever held that a plaintiff could discover his claim prior to release of the film, let alone prior to the *completion* of the film. Rather, as a matter of law, the first *possible* date of discovery occurs on the date of publication, whereafter the question is raised germane to the case at bar: When did the public and

plaintiff as part of that public have access to the film? In this case, this necessarily includes the question of when Plaintiff had access to the film in the language he understood.

The only court that addressed a pre-release discovery argument involving a film declined to award summary judgment to defendants. *Benay v. Warner Bros. Entm't*, CV058508PSGFMOX, 2007 WL 9706129 (C.D. Cal. Apr. 25, 2007) involved, in part, the pre-release communications between a plaintiff and his brother voicing "unconfirmed suspicions" that the film copied from plaintiff's work as purportedly evidencing that "the cause of action accrued before the release date [of the film, *The Last Samurai*]." *Id.,* at *2, 3. The court found triable issues of fact based on other evidence, *to wit*, plaintiff's *counsel's* settlement negotiations with defendants prior to the release of the film and a question not at issue here: Whether plaintiff alleged that defendants produced *and* "distributed" the film. *Id*., at *3.

The Defendants' related argument about Plaintiff's good faith beliefs about his statute of limitations-duties during the pre-release period of *Moana* are equally unavailing. It is well-settled that a plaintiff/layman's beliefs when the statute of limitations might run are of no probative relevance, particularly before the subject film has even been released. Defendants essentially urge this Court to adopt the false presumption that Plaintiff in this case purportedly "knew" the pertinent authorities governing the statute of limitations, as a layperson, DE430:8, and further urge this Court to adopt an incorrect discovery rule as to films not yet released. It is the law, not Plaintiff's untrained viewpoint at the time, that governs, especially where the available pre-release information is limited and misleading, as in this case. In short, the first possible date of discovery in a copyright case involving a film could not pre-date the date of the release of the film to the public, of which the plaintiff is a member. *See, e.g., Vint v. Universal Studios Co. LLC,* CV 20-6787-GW-MRWX, 2021 WL 6618535, at *3 (C.D. Cal. Apr. 29, 2021) ("[t]he statute of limitations period for Plaintiff's claim began to run when *Back to the Future* was publicly

released"); *Long v. Walt Disney Co.*, 116 Cal. App. 4th 868, 874-75 (2004) (first possible date of discovery occurred "when the images at issue were broadcast on national television and therefore publicly available").

Importantly and as a matter of common sense, this question is not answered here by ascertaining the public release date of *Moana* in the United States for the simple and undisputed reasons that Plaintiff (a) lived in Mexico at the time; (b) understood nearly none of the Spanish language; (c) did not understand the Spanish-dubbed version of *Moana*; (d) and thus had no choice but to wait for the English version of *Moana* to become accessible to him in Mexico. That release date fell on March 7, 2017, for a receipt by mail on May 15, 2017, as shown by the undisputed evidence. DE434, ¶¶4-7; DE433, ¶¶306-315. The final question, then, is whether Plaintiff would also be entitled to profits Defendants received from March 15, 2017, through April 24, 2017. The unrefuted evidence shows that comparing the two works in this case is not an overnight task and began with Plaintiff having to dig up *Bucky* materials dating back to 1998, before he could even begin to carefully dissect the many complex similarities. DE434, ¶7.

Plaintiff respectfully submits that Defendants' complete refusal to explore these questions—which are the only pertinent questions at hand as to discovery—is no oversight. Defendants are well-aware of the weakness of their statute-of-limitations defenses and that a copyright plaintiff is, in any event, entitled to damages incurred prior to the reasonable discovery of his claims, as re-affirmed by the Supreme Court mere days ago. *See*, *Warner Chappell*, 2024 WL 2061137, at *3, affirming availability of "damages going back more than three years," *id*., at *2, in a copyright case involving a ten-year delay in bringing suit from the date of release of a hit song, as a result of plaintiff being in and out of prison, Ex. 25, Botwin Decl. In the face of these principles, Defendants believe that their pre-release "suspicion" theory is the only way they might escape the discovery accrual rule and liability for damages, given that a bulk of profits were incurred when the film was released.

Having failed to pursue or meet their burden as to any alternative statute-of-limitations defenses, though no such alternative theory would be viable, Defendants have thereby forfeited the defense.[3]  Irrespective of waiver, the law favors Plaintiff's showing of reasonable discovery, which is why Defendants cited none of it. *See also, e.g., NBCUniversal Media, LLC v. Superior Ct.,* 225 Cal. App. 4th 1222, 1234 (2014) (discovery occurs when the TV show "became accessible to plaintiff to the same degree as it was accessible to every other member of the public"); *Donahue v. United Artists Corp.,* 2 Cal.App.3d 794, 802 (1969) (holding that the entire film must have been accessible to a "substantial segment of the public")—in this case to each member of the English-speaking public in the Mexico.

## B. The Trade Secrets Claims Are Not Time-Barred.

Defendants also rely on the "suspicion of wrongdoing" caselaw they cite in asserting that the trade secrets claims are time-barred, DE403:11, but they, again, omit the standard governing the "suspicion" rule. Indeed, the "suspicion" rule applies only if "a timely investigation would have disclosed" the facts necessary to bring suit. *Jolly v. Eli Lilly & Co.,* 44 Cal. 3d 1103, 1112–13 (1988). *See also, Corp. v. Apple Inc.,* SACV2000048JVSJDEX, 2022 WL 2177451, at *2 (C.D. Cal. Feb. 17, 2022) (Selna, J.) (same). In the trade secrets context, much like in the copyright infringement context, this duty is not triggered until, at a minimum, the trade secret is published and accessible to plaintiff, as expressly held, for example, in *Apple. Id.*, at *2 (duty to investigate was not triggered because "no confidential information was

---

[3] *Compare, e.g., Bradford v. State of Washington*, 3:12-CV-05366-KLS, 2015 WL 8208016, at **6, 8 (W.D. Wash. Dec. 7, 2015) (concluding that "[p]laintiff … was well aware of the factual basis for defendants' statute of limitations defense long before defendants filed their summary judgment motion," because defendants amended their answer to include factual basis of statute-of-limitations defense; otherwise, affirmative defense waived for purposes of trial or summary judgment proceedings where defendant's "conduct [is] inconsistent with a later assertion of the [affirmative] defense"); *Gessele v. Jack in the Box Inc.*, 3:10-CV-00960-BR, 2013 WL 4542033, at *1 (D. Or. Aug. 27, 2013) (striking "precautionary defense without a sufficient factual basis").

published" yet). In *Apple*, Judge Selna aptly rejected the very same defense advanced

by Defendants here, noting that defendant

> relies heavily on the assertion that 'a suspicion of wrongdoing'
> is sufficient to start the statute of limitations clock. … The
> "suspicion of wrongdoing" language comes from *Jolly v. Eli
> Lilly & Co.*, 44 Cal. 3d 1103, 751 P.2d 923 (Cal. 1988),[4] a
> personal injury suit brought by a plaintiff who suffered cancer
> as a result of an anti-miscarriage drug her mother took while the
> plaintiff was in utero. … Apple overlooks a critical distinction
> between the plaintiff in *Eli Lilly* and the Plaintiffs here. There,
> the plaintiff knew she had suffered injury, so it was up to her to
> seek redress against the cause of that injury. … [M]ere
> suspicion that misappropriation may or may not have occurred
> provides an insufficient basis under Rule 11 to file suit. …
> Although definitive knowledge is not required, absent actual
> injury, being suspicious of circumstances and watching for
> signs of misappropriation (or lack thereof) does not provide
> such a basis.

*Id.,* at *4–5 (citing, e.g., *Cypress Semiconductor Corp. v. Superior Ct.,* 163 Cal. App.

