GERARD P. FOX (SBN 151649)
GERARD FOX LAW, P.C.
1880 Century Park E, Suite 1410
GERARD FOX LAW P.C.
Los Angeles, CA 90067
Tel: (310) 441-0500
Fax:(310) 441-4447
gfox@gerardfoxlaw.com

JAMES WES CHRISTIAN
(Admitted *Pro Hac Vice*)
CHRISTIAN ATTAR, LLC
2302 Fannin, Suite 500
Houston, Texas 77002
Tel.: (877) 710-5170
Fax: (713) 659-7641
jchristian@christianlevinelaw.com

GUSTAVO D. LAGE
EL'AD D. BOTWIN
(Admitted *Pro Hac Vice*)
SANCHEZ-MEDINA, GONZALEZ, QUESADA, LAGE, GOMEZ & MACHADO, LLP
1200 Brickell Avenue, Ste 950
Miami, Florida 33131
Tel.: (305) 377-1000
Fax: (786) 304-2214
glage@smgqlaw.com
ebotwin@smgqlaw.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BUCK G. WOODALL,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>THE WALT DISNEY COMPANY, et al.,<br><br>　　　　Defendants. | **Case No.: 2:20-cv-03772-CBM-E**<br><br>**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>PTC Date: January 14, 2025<br>Time: 10:00 a.m.<br>Courtroom: 8D<br><br>Trial Date: February 25, 2025<br>Assigned to Hon. Consuelo B. Marshall<br>Magistrate: Judge Charles F. Eick |

**TABLE OF CONTENTS**

I. INTRODUCTION………………………………………………………………1

II. ISSUES OF LAW……………………………………………………………..5

III. BIFURCATION OF ISSUES………………………………………………….11

IV. JURY TRIAL…………………………………………………………………..12

V. ATTORNEY'S FEES………………………………………………………….12

VI. ABANDONMENT OF ISSUES………………………………………………12

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## I. INTRODUCTION

Plaintiff contends, and the evidence overwhelmingly shows, that Moana is the result of Disney and its subsidiaries, including Buena Vista Home Entertainment's, theft and infringement of Mr. Woodall's work " Bucky the Surfer Boy."

Plaintiff Buck Woodall is the brother of Benjamin Woodall, who is married to Lindsay Woodall—the step-sister to Jenny Marchick. Having lived in Kauia, Hawaii, Woodall fell in love with its people, its untouched land, as well as Polynesian culture and mythology. Starting in 1998, Woodall created his lifework, a tale about a modern-day boy, Bucky, who is drawn to the ocean and dreams of mastering the waves of Oceania on his surfboard when he visits Hawaii.

*Bucky* is a coming-of-age adventure about learning to respect and preserve the untouched bounty of Polynesia, its people and heritage. After Bucky learns that his favorite beach is threatened to be destroyed by construction, he and his friends venture out across the ocean on an outrigger canoe, on a mission to save the land. They are caught in an oceanic time-travel portal, which transports them to ancient Polynesia, where Bucky discovers Polynesian mythology, lore, and customs. Demigod Kamapua'a and his antagonist minions, capable of shapeshifting into bees, try to stop Bucky and his friends in their quest. In ancient Polynesia, Bucky meets an island princess, Keahe, a village chief, and encounters the volcano goddess, Pele, who presents a riddle to Bucky. Bucky manages to solve the riddle, saves the beach, and returns home as a hero and a skilled surfer.

In 2003, Marchick agreed to meet with Plaintiff to help him get *Bucky* into the right hands. Marchick felt that it made sense to review Plaintiff's *Bucky* works "because [she] happen[ed] to work in the movie business." Marchick worked at Mandeville Films at the time, first as an assistant to Mandeville co-owner, Todd Lieberman ("Lieberman"), then as a creative executive. Marchick arranged for a meeting with Plaintiff at her office on Disney's lot in 2003, at which time Plaintiff

also left *Bucky* materials with Marchick. Marchick asked Plaintiff to sign a Mandeville Films submission waiver, which she then filed with Mandeville Films, because that is what she "was supposed to do." Marchick submitted *Bucky* materials to "Disney TV." Marchick also arranged for Plaintiff to meet with Disney representatives on Disney's lot. At that meeting, Plaintiff left *Bucky* works with Disney representatives.

