Michael D. Roth (Bar. No. 217464)
mroth@kslaw.com
Arwen R. Johnson (Bar No. 247583)
arwen.johnson@kslaw.com
KING & SPALDING LLP
633 W. 5th Street, Suite 1600
Los Angeles, California 90071
Telephone: (213) 443-4355

Robert N. Klieger (Bar No. 192962)
rklieger@hueston.com
Moez M. Kaba (Bar No. 257456)
mkaba@hueston.com
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4310
Facsimile: (888) 775-0898

Peter Shimamoto (Bar No. 123422)
pshimamoto@willenken.com
Kenneth M. Trujillo-Jamison (Bar No. 280212)
ktrujillo-jamison@willenken.com
Michelle K. Millard (Bar No. 298245)
mmillard@willenken.com
WILLENKEN LLP
707 Wilshire Blvd., Suite 3850
Los Angeles, California 90017
Telephone: (213) 955-9240
Facsimile: (213) 955-9250

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

BUCK G. WOODALL, a.k.a. Buck Woodall, an individual,

Plaintiff,

v.

THE WALT DISNEY COMPANY, a Delaware Corporation; et al.,

Defendants.

Case No.: 2:20-cv-03772-CBM-E

**DEFENDANTS' MOTION FOR ATTORNEYS' FEES PURSUANT TO 18 U.S.C. § 1836, CAL. CIV. CODE § 3426.4, AND 17 U.S.C. § 505**

Date: April 22, 2025
Time: 10:00 a.m.
Courtroom: 8D

Trial Date: February 25, 2025

Assigned to Hon. Consuelo B. Marshall
Magistrate Judge: Charles F. Eick

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on April 22, 2025 at 10:00 a.m. or as soon thereafter as the matter may be heard, in Courtroom 8D of the above-entitled Court, located at 350 W. 1st Street, Los Angeles, California 90012, Defendants The Walt Disney Company, Walt Disney Pictures, Walt Disney Animation Studios, Disney Enterprises, Inc., Disney Consumer Products, Inc., Disney Consumer Products & Interactive Media, Inc., Walt Disney Direct-to-Consumer & International, Disney Interactive Studios, Inc., Disney Store USA, LLC, Disney Shopping, Inc., Buena Vista Home Entertainment, Inc., Buena Vista Books, Inc., Mandeville Films, Inc., Jenny Marchick, and Pamela Ribon (collectively, "Defendants") will, and hereby do, move for an award of attorneys' fees in the amount of $5,681,382.30 in connection with their defense of this case.

This motion is brought pursuant to the Defend Trade Secret Act, the California Uniform Trade Secret Act, and the Copyright Act on the grounds that Plaintiff's trade secret misappropriation claims were objectively specious and were brought by Plaintiff in bad faith, and all of the factors that courts consider in determining whether to award fees under the Copyright Act weigh strongly in favor of Defendants. *See* 18 U.S.C. § 1836(b)(3)(D); Cal. Civ. Code § 3426.4; 17 U.S.C. § 505. The number of hours worked and the hourly rates charged are reasonable in view of the work performed, the risks of the case, the qualifications and experience of Defendants' attorneys, and the successful result they obtained.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declarations of Robert N. Klieger and Peter Shimamoto filed concurrently herewith, all pleadings, records, and papers on file, such matters of which this Court may take judicial notice, and such other evidence and argument the Court may consider in connection with this motion.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on March 17, 2025.

Dated: March 25, 2025

HUESTON HENNIGAN LLP
KING & SPALDING LLP
WILLENKEN LLP

By: */s/ Robert N. Klieger*
Robert N. Klieger
Attorneys for Defendants

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................ 1

II. ARGUMENT ............................................................................................ 2

A. The Court Should Award Fees Incurred In Connection With Plaintiff's Trade Secret Misappropriation Claims ........................ 2

1. Legal Standard ........................................................................ 2

2. Plaintiff's Misappropriation Claims Were Objectively Specious ........................................................................ 3

3. Plaintiff Acted With Subjective Bad Faith In Bringing And Maintaining His Misappropriation Claims ........................................................................ 7

B. The Court Should Award Fees Incurred In Connection With Plaintiff's Copyright Claim ........................................................ 13

1. Legal Standard ........................................................................ 13

2. Defendants Achieved Complete Success On Plaintiff's Copyright Claim ................................................ 15

3. Plaintiff's Copyright Claim Was Objectively Unreasonable ........................................................................ 15

4. Plaintiff Engaged In Frivolous And Bad Faith Tactics ........................................................................ 16

5. Awarding Fees As Compensation And Deterrence Furthers The Policy Of The Copyright Act ............................... 19

C. Defendants' Requested Fees Are Reasonable ...................................... 20

1. The Number Of Hours For Which Defendants Seek Fees Is Reasonable ........................................................................ 21

2. Defendants' Requested Hourly Rates Are Reasonable ........................................................................ 23

III. CONCLUSION ........................................................................................ 25

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alamar Biosciences, Inc. v. Difco Labs., Inc.*,
1996 WL 784495 (E.D. Cal. Feb. 27, 1996) ....................4

*Animal Blood Bank, Inc. v. Hale*,
2013 WL 12305504 (E.D. Cal. Aug. 27, 2013)....................13

*Bernal v. Paradigm Talent & Literary Agency*,
788 F. Supp. 2d 1042 (C.D. Cal. 2010)....................16

*Bridgeport Music, Inc. v. Diamond Time, Ltd.*,
371 F.3d 883 (6th Cir. 2004)....................15

*Cabrales v. Cnty. of Los Angeles*,
864 F.2d 1454 (9th Cir. 1988)....................23

*Camacho v. Bridgeport Fin., Inc.*,
523 F.3d 973 (9th Cir. 2008)....................23

*Carson v. Billings Police Dep't*,
470 F.3d 889 (9th Cir. 2006)....................23

*Cherokee Chem. Co., Inc. v. Frazier*,
2022 WL 2036305 (C.D. Cal. Apr. 27, 2022)....................3

*Chivalry Film Prods. v. NBC Universal, Inc.*,
2007 WL 4190793 (S.D.N.Y. Nov. 27, 2007)....................20

*City of Burlington v. Dague*,
505 U.S. 557 (1992) ....................20

*Corwin v. Walt Disney World Co.*,
2008 WL 754697 (M.D. Fla. Mar. 18, 2008) ....................17, 18

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
479 F.3d 1099 (9th Cir. 2007) ....................3

TABLE OF AUTHORITIES (cont.)

