# SUPP. KLIEGER DECL., EX. A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_________________________

| | |
|---|---|
| BUCK G. WOODALL, a.k.a. Buck Woodall, an individual, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 2:20-cv-03772-CBM-E |
| THE WALT DISNEY COMPANY, a Delaware Corporation; et al., | ) |
| Defendants. | ) |

_________________________)

ZOOM VIDEOTAPED DEPOSITION OF BUCK WOODALL

Coral Gables, Florida

Wednesday, October 5, 2022

Volume I

Reported by:

LORI M. BARKLEY, CSR No. 6426

Job No. 5506614

PAGES 1 - 273

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

BUCK G. WOODALL, a.k.a. )
Buck Woodall, an )
individual, )
Plaintiff, )
vs. ) Case No.
THE WALT DISNEY COMPANY, ) 2:20-cv-03772-CBM-E
a Delaware Corporation; )
et al., )
Defendants. )

Videotaped deposition of BUCK WOODALL, Volume I, taken on behalf of Defendant, at Coral Gables, Florida, beginning at 12:19 p.m. Eastern Standard Time and ending at 9:41 p.m. Eastern Standard Time on Wednesday, October 5, 2022, before LORI M. BARKLEY, Certified Shorthand Reporter No. 6426.

APPEARANCES:

SANCHEZ-MEDINA, GONZALEZ, QUESADA, LAGE, GOMEZ & MACHADO, LLP (SMGQLAW)
BY: Jason Ross
Attorney at Law
1200 Brickell Avenue, Suite 950
Miami, FL 33131
305-377-1000
Jross@smgqlaw.com

SANCHEZ-MEDINA, GONZALEZ, QUESADA, LAGE, GOMEZ & MACHADO, LLP (SMGQLAW)
BY: Luis E. Suarez
Attorney at Law
2990 Ponce De Leon Boulevard, Suite 300
Coral Gables, FL 33134
305-800-4476
Lsuarez@hsmpa.com

APPEARANCES (Continued):

HUESTON HENNIGAN LLP
BY: Robert N. Klieger
Attorney at Law
523 West 6th Street, Suite 400
Los Angeles, CA 90014
323-788-4310
Rklieger@hueston.com

Also Present:
Peter Shimamoto (Willenken, LLP for defendants)
Jon Chow (In-House Counsel, Walt Disney Company)

Videographer:
Steven Togami

A. That's what I remember, yes. 14:54:54

MR. KLIEGER: All right, take a look at what in the marked exhibits folder is Exhibit 2 and you'll need to click on the folder to refresh it. 14:54:56 14:54:58 14:55:01

(Exhibit 2 was marked for identification by the court reporter and is attached hereto.) 14:55:37

BY MR. KLIEGER: 14:55:38

Q. Do you have that? 14:55:38

A. Yes. 14:55:39

Q. What is Exhibit Number 2? 14:55:40

A. Confidentiality agreement. 14:55:41

Q. When is the first time you recall seeing Exhibit Number 2? 14:55:42 14:55:44

A. Raining Heart would have shared it with me in 2003 or maybe late 2002, but probably 2003. 14:55:55 14:55:57

Q. When this Exhibit 2 was shared with you by Raining Heart in 2002 or 2003, did it look identical to the document that you have before you? 14:56:02 14:56:05 14:56:11

A. Yes. 14:56:15

Q. Did it have a signature? 14:56:17

A. Honestly, I'm not sure if I analyzed this document before it was mailed to Jenny. It could have been just mailed from somebody at Raining Heart and so -- 14:56:19 14:56:37 14:56:39 14:56:41

