ELIZABETH YANG (SBN 249713)
YANG LAW OFFICES
199 W. Garvey Ave.,
Suite 201
Monterey, CA 91754
Tel: (877) 492-6452
Fax:(626) 988-8827
elizabeth@yanglawoffices.com

BEAU BAGNAL BROGDON
(Admitted *Pro Hac Vice*)
SARAH ANDERSON TIMMONS
(Admitted *Pro Hac Vice*)
TIMMONS BROGDON LAW FIRM LLC
25 Delano Drive, Suite. E
Greenville, South Carolina 29601
Tel: (770)845-7140
beau@timmonsbrogdon.com
sarah@timmonsbrogdon.com

*Counsel Specially Appearing
For Attorney James Wesley Christian*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BUCK G. WOODALL,<br><br>Plaintiff,<br><br>vs.<br><br>THE WALT DISNEY COMPANY, et al.<br><br>Defendants. | Case No.: 2:20-cv-03772-CBM-E<br><br>**DECLARATION OF JAMES WESLEY CHRISTIAN PURSUANT TO COURT ORDER ISSUED AT DOCKET ENTRY 867**<br><br>Hearing Date: September 10, 2025<br>Time: 10:00 A.M.<br>Assigned to Hon. Consuelo B. Marshall<br>Magistrate: Judge Charles F. Eick |

1

Declaration of James Wesley Christian Compliant With Court Order, DE 867

# DECLARATION OF JAMES WESLEY CHRISTIAN

I, James Wesley Christian, declare as follows:

1. I am an attorney at law duly licensed to practice before all courts in the States of Texas and New York, as well as the United States Court of Claims, the United States Tax Court, the United States Court of Appeals for the Second Circuit, the United States Court of Appeals for the Eighth Circuit and the United States Court of Appeals for the Ninth Circuit. I am a shareholder in the law firm of Christian Attar, LLC of Houston, Texas. I have personal knowledge of the facts set forth in this declaration and if called upon to testify I could and would competently testify thereto.

2. I received my Bachelor of Science degree from West Texas State A&M University in 1975 and my Doctor of Jurisprudence from South Texas College of Law in 1978. For numerous years over the course of my career, I have been a member of the following professional organizations: the State Bar of Texas, the State Bar of New York, the American Bar Association, and the American Association for Justice—the nation's largest plaintiffs' trial bar. I also served in leadership positions with respect to some of these organizations. By way of example, I served on the State Bar of Texas's Advanced Evidence & Discovery Committee from 2006 to 2010, and I was elected Chair of the Litigation Council of the State Bar of Texas in 2018 and 2019.

3. Throughout my career, I authored or co-authored – on varying legal topics – numerous publications for the legal community and have undertaken extensive pro bono work pursuant to the commitment I made upon entering the profession. In connection with these and other activities undertaken in furtherance of the practice of law and service to the community, I respectfully attach my most recent Curriculum Vitae as Exhibit 1.

4. I submit this declaration pursuant to the Court's August 29, 2025 Order (DE 867 ("Order")), which directed me, along with certain other counsel identified

in Defendants' Motion for Sanctions (DE 829), to file a declaration under penalty of perjury concerning my role and involvement in this litigation "including but not limited to whether each counsel reviewed and approved pleadings, motions, applications, and briefs filed in the case." DE 867. The Order cites *Caputo v. Tungsten Heavy Powder, Inc.,* 96 F.4th 1111, 1153 (9th Cir. 2024) ("*Caputo*"). As I interpret the Court's Order, it is important for me to read and familiarize myself with that decision, and I have carefully done so.

5. I understand that the Court has set a deadline of September 5, 2025, at 12:00 p.m. for these submissions. I respectfully submit the following in compliance with the Order. In doing so and in light of *Caputo,* I respectfully invite the Court's attention to the fact that the proceedings there involved the appointment of a Special Master and a three-day evidentiary hearing, underscoring the judiciary's recognition of the need to safeguard privileged communications in similar circumstances and the unique circumstances of that case which necessitated sanctions against certain attorneys based on the facts of the case and each of their respective roles in the case. Consistent with that recognition, and although I have gone out of my way herein to avoid disclosures violative of applicable privileges and confidentiality obligations related to certain discovery, I wish to make clear that nothing stated herein is intended, nor should it be construed, as a waiver of any applicable privilege or protection or violation of any confidentiality obligations. This includes, without limitation, the attorney–client privilege, the attorney work product doctrine, and any other legal privilege. All such privileges and protections are expressly preserved notwithstanding my compliance with the Court's order.

