1        **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3       **HONORABLE CONSUELO B. MARSHALL, U.S. DISTRICT JUDGE**

4

5    BUCK G. WOODALL,                          )
                                               )
6                      Plaintiff,              )
                                               )
7         v.                                   )          Case No.
                                               )  CV 20-3772 CBM (Ex)
8    THE WALT DISNEY COMPANY, et al.,          )
                                               )
9                      Defendants.             )
     ──────────────────────────────────────   )

10

11             **REPORTER'S TRANSCRIPT OF PROCEEDINGS**
                       **MOTIONS HEARING**
12             **WEDNESDAY, SEPTEMBER 10, 2025**
                         **10:19 AM**
13              **LOS ANGELES, CALIFORNIA**

14

15

16

17

18

19

20

21

22   ────────────────────────────────────────────────────

23      **MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
                FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, ROOM 4455
                LOS ANGELES, CALIFORNIA  90012
25                      (213) 894-2305


**UNITED STATES DISTRICT COURT**

1                          **APPEARANCES OF COUNSEL:**

2

3     **FOR THE RESPONDING ATTORNEYS LUIS E. SUAREZ and**
      **PATRICIA MELVILLE SUAREZ:**

4
          IVERSEN PROCTOR LLP
5         BY:  MICHAEL J. PROCTOR
              Attorney at Law
6         1325 Palmetto Street
          Los Angeles, California  90013
7         (213) 787-7699

8     **FOR THE RESPONDING ATTORNEY GUSTAVO D. LAGE:**

9         STEPTOE LLP
          BY:  ROBYN C. CROWTHER
10            Attorney at Law
          633 West Fifth Street, Suite 1900
11        Los Angeles, California  90071
          (213) 439-9400

12
      **FOR THE MOVANT JAMES WESLEY CHRISTIAN:**
13
          TIMMONS BROGDON LAW FIRM
14        BY:  SARAH A. TIMMONS
              Attorney at Law
15        25 Delano Drive, Suite E
          Greenville, South Carolina  29601
16        (864) 290-9800

17    **FOR THE DEFENDANTS:**

18        KING & SPALDING LLP
          BY:  ARWEN JOHNSON
19        BY:  MICHAEL D. ROTH
              Attorneys at Law
20        633 West 5th Street, Suite 1600
          Los Angeles, California  90071
21        (213) 218-4002

22        HUESTON HENNIGAN LLP
          BY:  ROBERT N. KLIEGER
23            Attorney at Law
          523 West 6th Street, Suite 400
24        Los Angeles, California  90014
          (213) 788-4340

25

**UNITED STATES DISTRICT COURT**

|  |  |  |
|---|---|---|
|  | 1 | WEDNESDAY, SEPTEMBER 10, 2025; 10:19 AM |
|  | 2 | LOS ANGELES, CALIFORNIA |
|  | 3 | -oOo- |
|  | 4 | THE COURTROOM DEPUTY:  Item Number 3, |
| 10:19AM | 5 | CV 20-3772 CBM, Buck G. Woodall versus The Walt Disney Company. |
|  | 6 | Counsel, please state your appearances. |
|  | 7 | MR. PROCTOR:  Your Honor, my name is |
|  | 8 | Michael Proctor.  And I represent the lawyers Luis Suarez and |
|  | 9 | Patricia Melville Suarez.  They're seated in the front row, |
| 10:20AM | 10 | Your Honor. |
|  | 11 | THE COURT:  All right.  Good morning. |
|  | 12 | MS. CROWTHER:  Good morning, Your Honor.  I'm |
|  | 13 | Robyn Crowther from Steptoe LLP.  I represent the attorney |
|  | 14 | Gustavo Lage, who I believe you're familiar with and who is in |
| 10:20AM | 15 | the courtroom with me today. |
|  | 16 | THE COURT:  Good morning. |
|  | 17 | MS. TIMMONS:  Good morning, Your Honor.  My name is |
|  | 18 | Sarah Timmons, and I'm appearing on behalf of |
|  | 19 | Mr. Wesley Christian. |
| 10:20AM | 20 | MR. KLIEGER:  Good morning, Your Honor. |
|  | 21 | Robert Klieger, Michael Roth, and Arwen Johnson on behalf of |
|  | 22 | defendants. |
|  | 23 | THE COURT:  Good morning. |
|  | 24 | The matter before the Court is the defendants' |
| 10:20AM | 25 | motion for sanctions against plaintiff's attorneys.  And the |

UNITED STATES DISTRICT COURT

parties have briefed the issue, but the Court did ask for some

additional information.

What I -- what wasn't clear to me is:  What did the

various counsel do on the case?  What was their role?  And I

10:21AM  think we received a response from two of the counsel but not

the third one.

So we received a declaration from Christiansen *[sic]*

and Botwin, B-o-t-w-i-n.  They described their role in the

litigation.  But we received nothing from Gerard Fox, even

10:21AM  though the Court also included him in the order that the Court

issued.  So that would be one thing to address this morning.

Also pending are a plaintiff's motion for new trial,

defendants' motion for fees, defendants' renewed motion for

judgment as a matter of law.  These matters were previously

10:22AM  taken under submission, so we don't need to have any discussion

on those.  The Court will issue orders.

So my questions are:  What was the role of each

plaintiff's counsel in the litigation, to the extent that

that's unclear or the Court asks for declarations -- and I

10:22AM  didn't get a declaration from at least one -- just trying to

figure out what they did in the litigation that would have put

them on notice of certain things that were litigated during the

trial.  And one argument is they -- these other attorneys

should have known about this issue, the confidentiality

10:23AM  agreement.

         Another question is:  Which plaintiff's counsel were

responsible for reviewing and approving the pleadings, the

motions, applications, and the briefs that were filed in the

case?  Because if those things have been filed, then the Court

10:23AM  would expect that each plaintiff's counsel would have reviewed

those, even though you may not have been the person that

prepared the original Complaint and some of the other

documents.  But it would at least place counsel on notice that

there were some issues that one could argue and has been argued

10:24AM  here that certain things should not have been -- there should

not have been a need to litigate.

         Another question:  What was each plaintiff's

counsel's role with respect to the confidentiality agreement

that was attached to the First Amended Complaint and also

10:24AM  attached to the Second Amended Complaint?

         So, again, one could argue and maybe expect that

each counsel, regardless of what your role was in the case,

would have reviewed the pleadings, been put on notice as to

things that were contained in the pleadings or attached to the

10:24AM  pleadings that this could be an issue in the case.

         So I have additional questions, but why don't I just

start with those two that I've identified which really asks

about the role and the responsibility of counsel, each counsel

in the case.

10:25AM          And then the second question is about the

confidentiality agreement.  Since it was attached to the First

Amended Complaint and the Second Amended Complaint, whatever

your role was in the case, did you review those pleadings and

see those attachments?

10:25AM        And I'll let counsel who's going to speak on behalf

of the plaintiffs respond to Questions 1 and 2.  And that might

be more than one counsel so you each can respond.

        The first question is role for each of those that

you represent.  And the second question is attachments and the

10:26AM   First Amended Complaint and the Second Amended Complaint.  Did

you actually review those and, therefore, would have been aware

of those attachments?

        MS. CROWTHER:  I'll begin, Your Honor.

        THE COURT:  And would you go to the lectern, please?

10:26AM        MS. CROWTHER:  Yes.  Yes, Your Honor.

        THE COURT:  And then you will indicate which of the

attorneys you represent.

        MS. CROWTHER:  Yes, Your Honor.  I'm Robyn Crowther

and I represent Mr. Lage.

10:26AM        In some ways, our position is the easiest to

explain.  And Your Honor did not request a supplemental

declaration from Mr. Lage.  Mr. Lage has been counsel of record

from the time the First Amended Complaint was filed and --

        THE COURT:  Did he draft the First Amended

10:26AM   Complaint?

1           MS. CROWTHER:  I think he supervised the drafting of

2     the First Amended Complaint.

3           THE COURT:  And how about the second?

4           MS. CROWTHER:  Yes.  The same.  The same.  And he is

10:27AM   5     familiar with -- with the attachments and including the

6     confidentiality agreement.  As said, the declaration actually

7     of James Christian indicates he was also involved in the

8     investigation of the -- what I'll generally refer to as the

9     authenticity of the confidentiality agreement later in the

10:27AM   10    case, including working with experts to review the handwriting

11    and reaching the conclusion that some of the handwriting was

12    added by the plaintiff after the fact, that the plaintiff

13    continued to believe in good faith that the signature on the

14    document was that of Ms. Marchick, that the plaintiff --

10:27AM   15          THE COURT:  And counsel did not do any further

16    investigation once counsel was aware that there was at least a

17    question.

18          MS. CROWTHER:  To the contrary, Your Honor.  Counsel

19    had two experts review -- of our own review the document and

10:28AM   20    reach conclusions.  Those conclusions were as to the signature

21    itself, that it was not possible to say who was the one who

22    signed it.  There was request for additional handwriting

23    samples from Ms. Marchick to make a follow-up investigation.