4th 575, 587 (Cal. App. 2008) ("the misappropriation that triggers the running of the

statute is that which the plaintiff suspects [based on facts], not that which *may or

may not actually exist*."); *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 815

(Cal. 2005) (cautioning would-be plaintiff concerning possibility of "sanctions for

filing a cause of action without any factual support")).

Ironically, under the Defendants' proposed standard for substantial similarity,

the shreds of information released about *Moana* prior to its release (a good portion

of which was misleading), in isolation, would have never permitted Plaintiff to

---

[4] Also relied on by Defendants here, DE430:11. *Norgart v. Upjohn Co.,* 21 Cal. 4th
383, 391 (1999) (DE430:11) is part of the *Eli Lilly* line of cases. In both cases, the injurious
event already occurred: death or injury. *Id.* In contrast, the defendant's publication of a
trade secret is the very first possible event that could trigger "a reasonable investigation
[which] would produce facts sufficient to confirm this suspicion []and justify bringing
suit," *Apple*, 2022 WL 2177451, at **2, 5, and "publication" in this context means it must
have been "accessible" to Plaintiff and the English-speaking public.

successfully bring a claim against Defendants. And, as discussed, *supra*, the suggestion that Plaintiff simply would have had no redress if WDAS had not released the film for another 4 years after its 2014 teasers would obviously yield absurd results.

Defendants briefly address Plaintiff's receipt of the *Moana* DVD in English on March 15, 2017, but present no evidence or arguments that would reasonably dispute Plaintiff's showing that he discovered his claims in June of 2017, though he needed to justify only the first month thereof (DE1). DE434, ¶¶4-7; DE433, ¶¶306-315. But even if the Court found that Defendants' conclusory protestation raises a legitimate factual dispute—though it boils down to mere conjecture as to how long it should have taken Plaintiff to discover his claims after receipt of the DVD, a showing that cannot be attempted for the first time in a reply—summary judgment in Defendants' favor would nevertheless be inappropriate. *See, e.g., Eidson v. Medtronic, Inc.*, 40 F. Supp. 3d 1202, 1218 (N.D. Cal. 2014) (summary judgment is only proper when "reasonable minds can draw only one conclusion from the evidence") (citation omitted).

## C. The Fraud Claims Are Not Time-Barred.

For the same reasons, the fraud claims are not untimely. Again, Plaintiff could not have discovered what was not accessible to him yet, let alone what did not even exist yet at the time. Moreover, Defendants' fraudulent concealment further tolled the statutes of limitations as to each claim because the misrepresentations and fraud by omission leading back to the early 2000s about Defendants' intentions for Plaintiff's works were designed to plant seeds of doubt into Plaintiff's mind. "The fraudulent concealment doctrine holds that '[a] defendant's fraud in concealing a cause of action against him will toll the statute of limitations, and that tolling will last as long as a plaintiff's reliance on the misrepresentations is reasonable.'" *Finney v. Ford Motor Co.*, 17-CV-06183-JST, 2018 WL 2552266, at *3 (N.D. Cal. June 4, 2018) (citing *Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 744 (2007)).

## II.    The Evidence Supports Plaintiff's Trade Secrets Claims.

Defendants assert that Marchick was "under no obligation to protect the confidentiality of the information" Plaintiff provided to her, DE430:12, but the only evidence cited in support of this claim is the purported absence of a written confidentiality agreement. As previously demonstrated, Defendants' accusations surrounding the Confidentiality Agreement Plaintiff believed in good faith[5] was signed by Marchick is ultimately a red herring to the merits of this case. As an initial matter, Defendants incorrectly infer that Plaintiff's counsel was somehow involved in a ruse, DE430:9. Plaintiff already debunked these accusations under oath. DE221-4, ¶2. Thus, the "fraud on the Court" is, at most, being perpetrated by Defendants advancing false representations, designed to distract from the true fraud at issue in this case: Defendants' orchestrated misstatements and fraudulent omissions about Malone's interactions with Marchick, the pitches to "Disney TV," the Disney FedEx account number in Plaintiff's possession, and the cover-up of the facts surrounding WDAS' miraculous rescue from the "shocking" "chaos" and "dysfunction[]" it was facing at the time. DE441-38:9.

Moreover, the only handwriting expert in this case disagrees with the Defendants' interpretation of the questioned document,[6] DE438, and Pearl Young testified that she does *not* remember signing that document (Ex. 24, Botwin Decl., at 10:1-4) ("I don't remember signing it, but it does look like my signature when I was a teenager"), *id*., at 11:24—12:4 ("I do not remember signing it"). Even if the signature is that of a person named Pearl Young, Plaintiff would likely not have produced the other document Pearl Young allegedly signed, causing Defendants to

---

[5] If Plaintiff had had any intention to actively mislead anyone about the document, he presumably would not have readily disclosed, during his deposition, that he added the handwriting below and next to the signature he believed was that of Jenny Marchick, for his record-keeping. DE441-6 (Tr. 161:10-13, 164:19:21, *see* 161:1—169:13).

[6] Notably, to this date, Defendants never presented rebuttal expert opinions and declined to depose Plaintiff's handwriting expert, DE438.

depose her, if Plaintiff had truly intended to mislead the Court, Defendants, and his counsel of record. The bottom line is that Plaintiff's 2004 cover letter, which Marchick acknowledged she received, undisputedly proves that Plaintiff asked Marchick to keep his works confidential and that Plaintiff would not share his works unless she agreed to keep them confidential. *See*, Plaintiff's Statement of Genuine Dispute, filed herewith ("SGD"), at ¶6. Finally, Marchick herself repeatedly conceded that she never reviewed any *Bucky* works without first getting "the paperwork in order." *Id*. An example of such paperwork, DE434-8, contains an analogous promise not to improperly use or disseminate *Bucky* materials. In sum, Defendants' inflammatory attack on the integrity of Plaintiff and his counsel is clearly a diversionary tactic and smacks of bad faith. Apart from the fact that the only handwriting expert in this case disagrees with the Defendants' allegation, whether a confidentiality agreement was signed is ultimately immaterial because an "express or an implied understanding of confidentiality" can "sufficiently establish[] the existence of a trade secret." *McIntyre v. BP Expl. & Prod., Inc.,* No. 3:13-CV-149 RRB, 2015 WL 999092, at *4 (D. Alaska Mar. 5, 2015), *aff'd*, 697 F. App'x 546 (9th Cir. 2017).[7]

As to the 2011 trade secret, as Plaintiff already explained, the 2011 script is alleged to be a trade secret under the head-start doctrine. *See, e.g., Lamb-Weston, Inc. v. McCain Foods, Ltd.,* 941 F.2d 970, 975 (9th Cir. 1991) (discussing head-start advantage from date of misappropriation to publication of patent); *Intermedics, Inc.*

---

[7] A confidentiality agreement is also not required to support Plaintiff's other causes of action. *See, Berkla v. Corel Corp.,* 66 F. Supp. 2d 1129, 1150 (E.D. Cal. 1999) ("[t]ort-like copyright infringement claims … do not require a promise by the defendant to refrain from using protected subject matter"); *DocuSign, Inc. v. Clark,* 21-CV-04785-WHO, 2022 WL 18956601, at *6 (N.D. Cal. Sept. 27, 2022) (holding that "[t]he 'essence' of a confidential relationship [as an element of a fraud claim] is [not a confidentiality agreement but] 'that the parties do not deal on equal terms, because the person in whom trust and confidence is response and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party'") (citation omitted).

*v. Ventritex, Inc.*, 822 F. Supp. 634, 642 (N.D. Cal. 1993) ("The holder of a genuine trade secret enjoys a head start that it would lose if a competitor learned its secret.").