In about 2004 or 2005, Marchick reached out to Maggie Malone, creative executive at WDAS, in connection with *Bucky*. Marchick claims that Malone rejected any pitch efforts on the basis that WDAS would not accept pitches from outside sources. In 2011, Malone and Marchick developed a close relationship, when WDAS started producing *Moana*. Malone and Marchick would go out for lunch as well as cocktails and dinner after work. In 2011, Marchick worked for Disney Channel, then became an executive at Sony Pictures Animation ("SPA"). In the same year, Marchick asked Plaintiff to sign a release with SPA so that she could review Plaintiff's latest *Bucky* script and materials. During this time, Marchick and Malone would exchange creative submissions via a "blacklist."

In 2003, Plaintiff and his then-girlfriend Katie Speirs ("Speirs) lived in Kauai, Hawaii. Plaintiff and Speirs were hired by Peter Heckmann ("Heckmann"), who owned and operated a sound studio in Kauai, Hawaii. Heckmann saw great potential in *Bucky* and agreed to function as Plaintiff's agent to get *Bucky* off the ground. In 2003, Pixar Animation Studios ("Pixar") produced *The Incredibles* (2004), which was released by Walt Disney Studios. The protagonist's voice for *The Incredibles* was recorded at Heckmann's studio in Kauai. Parties present from Disney and Pixar at the time included actor Craig T. Nelson, director Brad Bird ("Bird"), director Osnat Shurer ("Shurer"), sound engineer Doc Kane ("Kane"), Debbie Pluimer ("Pluimer"). Heckmann and Speirs pitched *Bucky* to everyone who was present from the Disney/Pixar team. Kane and Pluimer took an interest in *Bucky*. Speirs was provided FedEx account numbers, addresses, and phone numbers for Disney and

Pixar so that *Bucky* materials could be mailed to them, which occurred shortly thereafter.

In 2016, Disney released *Moana*, an animated feature film that takes place about two-thousand years in the past. Moana, the daughter of a village chief of Motunui (a fictional island in Oceania), is naturally drawn to the ocean, despite her parents' warnings of the dangers of the ocean. She learns that her island is being destroyed by a mysterious force. Her grandmother tells her about their ancestors, who were navigators, and that the cause of Motunui's destruction leads back to shapeshifting demigod Maui stealing the heart of Te Fit, the goddess of creation. Moana decides to embark on a voyage on an outrigger canoe, in a quest to find Maui and restore the heart of Te Fiti. In the end, Moana succeeds, saves the land and her people, who become navigators once more. The film was produced by Shurer and Clements and Musker take "story by" credit. WDAS hired several writers to pen the script for *Moana*, including Defendant Pamela Ribon ("Ribon"), who was brought in to steer the script into a different direction at the time.

WDAS would regularly consider materials from outside sources until Disney acquired Pixar in 2006. Indeed, the vast majority of WDAS films have been adaptations of existing fairytales. Even after the 2006 acquisition of Pixar, WDAS considered materials that had been submitted to it years ago. Mandeville Films produced live-action and hybrid (i.e., partially animated) films, but there "were no hard and fast rules" as to what Mandeville Films representatives could submit to Disney, and Mandeville Films would ultimately consider and submit materials for "a wide range of types of movies."

Despite one of *Moana's* directors initially curiously disputing it during deposition, *Moana's* directors, who made the initial pitch for what became *Moana*, ultimately conceded that, initially, the pitch involved a modern-day boy who time-travels to ancient Polynesia on an outrigger canoe to save an island from destruction.

This reality simply "cannot satisfactorily be accounted for by a theory of coincidence, independent creation, prior common source." *Id*., at 1103.