Page(s)

*Dane-Elec Corp., USA v. Bodokh*,
35 Cal. App. 5th 761 (2019) .......... 13

*Erickson Prods. Inc. v. Kast*,
2024 WL 5011954 (N.D. Cal. Dec. 6, 2024) .......... 14

*Fantasy, Inc. v. Fogerty*,
94 F.3d 553 (9th Cir. 1996) .......... 14, 16

*FLIR Sys., Inc. v. Parrish*,
174 Cal. App. 4th 1270 (2009) .......... 3

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517 (1994) .......... 14

*Gable v. Nat'l Broad. Co.*,
2010 WL 11506430 n.10 (C.D. Cal. Aug. 6, 2010) .......... 21, 22

*Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc.*,
95 Cal. App. 4th 1249 (2002) .......... 3

*Good Job Games Bilism Yazilm ve Pazarlama A.S. v. SayGames LLC*,
2023 WL 3260528 (N.D. Cal. May 4, 2023) .......... 24, 25

*Identity Arts v. Best Buy Enter. Servs. Inc.*,
2008 WL 820674 (N.D. Cal. Mar. 26, 2008) .......... 19

*Inhale, Inc. v. Starbuzz Tobacco, Inc.*,
755 F.3d 1038 (9th Cir. 2014) .......... 14

*Kirtsaeng v. John Wiley & Sons, Inc.*,
579 U.S. 197 (2016) .......... 14

*Loomis v. Cornish*,
836 F.3d 991 (9th Cir. 2016) .......... 16

*Lynwood Invs. CY Ltd. v. Konovalov*,
2023 WL 2918754 (N.D. Cal. Apr. 11, 2023) .......... 24

TABLE OF AUTHORITIES (cont.)

Page(s)

*Mahan v. Roc Nation, LLC*,
2015 WL 4388885 (S.D.N.Y. Jul. 17, 2015) ........................................ 15

*Mattel, Inc. v. Walking Mountain,Prods.*,
353 F.3d 792 (9th Cir. 2003) ........................................ 14

*Meta-Film Assocs., Inc. v. MCA, Inc.*,
586 F. Supp. 1346 (C.D. Cal. 1984) ........................................ 16

*Mintz v. Mark Bartelstein & Assocs. Inc.*,
2013 WL 12182602 (C.D. Cal. Jun. 14, 2013) ........................................ 3

*Moore v. Jas. H. Matthews & Co.*,
682 F.2d 830 (9th Cir. 1982) ........................................ 23

*Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
953 F.3d 638 (9th Cir. 2020) ........................................ 14

*Perfect 10, Inc. v. GigaNews, Inc.*,
2015 WL 1746484 (C.D. Cal. Mar. 24, 2015) ........................................ 21, 23, 24

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ........................................ 7

*Sandy v. Paramount Pictures Corp.*,
2025 WL 659214 (C.D. Cal. Feb. 14, 2025) ........................................ 15, 19

*Smith v. Jackson*,
84 F.3d 1213 (9th Cir. 1996) ........................................ 14

*Swarmify, Inc. v. Cloudflare, Inc.*,
2018 WL 4680177 (N.D. Cal. Sept. 28, 2018) ........................................ 3

*Van Gerwen v. Guaranatee Mut. Life Co.*,
214 F.3d 1041 (9th Cir. 2000) ........................................ 20

TABLE OF AUTHORITIES (cont.)

Page(s)

*VSL Corp. v. Gen. Techs., Inc.*,
1998 WL 124208 (N.D. Cal. Jan. 5, 1998) ... 3

*Zamoyski v. Fifty-Six Hope Rd. Music Ltd., Inc.*,
767 F. Supp. 2d 218 (D. Mass. 2011) ... 15

*Zobmondo Entm't LLC v. Falls Media* LLC,
2009 WL 202034 (C.D. Cal. Jan. 23, 2009) ... 19

**Statutes**

17 U.S.C. § 505 ... 1, 13

17 U.S.C. § 507 ... 15

18 U.S.C. § 1836 ... 1, 2, 3

Cal. Civ. Code § 3426.6 ... 1, 2, 3

Cal. Penal Code § 470 ... 5

# I. INTRODUCTION

Plaintiff Buck Woodall filed this case in April 2020 and, over the course of three successive complaints, asserted claims against Defendants for alleged misappropriation of trade secrets, fraud, and copyright infringement. Plaintiff propounded hundreds of interrogatories and thousands of requests for production. Defendants produced or made available for inspection the entire development file for *Moana*, more than 2.5 million emails, more than 6.5 million visual development files, and more than 20 terabytes of data. Defendants took or defended depositions of 17 fact witnesses, defended 12 custodian of records depositions, took or defended depositions of eight expert witness, briefed at least 18 discovery motions and motions for review and at least five contempt and sanctions motions, successfully briefed and argued cross-motions for summary judgment, and obtained a unanimous verdict in favor of the one remaining Defendant following a two-week jury trial.

Defendants should never have been required to incur any of the time or expense of defending against Plaintiff's claims, all of which were specious from the outset. Plaintiff was required to file his statutory and common law claims within three years from the date he first saw *Moana* and suspected it copied his "Bucky" materials. Plaintiff first saw *Moana* in the theater and was convinced of copying in December 2016, but he did not file suit until April 24, 2020, more than three years later. Had Plaintiff been forthright in his complaints, *all* of his claims, aside from the single copyright claim against Defendant Buena Vista Home Entertainment, Inc. ("Buena Vista") that ultimately proceeded to trial, would have been dismissed as time-barred. Instead, Plaintiff lied, asserting that he had not seen *Moana* until June or July 2017, such that his claims were timely. Plaintiff was thereby able to maintain misappropriation, fraud, and copyright claims against 15 separate defendants, including two individuals, for more than four years, until the Court granted summary judgment in November 2024.

Plaintiff's misappropriation claims were objectively unreasonable, and filed and maintained in subjective bad faith, for other reasons as well, including that they were based on a forged Confidentiality Agreement and concerned purported trade secret materials that had Plaintiff had, in fact, made public on his own website, on public television in Hawaii, and through Copyright Office deposits. Even the copyright claim that proceeded to trial against Buena Vista was objectively unreasonable based on the absence of *any* evidence of access by *Moana*'s creators, as well as for the other reasons set forth in the motion for judgment as a matter of law that Buena Vista is filing contemporaneously herewith. Dkt. No. 811. Plaintiff expected that by seeking *billions* of dollars in damages on frivolous claims, he could leverage an undeserved settlement from Defendants. Defendants chose instead to defend and achieved a judgment in their favor on every one of Plaintiff's claims for relief.

*All* of the factors that courts consider in deciding whether to award fees to a prevailing defendant under the Defend Trade Secrets Act ("DTSA"), the California Uniform Trade Secrets Act ("CUTSA"), and the Copyright Act weigh strongly in favor of Defendants, and Defendants therefore respectfully request that the Court award them the attorneys' fees they were improperly forced to incur over the nearly five years this case was pending.

## II. ARGUMENT

### A. The Court Should Award Fees Incurred In Connection With Plaintiff's Trade Secret Misappropriation Claims

#### 1. Legal Standard

The DTSA and CUTSA each authorize a court to award attorneys' fees to the "prevailing party" if a claim of trade secret misappropriation is made in "bad faith." 18 U.S.C. § 1836(b)(3)(D); Cal. Civ. Code § 3426.4. "[C]ourts have developed a two-prong standard to determine whether a claim for trade secret misappropriation was made in bad faith: (1) objective speciousness of the claim,

and (2) subjective bad faith in bringing or maintaining the action, *i.e.*, for an improper purpose." *Cherokee Chem. Co., Inc. v. Frazier*, 2022 WL 2036305, at *3 (C.D. Cal. Apr. 27, 2022); *see Swarmify, Inc. v. Cloudflare, Inc.*, 2018 WL 4680177, at *2 (N.D. Cal. Sept. 28, 2018) (applying same test to DTSA and CUTSA claims for attorneys' fees).