Q. I'm not asking -- 14:56:43

MR. SUAREZ: Hold on. 14:56:44
THE WITNESS: Sorry. 14:56:48
MR. KLIEGER: Finish your answer, please. 14:56:48
THE WITNESS: So you're asking me if this is 14:56:52
the first time -- or I'm sorry. Just please repeat 14:56:53
the question I'm sorry. 14:56:57
BY MR. KLIEGER: 14:56:59
Q. Sure, Exhibit 2 has a signature on it, 14:56:59
correct? 14:57:01
A. Right. 14:57:05
Q. It has a date on it, correct? 14:57:06
A. Yes. 14:57:07
Q. It has a handwritten name on it, correct? 14:57:08
A. Yes. 14:57:11
Q. When is the first time you saw a copy of 14:57:12
this Exhibit 2 with the signature, the date -- and 14:57:15
the handwritten? 14:57:20
A. Well, let's see, it would have been I think 14:57:29
twenty -- sometime before my complaint was filed. So 14:57:33
maybe it's the second one, I'm not sure if they 14:57:39
attached it to one of the complaints. 14:57:42
Maybe, I don't know, six months before. 14:57:45
Q. Before it was attached to one of your 14:57:56
complaints? 14:57:59
A. Possibly three to six months. I'm not sure. 14:57:59

Q. Had you ever seen a copy of Exhibit 2 with only the signature, only the signature and the date or some other partial combination of handwriting, prior to 2020? 14:58:02 14:58:06 14:58:10 14:58:14
A. Yes, when I first found the document in my files because my attorneys asked me to look for a confidentiality form or any -- I'm sorry. 14:58:20 14:58:26 14:58:30
MR. SUAREZ: Don't reveal communications between the attorney and you. 14:58:34 14:58:35
THE WITNESS: Okay, so not supposed to reveal anything between me and my attorneys. But when I found the document, it just had the signature on it. 14:58:41 14:58:42 14:58:45 14:58:48
BY MR. KLIEGER: 14:58:51
Q. Where did you find the document? 14:58:51
A. In my files where I kept all my Bucky documents. 14:58:57 14:59:00
Q. Was it in that plastic trunk that had come from the storage unit? 14:59:00 14:59:06
A. Yes. 14:59:06
Q. At the time you retrieved this document from the trunk in 2020, did it have any handwriting on it other than the signature itself? 14:59:11 14:59:13 14:59:19
A. No. 14:59:24
Q. And when you saw this agreement what did you 14:59:24

believe this agreement to be? 14:59:27
A. I believed it to be Jenny Marchick's 14:59:32
confidentiality agreement. 14:59:34
Q. And what caused you to believe it was Jenny 14:59:35
Marchick's confidentiality agreement? 14:59:40
A. It was in with my other files with Jenny and 14:59:44
Disney and it looked to me like a J and an M and that 14:59:47
it was her signature. 14:59:56
And I laid it out on a bed, my bed at home, 14:59:57
with all of the confidentiality forms I had and after 15:00:05
looking carefully looking through all of them, I felt 15:00:09
confident that that was Jenny Marchick's signature 15:00:18
and her agreement. 15:00:20
Q. What do you mean when you say it was with 15:00:21
your other files with Disney and Jenny, what files 15:00:24
are you referring to? 15:00:28
A. I have multiple e-mails that I had printed 15:00:31
out from say 2005 and beyond up to 2016, between her 15:00:33
and I, and I kept them in a specific file. 15:00:43
And I wrote Disney on it because Jenny was 15:00:47
my main contact for Disney so that's what I mean. 15:00:50
Q. And how did you decide that not only must 15:00:55
Ms. Marchick have signed this agreement but she must 15:00:59
have signed it on October 22nd, 2003? 15:01:02
A. I looked it my timeline, you know, I created 15:01:11

a timeline with the best of my ability, working with all of the documents that I had from my Bucky production and I also discovered confidentiality agreement that in fact I had my own brother sign. 15:01:16 15:01:21 15:01:24 15:01:33

It was Chris Woodall because he was working for me and assisting in coloring characters on the computer while I was in Kauai working for Raining Heart in late 2003. 15:01:36 15:01:42 15:01:44 15:01:47

And I discovered a document he signed and that was in September I believe in 2003 and I knew that I only used those Raining Heart documents for just a very small window of time, maybe three months. 15:01:54 15:01:55 15:02:01 15:02:08

And I believed with all certainty that Jenny Marchick was the only person I was sharing my material with at that time. 15:02:10 15:02:16 15:02:19