### A. Role and Scope of Engagement

6. My role in representing Buck G. Woodall with respect to his copyrighted work, *Bucky,* mirrors the role I have played for the better part of two decades in other significant litigation across the United States. That role has two primary components. First, I personally finance, and when appropriate secure third-

party financing, to litigate complex cases against powerful corporate or individual opponents. Second, my law firm provides litigation support to a team of trial lawyers serving as lead counsel and handling the day-to-day operations of these cases. In practice, this support often requires me to appear as one of many counsel of record, since effective assistance in document-heavy litigation—often involving millions of pages—cannot always be given without conducting selected depositions or performing other supportive tasks. In these cases, my firm has not assumed responsibility for drafting or filing pleadings and motions. Where multiple counsel are of record, I have reasonably relied on lead counsel to review, finalize, and file all such papers and to instruct me regarding important evidentiary developments in the matters. My appearances have been limited to attending selected proceedings to remain informed and to assist when lead counsel's schedules or emergent circumstances have created gaps.

7. The present case is a classic example of that litigation model, both in its complexity and in the magnitude of its challenges alongside my involvement. Over the past several years, my understanding of the facts and procedural posture came at all times from lead trial lawyers who kept me apprised of material developments. In what follows, I recount the circumstances as they were conveyed to me, and—given the importance of the Court's Order—I include citations to the record where appropriate to show that the information conveyed to me by lead counsel has at all times been corroborated by the record evidence and the docket before this Court.

8. For instance, Defendants' production of documents was delayed and contested from the outset and one of my first litigation roles was to assist in the initial motion to compel before this Court. Actually, Plaintiff twice moved to compel production, and on both occasions the Court ordered Defendants to produce *all* requested documents. (DE 147; DE 252 ("To the extent, if any, Defendants still have not completed their belated efforts to comply with the Minute Order, filed

April 13, 2022, Defendants shall do so on or before February 2, 2023.")). Yet, those orders did not resolve the discovery disputes. As reported to me at the time by lead lawyers on the case, computers were later disposed of by sale shortly before Marchick's deposition (DE 269-3; DE 269-8; DE 269-9), documents were withheld despite an unambiguous stipulation entered into during contempt proceedings (DE 190), and further litigation followed over materials Plaintiff maintained should be produced and Defendants continued to resist. Regardless of the disposition of these and other discovery disputes, their litigation at the trial-court level required a team of support counsel and substantial financing. In this case, document management costs alone reached hundreds of thousands of dollars and my key role was providing financing for this and other necessary efforts. Acting both as financier and support counsel, I provided resources and litigation assistance during discovery to also maximize the likelihood that Plaintiff might receive the responsive documents the Court ordered produced.

9. My role was necessarily limited as well by the fact that the pleadings had already been framed by the time of my first appearance in the matter. Indeed, multiple motions to dismiss had already been denied by this Court prior to my entry into the case. The Court's orders denying the Defendants' motions to dismiss were issued on April 15, 2021 and August 5, 2021 (DE 91 and DE 101). My first appearance in the case did not occur until several months later in November of 2021. (DE 107 and DE 117.)

10. With the foregoing as a backdrop of the tenor and realities of this case, my role from the outset centered on financing and providing support as needed. In that capacity, I also recall taking a limited number of custodial depositions focused on document collection and attending a comparable number of hearings and meetings, including the pre-trial mediation in an effort to resolve the matter. (*See, e.g.*, DE 180-1 (regarding one of the custodial depositions).) Consistent with my engagement and Plaintiff's understanding, I did not assume responsibility for

drafting or filing pleadings or motions as that was the job of lead trial lawyers pursuant to the scope of engagement. Because trial counsel of record were actively litigating the case, I reasonably relied on them to review, finalize, file all papers and keep me accurately apprised of important developments. My direct involvement was therefore selective and intended to keep me reasonably informed about proceedings I was helping finance. By my recollection, I attended no more than ten events in total throughout the case —approximately three depositions, several hearings for real-time understanding, and one mediation with Defendants' representatives in Los Angeles. Because I ensured that lawyers at Christian Attar were available to fill gaps as needed, we assisted with trial preparation regarding motions in limine and offers of proof after Plaintiff terminated lead trial counsel Gerard P. Fox, recognizing that Mr. Gustavo D. Lage's small firm could not reasonably be expected to shoulder that burden alone against the multiple, large law firms representing the defense.