24          The conclusion was that the plaintiff had not

10:28AM   25    attempted to conceal that he had added some notations to the

agreement after the fact.  And the plaintiff continued to say

he believed that the signature was that of Ms. Marchick.  And

given the evidence that he had provided her with an agreement,

a draft agreement at the time, that his conclusion that the

10:28AM  signature was hers was in good faith.

THE COURT:  You may continue.

MS. CROWTHER:  As to the second question, reviewing

and approving pleadings and -- and briefs, Mr. Lage supervised

reviews and takes responsibility for those.  And to the extent

10:29AM  that Mr. Lage submitted a brief with Mr. Christian and

Mr. Botwin for Your Honor to consider today, I'm going to take

the lead on arguing those points with counsel for Mr. --

Mr. Christian to argue some specific positions from their point

of view.

10:29AM  And I don't know if now is the time, Your Honor, but

it seems that the only reason to ask what each counsel's role

was is if there has been a conclusion that there has been

sanctionable conduct.  And I have a lot to say about that

issue.  And I'm happy to make those arguments now or to wait

10:29AM  until you want to have those addressed, since they were not the

specific questions that you raised.

THE COURT:  Yes.  You can wait.

My law clerk has just passed up another question.

And you may feel that you've responded to this question or

10:29AM  maybe it is not -- you're not the person to respond.

            1          But plaintiff's counsel received notice in September

            2   of 2020 regarding defendants' concerns about the agreement.

            3   Why did counsel wait until September of 2020 to -- two years

            4   later to conduct an investigation?

10:30AM     5          MS. CROWTHER:  It took a long time to get the paper

            6   document itself, Your Honor.  The first --

            7          THE COURT:  How long?

            8          MS. CROWTHER:  It took --

            9          THE COURT:  As much as a year or more?

10:30AM    10          MS. CROWTHER:  More.  It took from April of 2022

           11   when it was raised until September -- I'm sorry -- April of

           12   2020 -- let me start again.

           13          THE COURT:  So the two years that the Court

           14   mentioned --

10:30AM    15          MS. CROWTHER:  Yes.

           16          THE COURT:  -- September of 2020, but it's not until

           17   September of 2022.

           18          MS. CROWTHER:  Yes.  Two years.  Yes.  I'm mixing up

           19   my -- my months.

10:30AM    20          Why did it take so long, Your Honor?  The first

           21   reason it took so long was the pandemic, the COVID pandemic.

           22   The plaintiff had the document.  The lawyers did not.  The

           23   lawyers could not travel to where the plaintiff said the

           24   document was located, and the plaintiff was responsible for

10:31AM    25   tracking it down.

1          There was also litigation over discovery relating to

2    the defendants' production.  And I think that's the first

3    reason why it took time.

4          THE COURT:  And so what happened, as far as your

10:31AM  5    client is concerned, about the discovery concerns?

6          MS. CROWTHER:  During the -- this period, the -- at

7    least for Mr. Lage and the -- the lawyers that he was working

8    with, the representation to the defendant was that the document

9    would be produced.  This is not a situation where there was a

10:31AM  10   motion to compel and, over objection, it was required to be

11   produced.  It was that the plaintiff is continuing to search

12   for the document.  And when he finds it, it will be made

13   available.

14         THE COURT:  So how much time do you think we're

10:31AM  15   talking about?  So the question includes a two-year period.  So

16   did it take the entire two years before you had -- your client

17   had something that the client could question or rely upon or

18   something less than two years; and, if so, what time?

19         MS. CROWTHER:  It was earlier in 2022 when an

10:32AM  20   attorney named James Ross, who was an associate of Mr. Lage,

21   traveled to Mexico to get the original document.  There was

22   concern that, if the document was sent through the mail or

23   otherwise, that it could be lost and, being the sole original,

24   that there was risk.  There was difficulty in traveling to

10:32AM  25   Mexico from the United States.

1          So it was not September when we first had the

2    original document that could be produced.  It was earlier in

3    2022.

4          THE COURT:  And so no trust in FedEx or other

5    carriers that could bring a document to someone requiring a

6    signature, certification?

7          MS. CROWTHER:  There was heightened concern,

8    Your Honor, given the efforts that the defense was making to

9    see this document that perhaps that would be too risky.  And

10   so, instead, it was decided that there should be a personal

11   representative who traveled to Mexico to get it and bring it

12   back.

13         THE COURT:  All right.  A few more questions.  And

14   some of these questions may have been covered in the response

15   to other questions.

16         So defendants submit evidence demonstrating that

17   they gave notice to Mr. Lage in September of 2020, that the

18   confidential agreement attached to the First Amended Complaint

19   was a forgery.

20         So you're not disputing that --

21         MS. CROWTHER:  No, Your Honor.

22         THE COURT:  -- correct?

23         And so my first question is about what investigation

24   did you undertake.  And you have responded, to some extent.

25   You hired experts to take a look at the document and to opine

on the signature.  But if there's more to add to that, you may.

The record appears to reflect that plaintiff's counsel did not retain and provide the confidentiality agreement to plaintiff's handwriting forensic experts until September of 2022.  And if you agree that that's correct, even though you had known earlier, so would your answer to that question be the same as you've already given?

MS. CROWTHER:  I think that we've discussed that, Your Honor.  Yes.

THE COURT:  And the other question, why was there a two-year delay?  And I think you've responded to that.

MS. CROWTHER:  Yes, Your Honor.

THE COURT:  So there were summary judgment motions filed in the case.  What was the counsel that you represent re: the summary judgment stage where the plaintiff reasserts his argument and any trade secrets publicly available on plaintiff's website were still trade secrets because the website posted a confidentiality agreement, an argument which the Court had previously rejected on April 14th, 2021, in ruling on the motion to dismiss the First Amended Complaint.

So some of these issues come up later in motions that were filed and, also, at that summary judgment stage.  So any further response?

The question is:  What was plaintiff's role in connection with plaintiff's argument at the summary judgment

stage.

MS. CROWTHER:  To the extent that it just concerns Mr. Lage's role -- again, at that point, he was involved, reviewed -- he was not the primary drafter of the documents, but we take responsibility for the arguments that were made and that those arguments were good faith arguments to oppose the summary judgment motion.

THE COURT:  And the Court will give counsel, even though the request for attorneys' fees is one of the motions that's under submission now -- and I earlier said we probably wouldn't discuss those now.  But to the -- to the extent that the request for attorneys' fees and the request for sanctions may overlap to some extent, if counsel wishes to comment on that, you may.

The question is that the parties don't address whether it's proper for defendants to recover attorneys' fees as a prevailing party in the trade secret and the copyright claims and also sanctions for excess fees and costs incurred under 28, U.S.C., 1927, for the trade secret and copyright claims.

The Court's interested in knowing what the parties' position is on the question of whether that would constitute double recovery.

MS. CROWTHER:  Your Honor, in -- I do have a comment on that as a matter of procedure.  Because I represent only

1    Mr. Lage and not Mr. Woodall, I'm not in a position to argue

2    the motion for the attorneys' fees itself.  But I --

3            THE COURT:  What about now -- so I have pending

4    attorneys' fee requests.  Also, this sanction motion.  So any

10:38AM   5    comment on defense counsel requesting both?

6            MS. CROWTHER:  Yes, Your Honor.  It would constitute

7    a double recovery, but it also is, at a minimum, awkward to be

8    arguing that a lawyer who pursued arguments did so vexatiously

9    and in violation of Section 1927 when there has not been a

10:38AM  10    ruling yet as to whether pursuing the litigation at all might

11    entitle the defense to -- to attorneys' fees.  And there is a

12    fully briefed motion on that that has many arguments, some of

13    which overlap, some of which do not, including things like

14    apportionment of fees.

10:39AM  15            So it -- as I was preparing for this argument, I was

16    interested to see had the Court made any rulings on post trial

17    motions or attorneys' fees that shed light on whether the

18    lawyers' conduct here was vexatious or violating of their

19    duties under a statute.

10:39AM  20            It's difficult to make those arguments.  It seems

21    cart before the horse to me.  And that -- it seems, at least,

22    this issue of sanctions should be addressed after those post

23    trial motions have been decided if the conclusion is not today

24    that there was no sanctionable conduct; that even if attorneys'

10:39AM  25    fees are awarded against the plaintiff, what counsel did here

was make arguments in good faith for application of law to

fact, which it's based on their interpretation of the law, of

Supreme Court decisions of the facts that they diligently

investigated to be true.

10:40AM          So to the extent that there is a belief that perhaps

there was sanctionable conduct here, it seems to me that that's

more appropriately addressed after the post trial motions and

motions for attorneys' fees have been decided.

          THE COURT:  And you indicated that there were other

10:40AM matters that you would want to put something on the record and,

I assumed, not already covered in briefs that have been filed.

So this would be your opportunity, whatever else you feel that

the Court needs to consider --

          MS. CROWTHER:  Yes, Your Honor.

10:40AM          THE COURT:  -- in ruling on this motion, motion for

sanctions.

          MS. CROWTHER:  What I would say, Your Honor, is --

and -- and this is covered in the papers to a certain extent.

But there's an overview that I think is useful.