As to the *Bucky* trailer, Defendants concede that it never aired on the Hawaiian channel as a full trailer, DE430:13, and never to a large demographic, nor was the trailer even completed at the time. It briefly aired as fragmented outtakes a viewer would not be able to piece together as a comprehensive story within the few seconds they aired. SGD, ¶¶8-9. Additionally, Defendants fail to disclose the average views for the *Hawaiian's Reel Stories* program on the small local channel it aired, OC16. The channel is not among the top local TV networks and caters to a small demographic of mostly or exclusively non-members of the film industry. Id. (showing that the population of Hawaii in 2006 was 1,285,498; OC16 not among the seven most-watched channels; the seventh most-watched outlet has few visits a month; and that, Hawaiian film productions are near-non-existent). As such, Defendants did not and cannot show that Plaintiff's trade secrets reached "the relevant people." *Kittrich Corp. v. Chilewich Sultan, LLC,* No. CV1210079GHKARGX, 2013 WL 12131376 at *4 (C.D. Cal. Feb. 20, 2013).

Finally, Defendants advance unsupportable claims as to Plaintiff's ability to prove Defendants' receipt of his trade secrets, falsely claiming, for example, that "Plaintiff does not have any evidence, other than his bare allegation, that Marchick ever received the 2008 trailer" or that there is no evidence that any of the non-Marchick Defendants received the trade secrets. DE430, at 14 & n3. Not only did Marchick expressly admit at her deposition to having watched the *Bucky* trailer, DE441-1, at 258:22-24, but the evidence also shows that Marchick told Plaintiff that her bosses and Disney directors wanted to see a trailer for *Bucky*. DE434-2, at 2, 3, 5; DE441-6, 122:12-18, 141:7-15. While Marchick now understandably denies these facts, she tellingly never disputed them in response to Plaintiff's 2016 emails reminding her of these events, nor did she ever testify that she lied to Plaintiff in her written promises to show *Bucky* materials to her "bosses" and directors at Disney.

1  DE434-2, at 2, 3, 5; Ex. 1, Botwin Decl. in support of Plaintiff's Cross-Motion

2  ("ISM") (Marchick Tr., to be sealed), at 301:11-15 ("Document speaks for itself"),

3  at 245:23—246:4 (same). Contrary to Defendants' inferences, Plaintiff need not

4  directly prove access by each Defendant. "Circumstantial evidence is particularly

5  appropriate in trade secret cases[.]" *UniRAM Tech., Inc. v. Taiwan Semiconductor*

6  *Mfg. Co.,* 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007). It is well recognized with

7  respect to trade secrets that:

> [m]isappropriation and misuse can rarely be proved by
> convincing direct evidence. In most cases plaintiffs must
> construct a web of perhaps ambiguous circumstantial evidence
> from which the trier of fact may draw inferences which
> convince him that it is more probable than not that what
> plaintiffs allege happened did in fact take place. Against this
> often delicate construction of circumstantial evidence there
> frequently must be balanced defendants and defendants'
> witnesses who directly deny everything.

14  *Id. See also*, *Masimo Corp. v. Apple Inc.*, No. SACV2048JVSJDEX, 2021 WL

15  925885, at *7 (C.D. Cal. Jan. 6, 2021) (explaining that, in a trade secret case, "the

16  Court must consider the entire sequence of events in context, and not the individual

17  allegations in isolation").

### III.   Plaintiff Presents Sufficient Evidence of Fraud.

19          Defendants' position that the fraud and fraudulent concealment claims apply,

20  at most, to Marchick has long been rejected by Courts in analogous conspiracy

21  cases. In *In re Animation Workers Antitrust Litig.,* 123 F. Supp. 3d 1175 (N.D. Cal.

22  2015), for example, the court held that, though this "interpretation is superficially

23  appealing," it cannot be squared with "Ninth Circuit conspiracy … cases." *Id.*, at

24  1206 (collecting cases). The court rejected the notion, for example, that "the

25  doctrine of fraudulent concealment tolls the statute of limitations only as to those

26  defendants who committed the concealment," which rationale applies only to

27  "those cases [that] either involved no conspiracy allegations at all, insufficient

allegations that were dismissed, or allegations of a conspiracy that bore no relationship with the alleged fraudulent concealment." *Id.*, at 1207.

The same standard applies to Plaintiff's fraud and fraud by omission claims, as, in the Ninth Circuit, "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n,* 620 F.2d 1360, 1367 (9th Cir. 1980). The single case Defendants rely on, *Invisible Dot, Inc. v. DeDecker,* 218CV08168RGKRAO, 2019 WL 1718621 (C.D. Cal. Feb. 6, 2019) (citing *Choate v. Cnty. of Orange*, 103 Cal. Rptr. 2d 339, 333 (Ct. App. 2000)), is not contrary to the foregoing, as it specifically holds that, aside from showing defendants acted in concert, *id.*, and "shared a common goal to intentionally conceal evidence," *Choate*, 103 Cal. Rptr. 2d 3at 354, it is sufficient to prove that only "one … of them committed an overt act to further it." *Invisible Dot*, 2019 WL 1718621, at *7.

The conspiracy at issue involves far more than the "false promises" Marchick uttered to Plaintiff, *see* DE432:30-32 (describing conspiracy to deceive and conceal involving all Defendants, continuing to this date, *inter alia*, ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████, "Disney TV," and Defendants' FedEx account number in Plaintiff's possession); DE433, ¶¶295-305; SGD, ¶22 (quoting, *inter alia*, from first look agreement).

## IV.    <u>Plaintiff Presents an Overwhelming Case of Copyright Infringement.</u>

### A. All Defendants Are Subject to Liability Under the Copyright Act.

Defendants insist that only the Defendants who were "involved in the development or production [and distribution] of *Moana*" can be liable under the Copyright Act. DE430:16-17. This proposition over-simplifies the theories of liability that squarely apply here, namely that each of the Defendants is liable (i) as a party to the distribution chain; (ii) as a contributory infringer; (iii) as a vicarious

infringer; and/or (iv) as an indirect infringer of *Moana*-related goods/services which enhance good will and/or market recognition. First, Walt Disney Company, WDAS, Walt Disney Pictures, Walt Disney Studios, Disney Enterprises, Inc., Walt Disney Studios Motion Pictures, Buena Vista Home Entertainment, Inc., and Walt Disney Direct-To-Consumer and International are part of the distribution of the film, both at the theatrical and home entertainment levels. DE433, ¶¶316-320. As to the remaining non-Disney Defendants, it is well-established that, "[t]raditionally, 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer.'" *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001) (citations omitted).

Importantly, as noted above, Marchick never testified that her express promise to share *Bucky* works with her "bosses" and the right people was a lie. DE434-4; ; DE434-2, at 2, 3, 5; Ex. 1 to Botwin Decl. ISM, at 301:11-15, 245:23—246:4, 283:2-7, 283:14-21.  Moreover, ███████████████████████████████████████████████████████████████████████████████████████████. SGD, ¶22. The record clearly supports a theory of contributory infringement. But even if the Court found that the record supported only the conclusion that Mandeville Defendants lacked direct knowledge, though there is ample evidence refuting it,[8]

---

[8] *See also*, Ex. 4, Botwin Decl. ISM (Hoberman Tr.), at 45:2-7 and Ex. 3, Botwin Decl. ISM, (Lieberman Tr.), at 31:23—32:6 (█████████████████████████████████████████████████████████); Ex. 22, Botwin Decl. ISM, (Clements Tr.), at 37:7-17, 40:2—43:25, 49:20—50:15 and Ex. 37, Botwin Decl. ISM, (Musker Tr.), at 28:12-25 █████████████████████████████████); Ex. 1, Botwin Decl. ISM (Marchick Tr.), at 66:22-23 (Marchick admitting that no one at Mandeville ever breached the first look agreement); Ex. 5, Botwin Decl. ISM, at section G3 ███████████████████████████████████.