By way of further example, Ribon worked on a so-called "sham script" involving *Moana* surfing, which was later scrapped, as Disney wanted to avoid any reference to surfing. Surfing Moana does appear in two books, one showing her speaking to a sea turtle while on her surfboard, like Bucky, and Moana's pet pig surfing on the back of a sea turtle, like *Bucky's* Keahe. The other book tells the story of Moana repeatedly getting wiped out until she finally masters the waves, like Bucky. This book was created by Shurer.

The record also contains undisputed evidence that WDAS "intentionally" stayed away from Hawaii and any reference to Pele. The record contains additional scrapped elements curiously similar to *Bucky*. This case neatly fits into the line of cases that recognizes that "some dissimilarities may be particularly suspicious."

While the Court has granted summary judgment in favor of Disney, the Defendants never moved for partial summary judgment or for summary judgment on the issue of conspiracy liability. Accordingly, the Court never made any ruling of any kind at summary judgment regarding this central issue in the case. Moreover, Defendant Buena Vista Home Entertainment has essentially admitted that it continued to infringe on Plaintiff's work well beyond the conspiracy through video sales and by virtue of streaming of Moana on Disney Plus – reaping untold hundreds of millions, if not billions, of dollars. None of these issues were decided adversely at summary judgment and if anything Plaintiffs all but prevailed there considering that the Defendants – although given the chance – never moved for any summary judgment ruling negating these critical elements of the Second Amended Complaint.

Because of the foregoing realities of this case, as set forth below, Plaintiff believes bifurcation of certain issues will substantially streamline the trial of this cause and will prove to be in furtherance of judicial economy and substantial justice.

## II. ISSUES OF LAW

The issues to be decided by the jury in this matter of law and fact are whether, a) Defendant infringed on Plaintiff's work; b) whether Defendant or its parent company had access to Plaintiff's work; c) whether the works are substantially similar; d) whether any other entities are liable for the infringement under the theory of conspiracy as alleged in the Second Amended Complaint[1]; e) whether the complaint should be amended to conform to the evidence and f) what damages has Plaintiff suffered as a result of the infringement.

Plaintiff satisfies the first element of the two-part infringement test because there is no disputed issue of material fact regarding Plaintiff's ownership of copyrights in the *Bucky* works that were registered with the U.S. Copyright Office.

As to access: "Because, in most cases, direct evidence of copying is not available, a plaintiff may establish copying by showing that the infringer had access to the work and that the two works are substantially similar." *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir. 1990), *overruled by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin on other grounds*, 952 F.3d 1051 (9th Cir. 2020); *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350, 354 (4th Cir. 2001) (access shown where intermediary/third party "shared an office with [defendant's owner] (who had a close relationship with the alleged infringers)" and had an "office was within 'earshot' of" infringer).

This case involves not only striking similarity in *Bucky* and *Moana* and *Moana*-related books, but also, extraordinarily eerie similarity in highly original expressions of ideas in the original concept that eventually became *Moana* that they are beyond happenstance. This necessarily serves as evidence of access, especially

---

[1] In the alternative, or in conjunction, whether there is enterprise liability.  *See, Buchanan v. Watkins & Letofsky, LLP*, 30 F.4th 874 (9th Cir. 2022). The test is interrelated operations; common management; centralized control and common ownership or financial control. *Id*.

"in light of the totality of the evidence in the record." *Stewart,* 574 F. Supp. 2d at 1100. "In deciding whether works are strikingly similar, 'the uniqueness and complexity of the common features' should be considered." *Id*., at 1103 (citing *Selle v. Gibb*, 741 F.2d 896, 904 (7th Cir. 1984) (finding that similarities can be striking when they are "particularly intricate")). *Selle,* 741 F.2d at 904 (citing e.g., *Meier Co. v. Albany Novelty Manufacturing Co.,* 236 F.2d 144, 146 (2d Cir.1956) (changes suggest a "crude effort to give the appearance of dissimilarity" are themselves evidence of copying)); *Malibu Textiles, Inc. v. Label Lane Int'l, Inc*., 922 F.3d 946, 953 (9th Cir. 2019) ("a jury could find these to be knowing modifications, which could be evidence of willful copying."); *Concord Fabrics, Inc. v. Marcus Bros. Textile Corp*., 409 F.2d 1315, 1316 (2d Cir. 1969) ("the very nature of these differences only tends to emphasize the extent to which the defendant has deliberately copied from the plaintiff.").