Objective speciousness exists "where the action superficially appears to have merit but there is a complete lack of evidence to support the claim." *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1275 (2009). With respect to subjective bad faith, "[a] subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence." *Cherokee Chem.*, 2022 WL 2036305, at *3. Subjective bad faith "may be inferred where the specific shortcomings of the case are identified by opposing counsel, and the decision is made to go forward despite the inability to respond to the arguments raised." *Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc.*, 95 Cal. App. 4th 1249, 1264 (2002). "It is firmly established that pursuing a trade secret claim through a dispositive motion without any basis demonstrates subjective bad faith." *Mintz v. Mark Bartelstein & Assocs. Inc.*, 2013 WL 12182602, at *7 (C.D. Cal. Jun. 14, 2013); *see CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1112 (9th Cir. 2007) (finding subjective bad faith where plaintiff refused to withdraw specious claim until after defendant filed a motion to dismiss); *VSL Corp. v. Gen. Techs., Inc.*, 1998 WL 124208, at *4 (N.D. Cal. Jan. 5, 1998) (finding subjective bad faith where defendant was required to bring dispositive motion after plaintiff failed to withdraw unsupported misappropriation claim).

### 2. Plaintiff's Misappropriation Claims Were Objectively Specious

Plaintiff's trade secret misappropriation claims were objectively specious for a number of reasons. *First*, the claims were time-barred from the outset. Plaintiff was required to file his claims within three years from the date he first suspected

that *Moana* had misappropriated his trade secrets. 18 U.S.C. § 1836(d); Cal. Civ. Code § 3426.6; *see* Dkt. No. 558 at 3-4 (citing cases). Plaintiff testified at deposition that he "had [his] suspicions" when he saw *Moana* in the theater in December 2016. Klieger Decl., Ex. A (Pl.'s Depo Tr. 247:17-25). Plaintiff was more forthright at trial, testifying that, by the time he finished the screening, "I was sure they copied my material." Trial Tr. 560:24-561:2 (Woodall). Yet, Plaintiff did not file this lawsuit until April 24, 2020, more than three years later.

How, then, did Plaintiff state misappropriation claims that were capable of surviving a motion to dismiss and providing the basis for years of written discovery, depositions, and discovery disputes? Plaintiff did so by alleging in each of his complaints, including the operative Second Amended Complaint, that he had not seen *Moana* until he watched it on DVD in June or July 2017—*i.e.*, less than three years before he filed suit. Dkt. No. 1 ¶ 5; Dkt. No. 18 ¶ 36; Dkt. No. 94 ¶ 36. That was a lie. Plaintiff knew that he had seen *Moana* in the theater in December 2016. Not only that, but Defendants discovered by piecing together information in Plaintiff's productions that Plaintiff had also watched the movie on DVD *by March 2017*. *See* Klieger Decl. ¶¶ 2-4 & Exs. B, C. Whether measured from the date of *Moana*'s release, from the date Plaintiff saw the movie in the theater, or from the date he first watched it on DVD, Plaintiff's claims were untimely as a matter of law. *See* Dkt. No. 558 at 4-5. "If a claim is clearly time-barred, then asserting the claim is frivolous and sanctionable." *Alamar Biosciences, Inc. v. Difco Labs., Inc.*, 1996 WL 784495, at *1 (E.D. Cal. Feb. 27, 1996).

*Second*, Plaintiff's misappropriation claims were based on a Confidentiality Agreement that Plaintiff stated Defendant Jenny Marchick had signed on October 22, 2003, and to which the remaining Defendants had allegedly acknowledged they were bound. Dkt. No. 18 ¶¶ 29, 61; Dkt. No. 94 ¶¶ 29, 67. Plaintiff alleged that because he provided his trailer and the 2011 script to Marchick only *after* she had signed the Confidentiality Agreement, he had taken reasonable steps to protect

those purported trade secrets. Dkt. No. 18 ¶¶ 29, 35, 61, 73; Dkt. No. 94 ¶¶ 29, 35, 56, 58, 67, 79. Had Plaintiff provided those materials to Marchick without her having signed the Confidentiality Agreement, and without the other Defendants having agreed to be bound, he could not have stated misappropriation claims at all.

But the Confidentiality Agreement upon which Plaintiff's misappropriation claims depended was not authentic. It was a fake. Plaintiff found an unaltered version of the Confidentiality Agreement in his files in the spring of 2020, when he was preparing to file suit. Trial Tr. 701:10-12 (Woodall). That unaltered version had a signature, but no name, and no date. *Id.* 701:13-17 (Woodall). The signature on the document was that of Pearl Young, a teenager who had modeled for Plaintiff years earlier. *Id.* 707:10-11 (Woodall); Klieger Decl., Ex. D (Young Tr. 8:24-9:4). Plaintiff handwrote Marchick's name under Young's signature, and he backdated the agreement nearly 17 years, to October 22, 2003. Trial Tr. 701:18-23 (Woodall). Plaintiff then attached that forgery to both his First Amended Complaint and his operative Second Amended Complaint as "a true and correct copy" of an agreement that Marchick had signed. Dkt. No. 18 ¶ 29 & Ex. C; Dkt. No. 94 ¶ 29 & Ex. C.[1] The Court specifically relied upon that forged Confidentiality Agreement in denying Defendants' motion to dismiss Plaintiff's misappropriation claims from the Second Amended Complaint, thereby allowing those claims to proceed to discovery. *See* Dkt. No. 101 at 10.

---

[1] Plaintiff has at various times asserted that the Confidentiality Agreement cannot be a forgery because Plaintiff did not actually sign Marchick's name to the Confidentiality Agreement; he simply wrote her name under someone else's signature. Plaintiff misunderstands the law. Every person who, with intent to defraud, forges the handwriting of another *or* falsely makes or alters a contract or other specified documents after signing—in this case, by adding Marchick's name and the October 2003 date—is guilty of forgery. Cal. Penal Code § 470(b)-(c). In any event, the debate is rather semantic, because falsification of evidence constitutes a fraud on the Court and an assault on the justice system regardless of whether it is separately chargeable as a crime.

*Third*, even if the Confidentiality Agreement had been authentic, Plaintiff *still* never had a good faith basis to allege he had taken reasonable steps to protect the confidentiality of his purported trade secrets. The Court granted Defendants' motion to dismiss the misappropriation claims from the First Amended Complaint, holding that any materials that had been publicly available on Plaintiff's website or deposited with the Copyright Office could not be trade secrets, and that Plaintiff had not specified any alleged trade secrets that did not fall into one of those categories. Dkt. No. 91 at 18-22. Plaintiff "cured" this deficiency by alleging that neither his "Bucky" trailer and 2011 script had been posted to his website or deposited with the Copyright Office. Dkt. No. 94 ¶ 65. The Court relied on that allegation in denying Defendants' motion to dismiss the misappropriation claims from the Second Amended Complaint. Dkt. No. 101 at 4-8.