Q. Why October 22nd? 15:02:22

A. Because that was when I believed it was signed. 15:02:30 15:02:32

Q. What makes you believe it was October 22nd as opposed to October 21st or October 23rd? 15:02:32 15:02:35

A. I don't know. I just -- that's when I thought it was signed. Right around that day and I didn't think it was so important which day it was as long as it was within the month or the year that it was executed or within two, three months, which is 15:02:44 15:02:46 15:02:51 15:02:53 15:02:58

what I thought was correct. 15:03:00

Q. So your testimony today is you believe that Ms. Marchick executed Exhibit 2 sometime within two or three months of October 22nd, 2003? 15:03:03 15:03:05 15:03:09

MR. SUAREZ: Object to the form. 15:03:20

THE WITNESS: Yes. 15:03:26

BY MR. KLIEGER: 15:03:29

Q. Was there any particular reason you picked October 22nd in particular or did you just pull a date out of the air? 15:03:29 15:03:31 15:03:34

A. It was my best possible estimation of when it could have been signed and I thought the document should have been completed. And when I found it I thought why didn't she put her name on it, you know, and I felt I was deceived. 15:03:39 15:03:42 15:03:44 15:03:47 15:03:50

And what maybe she didn't print her name because she didn't want me to realize whose it was when I found it years later. 15:03:54 15:03:57 15:04:00

So I thought it was important to have that name printed on there and it was for, you know, keeping track of my file. 15:04:04 15:04:05 15:04:09

Q. So do I understand correctly that you now believe that at a before you had even shared with Ms. Marchick what Bucky was and you simply told her that you wanted to share materials about an animated 15:04:11 15:04:16 15:04:19 15:04:23

project you were working on, you believed Ms. Marchick decided she was the going to steal it for Disney so therefore she would return a signed confidentiality agreement without her name on it. 15:04:25 15:04:28 15:04:31 15:04:35

Is that what you believe happened? 15:04:37

MR. SUAREZ: Object to the form. Where's the question in there. 15:04:38 15:04:40

MR. KLIEGER: That was the end where it says is that what you believe happened. Maybe you missed that piece. 15:04:42 15:04:44 15:04:47

MR. SUAREZ: Object to the form. You can answer if you understand the question. 15:04:47 15:04:48

THE WITNESS: Can you please repeat the question. 15:04:51 15:04:51

BY MR. KLIEGER: 15:04:52

Q. Sure, are you testifying it is your belief that Jenny Marchick purposely did not write her name on the October 2003 confidentiality agreement because at that point in time, she was already intending to steal your life's work and give it to Disney? 15:04:52 15:04:56 15:05:01 15:05:06 15:05:09

MR. SUAREZ: Object to the form of the question. 15:05:13 15:05:14

THE WITNESS: Yes, I believe that was a possibility. Very much so. Based on the fact that when I later contacted her in 2016, I believe, and 15:05:14 15:05:15 15:05:21

asked her specifically who she gave my materials to 15:05:32
at Disney, she proceeded to tell me that she 15:05:35
didn't -- first of all never worked at Disney or for 15:05:42
Disney. 15:05:45
And then she said that she didn't know if my 15:05:46
material ever even left her desk. And that it was a 15:05:50
long time ago, and that she was sorry but she didn't 15:05:52
want to engage in this and couldn't help me. 15:05:56
And so that led me to believe she had a lot 15:05:59
to hide because those seemed like lies to me. 15:06:02
Especially since soon after I Googled her and she had 15:06:06
that she worked at Disney a couple different times on 15:06:11
her resume and LinkedIn including Mandeville films 15:06:15
and Mandeville films first-look deal and the fact she 15:06:19
worked for Disney was all over the internet. 15:06:24
And so it just felt really shady to me that 15:06:26
I got ripped off and deceived. 15:06:28
BY MR. KLIEGER:
Q. We're going to be talking plenty about those 15:06:31
e-mails but you're fast forwarding quite a few years. 15:06:33
I want to stay back in 2003. 15:06:36
What caused you to estimate that this must 15:06:39
have been signed on October 22nd as opposed to 15:06:43
October 20th or November 1st. 15:06:47
How were you able to isolate it within a 15:06:50