11. In contrast to my role, the front-line trial lawyers were initially Mr. Gustavo D. Lage and Mr. Luis Suarez, following the brief involvement of the late Mr. Eric Buether. As reflected in his declaration, Mr. Suarez defended the deposition of Plaintiff Buck G. Woodall, consistent with his responsibilities at that time, while trial counsel Mr. Robert Klieger conducted the examination for the Defendants. I did not meet in person with Mr. Woodall, nor did I interview or prepare him regarding matters of substance, as those tasks were properly the responsibility of trial counsel. In my practice, it would have been ill-advised for Plaintiff's deposition to be defended by anyone other than a member of his trial team. After Plaintiff terminated Mr. Suarez, Plaintiff directly retained Mr. Gerard P. Fox as lead trial counsel in or about June of 2023. I had no prior acquaintance with Mr. Fox in any capacity before receiving notice of his retention. Mr. Fox's role as trial counsel was confirmed by him in multiple court-filings, including (for example) DE 269-1, portions of which I provide below for the Court's convenience, reflecting his

///

6
Declaration of James Wesley Christian Compliant With Court Order, DE 867

appearance in that capacity from June 2023 onward:

### DECLARATION OF GERARD P. FOX

I, Gerard P. Fox, declare:

1. I am an attorney at law duly licensed to practice before all State and Federal Courts in the State of California and am trial counsel for Plaintiff Buck G. Woodall in this matter.

### B. Limited Involvement in Matters Cited in Sanctions Motion

12. My involvement in the issues now before the Court was limited, and arose because of the serious allegation made in 2022 that the *entire* 2003 Confidentiality Agreement – i.e., the language, the signature and everything else – had been fabricated nearly two decades later (*see, e.g.,* DE 213-28, p. 4) (defense counsel stating "we expect [an 'ink dating analysis'] will show Plaintiff fabricated the Confidentiality Agreement in its entirety, more than seventeen years after Plaintiff has repeatedly, and falsely, attested it was created"). Lead trial counsel at the time reported this allegation to me; it was disconcerting and required verification. Indeed, if true, the allegation would have fundamentally and necessarily changed my willingness and ability to provide support for the case. Out of caution, and because I believed it important that the truth be established, I arranged for and financed experienced handwriting and document experts—including former government examiners Mr. Larry Stewart and Mr. Jim Blanco (see DE221-1; DE221-2)—to review the allegation alongside the relevant original documents. I had no prior relationship with these experts; I selected them for their credentials and independence (e.g., Mr. Stewart being former head of document forensics for the United States Secret Service and Mr. Blanco being an independent Forensic Document Examiner with over thirty (30) years of extensive experience). I also funded the collection of original materials from Mr. Woodall's residence in Mexico, which were then made available for in-person inspection by Defendants' own expert. My role was not to litigate the issue, but to ensure that qualified professionals could

test the accusation and report their findings.

13. As was reported to me at the time by lead counsel, the contemporaneous record shows that the allegation of wholesale fabrication did not withstand scrutiny. I understood Mr. Woodall testified at deposition that it had long been his practice to obtain confidentiality agreements from those with whom he shared creative materials, and that years later, when his files were incomplete, he attempted to reconstruct his records by printing copies and adding identifying notations. Consistent with what was reported to me at the time, Mr. Suarez, as trial counsel, disclosed this to Defendants in writing in mid-September 2022 (*see* DE 850, p. 9). Both sides then retained examiners; Defendants' consultant, Mr. Speckin, personally examined the original on September 21, 2022 (DE 229). Plaintiff's experts concluded that the origination of the document bore no signs of recent creation and that the handwriting notations were not disguised (DE 221-1; DE221-2). Defendants, however, did not submit an expert declaration to support their sweeping claim that the entire document was fabricated seventeen years after the fact. The Court denied the terminating-sanctions motion on December 19, 2022, while discovery remained ongoing (DE 243).