10:40AM          Every day in courts across the country motions to

dismiss are granted on the grounds of statutes of limitations

being violated.  There are summary judgment motions that

someone wins and someone loses.  There are trials that take

place where witnesses are believed and where witnesses are not.

10:41AM There are implied, in fact, agreements that are litigated

1    because one side contends there is a written agreement and

2    another side contends that the signature is not valid.

3            None of that is sanctionable.  And that's what

4    happened in this case.

10:41AM    5            We had a case that the plaintiff lost at trial.  But

6    along the way, there were several motions that the plaintiff

7    won, including a motion for terminating sanctions based on many

8    of the same arguments that are being addressed here.

9            This motion also asserts that there are facts that

10:41AM    10    were not brought in good faith, even though those facts haven't

11    been adjudicated at all.  And one such example is whether the

12    confidentiality agreement contains the signature of

13    Ms. Marchick or not.

14            It did take a long time for the original agreement

10:41AM    15    to be produced.  The reason that the defendants wanted it was

16    so that they could have it examined by an expert.  They did.

17    That expert has never produced a report, did not testify.

18    There's no one who has said that the signature on the

19    confidentiality agreement is definitely not Ms. Marchick except

10:42AM    20    for her.

21            The plaintiff has indicated that he believed it was

22    her signature, he believed that because he sent her the

23    agreement and because her conduct in the subsequent years

24    indicated that she understood that this would be treated

10:42AM    25    confidentially as between them.

**UNITED STATES DISTRICT COURT**

1        Therefore, when our lawyers argue that this is her

2    signature, we don't have any indication for sure that it is

3    not.  That's a contested issue of fact that hasn't been

4    resolved by the jury, by Your Honor.  It remains live and

10:42AM   5    undetermined.

6        Additionally, while there was litigation over the

7    agreement, it didn't actually expand the claims that were made

8    in the case.  Had there been no written agreement, there are

9    still facts that Woodall would have cited to say I provided

10:43AM  10    these materials on a confidential basis, that is, that they --

11    some of them were trade secrets, and I took reasonable measures

12    to protect them because that was my discussion with

13    Ms. Marchick.

14        And what is suggested in the moving papers is that

10:43AM  15    Mr. Lage or other counsel should have amended the Complaint to

16    remove the reference to the signed confidentiality agreement.

17    But that would have changed nothing.

18        The litigation would have been the same.  And to the

19    extent that what 1927 says is that a lawyer can be sanctioned

10:43AM  20    for engaging in vexatious multiplication of proceedings, that

21    doesn't apply to the confidentiality agreement.

22        It similarly doesn't apply to the question on the

23    statute of limitations.  Your Honor resolved the statute of

24    limitations on various claims in favor of the defense on

10:44AM  25    summary judgment.  Losing summary judgment is not sanctionable.

|       |                                                                          |
|-------|--------------------------------------------------------------------------|
| 1     | It happens to me more often than I'd like.  It happens to                |
| 2     | lawyers all of the time.  To find that there's no triable issue          |
| 3     | of fact does not mean that someone vexatiously litigated a               |
| 4     | case.                                                                     |
| 5     | In this case --                                                          |
| 6     | THE COURT:  What about the fact that it may put                          |
| 7     | someone on notice that would require that someone to do some             |
| 8     | further investigation?                                                   |
| 9     | MS. CROWTHER:  The facts here, Your Honor, show that                     |
| 10    | the defendants did the investigation.  They spoke to the                 |
| 11    | plaintiff, once he testified, that he had seen a Spanish                 |
| 12    | version of the film *Moana* in December 2016.  What did he do in         |
| 13    | March?  And what did he do in April?                                     |
| 14    | And citing Supreme Court authority and the recent                       |
| 15    | *Massimo* decision from the Ninth Circuit, what was argued here          |
| 16    | was that the discovery rule did not cause the claim to accrue            |
| 17    | until later than the Court concluded that it accrued.                    |
| 18    | What the plaintiffs argued here was that it required                     |
| 19    | a certain amount of investigation, reviewing of the movie,              |
| 20    | before the plaintiff realized that he had injury.  And this was          |
| 21    | not an actual injury, like a personal injury, a medical injury          |
| 22    | that you know that you have at a given time, that it is a more           |
| 23    | nuanced issue.                                                           |
| 24    | Given that this issue is one of application of law                      |
| 25    | to fact, it is not vexatious.  It is not a multiplication of            |

Time stamps (left margin): 10:44AM (line 5), 10:44AM (line 10), 10:44AM (line 15), 10:45AM (line 20), 10:45AM (line 25)

1    the proceedings for Mr. Lage to have argued his client's

2    position in opposition to the motion for summary judgment.

3              It was based on an understanding of the facts,

4    investigation, he made an argument, and it was rejected.

10:45AM    5              But, again, there's no indication that this

6    particular issue actually increased the scope of the litigation

7    in any material way.  There were certain causes of action that

8    were dismissed, but the evidence in the case that related to

9    the similarity between the two -- the two works that related to

10:46AM    10   the timing, that related to access, all of those issues were

11   live even through the trial.

12             And, therefore, it's not something that increased

13   the scope or that -- that did so frivolously or in bad faith.

14             As to the issue of publication, the argument that

10:46AM    15   was made on behalf of Mr. Woodall was that there were some

16   materials that were trade secrets and some that had been

17   disclosed.  And because of the way the summary judgment was

18   decided and because of the jury's finding at trial, it has

19   never been adjudicated whether there remained trade secret

10:46AM    20   information or not.

21             Defendants have their arguments that these were not

22   secret.  Plaintiff has his argument that, in fact, they were

23   not generally known, which is the standard under the law, and

24   also that he took reasonable measures to keep them secret.

10:47AM    25             Those are issues that might have been adjudicated at

some time.  They have not.  They are, again, another

application of law to fact, which is what lawyers do all the

time.

       In a case like this, particularly, where you have

someone who began pro se and is an individual against many

corporations, lawyers may push the envelope at times.  They

will advocate on behalf of their client and make zealous

arguments.  They may ask that the law be applied in a way that

judges disagree with.  That is just the adversarial American

judicial system in action.

       What strikes me about the papers that have been

submitted in this case is that there's an explanation for each

thing that the lawyers did.  Why did they believe that that was

the appropriate thing to do?

       When you compare this to *Caputo*, which I saw that

Your Honor cited in the minute order, asking for additional

information, there was a suggestion that the plaintiff's

lawyers -- that the lawyers there had misled the Court and

misled the Court about when they knew things and what the

impact of the things that they knew was.  That's not the

argument here.

       Here, we have several experienced lawyers who all

looked at the same situation and determined that there was a

good faith basis to make the arguments that they did, and

there's not a suggestion that the presentation they made to the

Court was based on false representations of fact by the

attorneys.

By mid 2022, Mr. Woodall had conceded that he was

the one who added certain language to the confidentiality

10:48AM    agreement, and the parties made their arguments based on those

facts.

This case is also different from *Caputo* in that none

of the lawyers has stipulated that what they did was

inconsistent with their duties as counsel.  Instead, all of

10:48AM    them have argued that they acted diligently and in good faith.

And for all of those reasons, Your Honor, I think

that there is not sanctionable conduct here, that 1927 does not

apply, and I would encourage that defendants' motion be denied.

THE COURT:  All right.  Thank you.

10:49AM    Other plaintiffs -- other counsel representing the

attorneys that are the subject to the -- of the motion for

sanctions?

MR. PROCTOR:  May I approach the lectern?

THE COURT:  Of course.

10:49AM    And, Mr. Proctor, is your argument addressing

certain lawyers or just generally?

MR. PROCTOR:  So, Your Honor, I represent Mr. Suarez

and Ms. Melville.  And I'm going to address their circumstances

in particular because I think that's what *Caputo* requires.  And

10:49AM    I --

|       |                                                                              |
|-------|------------------------------------------------------------------------------|
| 1     | THE COURT:  That's why the Court issued the order                            |
| 2     | asking for some attorneys to identify their -- their roles.                  |
| 3     | MR. PROCTOR:  And before I start, I just wanted to                           |
| 4     | note that in defendants' reply brief, defendants characterized               |
| 5     | our position as pointing fingers at some of the other counsel.               |
| 6     | And I don't think that's a fair representation of our position               |
| 7     | in the slightest.  We're not pointing any fingers.  But what                 |
| 8     | we're doing under *Caputo* is explaining the role that my clients            |
| 9     | had during the scant 11 months that they made an appearance in               |
| 10    | this case.                                                                   |
| 11    | And to address the role question directly,                                   |
| 12    | Your Honor, the reason why at the beginning of this proceeding               |
| 13    | I introduced Your Honor to my clients is because I don't                     |
| 14    | believe Your Honor has ever met Ms. Melville before.  She never              |
| 15    | appeared before you and never argued a motion.  And I believe                |
| 16    | Mr. Suarez, I think, showed up in court one time but didn't                  |
| 17    | argue the motion because there was more meeting and conferring               |
| 18    | to be done.  So in those 11 months, neither argued any motion.               |
| 19    | They made the appearance in this case on August 4,                          |
| 20    | 2022.  The case was already -- the pleadings were already set.               |
| 21    | Your Honor asked a pointed question about the disclosure that                |
| 22    | the plaintiff's lawyers made to the defendants about the fact                |
| 23    | that Mr. Woodall had made a modification to the confidentiality              |
| 24    | agreement.  I want to highlight two facts with respect to my                 |
| 25    | clients.                                                                     |

The timestamps in the left margin are:
10:50AM (line 5)
10:50AM (line 10)
10:51AM (line 15)
10:51AM (line 20)
10:51AM (line 25)

1    One, that disclosure was made approximately one

2    month after they got in the case.  So I -- I understand that

3    during the pandemic and the fact that this document was in

4    Mexico caused a delay.  But in terms of our clients, it was one

10:52AM    5    month.