Mandeville Films, Hoberman and Lieberman could very well be found to have been willfully blind, i.e., to have "avoid[ed] learning about the infringement." *AK Futures LLC v. LCF Labs Inc.*, 821CV02121JVSADS, 2022 WL 17883832, at \*4 (C.D. Cal. Dec. 7, 2022) (citing *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1073 (9th Cir. 2013)).

Alternatively, "vicarious liability extends beyond an employer/employee relationship to cases in which a defendant 'has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'" *Id.*, at 1022. A trier of fact could reasonably infer from the record that, though Marchick/Mandeville Defendants relinquished any official credit for their roles to further conceal the scheme, they "supervised" the project by virtue of submitting *Bucky* works to WDAS and had a financial interest in the activity. Similarly, those Defendants distributing *Moana*-related products would be vicariously liable because the "infringing material[s] 'act[] as a draw for customers,'" 239 F.3d at 1023, and/or are indirectly liable because the products enhance market recognition of Disney's flagship franchise. *Burns v. Imagine Films Entm't, Inc.*, 92-CV-2438, 2001 WL 34059379, at \*4–5 (W.D.N.Y. Aug. 23, 2001).

Finally, though the Court found that the conduct of the Disney Defendants that refused to search their files on the basis that Plaintiff needed to identify consumer products, e.g., DE365-1, ¶8, does not rise to the level of contempt, such conduct precludes them from obtaining summary judgment pursuant to Fed.R.Civ.P. 56(d). *See*, Botwin Decl., at ¶ 29 (explaining that Defendants, consequently, never searched for and produced all documents about the creation of three books showing *Moana* surfing eerily similarly to *Bucky*). Plaintiff respectfully submits that, *if* the Court were inclined to grant summary judgment as to the Defendants who refused to search for documents, his Rule 56(d) request should be considered. *See, Garrett v. City & Cnty. of San Francisco*, 818 F.2d 1515, 1519 (9th Cir. 1987) (Rule 56(f) request must be addressed prior to granting motion for summary judgment).

### B. Plaintiff's Access Theories Are Well-Supported.

Plaintiff notes that Defendants do not challenge, in their Separate Statement, the 2003-2005 events involving Plaintiff's 2004 copyright materials, which were accessed by Defendants both through Marchick's various efforts at Mandeville Films as well as the key creative people who later worked on *Moana* to whom *Bucky* was pitched at the studio of Plaintiff's agent in Kauia in 2003. *Compare*, DE403-1; *with* DE433, ¶¶ 8-108, 114-17, 213-265. For this reason alone, summary judgment in Defendants' favor as to access would be inappropriate.

As to Plaintiff's remaining access theories, Defendants rely on *Esplanade Prods., Inc. v. The Walt Disney Co.,* 93 Cal. App. 5th 793 (2023), DE430:18-19, but the two cases could not be less alike. First, there was no substantial similarity in *Esplanade*, let alone striking similarity, under the extrinsic test, such as to plot or sequence of events but, rather, the case boiled down to a single word, *to wit*, the title "Zootopia." *Id*., at 802 (finding that the works "were not substantially similar" and that generalities such as "anyone can be anything" are not protectible), at 806 (limiting substantial similarity to the title). Thus, plaintiff needed to meet a higher burden of proof of access, and yet the evidence of access plaintiff presented, compared to the evidence in this case, was near non-existent.

Specifically, the plaintiff in *Esplanade* showed his pitch package, which did not include a script but comprised a treatment, character descriptions/depictions, a 2-page synopsis and two teasers, *id*., at 798, to a single intermediary without presenting any other evidence—circumstantial or otherwise—that would established a chain of events sufficient to give rise to the inference that someone working on *Zootopia* had a reasonable opportunity to view plaintiff's work. *Id.*, at 802 (intermediary "never met Jared Bush, the co-writer and co-director of Disney's Zootopia"), at 807 (claim that "Lasseter and [the intermediator] … 'collaborated closely' … [was] not supported by the evidence"). By contrast, Plaintiff presents evidence showing, *inter alia*, that no less than five key people (Malone, Shurer,

Lasseter, Bird, Kane) who worked on *Moana*, including two of its producers and WDAS' Head of Creative Affairs, had reasonable opportunities to view *Bucky* works. DE433, ¶¶ 213-265. Unlike in *Esplanade*, Plaintiff here presents competent evidence refuting Defendants' denials and proving the mantra that WDAS did not accept materials from outside sources to be false. To the contrary, WDAS directors pitched stories to Lasseter almost exclusively based on outside materials at the time, did "not go into too much detail [about how rights would be acquired]," and engaged in "reverse pitching." DE433, ¶¶ 100, 266, 267. Somewhat uniquely to this case, Plaintiff is related to one of the key intermediaries, Marchick, who was, by contract, ████████████████████████████████, worked on Disney's lot, and whose efforts over the years render Plaintiff's work anything but "unsolicited." DE433, ¶¶ 8-212. Moreover, this case involves striking similarity, including in plot and scrapped elements, which cannot be explained by a theory of coincidence, as substantiated by expert opinions. DE435, DE436. In light of this overwhelming evidence, Defendants self-serving repudiations are contradicted by competent evidence and, at a minimum, "the jury [is] entitled to disbelieve" such "bare denials of knowledge,"[9] *Meta-Film Associates, Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1356 (C.D. Cal. 1984), to the extent the Court found that Plaintiff is not entitled to summary judgment on this question.

Defendants also insist that Mandeville Films was not interested in *Bucky* as purportedly evidenced by the lack of knowledge by Hoberman and Lieberman of *Bucky*, DE430:19-20, but these claims overlook the undisputed evidence that: (a) Marchick, as a Mandeville executive *herself*, could and did pitch materials directly to Disney; and (b) Marchick had a more than sufficient "interest" in *Bucky*, ███ ████████████████████████████—to cause her to make efforts to get *Bucky* into the right hands at Disney over the course of years. DE433, ¶¶40, 200, Ex. 5, Botwin Decl. ISM, section G. Moreover, the fact that Mandeville did not receive credit for

---

[9] If a copyright defendant's denials could automatically absolve the defendant of liability, no plaintiff could ever prevail in a copyright infringement action.

1   *Moana* is immaterial for at least three reasons: First, █████████████

2   ███████████████████████████████████████████████████████████

3   █████████████████████████████. Ex. 5, Botwin Decl. ISM.

4   Second, ███████████████████████████████████████████████████

5   ███████████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████████

7   ███████████████████████████████████████████████████████████

8   ███████████████████████████████████████████████████████████

9   ███████████████████" *Id.*, at section H1, pp. 33-34; section I, pp.4-5.[10]

10  Third, to give Mandeville official credit for *Moana* would have unquestionably

11  exposed the ruse Defendants took pains to conceal.

12       Defendants' insistence that no smoking guns were found in the documents

13  they made available to Plaintiff, DE430:20-21, is equally unsupportable. By way of

14  example, the terminology "smoking gun" is the only reasonable one to describe the

15  following extraordinary sequence of events: ███████████████████████

16  ███████████████████████████████████████████████████████████

17  ███████████████████████. Ex. 42, Botwin Decl. in support of Plaintiff's

18  Cross-Motion (to be filed under seal). ███████████████████████████

19  ███████████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████████████

22  ███████████████████████████████████████████████████████████

23  ███████████████████████████████████████████████████████████

24  ███████████████████████████████. DE433, ¶¶275, 276, 301.

25

26      [10] And *see, Britz Fertilizers, Inc. v. Bayer Corp.*, 665 F. Supp. 2d 1142, 1159 (E.D.

27  Cal. 2009) (when "the interpretation [of a contract] turns upon the credibility of extrinsic
    evidence," it creates a question of fact); *Factory Mut. Ins. Co. v. One Source Logistics,*

28  *LLC,* LACV1606385JAKJPRX, 2017 WL 2608867, at *4 (C.D. Cal. May 5, 2017) ("[i[f a
    contract is ambiguous, its interpretation is a question of fact for the jury.").