The totality of the evidence supports an overwhelming case of access.

In regards to substantial similarity: As a threshold matter, though ideas themselves are not protectible, it is equally well-established that, "[t]o make out infringement, the plaintiff must establish that … that there is 'substantial similarity *not only of the general ideas* [of the works] but of the expression of those ideas *as well*.'" *Landsberg v. Scrabble Crossword Game Players, Inc.,* 736 F.2d 485, 488 (9th Cir. 1984) (emphases added); *Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1442 (9th Cir. 1994) (same); *Data E. USA, Inc. v. Epyx, Inc.,* 862 F.2d 204, 206 (9th Cir. 1988) (same).

In applying the extrinsic test, Plaintiff's liability expert, David Román, Ph.D. ("Román"), finds that so many creative protectible expressions of ideas spirited away from *Bucky* and into *Moana* that "there would be no *Moana* without *Bucky*." Román Report, at 38. Román also concludes that the many elements lifted from *Bucky* "go to the heart *Bucky* and are qualitatively significant." Román Rebuttal Report, at 14. This case markedly differs from most other copyright infringement

cases in that it does not merely assert discrete elements that are randomly scattered throughout the works, as was, for example, the case in *Alfred v. Walt Disney Co.*, 388 F. Supp. 3d 1174. In the *Alfred* case, the plaintiff's script was based on "the basic elements of the *Pirates of the Caribbean* [theme park] ride" that *already existed* at the time, *Alfred*, 388 F. Supp. 3d at 1183, and the similarities alleged in *Alfred* generally "include[d] treasure maps, ghost pirates, the 'undead,' the supernatural, ships flying black sails, skeletons, privateers, naval attacks, dark fog, the 'pirate code,' ghosts, and sea monsters," and, otherwise, the works had different plots, *id*., at 1183-84 (noting that "Defendants' Films do not focus on a search for treasure"). In the case at bar, Plaintiff is not asserting such generic motifs, though they also appear in both works, including: outrigger canoes, island princesses, village chiefs, leis, feathered headdresses, ocean battles, heroic victories, dolphins racing canoes, other identical marine animals, island animals, such as chickens and pigs, lava, poi/taro, supernatural events, and monsters.

Dr. Roman's expert opinions will inform the jury on the question of substantial similarity in this case because certain elements are rooted in Polynesian mythology and folklore. Furthermore, Terry Hunt, Ph.D., a renowned expert in the field of Polynesian culture and folklore has provided detailed opinions that support the claim of substantial similarity. In contrast, Defendants' rebuttal expert, Marie Alohalani Brown, Ph.D., happens to be the former student of Hunt and admitted that Hunt is a "famous scholar" and during her deposition, Brown retracted most of her rebuttal opinions.

Defense experts are expected to raise the issue that the similarities are simply *scènes à faire*. The doctrine is mentioned three times in Rovin's two reports, each proving his misapprehension of the doctrine. It is clear that Rovin simply engaged in a cursory examination which are being used as tactics designed to distract and confuse given that neither he, nor any of Defendant's experts are able to identify a

single *scène à faire*. Thus, the issue of whether Moana's similarities to Bucky's are based on *scène à faire* should be excluded from being introduced as evidence.

Similarly, Defendant will argue the defense of "independent creation." However, said defense is negated by a showing of access and/or striking similarity. *See, Wachowski*, 574 F. Supp. 2d at 1101 ("'striking similarity' simply means that, in human experience, it is virtually impossible that the two works could have been independently created") (citing 4 Melville B. Nimmer & David Nimmer, Nimmer On Copyright, § 13.02[B] (2005)); *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1170 (7th Cir.1997) ("a similarity that is so close as to be highly unlikely to have been an accident of independent creation is evidence of access"); *Gaste v. Kaiserman*, 863 F.2d 1061, 1067–68 (2d Cir. 1988) (holding that striking similarity between works permits an inference of access because it establishes a high probability of copying and negates any reasonable possibility of independent creation); and *see, Doran v. Sunset House Distrib. Corp.,* 197 F. Supp. 940, 948 (S.D. Cal. 1961), *aff'd,* 304 F.2d 251 (9th Cir. 1962) ("access is but a means of eliminating coincidence or independent effort as an explanation for likenesses").