Again, that allegation was false. By the time Defendants filed their summary judgment motion in May 2024, Plaintiff no longer denied that the trailer had been available on his website (as well as on his YouTube page). Indeed, Plaintiff sought to introduce the trailer into evidence at trial by way of the webpage from which the trailer could be publicly viewed in 2009. *See* Klieger Decl., Ex. E (Pl.'s Proposed Trial Ex. 62); *see also* Trial Ex. 1379 at 4:28-4:44 (encouraging viewers to "visit the website buckcreations.com" to view "the finished trailer"); Klieger Decl., Ex. F (BENPRIV0019) (directing prospective counsel to "have a look at my trailer on You-Tube"). Plaintiff argued, however, that the availability of the trailer on his website did not matter because the website also included a form of confidentiality agreement. Dkt. No. 432 at 28-29. Plaintiff advanced this argument notwithstanding the fact that the Court had already held that the presence of a confidentiality agreement on Plaintiff's website was not adequate to support trade secret protection. Dkt. No. 91 at 19-20.

By the time of Defendants' summary judgment motion, discovery had also shown that nearly two-thirds of the "Bucky" trailer had publicly aired on a local

television channel in Hawaii in the late 2000s. *See* Trial Ex. 1379; Klieger Decl., Ex. G (Pl.'s Resp. to RFA No. 23). Plaintiff argued that, despite that public broadcast, the trailer still qualified for trade secret protection because the channel did not reach a large audience. *See* Dkt. No. 432 at 29. That argument, like the misappropriation claim itself, was objectively unreasonable. It makes no difference how many people actually watched the trailer on public television in Hawaii; Plaintiff's decision to make the trailer available for public viewing extinguished any viable claim of trade secret protection. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984).

Plaintiff's assertion in the Second Amended Complaint that the 2011 script had not been deposited with the Copyright Office, while literally true, was highly misleading. Discovery revealed that the 2011 script was virtually identical in all but formatting to the 2014 script that Plaintiff *had* deposited with the Copyright Office, meaning any viable claim of trade secret protection was lost. *See* Klieger Decl., Ex. H (redline of 2014 script to 2011 script).

In sum, Plaintiff lied about when he first saw *Moana*, falsified evidence, and misrepresented the public availability of the trailer and 2011 script. Only through that deceit was Plaintiff able to defeat Defendants' motion to dismiss and maintain his misappropriation claims until summary judgment three years, and millions of dollars in attorneys' fees, later. The claims were objectively unreasonable, and therefore objectively specious, from the start.

**3. Plaintiff Acted With Subjective Bad Faith In Bringing And Maintaining His Misappropriation Claims**

As the above discussion makes clear, Plaintiff's conduct with respect to his misappropriation claims was steeped in bad faith. Plaintiff knew he had seen *Moana* in the theater in December 2016. He knew he had posted the trailer to his website and that it had aired on public television in Hawaii. And he knew that the 2011 script was virtually identical to his 2014 Copyright Office deposit in all but

formatting. He knew all of these facts that rendered his misappropriation claims objectively unreasonable and subject to dismissal at the pleading stage, and he misrepresented and concealed them so that he could avoid that result. That, standing alone, is subjective bad faith.

Plaintiff's and his counsel's conduct with respect to the forged Confidentiality Agreement was especially repugnant and rises to the level of a true fraud on the Court. In September 2020, less than two months after Plaintiff filed his First Amended Complaint attaching that agreement, Defendants' counsel advised Plaintiff's counsel of their belief that the Confidentiality Agreement was a forgery. Declaration of Peter Shimamoto ("Shimamoto Decl.") ¶ 2. Plaintiff's counsel responded with feigned indignation:

> [Y]ou have suggested that either some or all of your clients will ultimately claim the Marchick confidentiality agreement is a forgery and we appreciate your advising us of same; however, your clients may wish to note that easily disproven facts or perjurious comments about the veracity of certain documents is likely something they should think carefully about before introducing them into the fray.

*Id*. ¶ 3 & Ex. A at 10.

On May 28, 2021, more than eight months *after* Defendants had placed Plaintiff's counsel on notice of the forgery, Plaintiff filed his Second Amended Complaint in which he reattached and doubled-down on his allegations regarding the Confidentiality Agreement, asserting it as the basis not only for his amended misappropriation claims but also for newly-asserted fraud claims against Marchick and the other Defendants. *See* Dkt. No. 94 ¶¶ 29, 56, 58, 67, 79, 95, 101.

During the parties' Rule 26(f) conference on October 29, 2021, Defendants' counsel advised Plaintiff's counsel that Defendants wanted to arrange for a forensic document expert to examine the original Confidentiality Agreement. Shimamoto Decl. ¶ 4. In their requests for production served the following week, Defendants asked that Plaintiff produce for inspection and copying "[t]he original of the Confidentiality Agreement attached as Exhibit C to the SAC." *Id.* ¶ 5 & Ex.

B (RFP No. 13). In response to that request, Plaintiff agreed to produce the original if it could be located after a diligent search. *Id.* ¶ 6 & Ex. C (Resp. to RFP No. 13). In emails to Plaintiff's counsel on November 17 and 30, 2021, Defendants' counsel reiterated that Defendants wanted to examine the original Confidentiality Agreement and requested proposed dates and a location for that examination. *Id.* ¶¶ 7-8 Exs. D & E.

In a December 2, 2021 response to those emails, Plaintiff's counsel explained that "we cannot tell you when you can examine the original because the files we are aware of are electronic and we believe our client is still searching for the original." *Id.* ¶ 9 & Ex. F. Plaintiff's counsel added "[t]he moment we locate 'the original confidentiality agreement' (if in fact it is located), I will inform you immediately." *Id.* Defendants' counsel replied the following day: "We hope that plaintiff will be able to locate the original of the alleged Marchick Confidentiality Agreement. If he has been able to locate it, please let us know as soon as possible." *Id.* ¶ 10 & Ex. G. Plaintiff's counsel again assured Defendants' counsel: "Yes, we will do that – we'll produce copies of the agreement with Plaintiff's production. Separately, I will let you know immediately when we have located the original, and if it is only located after the now agreed upon Plaintiff's production date of January 17, then we will produce it immediately." *Id.*

WDAS' First Set of Interrogatories requested that Plaintiff "[i]dentify the facts that support the contention in Paragraph 67 of the SAC that 'these Defendants all acknowledged that they were bound by the Confidentiality Agreement executed in support of Woodall.'" *Id.* ¶ 11 & Ex. H (Interrogatory No. 13). In sworn responses served on February 7, 2022, Plaintiff attested that Marchick had signed the Confidentiality Agreement. *Id.* ¶ 12 & Ex. I (Resp. to Interrogatory No. 13). Plaintiff reaffirmed that Marchick had signed the Confidentiality Agreement in his sworn supplemental interrogatory responses served more than six months later, on August 29, 2022. *Id.* ¶ 13 & Ex. J (Supp. Resp. to Interrogatory No. 13).

Defendants' First Set of Requests for Admission requested that Plaintiff "[a]dmit that Defendant Jenny Marchick's handwriting is not contained anywhere on the Confidentiality Agreement attached as Exhibit C to the Second Amended Complaint." *Id.* ¶ 14 Ex. K (RFA No. 1). In sworn responses served on February 7, 2022, Plaintiff, after first objecting that the undefined term "handwriting" was vague and ambiguous, unequivocally denied that request. *Id.* ¶ 15 & Ex. L (Resp. to RFA No. 1). Because the original of the Confidentiality Agreement still had not been produced, Defendants' Second Set of Requests for Admission asked Plaintiff to "[a]dmit that You do not have the original of the Confidentiality Agreement attached as Exhibit C to the Second Amended Complaint." *Id.* ¶ 16 & Ex. M (RFA No. 3). Plaintiff declined to respond to that request, instead objecting on July 5, 2022 – more than seven months after Plaintiff's counsel had pledged to "let [Defendants' counsel] know immediately when we have located the original" – that the request was "vague and ambiguous with respect to the word 'original.'" *Id.* ¶ 17 & Ex. N (Resp. to RFA No. 3). In meet and confer correspondence dated August 5, 2022, Defendants' counsel explained: "The term 'original' as used in this context means the version that was physically signed by the person whose handwriting appears on the document, as opposed to a copy of the document, which is the only version Plaintiff has produced to date. The term 'original' could not possibly have any other meaning in the context of these requests." *Id.* ¶ 18 & Ex. O at 2. Plaintiff declined to supplement his response.