day? 15:06:53
MR. SUAREZ: Objection, he just answered that question. 15:06:53 15:06:54
MR. KLIEGER: He did not. 15:06:55
MR. SUAREZ: Object to the form of the question. 15:06:58 15:06:58
THE WITNESS: Like I said, I looked at the file that I had and did my best estimate of when that would have been signed. 15:07:04 15:07:06 15:07:09
BY MR. KLIEGER: 15:07:10
Q. What files did you look at that time to come up with an October 22nd date? 15:07:10 15:07:12
A. Looking at when my brother signed the document with Raining Heart and when I had agreements with Raining Heart, when they dissolved. 15:07:22 15:07:24 15:07:28
Q. Okay, and you had agreements with Raining Heart from when, spring of 2003 until spring of 2004? 15:07:35 15:07:37
A. I don't remember the date on the document at this time. But I believe, yes, it was in -- early 2003 and -- I mean, I'm sorry. Late 2003 and early 2004. 15:07:47 15:07:49 15:07:55 15:08:04
Q. That Raining Heart was formed? 15:08:06
A. That we created an agreement. There was a small window there that I worked with them. 15:08:12 15:08:13
Q. Right, but when did you start working with 15:08:17

Raining Heart? 15:08:20
A. I'm not absolutely sure. But I know it was 15:08:24
a short period of time and the bulk of the work was 15:08:26
three months. 15:08:29
And I know is that my brother was the 15:08:30
beginning of at that time and it was September 22nd 15:08:36
when he signed. It was very early, it was like the 15:08:39
first month of working with them. 15:08:41
So I think really strongly that I worked 15:08:42
with Raining Heart from September 2003 for three -- 15:08:54
that month and two months after, October, November. 15:08:58
And I don't know that I worked with them any 15:09:02
further than that. So I inserted the date in the 15:09:05
middle of the time period that I knew for a fact that 15:09:09
I worked with Raining Heart and that I would have 15:09:11
sent Jenny that agreement. 15:09:15
It was, you know -- and I didn't think that 15:09:18
being off one month or two months would matter. 15:09:21
That that's what was my belief. I was just 15:09:24
trying to keep track of my documents. 15:09:27
Q. So you were shooting for about the midpoint 15:09:30
in your relationship with Raining Heart? 15:09:32
A. Exactly. 15:09:35
Q. Who else was part of Raining Heart? 15:09:36
A. I remember two other guys in Kauai who 15:09:48

worked there. One guy's name was Ron, I don't remember his last name right now, it was Ron something. And the other was Thor something. 15:09:50 15:09:58 15:10:00

And he was an editor and a videographer. Ron was a music guy. He did the sound engineering. They both lived in Kauai. 15:10:03 15:10:07 15:10:13

Q. On Exhibit 2, the writing October 22nd, 2003, that is your handwriting, not Ms. Marchick's, correct? 15:10:15 15:10:21 15:10:24

A. Yes, correct. 15:10:29

Q. The handwritten name Jenny Marchick is your handwriting, not Ms. Marchick's, correct? 15:10:30 15:10:33

A. Yes. 15:10:40

Q. And if we had looked at this exact same document at sometime in 2019, there would have been no date and no name, correct? 15:10:40 15:10:42 15:10:46

A. Yes. 15:10:49

Q. You specifically added the date and added the name in contemplation of filing this litigation, correct? 15:10:51 15:10:53 15:10:56

MR. SUAREZ: Object to the form. 15:10:59

THE WITNESS: I did it to organize my files and to give my files to my attorneys appropriately organized. 15:11:01 15:11:03 15:11:07