14. Since then, it was reported to me by lead counsel that the Defendants have advanced differing theories, including the claim that Mr. Woodall and his lawyers always knew the signature on the document was Pearl Young's rather than Jenny Marchick's. That is a distinct allegation from the one that prompted my action, and—unlike the seventeen year-fabrication claim—it concerns whether Ms. Marchick signed or agreed to confidentiality, a fact about which I have no knowledge. When confronted with the assertion that an ***entire*** contract was forged years after the fact, I believed it necessary to provide resources so that the originals could be collected, examined, and made available for inspection. I did that, and the result was a record showing that the document was not recently created: a record after which Defendants ceased relying on the only expert witness they had ever

retained in the case at bar, whose report and findings were never produced. The present motion advances new contentions about which Mr. Woodall was forthcoming during his October 5, 2022 deposition, as reported to me at the time by lead counsel. There, Mr. Woodall explained—without hesitation—why he believed the document at issue now bore Ms. Marchick's signature and date: its placement within his files relating to Ms. Marchick and Disney, his visual impression of the initials, and his contemporaneous timeline and related agreements. (*See* Woodall Deposition Excerpts. pp. 161-164, Exhibit 2 hereto.) In pages 161 through 163 of his deposition transcript, Mr. Woodall explains how he printed out numerous confidentiality documents (including the one now at issue) and he "laid it out on a bed, [his] bed at home, with all of the confidentiality forms [he] had and after looking carefully looking through all of them, [he] felt confident that that was Jenny Marchick's signature and her agreement." (*See* Exhibit 2, Woodall Deposition Excerpts, p. 162:9-13.) As I understood at the time, Mr. Woodall's testimony reflected his best estimate in light of incomplete records, not an effort to conceal anything. That context is meaningfully different from *Caputo*, where counsel stipulated in writing to knowingly advancing false claims and knowingly hiding evidence to the contrary. Respectfully, there is no such stipulation here. I cannot acknowledge any knowing impropriety because I did not engage in any. My role in the matters covered regarding the confidentiality agreement were narrow: to receive reports from lead counsel and to fund neutral expert review and the collection of originals so serious allegations could be tested, and to rely on trial counsel—and now appellate counsel—to address the legal and factual issues surrounding what Mr. Woodall admitted all along was his best estimate that the subject document contained the signature of Jenny Marchick.

15. Mr. Woodall's testimony that his belief that Jenny Marchick's confidentiality agreement was in fact the document now at issue, as reported to me by lead counsel at the time, was a matter of record in the case by October 5, 2022.

From my vantage point at the time, if the Court believed that his claimed reconstruction of numerous confidentiality agreements decades later was wrongful then the Court would have made an adverse ruling based upon Mr. Woodall's honest deposition testimony. I specifically recall at the time that there was no adverse ruling on this issue, although in my mind if the ink dating and handwriting analysis had returned the kind of results being threatened by defense We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. counsel then the situation would have been markedly different. At the time, lead counsel were concerned about a substantial inconsistency in the defense record that, respectfully, underscored why it was necessary to vigorously test their claims about knowing wrongdoing on the part of Mr. Woodall. That is regarding Ms. Jenny Marchick's sworn interrogatory responses. As reported to me at the time by lead counsel, in her sworn response to Interrogatory No. 11, Ms. Marchick stated that she "did not see the 2003 Confidentiality Agreement prior to the date the initial Complaint in this matter was filed" and that she had no discussions regarding it before that time (DE 213-2, sworn Marchick interrogatory responses). Yet, the initial complaint in this case, filed *pro se* in April 2020 as DE 1, makes no mention whatsoever of any confidentiality agreement. By tying her denial to that filing date, it was reported to me by lead counsel at the time that Ms. Marchick effectively admitted that the confidentiality issue was on her mind before Plaintiff himself ever placed it at issue. That inconsistency, coupled with what was reported to me about her acknowledged disposal (by sale) of her computer shortly before deposition, as discussed below, left Plaintiff's side without critical contemporaneous evidence. Considering that backdrop, when Defendants advanced the sweeping claim that the entire agreement had been fabricated seventeen years later, I believed it was my obligation to finance the collection of originals and the engagement of neutral examiners so the truth could be tested. What I recall being reported to me by lead

counsel was the following: On Plaintiff's side, documents were produced, testimony was given candidly, and all original confidentiality materials were made available for Defendants' own forensic inspection. On the other side, however, the record reflects shifting theories, unexplained gaps in evidence, refusal to produce volumes of documents, selective recollection of certain portions of evidence whose authenticity is not disputed, and no expert testimony refuting the findings of the neutral experts I hired to investigate the issues raised by counsel for the Defendants at that time.