6    Secondly, and more importantly, it was Mr. -- it was

7    Mr. Suarez himself who penned the letter to defense counsel and

8    advised them of -- of those facts.  These blockbuster facts

9    that we're relying on today supposedly to impose sanctions,

10:52AM    10    that fact was disclosed by Mr. Suarez himself because my

11    clients understand they have twin obligations here.

12    They understand they have an obligation as an

13    officer of the Court, to Your Honor, and to the justice system.

14    But they also have an obligation of zealous advocacy to their

10:52AM    15    client.  And in their 11 months under the unique circumstances

16    of this case, I am proud to represent them because I think they

17    did an excellent and ethical job carrying out both of those

18    responsibilities.

19    So in terms of the role -- of course they read the

10:53AM    20    pleadings.  They're -- you know, they're coming into the case.

21    Of course they read the pleadings.

22    THE COURT:  That's one of the Court's inquiries,

23    that, even though the role might have been limited, did they

24    review the pleadings and the attachments to the pleadings?  And

10:53AM    25    you've answered that they did.

10:53AM

 1          MR. PROCTOR:  Yes.  They did, Your Honor.  And, of

 2   course, reviewing the pleading wouldn't have put them on notice

 3   that the document had been altered.  But within one month of

 4   them coming into the case, they came forward and affirmatively

 5   wrote a letter to counsel for Disney and said, by the way, this

 6   document has been modified.

 7          They didn't say -- use the word "forgery" because I

 8   think that's the conclusion that the defense wants to suggest

 9   here.  What they said was the document was modified and we're

10:54AM

10   continuing to look into the issue.

11          My clients were focused on discovery during their

12   11 months.  And on July 11, 2023, they got out of the case.

13   They were -- they put this case in the rearview mirror,

14   Your Honor.  It's been three years.  They weren't involved in

10:54AM

15   any of the motions for summary judgment, all the pretrial

16   motions.  They weren't involved in the trial itself.  They --

17   they had nothing to do with this and --

18          THE COURT:  When counsel said they got out of the

19   case, what do you mean?

10:54AM

20          MR. PROCTOR:  There -- there became a -- a

21   disagreement among counsel that -- that I'm not at liberty to

22   discuss ethically --

23          THE COURT:  But did they ask to withdraw or --

24          MR. PROCTOR:  Yes, Your Honor, they withdrew.  And

10:54AM

25   the Court allowed them to withdraw on July 11th, 2023.

1            And I -- you know, it seems to me that the motion

2       that was filed for sanctions paints with a very broad brush.

3       And that's not what *Caputo* instructs us to do.  And I don't

4       know whether it was tactical or what, but -- but the defense

10:55AM  5       just decided to seek sanctions against every defense -- every

6       plaintiff lawyer involved in this case, including my clients,

7       who now -- you know, practicing law in Florida for the last

8       three years since getting out of this case now had to retain

9       me, flown here from Florida to appear in front of Your Honor

10:55AM  10      really for the first time.

11           I will say that I -- I give Mr. Suarez credit for

12      affirmatively disclosing that the document had been modified.

13      I also think I give Mr. Suarez credit because he sat at the

14      deposition of Mr. Woodall and represented Mr. Woodall at his

10:56AM  15      deposition when Mr. Woodall actually made the disclosures about

16      when he had seen the movie *Moana*, first in Spanish and then in

17      English.

18           So these are the two supposed blockbuster facts upon

19      which Disney says Mr. Suarez and Ms. Melville ought to have

10:56AM  20      gotten out of the case sooner, I suppose, or dismissed the case

21      on their own motion.  They got out within 11 months of getting

22      in.  And I suggest to Your Honor that, had they gotten out a

23      few months earlier, nothing in the course of this litigation

24      would have changed.  Their role was very limited and did not

10:56AM  25      multiply these proceedings.

**UNITED STATES DISTRICT COURT**

|     |                                                                          |
| --- | ------------------------------------------------------------------------ |
| 1   | And they have affirmed to Your Honor under oath that                     |
| 2   | at all times they acted in good faith and never with the intent          |
| 3   | to harass either defendants or defense counsel.  And that's              |
| 4   | uncontradicted.  And under 1927, they would need to have acted           |
| 10:57AM 5 | in bad faith and they did not.                                     |
| 6   | May I have one moment, Your Honor?                                        |
| 7   | THE COURT:  Yes.                                                          |
| 8   | (Off-the-record discussion.)                                             |
| 9   | MR. PROCTOR:  I said to Your Honor that I was proud                       |
| 10:58AM 10 | to represent my clients and I am.  They have a spotless record     |
| 11  | for the past -- I think it's now 25 or 27 years, carrying out            |
| 12  | their ethical responsibilities to their clients.  And I would            |
| 13  | urge Your Honor to find that they acted in this case ethically.          |
| 14  | Thank you.                                                               |
| 10:58AM 15 | THE COURT:  Thank you.                                             |
| 16  | Is there another counsel who is representing some of                     |
| 17  | the attorneys?                                                           |
| 18  | MS. TIMMONS:  Yes, Your Honor.  This is                                   |
| 19  | Sarah Timmons on behalf of Mr. James Wesley Christian.                   |
| 10:58AM 20 | May I approach the lectern?                                        |
| 21  | THE COURT:  Certainly.                                                    |
| 22  | MS. TIMMONS:  Thank you.                                                  |
| 23  | THE COURT:  And I think Christian did file a                              |
| 24  | declaration regarding his role based upon the order that the             |
| 10:59AM 25 | Court issued.                                                      |

UNITED STATES DISTRICT COURT

1          MS. TIMMONS:  That is correct, Your Honor.

2          THE COURT:  The Court has the benefit of that

3    declaration.

4          MS. TIMMONS:  Wonderful.  Yes, Your Honor.  We would

10:59AM  5    very much ask that you take notice of that along with the

6    exhibits attached thereto as the parts of the record that were

7    cited therein.  So thank you very much for acknowledging that.

8          Your Honor, as is outlined in our declaration and

9    in -- I think is very critical to this matter and as co-counsel

10:59AM  10   also noted, Your Honor cited *Caputo*.  And in that case in which

11   the Court -- the Ninth Circuit awarded sanctions under 1927, I

12   think it's really important to note the manner in which that

13   case arose.

14         In that instance, you had conduct where attorneys

10:59AM  15   had admitted to misconduct, specifically their misconduct which

16   was they had access to a witness's affidavit significantly

17   before when they said they had.  And they concealed that

18   evidence and then acted as if they came into that evidence as

19   newfound information to time along with proceedings for

11:00AM  20   attorneys' fees and then proceeded to double-down when

21   questions were raised with that Court.

22         And when those concerns were raised, Your Honor, I

23   think it's also critical to note that, here, we don't have the

24   same thing.  As was aptly discussed, the conduct of which

11:00AM  25   defendants are complaining really came down to a question of

1    fact as to the authenticity of an original document that was

2    produced by the plaintiff and whether that, in fact, was

3    authentic.  There was a question of fact as to that issue.

4          And plaintiff's counsel hired experts to evaluate

11:00AM    5    the authenticity.  And the plaintiff maintained throughout the

6    course of litigation that he thought that was Ms. Marchick's

7    signature but admitted, in fact, he had written her name and a

8    date below that based on contemporaneous evidence that he had.

9          In *Caputo*, the difference is the attorneys in that

11:01AM    10    case had the facts, had prepared affidavits arising from that

11    witness, and concealed them on purpose.  And then, later, it

12    came up to a head when a filing in another contemporaneous

13    action had that information that demonstrated that their

14    representations on the timing of the evidence was false.

11:01AM    15          And in its investigation as to whether or not

16    sanctions were appropriate against the attorneys under 1927 in

17    that matter, the Court did, in fact, refer this matter to a

18    special referee, recognizing the difficulties with

19    attorney-client privilege, work products doctrine and the

11:01AM    20    length of time in which the litigation had occurred and the

21    need for a significant investigation prior to making that

22    determination.

23          So it wasn't based solely on a declaration.  It was

24    a, um, extensive investigation that had to be conducted by a

11:01AM    25    special referee, given those confines, that was three days with

nine witnesses.

And, Your Honor, I think that's important because we -- we are somewhat restricted in that.  However, I would argue that specific to my client there are significant facts that, um, show that, with regard to his role in this case, sanctions would not be appropriate under 1927.