1    Furthermore, the evidence also shows ████████████████████████████

2    ████████████. *Id.*, ¶288. Whether Marchick and Ribon were already close friends

3    at that point is not relevant, given that Marchick enjoyed a close relationship with

4    Malone starting in 2011 and was ████████████████████████████████████

5    ████████ *Id.*, ¶ 201.

6         Without the benefit of reading Plaintiff's Cross-Motion for Partial Summary

7    Judgment, Defendants boldly posit that "Plaintiff has simply decided, without any

8    supporting evidence whatsoever, that Marchick and Malone are lying." DE430:22.

9    The problem for Defendants is that the evidence shows that Marchick and Malone's

10   story is refuted by competent evidence—████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████

15   ████████████████████████████████. DE433, ¶¶ 100, 267.

16        Next, Defendants raise a flurry of arguments about why Disney TV's receipt

17   of *Bucky* materials is purportedly irrelevant, DE430:22, but none have any merit and,

18   again, these claims are not challenged in Defendants' Separate Statement. First, the

19   meeting did not take place at a "geographically distinct place" but at Walt Disney

20   Pictures, repeatedly referred to as "the studio" by Marchick. Ex. 1, Botwin Decl.

21   ISM (Marchick Tr.) at 149:13-16, 153:19-21, 159:14-17. In fact, the Declaration of

22   Jessica Julius, at most, supports Plaintiff's recollection that the meeting actually took

23   place with "Walt Disney Pictures and Television," now Walt Disney Pictures,

24   because Julius' rationale about the "geographically different" location of Walt

25   Disney Television Animation, DE410, ¶ 4, *proves* that Plaintiff did not have his

26   second meeting at Disney TV Animation's lot in "Glendale," *id.*, as even Marchick

27   recalls the second meeting to have taken place on Disney's Burbank lot. Ex. 1

28   Botwin Decl. ISM, at 159:24 ("and then [Plaintiff] came to the studio another time");

---

171:24—172:3, 166:7-12 (referring to two meetings on Disney's Burbank lot); 166:25—16:1 (Marchick: "I[] met [the Disney representatives Plaintiff met with] in passing on the [Burbank] lot" who had an "extension at the office").

Marchick also tries to falsify the record in slipping in that she set up the meeting for Plaintiff "about working in animation," DE430:4-5; DE412, ¶6, when she previously admitted that the meeting was set up in connection with "Plaintiff's [*Bucky*] material." DE441-9, p.5, line 4. *See, Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (a subsequent statement under oath that conflicts with a prior sworn statement "cannot create an issue of fact"). But even if Disney TV Animation agreed to the meeting, though it created content solely based on property already within Disney's library at the time, it proves either that Disney TV Animation considered working with *Bucky* materials or had ulterior motives, which creates a sufficient "overlap in subject matter" through the production of an animated film. There is a considerable overlap in subject matter in connection with Disney's *Lilo & Stritch* franchise alone, in which WDAS and Disney TV Animation were involved, under the Walt Disney Pictures banner. DE433, ¶¶81-85.

Defendants briefly touch on the efforts to pitch *Bucky* to Disney/Pixar's *The Incredibles* team—the future *Moana* team—at the sound studio of Plaintiff's then-agent, Peter Heckmann, and Plaintiff's former partner, Katherine Speirs in their Motion, but not in their Separate Statement. DE430:23, DE430-1. Defendants do not bother to even address the Disney FedEx account number in Plaintiff's possession, based on notes taken by Speirs at the time, which Plaintiff could have only had in his possession if the events he and Peter Heckmann describe occurred: that, after *Bucky* was pitched to Disney/Pixar representatives, Speirs obtained their contact information and FedEx account numbers so that more detailed *Bucky* works could mailed to them, which occurred thereafter. DE433, ¶¶ 213-77.

The fact that the *Incredibles* team received earlier *Bucky* works does not weaken the copyright claims as to the 2014 copyright registration. The reality that

WDAS and Pixar representatives, who later worked on *Moana,* expressed an interest in the *Bucky* story at the time makes it more likely that Marchick agreed to secretly supply WDAS with additional *Bucky* materials in 20011/2012—created by someone who lived in Polynesia for nearly a decade, exponentially longer than the *Moana* team's research trips combined (Woodall Decl., ¶¶3-11)—to curry favor with the creative executives at WDAS and pull WDAs out of the admitted "chaos" it was facing. DE441-38:9. Again, it is undisputed that WDAS regularly engaged in ███████████████████████████████████████████████; that Marchick and Malone ███████████████████████████████████████████; that WDAS was in a desperate hunt for compelling content between 2006 and 2012; that Musker and Clements only made adaptations, and that WDAS was primarily experienced in making adaptations of existing fairytales at the time. DE433, ¶¶267, 201, 269-74.

Finally, Defendants do not address, under their defenses to "access" theories, the expert findings of striking similarity, whereunder a showing of "bare corporate receipt" alone would be sufficient, *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1101 (C.D. Cal. 2005), though Plaintiff has proven far more than that. *See also*, *Bouchat v. Baltimore Ravens, Inc*., 241 F.3d 350, 354–55 (4th Cir. 2001) ("plaintiff need not prove that the infringer actually saw the work"); *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 55 (2d Cir. 2003) (plaintiff "is not required to establish *actual* access").

## C. Defendants' "Independent Creation" Defense Is Refuted.

Defendants' self-aggrandizing "independent creation" defense presentation is not only disputed by competent evidence, *see* discussion, *infra* (discussing, *inter alia*, expert testimony), but it is also misguided, especially at this stage of the case, for important reasons: Plaintiff is not taking the nonsensical position that *Moana* appeared overnight after WDAS filmmakers decided to produce an Oceanic coming-of-age voyaging adventure that is substantially and strikingly similar to *Bucky*. It would defy common sense to presume that one of the biggest film studios in the

---

world will not spend enormous time and resources on developing an animated feature film[11] and, in the process, will not create millions of pages of materials, reflecting changes being made to the script. A studio does not forego this lengthy process whenever it copies ideas from an existing work, as the evidence, discussed *infra*, shows. It is for good reason that summary judgment in a defendant's favor is improper "where the evidence establishing independent creation is solely 'the self-interested testimony of those on the defense side,'" *Kaseberg v. Conaco, LLC*, 260 F. Supp. 3d 1229, 1247 (S.D. Cal. 2017) (citing 3 *Nimmer* § 12.11[D][1] n.99.5)), as is the case here, besides being disputed on the merits.

For instance, the research trips Defendants flaunt are a matter of routine for WDAS, *even if* the project is based on an existing fairytale, especially when the location of the story is a focal point, as is the case here. Clements, Musker, and their production crew went on similar research trips to New Orleans for *Princess and the Frog* (2009), for example, though it is based on *The Frog Prince* by the Brothers Grimm and *The Frog Princess* by E. D. Baker; and to Greece and Turkey for *Hercules* (1997), based on the legend of Heracles and a story pitched by animator Joe Haidar. SGD, ¶64. This is hardly surprising, given that Disney has the budget to embark on as many exciting research trips as it pleases. Musker confirms it was their "custom" to conduct extensive research, DE431-1, ¶13, though all of their films were adaptations, which substantiates that the amount of research and work put into an animated film does not preclude the possibility of copying. In the case of an Oceanic adventure, it would have been unthinkable for a California-based production team to avoid a trip to Polynesia, irrespective of whether Defendants pilfered from *Bucky*. In comparison to the few weeks *Moana's* directors spent in Oceania, Plaintiff lived

---

[11] The Ninth Circuit recognized in *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545 (9th Cir. 1989) that it would be error to give too much weight to what a big film studio tends to bring to the table in the making of a feature film. *Id.*, at 1549 (holding that "the district court erred in weighing these contributions so heavily").

in Polynesia for nearly a decade, during which he conducted extensive research. Woodall Decl., ¶¶3-11.