This is a case where the evidence adduced shows a staggering display of striking similarities between the two works at issue in this case.

The jury should also be tasked with determining whether or not Disney and its related entities are responsible for the theft and infringement under a conspiracy theory as alleged in the Second Amended Complaint. The Second Amended Complaint states in pertinent part:

Paragraph 22, how each Defendant "conducting themselves as co-conspirators and joint venturers with respect to the fraudulent theft and extensive exploitation of Woodall's intellectual property and trade secrets ...

Paragraph 36, how each Defendant "pursuant to the conspiracy described in this Complaint, the Defendants pirated, stole and otherwise purloined the registered, copyright [protected materials] submitted [with the] Presentation Package and other

materials, as fully set forth in this Complaint, belonging to Woodall in order for them to be able to produce the animated film, Moana."

Paragraph 38, how the named Defendant BVHE, "beginning in at least 2011 and continuing to the date of this Complaint, Defendants knowingly conspired with each other to develop, produce, distribute, sell and license products associated with both Disney and Moana that both infringe upon the copyrights of Plaintiff and otherwise violate Plaintiff's rights as alleged herein. These violations took numerous forms, including, but not limited to:
a) Defendant Mandeville and its officers and directors were able to bind Disney and induce action and inaction by Disney to further the conspiracy, both through their relationships with officials at Disney and their co-venturing creative relationships in other ventures with Disney. They used this ability to assure that Disney affected their and Marchick's plan to steal Bucky for the sole objectives of profit and self-aggrandizement;
b) Ribon, who received a Moana screen credit "Story By," assisted the Defendants in morphing the Bucky screenplay into the Moana screenplay knowing that by doing so she was assisting in the ultimate theft in protection and furtherance of Marchick's fraud and in pursuing her own business interests;
c) In order to assure that Woodall continued to deliver all of his Bucky-related ideas to and into the Defendant's fraudulent scheme, Marchick repeatedly and systematically concealed the scheme and lied to Woodall in order to both induce him to transfer his intellectual property and trade secrets to her as well as to assure that Woodall wouldn't find out the truth until after Moana was released and the fraudulent object of the conspiracy, i.e., the development and realization of more than a billion dollars in profit, was realized;
d) The Disney defendants operated as motion picture conglomerates usually do

in cases of intellectual property theft, with (i) the film related entities of the conglomerate (in this case The Walt Disney Company, Walt Disney Pictures and Walt Disney Animation Studios) assuring the exploitation, development and release of the movie into theatrical and secondary markets, and (b) then the commercialization entities (in this case Disney Enterprises, Inc., Disney Consumer Products, Inc., Disney Consumer Products & Interactive Media, Inc., Walt Disney Direct-To-Consumer & International, Disney Book Group, LLC, Disney Interactive Studios, Inc., Disney Store USA, LLC, Disney Shopping, Inc., Buena Vista Home Entertainment, Inc. and Buena Vista Books, Inc.) assuring and implementing the production and distribution of products derived from the motion picture on a national and worldwide basis. All of the foregoing Disney defendants intentionally affected these specific activities with classic wrongful intentions of making off with and profiting from the stolen assets, which they have done as of the date of filing this Complaint in the sum of nearly $1 billion.

Paragraph 37 explaining how the Defendants engaged and profited in the civil conspiracy: "As a further example of Disney's exploitation of the Moana franchise, in late 2019, Disney introduced its subscription based online streaming portal called Disney+, at which Moana is prominently displayed as being available to online subscribers. The current and ultimate financial results of all such massive marketing efforts by Disney of the full array of all Moana products is currently unknown to Woodall but will be the subject of discovery and evidence presented at trial or in connection with summary judgment proceedings as applicable."