On August 15, 2022, Defendants advised Plaintiff that a forensic document examiner retained by Defendants had determined to a high degree of probability based on his review of a copy of the Confidentiality Agreement that none of the handwriting on the agreement was Marchick's, and that much (if not all) of the handwriting was instead that of Plaintiff. Klieger Decl., Ex. I. Defendants again demanded that the original be made available for review. In their response the next day, Plaintiff's counsel staked out several remarkable positions:

- *First*, Plaintiff's counsel disputed that Defendants were entitled to review the original Confidentiality Agreement, despite having earlier agreed to precisely that review. *Id*.
- *Second*, Plaintiff's counsel, ignoring all of the earlier correspondence, declared it "odd that you are complaining so vociferously even though no lawyer for [Defendants] has ever before in more than two years asked for the inspection of such paper-original of the Confidentiality Agreement." *Id.*
- *Third*, again ignoring the earlier correspondence, Plaintiff's counsel asserted that Defendants' counsel's August 15 letter was "the very first time the Defendants have made the bold claim of forgery with respect to the Confidentiality Agreement." *Id.*
- *Fourth*, Plaintiff's counsel questioned why Defendants even wanted to examine the original Confidentiality Agreement in light of Plaintiff's verified interrogatory responses that Marchick had signed that agreement, upon which Plaintiff and his counsel intended Defendants to rely. *Id.*
- *Finally*, Plaintiff's counsel expressly "disagree[d] with all of [Defendants'] claims about the Confidentiality Agreement" and stated that Plaintiff's counsel looked forward to debunking those claims in court. *Id.*

*Id.*, Ex. J.

Defendants refused to back down and were finally able to make arrangements for their forensic document examiner to review the original Confidentiality Agreement in late September 2022. *Id.* ¶ 13. On the eve of that examination, and recognizing that the examination would betray Plaintiff's lies, Plaintiff's counsel finally came clean that neither the signature nor the handwriting on the Confidentiality Agreement was Marchick's:

> Our examination of the facts reveals that Plaintiff printed the name of the signor below the signature line when he retrieved this document from his files. Our understanding is that he did so to make things easy and identify one of the many signors of all confidentiality agreements.

> *To be sure, as to the signor of the document, it is, at this point, unknown to us who signed the document in 2003.*

*Id.*, Ex. K (emphasis added).

Plaintiff was somewhat less forthcoming in his deposition several weeks later. Plaintiff admitted that when he located the Confidentiality Agreement in his files, the document had a signature but no name or date. *Id.*, Ex. A (Pl.'s Depo. Tr. 161:1-23). Plaintiff further admitted that he is the one who handwrote Marchick's name and the October 22, 2003 date. *Id.* 169:7-24. However, Plaintiff continued to insist that it was Marchick's signature on the Confidentiality Agreement. *Id.* 176:7-177:8. Perhaps most remarkable, Plaintiff testified that he had disclosed to his attorneys *before* filing the First Amended Complaint that he had written Marchick's name and the October 2003 date on the Confidentiality Agreement, and that it was *their* decision to describe the document as "true and correct copy" of an agreement that Marchick had signed, without disclosing the material alterations Plaintiff had made. *Id.* 170:1-9, 172:13-174:16.

Plaintiff finally admitted at trial, in February 2025, that the signature on the Confidentiality Agreement was *not* Marchick's, but instead Pearl Young's. Trial Tr. 707:10-11 (Woodall). Although Plaintiff continued to assert that he *initially* believed the signature was Marchick's, he testified that "a number of months" after he filed suit, his attorneys "found" something in his files "that they were concerned about," and that caused him to conclude that he had been mistaken. Trial Tr. 739:3-9 (Woodall). Plaintiff did not attempt explain why it took him nearly five *years* at admit that "mistake," nor did he attempt to explain why, after discovering the "mistake," he continued to insist the signature was Marchick's in sworn written discovery responses and at deposition, and that he never sought to further amend the Second Amended Complaint to remove the Confidentiality Agreement and all allegations, and claims, with respect thereto.

Perhaps most remarkable, Plaintiff, when apologizing to the Court for "probably the biggest mistake of my life," stated that he hoped "it doesn't waste anyone's time, to say the least." Trial Tr. 739:10-18 (Woodall). Of course, it had wasted *a lot* of time—both Defendants' time and the Court's time—and *a lot* of money. By submitting and repeatedly reaffirming the authenticity of the forged Confidentiality Agreement, along with Plaintiff's other misrepresentations discussed above, Plaintiff forced Defendants to endure years of written discovery, depositions, and motion practice regarding his bogus misappropriation claims before they were finally dismissed on summary judgment in November 2024. Plaintiff's apology, even if genuine[2], was much too little, and much too late.

Defendants estimate that one-half of the fees they incurred through the Court's summary judgment ruling pertained substantially to the misappropriation claims and closely related fraud claims. Klieger Decl. ¶ 16. The Court should award Defendants those fees, in the amount of $1,794,051.55, as the prevailing parties on Plaintiff's claims under the DSTA and CUTSA. *See id.*, Ex. M.[3]

### B. The Court Should Award Fees Incurred In Connection With Plaintiff's Copyright Claim

#### 1. Legal Standard

Under section 505 of the Copyright Act, a district court may award attorneys' fees to the prevailing party on a copyright infringement claim. 17

---

[2] To Defendants, at least, Plaintiff's true regret appears not to have been his forging the Confidentiality Agreement, attaching it to his First and Second Amended Complaints as a "true and correct copy" of an agreement Marchick had executed, or repeatedly reaffirming its authenticity under oath, but instead getting caught.

[3] Because the misappropriation and fraud claims were based on the same underlying contentions, the fees associated with the fraud claims were largely overlapping with the misappropriation claims and are recoverable under CUTSA. *See Animal Blood Bank, Inc. v. Hale*, 2013 WL 12305504, at *1 (E.D. Cal. Aug. 27, 2013); *Dane-Elec Corp., USA v. Bodokh*, 35 Cal. App. 5th 761, 771 (2019).

U.S.C. § 505. "[D]efendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims for infringement." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994). This is because, as a general matter, "[a] successful defense furthers the purposes of the Copyright Act just as much as a successful infringement suit does." *Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 755 F.3d 1038, 1043 (9th Cir. 2014). "[T]he question is whether a successful *defense* of the action further[s] the purposes of the Act, not whether a *fee award* would do so." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 816 (9th Cir. 2003).