BY MR. KLIEGER: 15:11:11

Q. Did you disclose to anybody that the date and name had been written by you in 2020 as opposed to by whoever signed the document at some point in the past? 15:11:12 15:11:14 15:11:19 15:11:22
A. Yes. 15:11:28
Q. Who did you disclose what to? 15:11:28
A. Multiple attorneys I believe. 15:11:30
Q. When? 15:11:33
A. When? I think prior to the time we filed -- 15:11:39
MR. SUAREZ: Objection to privilege. Calls for privileged information. You just asked a question and I instruct the witness not to answer and I move to strike the prior answer because it directly asks for the disclosure of testimony to a lawyer. 15:11:46 15:11:48 15:11:52 15:11:54 15:11:58
MR. KLIEGER: Opposed. 15:12:03
BY MR. KLIEGER: 15:12:04
Q. Who other than lawyers did you ever tell that you, Buck Woodall, and not Jenny Marchick or whoever it is that signed Exhibit 2, was the one who applied the date and the handwritten name? 15:12:04 15:12:07 15:12:12 15:12:15
A. Who did I tell that to? 15:12:25
Q. Other than lawyers? 15:12:26
A. That reminds me I forgot to mention one lawyer that -- 15:12:31 15:12:34
MR. SUAREZ: Wait, wait. Do not disclose 15:12:35

what you told lawyers. If you're going talk about -- if you're going to disclose a lawyer's name, you can do so. But do not say what you told lawyer, okay, go ahead. 15:12:38 15:12:43 15:12:45 15:12:48

What were you going to say. 15:12:53

THE WITNESS: Just forgot for mention that Wes Christian is one of my lawyers as well. I didn't mention him earlier I forgot to mention him. 15:12:54 15:12:56 15:12:59

And I guess the rest whatever I said to them -- is it okay to say -- 15:13:03 15:13:11

MR. SUAREZ: You cannot talk about anything that you told your lawyer. 15:13:12 15:13:15

THE WITNESS: Okay. 15:13:20

MR. SUAREZ: You cannot talk about anything -- 15:13:20 15:13:22

THE WITNESS: This is attorney -- 15:13:22

MR. SUAREZ: You cannot talk about anything -- 15:13:23 15:13:25

THE WITNESS: -- privilege. 15:13:26

MR. SUAREZ: -- that your lawyers told you. 15:13:27

BY MR. KLIEGER: 15:13:32

Q. Have you at any point in time before this deposition today told anybody other than your own lawyers that you are the one who wrote the date and you are the one who wrote Jenny Marchick's name on 15:13:32 15:13:35 15:13:38 15:13:44

Exhibit 2? 15:13:46

MR. SUAREZ: Object to the form of the question to the extent that it implies that he told his lawyers that information. Go ahead, you can answer. 15:13:52 15:13:52 15:13:56 15:14:03

THE WITNESS: Tell anyone? No, not that I remember. 15:14:11

BY MR. KLIEGER: 15:14:17

Q. Have you ever told the court? 15:14:17

MR. SUAREZ: Object to the form of the question. 15:14:22 15:14:23

BY MR. KLIEGER: 15:14:23

Q. You recognize that this confidentiality agreement was attached to your first amended complaint, correct? 15:14:23 15:14:25 15:14:27

A. Yes. 15:14:31

Q. It was attached to your second amended complaint? 15:14:31 15:14:33

A. I don't remember that but if it was it was. 15:14:38

Q. To the best of your recollection -- well, strike that. 15:14:40 15:14:44

Did you review the amended complaints before they were filed? 15:14:44 15:14:46

A. Yes. 15:14:52

Q. Do you recall whether those complaints 15:14:52

indicated that this a true-and-correct copy of a confidentiality agreement except that you, Buck Woodall, had added the date and handwritten name? 15:14:53 15:14:55 15:14:59

A. No, I don't recall that. 15:15:06

Q. Do you recall it simply said it was a true-and-correct copy without disclosing that information? 15:15:07 15:15:10 15:15:12

A. I believe so. 15:15:14

Q. And is that because you believe it's immaterial that you wrote the date and you wrote the name on this agreement? 15:15:19 15:15:21 15:15:23

MR. SUAREZ: Object to the form of the question. 15:15:25 15:15:26

THE WITNESS: I'm not an attorney. That's my attorneys' jobs to make those calls. I have no idea. 15:15:28 15:15:31 15:15:35

MR. KLIEGER: Take a look at what I've just put in the exhibits folder as Exhibit 3. 15:15:36 15:15:38