16. In addition, I respectfully note that the statute of limitations issue was not one I originated. I inherited the pleadings already on file when I became involved, and Plaintiff himself testified candidly at deposition regarding when he believed he discovered the alleged infringement. By candidly testifying in 2022 to the circumstances of his examination and evaluation of *Moana*, Mr. Woodall supplied the very proof to which Rule 15(b) permits the pleadings to conform, underscoring that such alignment is standard federal practice. The Court ultimately held that such evidence did not suffice to submit the issue of reasonable discovery to a jury, which is a matter of law that trial counsel addressed, and which appellate counsel will now brief. Likewise, with respect to the confidentiality agreement, at no time was I told by anyone—client, neutral experts, or counsel—that Ms. Marchick had not signed such an agreement. To the contrary, as reported to me during the course of litigation by lead lawyers in the case at bar, paragraph 29 of the Second Amended Complaint pleads the agreement, and Ms. Marchick's answer admits early-2000s interactions while denying some allegations and stating she lacked knowledge as to others (DE 94, ¶29; DE 104, ¶29 (Marchick denying certain confidentiality allegations based on lack of information and belief). Her deposition testimony further underscores the uncertainty: she recalled receiving Plaintiff's September 22, 2004 email enclosing the confidentiality agreement and confirmed that the notations of delivery of the accompanying motion picture materials "looks

familiar," but when asked about the very sentence requesting return of the signed confidentiality sheet, she professed no memory of that portion of the email she previously admitted to recognizing. (Marchick Deposition Excerpts, pp. 273-278, Exhibit 3 hereto.) I also was aware of this Court's order stating that—even taking Defendants' position at its highest—the confidentiality agreement, if relevant at all, pertains to certain trade-secret theories and has no bearing on the copyright claim (DE 243, p. 2). In the face of these ambiguities and rulings as reported to me by lead counsel at the time, my role was limited to funding expert review and document retrieval so that the trial team could present the issue. I never undertook to resolve, and never could have resolved, the factual uncertainties reflected in the testimony of either Ms. Marchick or Mr. Woodall.

17. At all times, I was troubled by trial counsel's reporting that the focus of Defendants' accusations has not remained consistent. In the period after I first became involved, the claim was that the entire confidentiality agreement had been fabricated nearly two decades later—a charge so serious that it required immediate expert review and collection of originals. After that allegation failed to withstand scrutiny and neutral experts found the documents to be authentic without challenge, I understood that Defendants later advanced a different theory, namely that Plaintiff and his lawyers always knew the signature was Pearl Young's rather than Jenny Marchick's. My role was never to decide among the competing narratives—particularly in light of the ambiguities outlined in this declaration, including the important record discrepancy in Ms. Marchick's interrogatory responses. Rather than litigate those questions myself, my charge was to ensure that, when serious allegations arose, qualified professionals were engaged and the relevant materials were located, collected, and examined. Beyond that, I deferred to trial counsel to present and test the evidence, and I understand appellate counsel will address the legal rulings that followed. At every stage of this case, I understood and believed that the evidence upon which I proceeded was truthful and accurate.

18.  I respectfully submit this account so the Court may understand the narrow scope of my involvement during what were, at the very least, evolving defense theories that the Court itself has already recognized as immaterial to the copyright core of the case at bar (DE 243, p. 2). At its essence, the trial lawyers leading Plaintiff's case always reported to me that the confidentiality issue is about whether Plaintiff entrusted his materials to a close family member expecting they would be treated confidentially, as her own testimony acknowledges she received them (*see, e.g,* Exhibit 3 hereto, Marchick Deposition Excerpts, pp. 273-278), or whether—against both common sense and the record—Plaintiff somehow gave them away to be used freely. In connection with my obligation to review *Caputo*, it appears important in that case that the attorneys themselves stipulated in writing to having wrongly advanced false claims and to other conduct a Special Master found improper. Respectfully, as I have already said, there is no such stipulation here. The only sweeping claim later shown to be unfounded was Defendants' allegation that the entire Confidentiality Agreement had been fabricated seventeen years after the fact—a claim withdrawn after their own expert could not support it and apparently himself withdrew. I was and remain confident that trial counsels' reporting to me at the time – that Ms. Marchick herself acknowledged at deposition that she received Plaintiff's September 22, 2004 email and that its contents (including the materials he described as a confidentiality agreement) "look familiar" to her (*see, e.g., id.*), even if she professed no memory of the sentence requesting return of the enclosed confidentiality sheet – was indeed accurate as shown on Exhibit 3 hereto. The Defendants' shifting claims that the agreement was fabricated seventeen years later, and then that counsel always knew or should have known that it bore another signature, reflect arguments made only after the first theory failed. My role was simply to ensure that such extraordinary accusations were tested responsibly as instructed by trial counsel; beyond that, I relied on trial counsel to bring the truth to