And that is because, Your Honor, my client, Mr. Christian, came into this case specifically to finance and provide litigation support for the tremendous amount of discovery work that was occurring in this case due to discovery fights over obtaining Disney's documents.

And so he came into this case on November 12th of 2021 after the pleadings were framed, after the motions to dismiss had been denied by Your Honor, and after the answers had been filed.

And when he came into that case, it was specifically for the purpose of financing and assisting the plaintiff -- and this is what he had done consistent with all of the prior cases with his well-experienced career in fighting against large powerful companies and well-funded individuals of helping with those efforts.

And in this case, Your Honor, that's exactly what he did.  He came in specific for the purpose -- specifically for the purpose of assisting the plaintiff with motions to compel against Disney, which they continued to win.  I would also

point Your Honor to the facts that, through that process, there
were numerous motions.  And, ultimately, I think there is a
hearing on sanctions against the defendants where a stipulation
that they would be producing those documents was entered.  I
believe that's Docket Entry 190.

And so that was the focus of my client's efforts
was, in fact, focusing more on the plaintiff's ability to get
the documents to which he was entitled that were critical to
the fact of whether the defendants, in fact, had committed the
claims that -- that his copyright and trade secrets had been
misappropriated.  And I think that's important because the
focus on the confidentiality agreement was actually not
critical to the outcome of any of plaintiff's claims in this
case.

Specifically here, my -- my client, Mr. Christian,
notes that, once it came to his attention -- which was not his
role, he had nothing to do with the pleadings.  He was
specifically focused on financing the discovery and providing
litigation support as to obtaining defendants' documents and
fighting those battles.

But once it came to his attention in 2022, that they
were questioning the authenticity of the confidentiality
agreement that plaintiffs maintained was Ms. Marchick's,
Mr. Christian, in fact, more so than *Torres* in the -- in the
case that Your Honor cited, he actually financed the obtaining

```
 1   of that document from plaintiff in Mexico, which was a

 2   significant effort because it was, you know, very difficult to

 3   get to and it was expensive and it was COVID.

 4           So he paid to further and in good faith conduct the

 5   investigation, once the concern was raised.  Although, I would

 6   say that there was no evidence backing defendants' concern as

 7   to the authenticity.

 8           And so he -- he obtained the document.  He, in fact,

 9   financed the two -- two very qualified experts on the

10   plaintiff's side to evaluate the authenticity of that document.

11           And, Your Honor, I think that is incredibly

12   important to note because these experts were not just some

13   experts that you just find on the side of the road.  In fact,

14   one of the experts -- and I would point Your Honor to 221-1 and

15   221-2 docket entries, which contain the declarations of those

16   two experts, that Mr. Christian hired on behalf of plaintiff to

17   evaluate the authenticity of the document.

18           Mr. Larry Stewart was the former head of forensics

19   for the United States Secret Service.  And he examined the

20   document, both chemically and physically, and found that there

21   was absolutely no evidence that the document had been

22   falsified.  And that's contained in his report, 221-1.

23           Secondarily, Mr. Jim Blanco is a -- 30 years of

24   experience in forensic document examination.  And in his

25   examination of the document, he made multiple findings, which I
```

1    think are critical, and support the plaintiff's attorneys'

2    conduct in this case by proceeding with this case, namely, that

3    consistent with plaintiff's testimony, it was plaintiff's

4    handwriting of her name and the date, not the signature, and

5    that that handwriting did not show any attempt at falsification

6    or disguise, which was consistent.  He said, "I wrote the name,

7    I wrote the date."  Okay.  But at the end of the day, they're

8    trying to argue now that it's not her signature.

9         So he continues to look at the document.  He says

10   that is, indeed, plaintiff's handwriting below, consistent with

11   his testimony.  And it's not showing elements of self disguise,

12   as in he's not pretending to be someone he's not.

13        And moreover, when he specifically looks to the

14   signature on the document -- and that would be 221-2,

15   Your Honor, page 13 and 14 -- I think that this is important,

16   specifically, again, to all of the attorneys' conduct in this

17   case -- because he states there were only two known signatures

18   of Jenny Marchick that were provided for examination and a

19   cross-comparison of the two known signatures for Ms. Marchick

20   shows that they had a very wide range of stylization, as in one

21   signature of hers was very markedly different from the other

22   which he used to compare to the confidentiality agreement

23   signature.

24        And he said, based on that, I cannot make a

25   determination unless I have 20 additional examples provided by

Ms. Marchick in order to determine, number one, is it her signature and, number two, were there elements of self-disguise?

Plaintiff's counsel engaged in signature efforts to obtain those signatures from Ms. Marchick, but defendants objected to the production of those signatures and, therefore, his investigation was not able to come to a head.

And so I think that is critical, Your Honor, in evaluating our conduct is that we provided two expert reports and paid -- my client paid for the two expert reports and he paid to obtain the original documents from Mexico in order to have that examination.

Defense counsel never provided any expert reports whatsoever in the -- in their prosecution of the motion for terminating sanctions that Your Honor ultimately denied, in which you did note in that order that they had not provided any expert declaration or report and, therefore, you were going to allow that to proceed to the summary judgment stage.

Um, secondarily, Your Honor, I would say that my client's role in this litigation, once -- was not to litigate the issues once he paid for the expert reports to occur -- because he was the financing attorney, he was not drafting any documents, he was not filing any documents. He made very limited appearances in this case. And he was not in charge of the strategy or anything like that. He came in after the

pleadings.

And, Your Honor, once he -- that issue arose, he did
pay to obtain that information, consistent with what he
perceived to be his ethical obligations.  But at no point in
time did he have concerns that they were proceeding on a
falsified document or that there were definitive statute of
limitations concerns that necessitated pulling out of the case.

Our client was very clear that, yes, while he saw
the movie in Spanish, he doesn't speak Spanish.  He lives in
Mexico.  He could not get the DVD for him to be able to do a
side-by-side comparison until June.  And that's what he
consistently testified.

And so a question of fact as to the statute of
limitations, I would argue, does not arise to sanctionable
conduct as it relates to the attorneys.  At all times, we acted
in good faith.

Moving forward, Your Honor, I would -- I would
further note that the defendants' motion against Mr. Christian
specifically cites to two specific main instances as to why
they think he should be responsible for over $400,000 of
attorneys' fees that they incurred since he appeared in
November of 2021 despite his limited appearance, only financing
discovery against defendants, and then assistance with the
investigation.

They basically say, because you were here, you're

responsible for all of it.  And that I would argue, Your Honor,

is not necessarily appropriate, specifically when you look at

what they cite that Mr. Christian actually did.  They say --

and I would say we disagree with their categorization of what

11:10AM   he did.

They say that he was on relevant correspondence and

pleadings.  The pleadings, as I've already indicated to

Your Honor, were closed by the time he got there.  They were

framed out.  It was over.

11:10AM   Relevant correspondence, Your Honor, that's kind of

vague.  Although, I did point Your Honor to the conduct that he

engaged in once he became aware of the issue in financing the

investigation as to the document in question.

Secondarily, they argue that Mr. Christian argued on

11:11AM   behalf of plaintiff at the hearing on defendants' motion for

terminating sanctions and, therefore, was intimately familiar

with defendants' specific contentions regarded thereto.

That, Your Honor, is -- is not entirely accurate.

Mr. Christian was present for the hearing on the cross motions

11:11AM   for sanctions before Your Honor.  However, he was only there

in -- only appeared to argue for plaintiff's motion for

sanctions against the defendants for their discovery

violations.

And that is made clear in the facts that -- the

11:11AM   transcripts before Your Honor on that hearing was Docket Entry

1    237 and took place on December 1st, 2022, in which he

2    appeared -- and Your Honor correctly indicated -- that, due to

3    the numerous discovery issues that he had raised against

4    defendants, that that was more appropriate to be done before

11:12AM    5    the magistrate.

6         And that's all there was, as you basically said,

7    Your Honor -- you basically said you need to go back to the

8    Magistrate Court to have that determined.  And he said, yes,

9    ma'am.

11:12AM   10         In terms of the defendants' motion for sanctions,

11   that, as you will see in the transcript, was made to be argued

12   by Mr. Suarez.  However, Mr. Suarez never had the opportunity

13   to argue whatsoever as Your Honor was able to adjudicate how

14   you wanted to handle it without his argument.  And that is that

11:12AM   15   you noted that the defendants' contentions as to the

16   authenticity of the confidentiality agreement and the statute

17   of limitations were properly questions of fact and more

18   appropriate for the summary judgment stage.  And, therefore,

19   you denied both of the motions.

11:12AM   20         But plaintiff's counsel actually never argued

21   anything about their motion.  And you basically indicated to

22   defense counsel that that -- that motion for sanctions, for

23   terminating sanctions was improper and was better for summary

24   judgment.

11:12AM   25         And, therefore, Your Honor, by proceeding -- and I

would note, Your Honor, that at that hearing, the -- the -- plaintiff's counsel, we submitted our two expert reports to you for consideration at that time.  And at that time, they did not have an expert report.  And you adequately -- you absolutely noted that in your order denying both motions for sanctions and indicated that they had not provided any expert report.