Despite most Disney animated films pre-dating *Moana* comprising adaptations, these films nevertheless generally took many years to produce. Exhs. 20-22, Botwin Decl. (showing that, e.g., *Tangled* (2010), based on *Rapunzel* by the Brothers Grimm, took WDAS six years to produce; *Sleeping Beauty* (1959), based on *Sleeping Beauty* by Charles Perrault (1697), took seven years to produce); *Princess and the Frog* took 3.5 years to produce). It is equally unsurprising that WDAS worked with an Oceanic Story Trust, after Disney was heavily criticized for its insensitive portrayal of Polynesian people and culture in *Lilo & Stitch*. Ex. 23, Botwin Decl., at 217; ███████████. Notwithstanding the efforts of working with the Oceanic Story Trust, WDAS was criticized for one key deviation from *Bucky*: *Moana's* Maui, whose portrayal many locals found to be offensive and inaccurate. Ex. 23, Botwin Decl., at 219.

Furthermore, Plaintiff's expert, Terry Hunt, concludes that the similar deviations from traditional beliefs that appear in both works could not have been inspired by any amount of "research" because they are unique to both *Moana* and *Bucky*, including the notion that Pele helps save Oceanic land from destruction, the appearance of the goddess, the tribe of coconut-clad spear-wielding little people, the faceless ocean spirit emerging from the ocean, to name a few, which are not rooted in traditional beliefs.[12] Additionally, Hunt concludes that WDAS had a vast body of mythologies and lore to select from but settled on elements similar and identical to those appearing in *Bucky*. DE436-1. Even Defendants' rebuttal expert, Marie

---

[12] *Compare, Stabile v. Paul Smith Ltd.*, 137 F. Supp. 3d 1173, 1189 (C.D. Cal. 2015) (expert opinion negating independent creation should be non-conclusory); and *see, United Fabrics Int'l, Inc. v. J. C. Penney Corp., Inc.*, CV 08-1936-VBF(PJWX), 2009 WL 10674938, at *3 (C.D. Cal. Apr. 10, 2009) (denying defendants' motion for summary judgment where "[d]efendants have discharged their burden to set forth enough evidence of independent creation to create a genuine issue of material fact" even though plaintiff failed to rebut the evidence).

Alohalani Brown, eventually conceded that none of the traditional depictions of Pele resemble Te Fiti as much as *Bucky's* Pele does, and none of the thousands of Oceanic islands more closely resemble Motunui as does Hanalei Bay. DE433, ¶7. In sum, no amount of traveling and research could create these unique similarities by sheer coincidence.

Similarly, despite efforts to depart from the *Bucky* story, Román found that an overwhelming number of similarities ultimately found their back way into *Moana*, whether consciously or subconsciously, which cannot be explained by a theory of coincidence. *See, e.g.*, DE435-1, at 36-38. That is not because these elements flow naturally from the premise (which none of the parties' experts legitimately found), but because the filmmakers correctly predicted that Plaintiff's story surrounding the teenager's mission to preserve sacred land and ancient culture constitutes a creative vehicle to journey into this rich heritage and charm viewers across the world.

It is understandable that Clements and Musker wish to defend their "story by" credit for a film recognized as "the perfect Disney movie" "after 80 years of experiments,"[13] *see also*, DE433, 273 (describing *Moana* as WDAS' miraculous comeback). But Clements and Musker's insistence that *Moana* is the *only* original creation of their careers, taking place in a world that is very distant to them, when each and every film they made pre-dating *Moana* and even each and every film since *Moana* is an adaptation, strains credulity. Positions of "independent creation" are taken in virtually every copyright action, but the defense is contradicted by striking evidence in this case. In fact, Clements testified that ████████████████████, Ex. 22, Botwin Decl. ISM, at 57:23-58:2, and could thus not be an "independent creation," let alone as a matter of law. Additionally, Musker admitted that *Moana* is the only screenplay Clements and Musker did not write, for which there was "a whole reason," Ex. 6, Botwin Decl. IOM, at 00:18:14—00:18:23.

---

[13] Moana review: after 80 years of experiments, Disney has made the perfect Disney movie - The Verge (last accessed on May 21, 2024).

Defendants also apparently cannot get their story straight. While Musker takes credit for the original idea of an Oceanic adventure, DE431-1, Clements once publicly stated that "[i]t was John Lasseter's idea. He wanted to do a movie based on the world of the Pacific Islands and the mythology, which led to … taking a trip to Fiji, Samoa and Tahiti." Ex. 15, Botwin Decl. IOM. Moreover, if Musker had "long been" interested in making such a film, DE431-1, ¶9, it begs the question why Musker and Clements did not present the idea to Lasseter sooner to pull WDAS out of its predicament at the time, which in fact resulted in Musker and Clements parting ways with WDAS to avoid getting laid off in 2005, before being re-hired to direct *Moana*. DE441-38:4.

The evidence that the story of *Moana* went through many admitted-to iterations and ███████████ also resulted in a longer production process, creating a more voluminous production file. DE433, ¶¶279-288. As to the decidedly "self-interested"[14] Writer's Contribution document, DE430:27, Clements notably testified that ████████████████████. Ex. 22, Botwin Decl. ISM (Clements Tr.), 113:5—114:5. The document is largely immaterial for the additional reason that it is highly likely that only a handful of people in the crew would have knowledge about the theft—people who were not involved in the creation of this document. As Plaintiff pointed out in his Cross-Motion, █████████████ ███████████████████████████████ ████████████████████ the story about the time-traveling boy that Clements originally claimed ███████████. Ex. 48, Botwin Decl. ISM; Ex. 42, Botwin Decl. ISM; Ex. 22, Botwin Decl. ISM (Clements Tr.), at 108:7—110:1, 122:4-18, 123:2—124:24.

Finally, even if a trier of fact could reasonably reject the notion that *Bucky* works were copied *consciously* and *deliberately*, for the sake of argument, copyright law recognizes that "copying need not be conscious, but 'may be the result of

---

[14] *Kaseberg*, 260 F. Supp. 3d at 1247.

subconscious memory derived from hearing, seeing or reading the copyrighted work at some time in the past.'" *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 741 (9th Cir. 1971) (citations omitted). Here, the directors viewed *Bucky* works many years ago and may not recall having seen the works, let alone the title "Bucky" or Plaintiff's name associated with it. In fact, it is undisputed that Musker and Clements ███████████████████████████████████████ the time-traveling boy who discovers ancient Polynesia. Ex. 37, Botwin Decl. ISM (Musker Tr.), at 107:7—109:5; Ex. 22, Botwin Decl. ISM (Clements Tr.), at 140:16—141:18.[15] This is consistent with Clements' admission that ████████████ ████████████████████████████████████████████████████." Ex. 22, Botwin Decl. ISM (Clements Tr.), at 37:3-8.

"[W]hen a defendant's work is copied from the plaintiff's, but the defendant in good faith has forgotten that the plaintiff's work was the source of his own, such 'innocent copying' can nevertheless constitute an infringement," *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 998–99 (2d Cir. 1983) (citing *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir. 1936); 3 M. Nimmer, *Nimmer on Copyright* § 13.08 (1983), which does not "conflict with the rule permitting independent creation of copyrighted material." *Id. See also, Gray v. Perry*, 215CV05642CASJCX, 2018 WL 3954008, at *5 n.5 (C.D. Cal. Aug. 13, 2018) (rejecting protestation that defendant "never heard" the song, reasoning that copying can occur subconsciously, even if defendant "cannot remember" it); *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 741 (9th Cir. 1971) ("It seems unrealistic to suppose that defendants could have closed their minds to

---

[15] Defendants' recent Declarations in support of their Motion confirms as much, though the fact was already established during depositions and cannot be self-servingly subsequently refuted. Tellingly, the vague references in Defendants' declarations to this ████████████████████████████████████████████████████████ DE431-1, ¶¶67-69, DE409, ¶20.

plaintiff's [creative work] as they designed their own."); *Arica Inst., Inc. v. Palmer*, 761 F. Supp. 1056, 1066 (S.D.N.Y. 1991) ("Subconscious copying stemming from having read the copyrighted work at some time in the past is equally as actionable under the copyright laws as intentional copying").