Civil conspiracy is a viable cause of action in California as held in *Applied Equip. Corp. v. Litton Saudi Arabia, Ltd.,* 869 P.2d 454 (Cal. 1994).

To the extent the evidence adduced permits additional claims or causes of actions, the pleadings should be amended to conform to the evidence as the Rule

governing amendments allows for amendments even during trial. See, F.R.Civ.P. 15(b)(2) and *American Family Mut. Ins. Co. v. Hollander*, 705 F.3d 339 (8th Cir. 2013).

The expert reports of Dr. Smith and Cedar Boschan show the substantial damages that have been suffered by plaintiff as a result of the theft and infringement of his works. Depending on the damage model, the damages range from millions to billions of dollars and continuing because of the ongoing use of the work by streaming through Disney Plus, in Moana 2, a live action movie, and theme park. Furthermore, Defendant has not provided all of the financial material required under their obligations in responding to discovery and as required under their ongoing obligation to supplement discovery under Rule 26(e).

### III. **BIFURCATION OF ISSUES**

Plaintiff believes that bifurcation of some issues is appropriate and in the interest of justice and judicial economy.

Plaintiff believes that bifurcation and a trial on the issue of fraud upon the court with respect to the claim by Disney Defendants that all revenues arising from the non-theatrical display of Moana inured solely to Buena Vista Home Entertainment, Inc. Summary Judgment Order, Dkt. No. 558, page 13 ("Defendants acknowledge Plaintiff has a "timely claim" for copyright infringement as to Defendant Buena Vista Home Entertainment, Inc. ("BVHE"), "whose home video distribution of Moana continued beyond April 24, 2017." (Dkt. No. 491, Defendants' Reply at 8.) would reduce time and expense.

The Disney public filings prove that Disney is a conglomerate (including BVHE) that is a single entity for purposes of doing business. Disney+ revenue based on streaming, which was not the subject of a summary judgment, does not inure solely to BVHE and Plaintiff is thus entitled to prove same.

If plaintiff were allowed to bifurcate and address the foregoing, Plaintiff is entitled to various remedies including an adverse inference, a jury instruction, the continuance of the trial, and reversal of portions of the summary judgment order.

Given that the SAC alleges a viable conspiracy claim among these entities, bifurcation is simply in furtherance of Plaintiff's right to prove the conspiracy.

If Plaintiff were to suffer an adverse verdict in regards to the matter being bifurcated, and the only true Defendant were found as a matter of fact and law to be BVHE, then the trial will significantly shortened and the conspiracy claim may also become truncated in terms of applicable witnesses and proof thereon.  In the event the Defendants stipulate to the Court that following June of 2017 more than simply BVHE has received revenues from the display of Moana, then this bifurcation would be unnecessary and Plaintiff will proceed in seeking remedies as a result of the change in position.

### IV. JURY TRIAL

All remaining counts are triable to a jury as a matter of right as pled in the Second Amended Complaint and all prior iterations of the Complaint.

### V. ATTORNEY'S FEES

The Court has discretion to award fees on a copyright claim pursuant to 17 U.S.C. Section 505.

### VI. ABANDONMENT OF ISSUES

Neither party has abandoned any issues or claims.  Plaintiff reserves the right to raise any claims as may be necessary in the interests of justice including all matters and

motions addressed at the parties' meet and confer which included motions in limine and Daubert motions.

Dated: December 24, 2024            Respectfully Submitted,

GERARD FOX LAW PC

SANCHEZ-MEDINA, GONZALEZ, QUESADA, LAGE, GOMEZ & MACHADO, LLP

By: *s/Gustavo D. Lage*
     Gustavo D. Lage, Esq.

Attorneys for *Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 24th date of December 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Electronic Service List for this Case.

Dated: December 24, 2024           Respectfully Submitted,


                                    *s/Gustavo D. Lage*
                                    Gustavo D. Lage, Esq.