In assessing whether to award fees, a court may consider: (1) the degree of success obtained, (2) frivolousness, (3) motivation, (4) objective reasonableness of the losing party's legal and factual arguments, and (5) the need to advance considerations of compensation and deterrence. *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 653 (9th Cir. 2020). "While these factors are not exclusive and need not all be met, the Supreme Court has instructed courts to accord substantial weight to the fourth factor, the reasonableness of the losing party's legal and factual arguments." *Erickson Prods. Inc. v. Kast*, 2024 WL 5011954, at *3 (N.D. Cal. Dec. 6, 2024) (cleaned up). "[B]lameworthiness is not a prerequisite to awarding fees to a prevailing defendant," and a fee award may therefore be proper even where a plaintiff pursued a claim in good faith. *Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 558 (9th Cir. 1996); *see Smith v. Jackson*, 84 F.3d 1213, 1221 (9th Cir. 1996). Affording substantial weight to the reasonableness of a losing party's position "encourages parties with strong legal positions to stand on their rights and deters those with weak ones from proceeding with litigation." *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 205 (2016).

#### 2. Defendants Achieved Complete Success On Plaintiff's Copyright Claim

Defendants achieved complete success on Plaintiff's copyright claim. The Court dismissed Plaintiff's copyright claim as to all Defendants other than Buena Vista, and as to Buena Vista for periods through April 24, 2017, on summary judgment. Dkt. No. 558; *see Sandy v. Paramount Pictures Corp.*, 2025 WL 659214, at *2 (C.D. Cal. Feb. 14, 2025). On March 10, 2025, after eight days of testimony and evidence, the jury returned a verdict in favor of Buena Vista on Plaintiff's remaining copyright claim for periods after April 24, 2017. This first factor therefore weighs strongly in favor of a fee award to Defendants.

#### 3. Plaintiff's Copyright Claim Was Objectively Unreasonable

The second factor also weighs in favor of Defendants. Plaintiff was required to file his claim within three years of the date he first suspected infringement. 17 U.S.C. § 507(b); *see* Dkt. No. 558 at 11. Plaintiff suspected infringement when he watched *Moana* in the theater in December 2016. Klieger Decl., Ex. A (Pl.'s Depo. Tr. 247:17-25); Trial Tr. 560:24-561:2 (Woodall). Yet, Plaintiff did not file suit until April 24, 2020, more than three years later. Dkt. No. 1. Copyright claims filed after the statute of limitations has expired are considered objectively unreasonable. *See, e.g., Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 895 (6th Cir. 2004); *Mahan v. Roc Nation, LLC*, 2015 WL 4388885, at *2 (S.D.N.Y. Jul. 17, 2015); *Zamoyski v. Fifty-Six Hope Rd. Music Ltd., Inc.*, 767 F. Supp. 2d 218, 223 (D. Mass. 2011). Plaintiff's misrepresentations that he saw *Moana* for the first time in June or July 2017, and therefore within the Copyright Act's three-year statute of limitations, confirms the *knowing* unreasonableness of his position. *See* Dkt. No. 1 ¶ 5; Dkt. No. 18 ¶ 36; Dkt. No. 94 ¶ 36.

Plaintiff's remaining claim against Buena Vista for periods after April 24, 2017 was objectively unreasonable based upon the absence of any viable theory of access. *See Sandy*, 2025 WL 659214, at *2. As an essential element of his

copyright claim, Plaintiff was required prove that *Moana*'s creators had access to his copyrighted works. *See Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1357 (C.D. Cal. 1984); *see Loomis v. Cornish*, 836 F.3d 991, 995-98 (9th Cir. 2016) (affirming summary judgment for defendant where plaintiff lacked evidence creators had access to copyrighted work); 9th Cir. Model Jury Ins. No. 17.18 (plaintiff must prove access by "whoever created the work" where applicable to the facts of the case). Despite advancing multiple theories of access, Plaintiff failed to present evidence to establish anything more than bare corporate receipt, which is insufficient to support a finding of access. *See Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1056 (C.D. Cal. 2010). Indeed, by the time of trial, Plaintiff conceded even he did not believe *Moana*'s creators copied anything from his "Bucky" works. *Id.* 712:3-6 (Woodall).[4]

Plaintiff's claim against Buena Vista for periods after April 24, 2017 was also objectively unreasonable in view of Plaintiff's failure to present evidence from which a reasonable jury could rule in his favor under either the extrinsic test or the intrinsic test, as well as his failure to rebut Buena Vista's conclusive showing of independent creation. *See* Dkt. No. 811 at 26-27. In short, Plaintiff's copyright claim was objectively unreasonable on every single element of the claim, and this factor therefore weighs strongly in favor of a fee award to Defendants.

### 4. Plaintiff Engaged In Frivolous And Bad Faith Tactics

Neither a finding of frivolousness nor bad faith is a prerequisite to an award of attorneys' fees in copyright litigation. *See Fantasy*, 94 F.3d at 560. However, in this case, Plaintiff's bad faith was manifest.

---

[4] Plaintiff attempted to overcome his clear inability to establish access by *Moana*'s creators by arguing the relevant access is access *by defendant (i.e.,* Buena Vista) rather than *Moana*'s creators. Setting aside the lack of support for that proposition, Plaintiff also did not present evidence that Buena Vista had access to Plaintiff's work before it began distributing the movie on DVD and Blu-ray in March 2017.

Plaintiff's bad faith conduct begins with the same falsification of evidence and misrepresentations and concealment of material facts that are discussed above with respect to his trade secret misappropriation claims. *See* Part II.A, *supra.* But it does not end there. Rather, there are numerous other indicia of Plaintiff's bad faith in connection with his copyright claim.

*First*, in addition to lying and falsifying evidence on matters pertaining to both his misappropriation and copyright claims, Plaintiff perjured himself on matters specific to his copyright claim. For instance, in an effort to sustain his copyright claim against Defendants Buena Vista Books, Inc., Disney Store USA, LLC, Disney Consumer Products, Inc., Disney Consumer Products & Interactive Media, Inc., Disney Interactive Studios, Inc., and Walt Disney Direct-to-Consumer & International, Plaintiff stated in sworn interrogatory responses that each of those Defendants had "assisted in some capacity in the final development of characters and story lines associated with *Moana*." Shimamoto Decl. ¶¶ 20-24 & Exs. P-U. Yet, at his deposition, Plaintiff conceded that he had *no idea* whether the statements in those attorney-prepared responses were accurate (and they were not). *See* Klieger Decl., Ex. A (Pl.'s Depo. Tr. 241:18-243:5).

*Second*, Plaintiff pursued a grossly overstated damages claims. An improper motive may be gleaned from exorbitant and unjustified claims for damages. *See* *Corwin v. Walt Disney World Co.*, 2008 WL 754697, at *12 (M.D. Fla. Mar. 18, 2008) (finding it "extremely unlikely that Plaintiff was motivated by anything other than a large damages recovery" where plaintiff's expert submitted a report concluding that plaintiff "was entitled to $3.6 billion (with a 'b') in damages"). Here, Plaintiff submitted damages theories in the form of expert reports from Cedar Boschan and Stan Smith concluding that Plaintiff was entitled to between $8.6 *billion* to $23.7 *billion* in damages depending on which expert was believed. *See* Dkt. No. 571 at 43; Dkt. No. 621 at 35-36. Boschan grossly inflated her figure by speculating that Defendants had failed to report hundreds of millions of dollars

in studio revenues, and that every other business segment of The Walt Disney Company derived the same percentage of its revenues from *Moana* as the motion picture studio. Dkt. No. 571 at 31, 33. Smith derived his even more ludicrous damages figure by including more than $5 billion in Disney+ streaming revenue, an additional nearly $5 billion in revenue from a non-existent musical television series, and another more than $2 billion in revenue from then unreleased *Moana* animated and live action sequels. Dkt. No. 621 at 35-56.