(Exhibit 3 was marked for identification by the court reporter and is attached hereto.) 15:16:04

BY MR. KLIEGER: 15:16:04

Q. Exhibit 3 is a document that you produced that is a amendment to an employment agreement between Jenny Marchick and Sony Pictures Animation as of October 4th, 2013. 15:16:04 15:16:07 15:16:10 15:16:15

How did this document come to be within your possession? 15:16:22 15:16:26
A. Trying to open it, okay. 15:16:26
(Technology discussion.)
BY MR. KLIEGER: 15:17:38
Q. How did this document come to be in your possession? 15:17:38 15:17:41
A. I believe a man by the name of Mike Azcam who was the working on my behalf as an agent, am I allowed to speak to about this? He was an agent of mine -- 15:17:48 15:17:51 15:17:56 15:18:00
MR. SUAREZ: Wait, did Mr. -- did the gentleman work for an attorney? Just give me -- 15:18:00 15:18:05
THE WITNESS: He was my agent. 15:18:15
MR. SUAREZ: Did he work for an attorney? 15:18:16
THE WITNESS: I don't know. 15:18:25
MR. SUAREZ: Did you do this at the direction of an attorney? 15:18:26 15:18:27
THE WITNESS: No. 15:18:28
MR. SUAREZ: You may answer the question. 15:18:31
THE WITNESS: Okay, so Mike Azcam was working as an agent of mine and he found this document and shared it with me. 15:18:34 15:18:37 15:18:49
BY MR. KLIEGER: 15:18:51
Q. When? 15:18:51

A. Good question -- I'm not sure exactly. Prior to me filing my initial complaint, maybe three years prior or more. 15:19:01 15:19:04 15:19:10

Probably, I don't know. I'm not absolutely sure but maybe two and a half to three years prior. 15:19:13 15:19:17

Q. You had this document in your possession before you filed your complaint, correct? 15:19:28 15:19:30

A. Yes. 15:19:37

Q. Do you have understanding as to why your agent, Mr. Azcam, believed there would be useful or interesting for you to have a copy of this document? 15:19:37 15:19:44 15:19:48

A. As far as I recall, he was interested in learning what Jenny's roles, role was in the industry and roles in the past. 15:19:58 15:20:00 15:20:05

And he was also interested in the salary that she had been receiving, is what I remember. 15:20:10 15:20:12

Q. Did it have anything to do with Bucky? 15:20:18

A. In a way, yes. 15:20:25

Q. In what way? 15:20:26

A. He was trying to do research to figure out how my material had been stolen by Disney and he was aware that Jenny was involved so he was trying to learn as much information about Jenny as he could. 15:20:33 15:20:35 15:20:40 15:20:44

And I believed he found this information online. 15:20:46 15:20:49

Q. So in 2020 when you laid out all your confidentiality agreements and were trying to ascertain whose signature was on the one that didn't have a name written, did you look back to Exhibit 3 and see what Jenny Marchick's signature looked like? 15:20:51 15:20:55 15:20:56 15:21:00 15:21:04

A. At that moment, I don't believe so, no. 15:21:20

Q. Have you at any point since then looked back and said maybe it would be interesting to compare Jenny Marchick's signature on Exhibit 3 to the signature that I believe is Ms. Marchick's signature on Exhibit 2? 15:21:22 15:21:24 15:21:27 15:21:30 15:21:34

A. When I learned that you all or Jenny was claiming what she did not sign that document, I did grow concerned and I did remember I had that document and I went back to look that document so yes. 15:21:45 15:21:47 15:21:50 15:21:55

Q. And what did you conclude upon doing so? 15:22:00

A. I concluded that they looked very similar and that was about all. They weren't exactly the same but I believed they were similar and I also believed that Jenny might have intentionally, intentionally tried to camouflage her signature by one, not printing her name on it, and two, start making it a little different. 15:22:08 15:22:17 15:22:19 15:22:22 15:22:26 15:22:31 15:22:35

But I also know that no two signatures are alike even from the same person. And sometimes 15:22:37 15:22:39

people's scribble their signatures faster than others and sometimes they set their wrist on the table in a different way. 15:22:41 15:22:45 15:22:49