light.

19. In light of the foregoing reports to me and evidence and circumstances adduced throughout the case as set forth above, I was shocked to learn that Mr. Woodall's trial testimony acknowledged on cross examination that he "think[s] [he] made a mistake" and that he "thinks" the signature on the document was not that of Jenny Marchick. (DE 797, p. 85.) My shock was in no way tempered by Mr. Woodall's deposition testimony, recounted above, that he was at all times merely estimating whose signature was on the document and when it was signed (Exhibit 2 hereto, Woodall Deposition Excerpts); and it is also not tempered by any of the other evidence reported to me during the course of the case as set forth above. It was also in no way tempered by Ms. Marchick's sworn admission to the effect that she may have discussed this very confidentiality agreement before it was ever raised or proffered, directly or indirectly, in the case at bar (*see,* ¶15, *supra*). These inconsistencies, as reported to me by lead counsel during the litigation, are disconcerting just as I was surprised and nonplussed upon learning of the trial testimony of Mr. Woodall. I state unequivocally that the testimony of Mr. Woodall at trial was the first time I learned that Mr. Woodall gave credence to any of the defense theories about the document now at issue regarding an agreement of confidentiality regarding his motion picture materials that Ms. Jenny Marchick admitted she received more than twenty years ago (*see, e.g.,* Exhibit 3 hereto, Marchick Deposition Excerpts).

20. Finally, I respectfully note for the record that this declaration has been prepared within a seven (7) day time-frame over the Labor Day Weekend and under significant time constraints on a long pending motion, requiring review of a five-year litigation matter and associated record evidence now spanning millions of pages and necessitating the navigation of substantial discovery and litigation documents and the preservation of numerous privileges, including the attorney-client privilege

and work product doctrine. The circumstance is not unlike what arose at trial when, after Plaintiff terminated Mr. Fox, no continuance could possibly be obtained to bring in new lead counsel, and my firm stepped in to assist as best we could. These efforts were undertaken in good faith and under pressure of time, in the face of defense claims that often proved unsupportable. With the limited time available to reconstruct events, it is impossible to recount everything with exactness, but I attest that the foregoing is substantially accurate in every single material respect to the best of my knowledge.

21. Finally, I would note that I endeavored to always comply with the California and Texas Rules of Professional Conduct and never acted in bad faith. In accordance with the California Rules of Professional Conduct, including Rule 1.1 (Competence) and Rule 1.2(b) (Scope of Representation and Allocation of Authority), and the Texas Disciplinary Rules of Professional Conduct, including Rule 1.01(b) (Competent and Diligent Representation) and Rule 1.02(b) (Scope and Allocation of Authority), it is entirely proper for co-counsel to divide responsibilities by agreement with the client, so long as the client is informed and the representation remains competent. In this matter, my role was limited and non-managerial as set forth in detail throughout this declaration and as previously admitted to the Court under oath by Mr. Buck Woodall. At all times in the case at bar, I reasonably relied on lead counsel to manage strategy, filings, and primary litigation decisions consistent with our agreed division of labor. Such reliance is expressly permitted under both sets of rules and reflects my compliance with the professional duties owed to the client.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 5, 2025

*/s/ James W. Christian*
**JAMES WESLEY CHRISTIAN**

## CERTIFICATE OF SERVICE

I hereby certify that, on this 5th date of September, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Electronic Service List for this Case.

Dated: September 5, 2025

Respectfully submitted,

TIMMONS BROGDON LAW FIRM, LLC

By: */s/ Sarah Anderson Timmons*
Sarah Anderson Timmons,
Attorneys for James Wesley Christian