So their expert had already investigated the document at that time.  It was their decision not to provide an expert report.  And I think that's important to note as they try to point to delay and responsibility for attorneys' fees because at any point in time they could have provided an expert report and they didn't.  We did.

And we proceeded under our good faith assumption that the expert reports didn't point to forgery.  And we proceeded in good faith, Your Honor, under the auspices that these were questions of fact that needed to be fully litigated out.

And so, Your Honor, in closing, I would say that, um, in pointing to 1927 and *Caputo* -- *Caputo* is a very long opinion.  It's over 100 pages.  And in that case, the master -- or excuse me -- the special referee/master in equity goes through extreme lengths to look at the conduct in question in determining responsibility on behalf of the attorneys.

As I already mentioned, *Caputo* already indicated that the attorney -- certain attorneys admitted to their bad

conduct, not questions of fact on a document.  But specific to

my client, my client -- in that case, *Torres* was the --

probably the only one that had the lesser conduct that the

Court looked at.

11:14AM    And that was in line with, you know, she -- she

should have known and done a better investigation once

questions were raised.  And because she didn't, her misconduct

was omission, not commission.  However, she had drafted court

filings, she argued in front of the court, and she continued to

11:15AM    proceed with that kind of conduct.

That is clearly distinguishable, that my client

actually did less and that he did not draft or file any

documents or argue anything related to these documents in

question.  However, he did finance the investigation into those

11:15AM    issues to make sure that if he was going to continue to finance

this case, that he felt comfortable that he was complying with

his ethical obligations.

And so, Your Honor, I would argue that Mr. Christian

is not -- it would not be proper to sanction him under 1927

11:15AM    because his conduct was far less than *Torres*.  And in *Torres* --

*and Caputo*.  *Torres* was not financially fined and had a verbal

reprimand.  But my client actually undertook the investigation

to ensure that all of -- he was comfortable that our conduct

was in line with the ethical obligations under this Court.

11:15AM    The only other thing I would mention, Your Honor, is

that this document is not directly -- so basically they have

not tied 1927 to any misconduct on behalf of my client other

than being there.

I would note that, you know, Mr. Woodall's

11:16AM   testimony, even at trial, he -- you know, where he says he

makes a mistake is by writing Jenny Marchick's name below it

and the date.  He never plagiarized her signature.  In good

faith, he thought it was.  And so I think that we in good

faith, our attorneys in good faith were entitled to rely

11:16AM   thereon and the expert testimony.

And under 1927, you have to tie his conduct

specifically to recklessness or bad faith under 1927, which is

not present here.

And as co-counsel adequately stated, that

11:16AM   confidentiality agreement had no bearing whatsoever on the

disposition of plaintiff's claims.  The claims that might have

come up with a confidentiality agreement were dismissed on your

determination of facts that the statute of limitations had run.

And it was determinative of when he became aware of it, not

11:16AM   anything else.  It was a question of fact.

And the copyright claim was not based whatsoever on

the confidentiality agreement.

And so, Your Honor, I do think that this is just an

instance where, um, our -- you know, the plaintiff lost this

11:17AM   case.  But I don't believe that the conduct -- my client's

```
 1   conduct arises to sanctionable conduct under 1927 or

 2   necessarily the other attorneys in this case as well.

 3            Thank you very much for your consideration.

 4            Do you have any additional questions for me?

 5            THE COURT:  No additional questions.

 6            MS. TIMMONS:  Okay.  Thank you.

 7            THE COURT:  So defendants, the Court has asked for

 8   additional information.  And two of the counsel actually

 9   identified their roles, information that maybe the defendants

10   already had.  But that's something that you may want to comment

11   on.

12            And then Gerald Fox -- Gerard Fox, G-e-r-a-r-d, did

13   not file a declaration.

14            So counsel may proceed.

15            MR. KLIEGER:  Thank you, Your Honor.  And one other

16   question that Your Honor posed that I think is -- I want to

17   address upfront because it is appropriately addressed by us is

18   the question of double recovery.

19            Um, obviously there would be no double recovery

20   unless both attorneys' fees and sanctions were recovered.  Our

21   view here is we're not seeking a double recovery.  Our view is

22   that, to the extent there are attorneys' fees awarded and

23   sanctions awarded, they would be joint and several up to the

24   amount of the sanctions that are awarded.  Everything above

25   that only the plaintiff would be responsible for.
```

**UNITED STATES DISTRICT COURT**

1          So we're not seeking to recover the same monies from

2    plaintiff that we would be seeking to recover from his counsel;

3    rather, it would just be joint and several up to the point of

4    the sanctions.

11:18AM  5          Um, there were a number of factual

6    misrepresentations, um -- I'll stop there.  I'll say factual

7    mistakes that were made in the presentation this morning that I

8    want to hit on, both in terms of chronology and in terms of

9    some of the counsel's roles and when things actually occurred.

11:18AM 10          Um, and I think there's also been a lot of confusion

11   created -- I think purposely created about the role of the

12   experts and this notion that they presented experts, we didn't

13   present experts, why is that.

14          So I'd like to address, if I could, the three --

11:19AM 15   really the three separate bases, the three separate occurrences

16   that give rise to this motion, which are the falsified

17   confidentiality agreement, the public availability of the

18   trailer, and then the statute of limitations issue.

19          And I do want to note, before I jump in, two things:

11:19AM 20   One, there was a statement made -- I believe it was by

21   Mr. Proctor -- that we sued every plaintiff's counsel that was

22   on this case.  That's actually not true.  We did not name --

23   seek sanctions of any of the plaintiff's counsel that were

24   involved prior to the confidentiality agreement issues coming

11:19AM 25   to light.

1          Um, so there were a number of plaintiff's counsel

2     involved earlier in the case that withdrew from the case before

3     that point or withdrew from the case immediately at the time

4     that came to light.  We have not sought sanctions against

11:19AM  5     those.

6          And I will also note, um, this is not a motion we

7     brought lightly.  I -- I don't have a perfect memory, but I'm

8     99 percent sure that I've never brought a 1927 motion prior to

9     the motion before the Court today.  This is not a question of

11:20AM  10    pushing the envelope.  These are all issues in which counsel

11    went outside the envelope.  And I think that will be clear

12    from -- from the specifics of each instance.

13         Let's start with the confidentiality agreement.

14         Mr. Lage -- the first time we saw the

11:20AM  15    confidentiality agreement, Mr. Lage attached the

16    confidentiality agreement as an exhibit to the First Amended

17    Complaint.  It stated in the Complaint true and correct copy of

18    the confidentiality agreement executed by Jenny Marchick.

19         Obviously, if Mr. Woodall had written everything on

11:20AM  20    that document other than the signature -- let's set the

21    signature aside for a moment -- Mr. Woodall knew that -- if

22    they asked their client whose handwriting is on the document,

23    Mr. Woodall could have told them -- maybe he did tell them --

24    it's my handwriting on the document.

11:21AM  25         That alone, you don't file that with the Court and

|   | |
|---|---|
| 1 | say this is a true and correct copy of the agreement she |
| 2 | executed.  You could say this is a true and correct copy of -- |
| 3 | of a form of agreement that Mr. Woodall 17 years later wrote |
| 4 | Ms. Marchick's name on and backdated 17 years and we believe |
| 11:21AM   5 | it's Ms. Marchick's signature on the document.  Like, you don't |
| 6 | need experts at that point in time to know that that actually |
| 7 | was not a true and correct copy of a confidentiality agreement |
| 8 | executed by Ms. Marchick. |
| 9 | Plaintiff knew.  And presumably, if plaintiff's |
| 11:21AM  10 | counsel asked plaintiff, plaintiff's counsel knew. |
| 11 | September -- so that's July 2020.  September 2020, |
| 12 | just two months later, defense counsel, after confirming with |
| 13 | Ms. Marchick that she had not signed any confidentiality |
| 14 | agreement, specifically -- we're not beating around the bush on |
| 11:22AM  15 | this -- specifically tell Mr. Lage that we believe the |
| 16 | confidentiality agreement is a forgery because Ms. Marchick did |
| 17 | not sign the confidentiality agreement. |
| 18 | And the response we got, it was not thank you for |
| 19 | bringing this to our attention, let us conduct an |
| 11:22AM  20 | investigation, we'll get back to you.  What we got was a letter |
| 21 | from -- from Mr. Lage.  This is Docket 829-2.  And what he says |
| 22 | on the confidentiality agreement is he says, "On a final note, |
| 23 | you have suggested that either some or all of your clients will |
| 24 | ultimately claim that Marchick confidentiality agreement is a |
| 11:22AM  25 | forgery, and we appreciate your advising us of same.  However, |

1   your clients may wish to note that easily disproven facts or

2   perjurious comments about the veracity of certain documents is

3   likely something they should think carefully about before

4   introducing them into the fray."

11:22AM   5        So basically the response isn't let me look into it.

6   The response is, well, you know what?  It is Mr. Woodall's

7   handwriting on it, but we believe it is Ms. Marchick's

8   signature.  But can we have some exemplars of her signature to

9   try to determine that?

11:23AM  10        It's basically a warning.  You should think twice

11   before you even insert this issue into the case.