For the foregoing reasons, this case is wholly distinguishable from the cases Defendants cite, none of which are binding on this Court, DE430:24, for the proposition that summary judgment on their independent-creation defense is appropriate.[16] In the case at bar, Plaintiff presents not only overwhelming evidence of access, but also evidence of substantial and striking similarity, while also presenting evidence refuting Defendants' "independent creation" defense. Indeed, to this day, Clements and Musker █████████████████████████████████ ████████████████████████████████████████████████████████ █████████████—whether consciously or subconsciously – while ████████ ██████████████████████ by the press when the Defendants produced proof that ████████████████████████████████████████████████. On this record, summary judgment in Defendants' favor based on the defense of independent creation would be improper.

---

[16] *See, Corwin v. Walt Disney Co.,* 602CV1377ORL19KRS, 2004 WL 5486639, at *22 (M.D. Fla. Nov. 12, 2004) ("[p]laintiff failed to proffer *any* admissible evidence" on "access" or copying) (emphasis added); *McGaughey v. Twentieth Century Fox Film Corp.,* 12 F.3d 62, 65 (5th Cir. 1994) (*no* evidence of access and no controverting affidavits by plaintiff); *Morford v. Cattelan,* 21-20039-CIV, 2023 WL 3971968, at *11 (S.D. Fla. June 12, 2023) (plaintiff "fails to rebut *any* of it") (emphasis added); *Maharam v. Patterson*, 04 CV 9569KMW, 2007 WL 2702195, at *2 (S.D.N.Y. Sept. 17, 2007) (plaintiff presented *only* "generalized assertions" and *no* evidence); *Bethea v. Burnett,* CV04-7690JFWPLAX, 2005 WL 1720631, at *16 (C.D. Cal. June 28, 2005) (plaintiff presented *no* "evidence which would refute [the] defense of independent creation"); *Kootenia Homes, Inc. v. Reliable Homes, Inc.*, CIV. 00-1117ADMAJB, 2002 WL 15594, at *7 (D. Minn. Jan. 3, 2002) (summary judgment appropriate "[i]n light of the *absence* of substantial similarity" and "uncontradicted evidence" of independent creation) (emphasis added); *Dimmie v. Carey,* 88 F. Supp. 2d 142, 151 (S.D.N.Y. 2000) (*no* proof of access or copying).

---

1

**D. Defendants Fail to Rebut the Evidence of Substantial Similarity.**

2       Defendants' misleading argument that Plaintiff's expert opinions must be

3   disregarded because they are based on various *Bucky* works in progress is based on

4   a misreading of a case they rely on, *Gilbert v. New Line Productions, Inc.*, CV 09-

5   02231 RGK, 2010 WL 5790628 (C.D. Cal. Aug. 13, 2010), DE430:29. *Gilbert*—

6   unlike in this case, which involves a single film that is compared to a number *Bucky*

7   works that were updated over the years[17]—involved, rather, "*eighteen* screenplays

8   by *[d]efendants*," *id.*, at *4 (emphases added), and though the Court found that "the

9   [defendants' final] Movie did *not* infringe upon [p]laintiff's work," *id.*, at *1

10  (emphasis added), the Court held that plaintiff could nevertheless pursue his claims

11  as to three of defendants' draft screenplays, as to which the Court applied the

12  extrinsic test. *Id.*, at *4–11. The case at bar is an entirely different case. Plaintiff

13  conservatively sticks to the final film, *Moana*, to prove copying and relies on

14  similarities in scrapped elements and elements that appear in *Moana*-related

15  products in support of one of his theories of access.

16      Defendants' argument that, alternatively, the expert reports may be

17  disregarded because "the works are targeted at a general audience and deal with

18  subject matter readily understandable by any ordinary person," DE430:29,[18] is

19  equally confusing, given that this Court expressly disagreed with that position in this

20  _____

21      [17] There is nothing uncommon for various materials by plaintiff being amassed and

22  considered, as substantiated in cases even cited by Defendants, e.g., *Esplanade*, 93 Cal.
    App. 5th at 798. Defendants cite to no authority for the proposition that the Court must

23  disregard materials a defendant had access to simply because they comprise more than a
    single script.

24      [18] Defendants also boldly posit that "[t]he Court denied Defendants' prior motions

25  to dismiss because it was required to and did accept the allegations in Plaintiff's
    Complaints as true." DE430:1. As this Court knows best, however, the law is well-settled—

26  and copyright claims are frequently dismissed on this basis—that, "[i]f after examining the
    works themselves [in ruling on a motion to dismiss], th[e] Court determines that there is

27  no substantial similarity, then the plaintiff … can prove no facts in support of his claim
    which would entitle him to relief…." *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124,

28  1131 (C.D. Cal. 2007) (citation omitted).

particular case, likely, in part, because Defendants repeatedly argued that the works involved elements which appear in Polynesian folklore, DE90:10; DE68:23, DE68-1. *See also, Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004) ("The extrinsic test requires analytical dissection of a work and expert testimony") (citation and internal quotation marks omitted). Defendants apparently seek to escape the consequence of their failure to diligently seek out an expert in support of this defense for their initial expert disclosures. But the argument about unprotectible folklore elements was raised by *Defendants*—not Plaintiff—and yet Plaintiff expended the time and funds to present to the Court and trier of fact competent and well-balanced opinions by an expert who, Defendants' rebuttal expert conceded, is a famous scholar and her former teacher. DE441-57, at 27-28. There is no reason to disregard Plaintiff's expert opinions.

### E. Defendants' Thin Analysis Under the Extrinsic Test

Defendants make much ado about the fact that Bucky does not venture out to save an "island" but, instead, a "beach" in Polynesia, DE430:29-30, which is a distinction without a meaningful difference, given that both stories, at their core, involve saving the sacred and untouched land of beautiful Oceania from destruction, and both places in peril are left behind by the protagonist in a search for answers, which does not flow naturally from a coming-of-age voyaging adventure.

Next, Defendants make the conclusory argument that, even though the plot in *Moana* and *Bucky* might be similar, general plot ideas are not protectible, DE430:30. Plaintiff described in painstaking detail in his Cross-Motion how this standard is defined. DE432:18-24. Disregarding what defines a "general plot idea" or "idea" vs. "expression of idea" would mean that no court would ever engage in the "plot" portion of the extrinsic test for the simple reality that each literary work and film involves a "plot." A plot element is not protectible when it is decisively "standard in [the] treatment of [an] idea," *Data E. USA, Inc. v. Epyx, Inc.,* 862 F.2d 204, 208 (9th Cir. 1988) (also holding that "the substantial similarity of both the general ideas and

expression between the copyrighted work and defendant's work" must be considered), or are "*indispensable* expression of these ideas" which "lack originality, flow naturally from basic ideas, or are one of the few ways in which a particular idea can be expressed…." *Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1439, 1443, 1444 (9th Cir. 1994) (emphasis in original). Examples of such unprotectible stock plot elements given in other cases are instructive. For example, in *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al*., 223CV02147SVWAGR, 2023 WL 8948288 (C.D. Cal. Dec. 7, 2023), the mere *presence* of a "club owner" and "dancers" at a nightclub was found to constitute unprotectible stock elements. *Id.*, at **16-21. *Compare*, e.g., *Smart Inventions, Inc. v. Allied Communications Corp.,* 94 F. Supp. 2d 1060, 1069–72 (C.D. Cal. 2000) (finding protectible the following sequence in a commercial: "woman fumbling in dark," "a woman getting up from bed in a dark room [and] turning on the Light placed on her nightstand; [while] the man remains sleeping in bed; and … the woman standing in front of the bathroom sink, turning on the water and washing her hands;" "a young boy walking up or down an indoor carpeted stairwell;" "[l]ights aligned on the edge of a walkway leading up to the front door of a house;" "no … person with no other activities [in the background];" and "the use of an identical type of front door."); and *see, id*., at 1073 (noting also that "wholly fictional and dramatic works" would be afforded even broader protection than a commercial).