Plaintiff persisted in seeking to disgorge billions of dollars in Disney+ revenues even after all Defendants other than Buena Vista had been dismissed, and notwithstanding the uncontroverted fact that Buena Vista had nothing to do with, and derived no revenues whatsoever, from Disney+. *See* Dkt. No. 576-1. Indeed, Plaintiff repeatedly sought to reintroduce Disney+ revenues into his damages calculations even after the Court had ruled, in no uncertain terms, that those amounts were not recoverable. *See, e.g.,* Dkt. Nos. 665, 677, 687, 712, 734.

*Third*, in addition to seeking Disney+ revenues through Buena Vista, Plaintiff repeatedly sought to drag the other Defendants back into the case following their dismissal on summary judgment, including by invoking a conspiracy claim that had neither been pled nor raised in opposition to Defendants' motion for summary judgment. *See, e.g.,* Dkt. Nos. 587, 617, 625. Even as late as the submission of his proposed jury instructions and verdict form, Plaintiff continued to insist that the dismissed Defendants actually remained defendants in the case against whom damages could be awarded. *See* Dkt. No. 704, 705.

*Fourth*, Plaintiff forced Buena Vista to incur unnecessary fees by, among other things, opposing motions *in limine* to exclude evidence Plaintiff had agreed should be excluded from trial, and by forcing Buena Vista to prepare for trial testimony from witnesses Plaintiff had no intention of calling. For instance, Plaintiff opposed Buena Vista's motion *in limine* to exclude evidence concerning *Moana 2* despite his counsel having "agreed that we are not going to discuss

Moana 2." Klieger Decl., Ex. K (Tr. 54:16-17). And less than two weeks before trial, Plaintiff's witness list still included 31 witness (39 if custodians of records are included), including at least 11 witnesses who he made no effort to present either live or by deposition. *See* Dkt. No. 682 (listing Benjamin Woodall, Pamela Ribon, Don H. Hall, Marc Sneitker, Jeff Ranjo, Jared Bush, Aaron Kandell, Jordan Kandell, John Lasseter, Larry Stewart, and Debbie Pluimer).

*Finally*, Plaintiff made repeated attempts to delay trial on his copyright claim so as to extend his opportunity to leverage a settlement with his inflated damages claims before an inevitable loss on the merits. Plaintiff did this by way of meritless, and untimely, motions to continue trial, to bifurcate trial so as to try damages first, and to consolidate this case with a separate case involving *Moana 2* that Plaintiff filed in January 2025. *See* Dkt. Nos. 604, 611, 617, 665, 666, 712.

These are just some of the examples of Plaintiff's frivolous and bad faith conduct that weigh strongly in favor of a fee award to Defendants.

**5. Awarding Fees As Compensation And Deterrence Furthers The Policy Of The Copyright Act**

The final factor also weighs strongly in favor of a fee award. Where a plaintiff asserts an unreasonable copyright claim, "awarding attorneys' fees as compensation and deterrence furthers the policy of the Copyright Act, as it both encourages Defendant and others to defend against meritless claims instead of paying nuisance settlements, and deters Plaintiff and others from unreasonably litigating future copyright claims." *Sandy*, 2025 WL 659214, at *3; *see Zobmondo Entm't LLC v. Falls Media LLC*, 2009 WL 202034, at *3 (C.D. Cal. Jan. 23, 2009) (awarding fees to deter "baseless claims [that] are inimical to the purposes of the Copyright Act"); *Identity Arts v. Best Buy Enter. Servs., Inc.*, 2008 WL 820674, at *6 (N.D. Cal. Mar. 26, 2008) (holding "a fee award would … aid in deterring other would-be plaintiffs from prosecuting any similarly ill-advised and meritless claims for copyright infringement"). Indeed, "denial of fees and costs to a prevailing

defendant in an objectively unreasonable copyright case may spur additional frivolous lawsuits, of exactly the sort that an award of fees and costs is designed to 'chill.'" *Chivalry Film Prods. v. NBC Universal, Inc.*, 2007 WL 4190793, at *3 (S.D.N.Y. Nov. 27, 2007).

Plaintiff's copyright claim was unreasonable for all of the reasons discussed above and in Buena Vista's accompanying motion for judgment as a matter of law. *See* Dkt. No. 811. Plaintiff's efforts to prosecute a separate copyright action involving *Moana 2*, seeking more than $10 billion in damages against many of the same defendants and on largely the same theories, demonstrates that deterrence is required as to Plaintiff in particular, as well as to others who may follow in his path.[5] Defendants' successful defense of this action plainly furthered the policies of the Copyright Act, and every factor therefore favors a fee award for Defendants.

### C. Defendants' Requested Fees Are Reasonable

To calculate reasonable attorneys' fees, courts use the lodestar approach. *See City of Burlington v. Dague*, 505 U.S. 557, 559-60 (1992). The lodestar is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *See Van Gerwen v. Guaranatee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000). Here, that lodestar calculation results in a fee award in the amount of $1,794,051.55 on Plaintiff's trade secret misappropriation claims and a fee award of $3,887,330.75 on Plaintiff's copyright infringement claim, for a total award in the amount of $5,681,382.30.

"A fee award is not unreasonable simply because it involves a lot of money. The operative question isn't the dollar amount, the question is whether the rates charged and the hours spent are reasonable in light of the totality of the litigation."

---

[5] Plaintiff's $10 billion damages claim in his *Moana 2* lawsuit includes at least $5 billion in damages with respect to *Moana* pursuant to claims that the Court held were time-barred in this action. *See* Complaint in *Woodall v. The Walt Disney Co., et al.*, Case No. 2:25-cv-00273 (Dkt. No. 1), Prayer for Relief ¶ B.

*Perfect 10, Inc. v. GigaNews, Inc.*, 2015 WL 1746484, at *27 (C.D. Cal. Mar, 24, 2015) (awarding over $5 million in fees). Although a court may consider a plaintiff's inability to pay in ruling on a fees motion, a court should not deny fees on this ground alone, as otherwise "indigent plaintiffs could bring wholly frivolous suits against successful authors in the hopes of negotiating a nuisance settlement, without any concern about having to pay attorneys' fees." *Gable v. Nat'l Broad. Co.*, 2010 WL 11506430, at *9 n.10 (C.D. Cal. Aug. 6, 2010).

**1. The Number Of Hours For Which Defendants Seek Fees Is Reasonable**

The number of hours incurred in defending against Plaintiff's claims are considerable, but they are reasonable in the grand scheme of this litigation. From the inception of this action in April 2020 through the Court's summary judgment ruling in November 2024, Defendants' counsel billed 4,225 hours to the case across six attorneys from Willenken LLP and Hueston Hennigan LLP, or roughly 77 hours per month on average. Klieger Decl. ¶ 16.[6] The work performed by counsel included:

- briefing two motions to dismiss;
- collecting and reviewing for production the entire development file for *Moana*, more than 2.5 million emails, more than 6.5 million visual development files, and more than 20 terabytes of data;
- taking and defending depositions of 17 fact witnesses;
- defending 12 custodian of records depositions;
- taking and defending depositions of eight expert witnesses;
- briefing at least 18 discovery motions and motions for review;

[6] This figure, and Defendants' resulting fee request, *excludes* more than 315 hours billed by attorneys at King & Spaulding through October 2024. Klieger Decl. ¶ 20.