So I wasn't really sure what to believe but I believed that that confidentiality agreement that I turned in was Jenny's. 15:22:50 15:22:53 15:22:56

Q. Do you still believe that? 15:22:58

A. Yes. 15:23:07

Q. Who's Pearl Young? 15:23:07

A. Pearl Young -- I think she might have been -- she was a model for me for the Bucky production. 15:23:11 15:23:35 15:23:39

Q. Right, she was the model for the female lead, right? 15:23:40 15:23:44

A. I think that was a consideration. But I know that I wasn't happy with her looks as a Polynesian woman because she didn't have curly hair and I ended up drawing her for about maybe two hours at the most. 15:23:48 15:23:52 15:23:57 15:24:01 15:24:06

And decided she wasn't good for that role and I saved her drawings and ended up using them for a character that I named Hiiaka, who was a goddess of the forest. 15:24:07 15:24:11 15:24:17 15:24:22

That's what I remember. 15:24:23

Q. When in time did you do those drawings? 15:24:26

A. Might have been around 2004, early 2004, towards when I left Raining Heart, I think. 15:24:37 15:24:47

Q. Maybe in the fall of 2003? 15:24:52

A. I don't know for sure. It's possible, I guess. 15:24:54 15:25:04

Q. Did Ms. Young sign a confidentiality agreement? 15:25:05 15:25:10

A. I don't believe so. There was no reason to ask her to. I wasn't sharing the story with her, pitching the project to her. 15:25:11 15:25:13 15:25:17

She was just hired to be a model. 15:25:18

Q. What did you tell her that you were drawing her for? 15:25:21 15:25:24

A. I don't know there I told her that I was even what I was drawing her for. I don't know that I even made that clear. 15:25:27 15:25:30 15:25:36

Q. It's your belief that she would not know what you had asked her to model for? 15:25:38 15:25:40

A. Possible -- I mean, I may have just told her it was for one of the characters possibly. It wasn't a sure thing it, though, because I didn't use her drawings. 15:25:47 15:25:51 15:25:54 15:25:57

Q. But you're certain you did not ask her to sign a confidentiality agreement? 15:25:57 15:26:00

MR. SUAREZ: Object to the form. 15:26:01

THE WITNESS: No, not certain. 15:26:04
BY MR. KLIEGER: 15:26:08
Q. Maybe you did, maybe you didn't? 15:26:08
A. I don't have one for her. 15:26:17
MR. KLIEGER: I'm going to ask you to take a look at what I'm introducing as Exhibit 4. 15:26:22 15:26:25
(Exhibit 4 was marked for identification by the court reporter and is attached hereto.) 15:26:37
BY MR. KLIEGER:
Q. Let me know when you have that opened. 15:27:22
A. Having a hard time getting it open. That's the problem, it's just opening? 15:27:27 15:27:29
Okay, so not a document, this is something else -- 15:27:42 15:27:44
MR. SUAREZ: Are you intending to show some sort of picture with some metadata? We're seeing something that says writing and art shared with Marchick. 15:27:44 15:27:47 15:27:51 15:27:54
MR. KLIEGER: Yes, this is literally a document you produced. 15:27:55 15:27:57
MR. SUAREZ: Okay, just making sure that you're intending to show this. 15:27:59 15:28:02
MR. KLIEGER: Yes, I'm intending to show a document that you produced. 15:28:05 15:28:07
MR. SUAREZ: Okay. 15:28:07

STATE OF CALIFORNIA ) ss.
COUNTY OF LOS ANGELES )

I, Lori M. Barkley, CSR No. 6426, do hereby certify:

That the foregoing deposition proceedings were taken before me at the time and place therein set forth and were recorded stenographically by me, and were thereafter transcribed under my direction and supervision, and that the foregoing pages contain a full, true and accurate record of all proceedings and testimony to the best of my skill and ability.

I further certify that I am neither counsel for any party to said action, nor am I related to any party to said action, nor am I in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name this 10th day of October, 2022.

LORI M. BARKLEY, CSR No. 6426