12        Over the next year, two years, repeatedly there were

13   requests made to examine the original of the agreement.

14   Incidentally, Mr. Christian is on every one of those letters.

11:23AM  15   There was an issue raised as to what correspondence he was on.

16   He was on every one of those letters.  They're in the record

17   before the Court.

18        We didn't ask for them to send us the

19   confidentiality agreement.  We asked to be able to examine it.

11:23AM  20   We would have examined it in Mexico.  We had no problem going

21   to Mexico, sending our handwriting expert to Mexico and doing

22   an examination there.

23        This notion that because of COVID for two years,

24   they weren't comfortable putting it in the mail and, therefore,

11:24AM  25   they couldn't get it before then -- if we wanted to do an

examination, we would have gone to where the document was to do

an examination.

Examination request of October '21, November '21,

late November '21.  December 2021, Elad Botwin, who is not

11:24AM  present in court today and apparently doesn't have counsel

speaking on his behalf today, says, "We think our client's

still looking for the original and we'll let you know as soon

as it's located."

Well, what we do know is that when, in the document

11:24AM  production a couple of months later, a digital version of the

confidentiality agreement was produced, the metadata showed

that the photograph was taken in 2020.

So this isn't a confidentiality agreement that was

somewhere in boxes of files for many years before the

11:24AM  litigation had been filed.  This is a document that a

photograph was taken of right around the time this Complaint

was filed.  And they're now telling us, well, the plaintiff's

still searching for the document.  We'll let you know the

second that we find the document.

11:25AM  They then stop responding to inquiries about the

original of the document.  So we, defendants, propound two

requests for admission in May of 2022.  We say, admit that you

still have the original, admit that you no longer have the

original.  It has to be one or the other.  Presumably we'll get

11:25AM  the answer.  No.  We get an objection from Mr. Lage that it's

vague and ambiguous as to "original," notwithstanding the fact
that they themselves used that term in telling us exactly what
they would produce to us as soon as it was located.

This was two years of keepaway.  Um, they, perhaps,
thought we would give up on asking for it.  Perhaps Mr. Lage
thought his warning to us would scare us off for pursuing the
issue.  But for two years, we pursued the issue.

And the only reason we ultimately got a letter from
Mr. Suarez disclosing that, yep, turns out it's Mr. Woodall's
handwriting and we have no idea -- and that's literally what
the letter said.  It didn't said -- it doesn't say we think
it's Ms. Marchick's signature still.

What Mr. Suarez said in his letter was that they --
to be sure, as to the signer of the document, it is at this
point unknown to us who signed the document in 2003.

So when they finally do come clean, they come clean
to say it's Mr. Woodall's handwriting.  We have no idea whose
signature it is.  Okay.

Why do we not put in an expert to say it's
Mr. Woodall's handwriting and it can't be confirmed to be
Ms. Marchick's signature?  They've said it.  Their experts have
said it.  The two experts that they hired, the two experts
didn't come back and say, yeah, we think it's Jenny Marchick's
handwriting and signature.  They came back and they said we
think it's plaintiff's handwriting and we can't tell whose

signature it is.

So what do we do?  We find whose signature it was.
We go through Mr. Woodall's production, thousands of pages.  We
find the name Pearl Young as the name of a model who had
11:27AM  modeled for Mr. Woodall back in the early 2000s when he was
working on Bucky.

We notice that the -- the signature kind of looks
like it says Pearl Young.  So we track down Ms. Young.  We find
her in Kauai.  She's a real estate agent in Kauai.  We subpoena
11:27AM  her for deposition.  She appears for deposition.  Mr. Suarez is
the examining attorney for plaintiff at that deposition.  She
says, look, this handwriting isn't mine, but the signature sure
looks like my signature from when I was a teenager.

Okay.  So we know now -- and this is by December of
11:28AM  2022.  We know that it's not a true and correct copy that was
attached to the Complaint.  We know that it's Mr. Woodall's
handwriting.  And we know whose signature it is.  It's not
Jenny Marchick.  It's Pearl Young's.

At that point, to continue to pursue trade secret
11:28AM  claims, to not even seek to amend the operative pleading, to
take out the allegations about the confidentiality agreement,
which are in dozens of paragraphs throughout the operative
pleading, that's not pushing the envelope.  You're far beyond
the envelope at that point.

11:28AM  Now, there is this notion -- I thought it was

interesting.  In -- in Mr. Lage's response to the motion,
there's an attempt to downplay the importance of the
confidentiality agreement, even as to the trade secret claims.
I believe the statement is made that it was -- in fact, it is.
It was immaterial to the trade secret claim.

I think Mr. Proctor, in the response that's filed on
behalf of Mr. Suarez, more accurately portrays it as, quote,
"central" to plaintiff's claims.  Mr. Proctor has it right.

Why was it central to the claims?  It was central to
the claims because the Court made clear, in connection with the
rulings on the motion to dismiss, that the plaintiff would have
to allege facts sufficient to show that -- support their
allegations that not only Ms. Marchick signed the
confidentiality agreement, but they allege that every other
defendant in the case agreed to be bound by the confidentiality
agreement that Ms. Marchick had signed.

And Your Honor's basis for not dismissing the trade
secret claims and the fraud claims as to all the other
defendants was they've alleged that she signed a
confidentiality agreement and that all of the other defendants
expressly agreed to be bound by the confidentiality agreement
that she signed so, therefore, claims go forward.

If that confidentiality agreement had not been
there, there would have been no evidence that Mr. Woodall took
adequate steps to protect the confidentiality of the materials

he provided to Ms. Marchick.  And there would have been zero

basis to allege that the other defendants had expressly agreed

to be bound by a signed agreement that never existed.

So once you remove the confidentiality agreement

from the -- the Complaint, there's no trade secret claim.

Now, could they have conjured up a new argument for

a trade secret claim?  Maybe.  Maybe they could have a Third

Amended Complaint and alleged something completely new.  But

the operative pleading did not survive without the -- that

allegation.

It never should have been presented as part of the

pleading, given that, by their own admission, it wasn't -- it

was plaintiff's handwriting.  They didn't need an expert to

tell them that.  Plaintiff could have told them it's my

handwriting on the document before they ever filed the First

Amended Complaint, before they ever filed the Second Amended

Complaint.

Um, and -- and, by the way, they also didn't need

the original to do the handwriting analysis.  Um, I was shocked

to hear -- and I would love a record cite.  I was shocked to

hear that we refused to provide other exemplars of

Ms. Marchick's signature.

We were never asked for other exemplars of

Ms. Marchick's signature.  We would have provided everything

and anything to get to the bottom of who signed that

confidentiality agreement because it was so fundamental to the

trade secret and fraud claims that were being pursued against

our client.

So I think that when you go through the actual facts

and the actual timeline, it is abundantly clear, one, they

weren't making every effort to get that original agreement and

get it to us.  They were playing keepaway and were not even

acknowledging that it existed anymore because they didn't want

us going to Mexico to even examine the original confidentiality

agreement.

It's undeniable that they knew or absolutely if they

had asked their client would have known that it was his

handwriting on the document from the moment they filed that as

part of the First Amended Complaint.  And the second their

experts took a look at it, they said we don't know if this is

Jenny Marchick's signature and we found the person whose

signature it was.

So there's absolutely no world in which there was a

basis to continue pursuing claims based on that confidentiality

agreement after Pearl Young testified in December of 2022.  We

then have two more years of discovery and motion practice with

respect to the trade secret and the fraud claims.

And I think it's very important to note in terms of

when we come up with a dollar value of the sanctions we're

seeking, we were very narrow in terms of what we attributed to

 1    the additional discovery.  We actually -- for the discovery

 2    that the defendant -- that the plaintiff was taking, discovery

 3    motions the plaintiff brought, we're seeking zero because we

 4    will accept for purposes of this motion that they would have

 5    taken all of the same discovery, whether there was a trade

 6    secret claim or no trade secret claim, they would have taken

 7    all of the same discovery whether Buena Vista Home

 8    Entertainment was the only defendant or whether there were 14

 9    other defendants.  We're not seeking any of that.

10         The discovery that we took from plaintiff was

11    100 percent directed at the trade secret claim and the fraud

12    claim.  We had his works for the copyright claim.  We had his

13    works to be able to determine whether or not they were

14    substantially similar.  We didn't need discovery for that.  We

15    needed the discovery about whether he had tried to keep it

16    confidential when he provided it other people.  We needed to

17    figure out exactly what the alleged trade secrets were, since

18    those remained unclear far into the case.  The deposition was

19    almost entirely focused on those issues.  And we had to move

20    for summary judgment on those issues.

21         So these are excess costs that would not have been

22    incurred but for the fact that the trade secret and fraud

23    claims remained in the case.

24         I -- I will note that I find it remarkable that at

25    least some counsel present today consider it a live and

1    undetermined issue whether that's Jenny Marchick's signature on

2    the confidentiality agreement.  Jenny Marchick testified it

3    wasn't.  Buck Woodall ultimately at trial testified he thinks

4    he made a mistake, isn't her signature.  Pearl Young, whose

11:34AM    5    deposition was presented at trial, testified it was her

6    signature from when she was a teenager.