Defendants also take issue with similarities in characters, DE430:30-31, but these positions are rebutted by competent expert opinions. For example, Defendants' conclusory claim that Pele is not protectible overlooks the expert opinions of similarities in deliberate and unique *deviations* from the traditional depiction of Pele. DE436-1:8-12. Each of Defendants' challenges, DE430:31-32, conflicts with well-reasoned expert opinions. By way of further example, Defendants posit that "Te Fiti/Te Ka also plays an entirely different role in *Moana* than Pele in 'Bucky,'" DE430:32, but that is refuted by the fact that both deities play a pivotal and similar

role at the climax of the protagonists' mission, initially angered when sought out, representing a riddle which, once solved, saves the land, both embodying the axiom that one must respect the powers that created all things living, none of which flows naturally from the premise. Moreover, a film featuring Polynesian deities and demi-gods could have easily been expressed by telling stories about them, rather than actively involving such figures in then plot, which, in and of itself, is protectible. *See also*, *Alfred v. Walt Disney Co*., 821 F. App'x 727, 729 (9th Cir. 2020) (courts must "compare the original selection and arrangement of the unprotectible elements"). Here, *both* the underlying expressions of ideas as well as their treatment and arrangement are protectible.

Defendants prove their positions about what is unprotectible to be fundamentally misguided for additional reasons. They argue that a certain theme or mood, for example, is not protectible, which defies logic, because no articulable theme or mood we know of can be protectible in this sense. For example, naturally, the theme of "a hero's journey" appeared in "countless other movies," DE430:32-33. But the question under the extrinsic test under these categories is, rather, whether the theme and mood are substantially similar—not whether the plaintiff has invented a new theme or mood that did not previously exist. In other words, Defendants tacitly concede that the theme and mood are substantially similar, if not identical.

As to dialogue, DE430:33-34, the parties' experts are divided. *See*, DE435-1:31-32. In any event, given how easy it is for a defendant to change words in a dialogue without changing the story in efforts to conceal copying, courts have denied defendants summary judgment as to substantial similarity without addressing dialogue, e.g., *Alfred v. Walt Disney Pictures*, CV 18-8074-CBM-ASX, 2021 WL 6882322, at *1 (C.D. Cal. Dec. 16, 2021); *Metcalf*, 294 F.3d at 1073-75*; Baxter v.*

*MCA, Inc.,* 812 F.2d 421, 424–25 (9th Cir. 1987).[19] The Ninth Circuit has recognized that "differences in characters and dialogue [can be] evasive with a view of disguising the plagiarism;" that similarity in dramatic works can be substantial "irrespective of the dialogue," in which case "it is immaterial whether [the expression] is done by means of dialogue or otherwise," which is why a "pantomime," for example, can be subject to copyright law. *Universal Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354, 378 n. 4, 7 (9th Cir. 1947).

Finally, Defendants' expert having failed to conduct this analysis altogether, Defendants mischaracterize Plaintiff's expert opinions about the sequence of events, arrangements, and "cumulative weight"[20] of protectible and unprotectible elements. It is simply untrue that Plaintiff's expert focused on a "different" script involving a scrapped "time-travel element," DE430:34. Though Plaintiff's expert did find that traces of time-travel survived the final film, DE435-1, e.g., at 26-27, he focused on the final film in the sequence-of-events analysis. *Id.*, at 20-29. And, as discussed at pp. 29-30, *supra*, Defendants' "mixing and matching" defense, DE430:35, is patently misplaced. Defendants clearly try to distract the Court from the fact that Defendants' expert, Jeff Rovin, admitted that he "failed to mention" similarities altogether on the basis that they were allegedly "not the same," Ex. 59, Botwin Decl. ISM, DE441-59 (First Rovin Tr.), at 241:7-19, 242:19-23, 247:13-18, when no such standard applies in the context of fictional works, as discussed in more detail in Plaintiff's *Daubert* Motion. DE378; DE387. Defendants' conclusory position that this case does not involve as many similarities in selection and arrangement of elements as in *Metcalf* is not persuasive. To the contrary, in *Metcalf*, the interpersonal and cultural challenges both surgeons faced at the hospitals in inner-

---

[19] In fact, courts have referenced a claim of similarity in dialogue as a distinct type of copyright infringement, referred to as "dialogue infringement." *Esplanade Prods., Inc. v. Walt Disney Co.*, No. CV1702185MWFJCX, 2017 WL 5635024, at *9 (C.D. Cal. July 11, 2017).

[20] *Metcalf,* 294 F.3d at 1074.

city Los Angeles, DE430:34-35, unquestionably flow naturally from the premise, and yet the Court found the totality of them to be striking. This case presents a much more overwhelming wealth of similarities, as not even Defendants' expert found that the elements flow naturally from the premise.

Moreso than in *Metcalf*, the similarities are pervasive in the case at bar: Both stories tell the coming-of-age adventure of a headstrong teenager who is drawn to the ocean and to animals, who learns about the destruction of the beloved land of Oceania, defies parental warnings and sails across the ocean on a outrigger canoe on a mission to save the land, carrying a special necklace gifted to her/him. On this journey, both protagonists encounter substantially similar adventures, including being sucked through an oceanic whirlpool portal into a different world, facing coconut clad little creatures, encountering a demi-god who shapeshifts, *inter alia*, into a tiny insect, and a fiery goddess who emerges from lava, who represents a riddle. In both works, the protagonists solve the riddle, thereby saving the land, and return home heroically, now mastering the waves. At the heart of both stories lies the importance of preserving the rich land and heritage of Oceanic people. This is the mere tip of the iceberg of similarities. *Compare*, another example from *Metcalf*: "where main characters are both well dressed, wealthy, self-assured and have expensive tastes, 'the totality of the[se] similarities ... goes beyond the necessities of [defendants' work's] theme….'" *Id*., at 1074 (citing *Shaw v. Lindheim*, 919 F.2d 1353, 1363 (9th Cir. 1990)).

In sum, unlike in *Metcalf, Alfred*, or *Shaw,* for example, this case does not involve mere similar discrete motifs, generalities, and stock elements scattered throughout the works but involves, rather, entire storylines and deviations from traditional depictions so eerily identical that only one conclusion can be drawn therefrom: that the totality of similarities is beyond happenstance.

1

## CONCLUSION

2
Wherefore, Defendants' Motion for Summary Judgment must be denied.

3
Dated: May 21, 2024                    Respectfully Submitted,

4
GERARD FOX LAW PC

5

6
SANCHEZ-MEDINA, GONZALEZ, QUESADA, LAGE, GOMEZ & MACHADO, LLP

7

8
By:  *s/Gustavo D. Lage*

9
Gustavo D. Lage, Esq.

10
Attorneys for *Plaintiff*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 21st date of May 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Electronic Service List for this Case.


Dated: May 21, 2024                          Respectfully Submitted,


                                             *s/Gustavo D. Lage*
                                             Gustavo D. Lage, Esq.