- briefing at least five contempt and sanctions motions; and
- briefing and arguing cross-motions for summary judgment.

*Id*.

From November 2024 through March 11, 2025, Buena Vista's counsel billed an additional 1,950 hours across four attorneys and one paralegal in connection with pretrial filings, trial preparation, and trial. *Id.* ¶ 18.[7] The work performed by counsel included:

- preparing pretrial filings, including witness lists, exhibit lists, memorandum of contentions of fact and law, the final pretrial conference order, deposition designations and objections and counter-designations thereto, proposed voir dire, and proposed jury instructions;
- briefing at least 17 pretrial motions;
- preparing witness examinations, an opening statement, and demonstratives for a two-week jury trial;
- selecting a jury;
- conducting the examination of six fact and five expert witnesses over the course of a two-week trial;
- preparing closing argument; and
- briefing and arguing numerous motions over the course of the trial.

*Id*.

Defendants incurred these hours, and the resulting fees, defending against claims for which Plaintiff sought to recover between $8.6 *billion* to $23.7 *billion* in damages. *See* Dkt. No. 571 at 43; Dkt. No. 621 at 35-36. In view of the work

---

[7] Again, this figure, and Defendants' resulting fee request, *excludes* more than 785 hours billed by attorneys at King & Spaulding from November 2024 through March 2025. Klieger Decl. ¶ 20.

performed and the potential exposure, the hours billed over the five years this case was pending plainly were reasonable.

**2. Defendants' Requested Hourly Rates Are Reasonable**

Defendants' requested rates also are reasonable. To determine whether attorneys' rates are reasonable, a court evaluates whether the requested rates align with the "rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). The court may also take into account the novelty and complexity of the issues, the special skill and experience of counsel, the quality of the representation, and the results obtained. *See Cabrales v. Cnty. of Los Angeles*, 864 F.2d 1454, 1464 (9th Cir. 1988).

As an initial matter, Defendants' counsels' rates are presumed reasonable because they are the rates Defendants actually paid. *See Carson v. Billings Police Dep't*, 470 F.3d 889, 892 (9th Cir. 2006) ("That a lawyer charges a particular hourly rate, and gets it, is evidence bearing on what the market rate is, because the lawyer and his clients are part of the market."); *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 840 (9th Cir. 1982) ("Billing rates usually reflect, in at least a general way, counsel's reputation and status[.]"); *Perfect 10*, 2015 WL 1746484, at *20 ("[T]he actual rate that [the attorney] can command in the market is itself highly relevant proof of the prevailing community rate."). Defendants' requested rates are also reasonable given the risks of the case, the qualifications and experience of Defendants' attorneys, and the successful result they obtained.

Hueston Hennigan has repeatedly been recognized as one of the best litigation trial firms in the country, including recognition as U.S. Trial Firm of the Year for each of the past three years by Benchmark Litigation and Law360. Klieger Decl. ¶ 25. Moez Kaba is a Fellow of the American College of Trial Lawyers and the International Academy of Trial Lawyers, has been ranked by Chambers USA in both General Commercial Litigation and Trial Lawyers, has

been recognized as one of the Top 100 Lawyers in America, one of the Top 20 Trial Lawyers in California, and as a Litigation Star by Benchmark Litigation, has been recognized as one of the Top 100 Lawyers in California and as a Leading Commercial Litigator by the *Daily Journal*, and has been recognized in *The Best Lawyers in America* every year since 2020, including as Lawyer of the Year in 2025. *Id.* ¶ 26. Robert Klieger has been ranked by Chambers USA in both Media & Entertainment and General Commercial Litigation, has been recognized as a Litigation Star and Entertainment Litigation Attorney of the Year by Benchmark Litigation, has been included on *The Hollywood Reporter* Power Lawyers List and the *Variety* Legal Impact Report, and has been recognized in *The Best Lawyers in America* every year since 2020. *Id.* ¶ 27. Mr. Kaba, Mr. Klieger, Sourabh Mishra, and Deeksha Kohli regularly represent clients in high-stakes litigation, including frequent copyright and other intellectual property disputes. *Id.* ¶¶ 26-29.

Willenken has also received national recognition as one of the most elite litigation firms in the country, including by Benchmark Litigation, *The American Lawyer*, and *Corporate Counsel*. Shimamoto Decl. ¶ 25. Peter Shimamoto has more than 30 years of experience in complex commercial litigation, with an emphasis on entertainment and intellectual property matters. *Id.* ¶ 26. Mr. Shimamoto, along with Kenneth Trujillo-Jamison, Michelle Millard, and Sherin Varghese, regularly represent Fortune 500 companies and other clients in high-profile copyright and other intellectual property disputes. *Id.*[8]

[8] Michael Roth and Arwen Johnson of King & Spalding, who joined the case shortly before trial, are also recognized as leading trial lawyers, including in copyright and other intellectual property matters. Defendants are not seeking to recover fees incurred by Defendants for Mr. Roth and Ms. Johnson's time despite the substantial role they played in Buena Vista's trial victory, and the requested fee award is reasonable for that reason alone.

Courts in the Ninth Circuit have previously found rates similar to those charged by Hueston Hennigan and Willenken in this matter to be reasonable in copyright infringement cases. *See, e.g., Lynwood Invs. CY Ltd. v. Konovalov*, 2023 WL 2918754, at *6-7 (N.D. Cal. Apr. 11, 2023) (approving $1,293.75 partner rate), *rev'd in part on other grounds*, 2024 WL 4688895 (9th Cir. Nov. 6, 2024); *Good Job Games Bilism Yazilm ve Pazarlama A.S. v. SayGames LLC*, 2023 WL 3260528, at *8-9 (N.D. Cal. May 4, 2023) (approving $1,025 partner rate). Courts in the Ninth Circuit have also found Hueston Hennigan's rates in particular to be reasonable in the Southern California legal market. *See Monster Energy Co. v. Vital Pharmaceuticals, Inc.,* Case No. 18-cv-01882 (C.D. Cal. Oct. 6, 2023) (Klieger Decl., Ex. S); *Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Case No. 20-cv-01464 (C.D. Cal. Sept. 29, 2022) (*id*., Ex. T). Moreover, the rates charged by Hueston Hennigan and Willenken's attorneys in this matter reflect substantial discounts off their standard rates. *Id.* ¶ 24; Shimamoto Decl. ¶ 25.

For all of these reasons, Defendants' requested rates are reasonable.

## III. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion and award Defendants $1,794,051.55 in attorneys' fees under the DTSA and CUTSA and $3,887,330.75 under the Copyright Act, for a total fee award in the amount of $5,681,382.30.

Dated: March 25, 2025

HUESTON HENNIGAN LLP
KING & SPALDING LLP
WILLENKEN LLP

By: */s/ Robert N. Klieger*
Robert N. Klieger
Attorneys for Defendants