7            So the idea that in opposing sanctions one of the

8    bases is this is still a live and undetermined issue is

9    mind-boggling to me.

11:35AM    10           Um, statute of limitations.  First Amended

11   Complaint, Second Amended Complaint.  Both allege that

12   Mr. Woodall never saw *Moana* until late June of 2017 because he

13   couldn't get the DVD out of the country until that date.  Those

14   are pleadings signed by Mr. Lage.

11:35AM    15           In his deposition in October of 2022, which

16   Mr. Suarez defended, Mr. Woodall says I saw it in the theater

17   in December 2016, couldn't understand all of it, but I thought

18   they copied.  I thought they used my trade secrets, I thought

19   they copied my copyrighted work.

11:35AM    20           March 2017, he testified -- this is in his

21   deposition.  He admits that he had the DVD in his possession in

22   March of 2017 and performed a detailed side-by-side comparison

23   and was convinced that the defendants had copied his work,

24   copied his trade secrets, infringed his copyright.

11:36AM    25           It was more than three years after that date that

11:36AM

this lawsuit was filed.  So we're -- it's not just three years
after the movie was released.  It's not just three years after
he first suspected infringement.  It's three years after he did
a side-by-side and was absolutely convinced that it was
infringing.

There is no possible basis for any reasonable lawyer
to look at the law of the Ninth Circuit as it existed then, as
it exists now, as it ever existed since the *Polar Bear* case, I
think, and not know that the statute of limitations had elapsed
before the plaintiff filed his copyright infringement claim.

It's not an unsettled area of law.  It's not a
nuanced area of law.  We're giving them the benefit of the
discovery rule.  Even with the full benefit of the discovery
rule, it was clearly untimely.

Mr. Christian's counsel today represented to the
Court that Mr. Woodall did not receive the DVD until June of
2017, the same allegation that was in the First Amended
Complaint, in the Second Amended Complaint that Mr. Woodall
said was false, that he actually had the DVD in March of 2017.

Um, so an argument as to why the -- the statute of
limitations issue is not as clear-cut as it seems is still
based on false or mistaken representations of facts to the
Court.

Another reason the trade secret claim and fraud
claim should have been out by no later than Mr. Woodall's

deposition, I find it hard to believe that -- well, I shouldn't

say this.  It must be -- if Mr. Lage was able in the First

Amended Complaint and Second Amended Complaint to allege that

the plaintiff first saw *Moana* in late June of 2017, either

11:38AM   Mr. Lage didn't actually investigate and ask his client but

just came up with a date that was after the statute of

limitations date or his client lied to him.

But let's assume the most charitable case, which is

his client lied to him.  Once his client stopped lying in

11:38AM   August of 2022, the trade secret claim was time-barred, the

fraud claim was time-barred, and the copyright claim as to all

but one defendant was time-barred.

It wasn't a question of applying facts to law and

you could make arguments under the law.  The law was clear.  I

11:38AM   mean, the standard under 1927 is if a lawyer pursues a path

that a reasonably careful lawyer would have known after

appropriate inquiry to be unsound, the conduct is objectively

unreasonable and vexatious.

There was no basis after Mr. Woodall's deposition to

11:38AM   assert that there was -- that these claims were timely as to

anyone other than Buena Vista Home Entertainment.

Last piece I want to address -- and I appreciate --

I appreciate Your Honor's patience with me.  Last point I want

to address is the public availability of the trailer.  And this

11:39AM   one I really think potentially speaks much more to, um, beyond

recklessness, um, beyond frivolous and actually does, I think, go to bad faith, which is the First Amended Complaint did -- was not very specific as to what the alleged trade secrets were.  But it was clear that they were including among the alleged trade secrets Copyright Office filings and things that had been on the Internet.

And defendants made the argument, in moving to dismiss the trade secret claim, that things that were deposited with the Copyright Office and things that were on the Internet could not be trade secrets.  And Your Honor in ruling the motion granted the motion to dismiss the trade secret claim but with leave to amend and said if you can identify things that were not either deposited with the Copyright Office or posted on the Internet, I'll give you leave to do that.

What did they identify?  A trailer.  They said the -- Bucky trailer was never deposited with the Copyright Office, was never publicly available.  And that was the hook for their trade secret claim for the next three -- two years -- no.  Change that.  Actually, probably three or four years between the time of the -- the Second Amended Complaint and summary judgment.

Trailer was never publicly available.  We took discovery.  The trailer is publicly available.

You may recall, Your Honor -- and I point to this just to show how somewhat absurd the position is.  At trial,

11:41AM

when they realized they hadn't put the trailer itself on the
exhibit list, they tried to introduce the trailer through a
copy of the web page for Mr. Woodall's website on which the
trailer had been posted at least as early as 2009, probably
even earlier.

So there was no question that the trailer was on his
website.  When we got to summary judgment, plaintiff's counsel
didn't even dispute that the trailer had been on the website.
All they said was two things:  One, there was also a
confidentiality agreement on the website.  Well, that's exactly
what Your Honor had rejected in ruling on an earlier motion to
dismiss.  And, two, not a lot of people visited the website.

I'm sorry.  If you -- lawyers that know about trade
secret law -- which if you're prosecuting a trade secret claim,
you should -- know that it's not a question of how many people
actually went and looked at it, it's a question of whether you
took reasonable steps to protect the confidentiality.  And
putting it on a public website, whether two dozen people
watched it or 200 people watched it or 2,000 people watched it,
it's not reasonable steps to protect.

So it really does seem here that an allegation was
made that something that was publicly available had not been
for the sole purpose of being able to survive the pleadings
stage and to actually go forward.  And by the time we got to
summary judgment, no one was even arguing that it hadn't been

publicly available.  It was just a device to get past the

pleading stage.  And it's just a basis on which we then had to

endure three years, four years of discovery and motion practice

with respect to the trade secret claim.

11:42AM   Um, two very brief additional points.  One, um,

Mr. Proctor indicated that his, um, clients -- I'm sorry --

yeah, his clients, Mr. Suarez and Ms. Suarez, voluntarily

withdrew from the case.  That's not true.  They were fired.

Well, I should say Mr. Christian in his declaration

11:42AM   says they were fired, in paragraph 11 of his declaration.

Mr. Woodall at the time said they were fired for cause.  They

filed a lien, wanting to get a piece of any recovery in this

action because they contended they were entitled to it even

though they were being fired.

11:43AM   So this isn't a case where at some point they said,

you know what, ethically we don't feel we can continue to

pursue this so we have to withdraw.  They should have done

that.  But they were fired, and that's why they no longer

remained counsel in the case.

11:43AM   And last point, um, I wanted to make is that -- and

this is just a side note, but it goes to -- just that -- I

won't use the term "finger pointing," but Mr. Lage's counsel

said that Mr. Lage was not the primary drafter of the summary

judgment motion.  Okay.  Not a critical -- not a critical point

11:43AM   for this motion.

1          But the reason I want to highlight that is we have

2    Mr. Lage saying he's not the primary drafter.  Mr. Botwin

3    submitted a declaration saying he didn't draft any of the

4    dispositive motions.  We have Mr. Christian saying I didn't

11:44AM 5    draft anything.  I reviewed stuff, but I didn't draft anything

6    in the case.  We have Mr. Fox, who, granted, is not here today,

7    saying, I didn't touch anything strategic or substantive in the

8    case.  I just took depositions based on outlines that Florida

9    counsel prepared for me.  And we have Mr. and Mrs. Suarez --

11:44AM 10   Mr. and Mrs. Suarez who are out of the case by the time of the

11   summary judgment motion.

12          So I'm sitting here today thinking to myself, Who

13   drafted it?  Um, we basically have every lawyer who was in the

14   case at the time disclaiming responsibility for a motion in

11:44AM 15   which -- opposition to a motion in which they were taking

16   patently unreasonable positions.  And I find that remarkable as

17   well, and I think that warrants mention.

18          I appreciate your patience.  Any questions, I'm

19   happy to answer.  But that's what I wanted to address.

11:44AM 20          THE COURT:  No additional questions.

21          And I don't have time to hear from other defense

22   counsel.  I assume that one defense counsel would speak for

23   all.

24          MR. KLIEGER:  They have wisely or unwisely deferred

11:45AM 25   to me.

1          THE COURT:  All right.  Thank you.

2          The Court's going to deem the matter submitted.

3          And we're in recess now.

4          MR. KLIEGER:  Thank you, Your Honor.

11:45AM   5          MS. TIMMONS:  Thank you, Your Honor.

6          MS. CROWTHER:  Thank you, Your Honor.

7          THE COURTROOM DEPUTY:  All rise.

8              (Proceedings concluded at 11:45 AM.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3     COUNTY OF LOS ANGELES    )
                               )
4     STATE OF CALIFORNIA      )

5

6          I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7     REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8     CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9     TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11    REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12    THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17          DATED THIS 14TH DAY OF OCTOBER, 2025.

18

19

20          /S/ MYRA L. PONCE
      _____
21          MYRA L. PONCE, CSR NO. 11544, CRR, RDR
              FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**