1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

Buck G. Woodall, a.k.a. Buck                Case No.:  2:20-cv-3772-CBM-E
Woodall, an individual,

11

12            Plaintiff,                       **ORDER RE: PLAINTIFF'S
                                               MOTION FOR A NEW TRIAL**
v.

13

The Walt Disney Company *et al.*,

14            Defendants.

15

16            The matter before the Court is Plaintiff's Motion for a New Trial pursuant

17      to Fed. R. Civ. P. 59(a).  (Dkt. No. 824.)[1]

18                          **I.    BACKGROUND**

19            Following the Court's ruling on the parties' cross-motions for summary

20      judgment (Dkt. No. 558), Plaintiff's sole claim for copyright infringement against

21      Defendant Buena Vista Home Entertainment ("BVHE") for distribution of *Moana*

22      after April 24, 2017 was tried to a jury.  On March 10, 2025, the jury returned a

23      verdict in favor of Defendant BVHE, finding Plaintiff did not prove the creators of

24      *Moana* had access to any of Plaintiff's copyrighted works.  (Dkt. No. 787.)  On

25      March 13, 2025, the Court entered judgment in favor of Defendants and against

26

27      _____

[1] Plaintiff failed to comply with Local Rule 7-3's meet and confer requirements
prior to filing the instant Motion.  While the Court can deny Plaintiff's Motion on

28      this basis, the Court rules on Plaintiff's Motion for New Trial on the merits.

Plaintiff, and dismissed the action with prejudice.  (Dkt. No. 807.)

## II.    STATEMENT OF THE LAW

Fed. R. Civ. P. 59(a) provides:  "The court may, on motion, grant a new trial on all or some of the issues--and to any party--. . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  "Rule 59 does not specify the grounds on which a motion for a new trial may be granted; instead, it allows such a motion to be granted 'for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.'  We are thus bound by those grounds that have been historically recognized."  *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003) (quoting Fed. R. Civ. P. 59(a)).

## III.    DISCUSSION

**A.    Futility**

Defendant BVHE argues a new trial would be futile because it is entitled to judgment as a matter of law.  Defendant BVHE made an oral Rule 50(a) motion when Plaintiff rested his case at trial, which the Court deemed submitted.  Post-trial, Defendant BVHE filed a written renewed motion for judgment as a matter of law which the Court denied on September 23, 2025.  (Dkt. No. 873.)

**B.    Trial Errors re: Access**

Plaintiff contends there were four trial errors re: access which warrant a new trial.

**(1)    Verdict Form re: Access**

First, Plaintiff contends the verdict form failed to fully and fairly present to the jury the issue it was called upon to decide because the verdict form was inconsistent with Plaintiff's burden of proof re: access, and established a new burden re: access by requiring Plaintiff to prove direct access by two persons within Walt Disney Animation Studios ("WDAS"), and instructing jurors that if Plaintiff did not "prove the creators of *Moana* had access to Plaintiff's copyrighted

works" then the jury does "not need to answer any further questions" in this case.
Plaintiff contends "[t]he failure to list the many ways in which access can be
circumstantially proven" such as through "bare possibility of access or bare
corporate receipt" or "striking similarity" was "fatal and established an
insurmountable obstacle which copyright law was carefully crafted to overcome."
Plaintiff contends even if the Court read more detailed jury instructions into the
record before the verdict form, the jury instructions did not cure the "fundamental
defect in the verdict form" because the verdict form was the "final and inescapable
document every jury must ultimately address."

The first question on the special verdict form stated the following:

1. Did Plaintiff prove the creators of *Moana* had access to Plaintiff's
copyrighted works identified below?

    a. The 2003 Treatment entitled BUCKY, which is Exhibit 11:

        _____    _____
        Yes        No

    b. The 2008 Treatment entitled BUCKY THE SURFER BOY, which
is Exhibit 13, and additional 2008 materials, which are Exhibits
14, 15, 16, and 17:

        _____    _____
        Yes        No

    c. The 2011 Script entitled BUCKY THE SURFER BOY, which is
Exhibit 12:

        _____    _____
        Yes        No

*If you answered "No" to all of (a), (b), and (c) above, you do not need
to answer any further questions. Skip to the end and sign and date the
Verdict Form. If you answered "Yes" to one or more of (a), (b), or (c)
above, proceed to Question No. 2.*

(Dkt. No. 787.)  The Court's Instruction No. 24 to the jury stated:

    As part of Plaintiff's burden in Instruction No. 23, Plaintiff
must prove by a preponderance of the evidence that the creators of

*Moana* had access to Plaintiff's copyrighted works. You may find that the creators of *Moana* had access to Plaintiff's copyrighted works if the creators of *Moana* had a reasonable opportunity to read, view, or copy Plaintiff's copyrighted works before *Moana* was created.

Access may be shown by:

1. a chain of events connecting Plaintiff's copyrighted works and opportunity of the creators of *Moana* to read, view, or copy Plaintiff's copyrighted works such as dealings through a third party that had access to Plaintiff's copyrighted works and with whom both Plaintiff and the creators of *Moana* were dealing; or

2. a similarity between Plaintiff's copyrighted works and *Moana* that is so "striking" that it is highly likely the works were not created independent of one another.

Bare corporate receipt of Plaintiff's copyrighted works by an individual who shares a common employer with the creators of *Moana* does not establish access.

(Dkt. No. 780 at 28.) Contrary to Plaintiff's contention, the jury was instructed that access could be shown based on dealings with a third party with access to Plaintiff's work with whom both Plaintiff and the creators of *Moana* were dealing, or based on striking similarity.[2]

With respect to Plaintiff's contention that a "bare possibility of access" is sufficient for Plaintiff's burden to demonstrate access, that is not the law of the

---

[2] Plaintiff's reliance on *United States v. Tejeda*, 784 F. App'x 493 (9th Cir. 2019), is misplaced. In that case, the Ninth Circuit found that the district court's use of the language "reasonably foreseeable" for the required mens rea for possession with intent to distribute on the special verdict form was plain error that affected the defendant's substantial rights because "[t]he required mens rea for possession with intent to distribute is 'knowingly.'" *Id.* at 495. The Ninth Circuit found "[t]he fact that the court provided accurate jury instructions does not cure that defect, as ultimately the incorrect verdict form was right before the jury and was, presumably, the last thing the jury read before entering its verdict." *Id.* However, here, there was no error in the special verdict form as to the element of access, and the special verdict form did not contradict the Court's jury instructions.

Ninth Circuit.  "To prove access, a plaintiff must show a reasonable possibility, not merely a bare possibility, that an alleged infringer had the chance to view the protected work."  *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009); *see also Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016). Moreover, Plaintiff's contention that "bare corporate receipt" is sufficient to infer access is not the law of the Ninth Circuit.  "[A] plaintiff cannot create a triable issue of access merely by showing ***bare corporate receipt*** of her work by an individual who shares a common employer with the alleged copier.  Rather, it must be reasonably possible that the paths of the infringer and the infringed work crossed."  *Loomis*, 836 F.3d at 995 (emphasis added).  To the extent Plaintiff contends the verdict form should not have limited access to the "creators of *Moana*," the 9th Circuit Model Instruction No. 17.18 and several district court decisions demonstrate Plaintiff was required to show the creators of *Moana* had access to Plaintiff's copyrighted works.  *See* 9th Cir. Model Inst. No. 17.18; *Changing World Films, LLC v. Parker*, 2025 WL 466443, at *3 (C.D. Cal. Jan. 10, 2025); *Bernal v. Paradigm Talent and Literary Agency*, 788 F. Supp. 2d 1043, 1056-57 (C.D. Cal. 2010); *Panton v. Strong*, 2018 WL 5099666, at *2 (C.D. Cal. Mar. 14, 2018); *Wilson v. Walt Disney Co.*, 123 F. Supp. 3d 1172, 1173-74 (N.D. Cal. 2015); *Straughter v. Raymond*, 2011 WL 13176750, at *4 (C.D. Cal. Nov. 21, 2011).  Therefore, the special verdict form's language regarding access does not warrant a new trial.

> **(2)    Permitting Hearsay for its "Effect on the Listener" Without Limiting Instruction**

Second, Plaintiff contends a new trial is warranted because the Court committed plain error when it overruled Plaintiff's hearsay objection at trial and allowed hearsay as to what Jenny Marchick was allegedly told by Maggie Malone for its purported effect on the listener without a limiting instruction which was highly prejudicial to Plaintiff.  During trial, Marchick testified as follows

regarding her conversation with Malone:

Q Were you friends with Ms. Malone during this time frame?

A No.

Q Do you recall talking to Ms. Malone sometime during this '03 to '05 time frame?

A Yes.

Q What do you recall, with every level of detail, from that conversation?

MR. LAGE: Objection. Hearsay.

THE COURT: As phrased sustained.

Q BY MR. KABA: What do you recall -- what do you recall the format of the conversation being? Let's start there.

A I called Ms. Malone to specifically ask her a question.

Q Okay. What was the question you called and asked her?

MR. LAGE: Objection. Hearsay.

THE COURT: Overruled.

THE WITNESS: Does Disney Feature Animation take outside submissions?

Q BY MR. KABA: So let's just make sure that's clear for the jury. What does it mean to say "does Disney Feature Animation take outside submissions"?

A So an outside submission is considered anything that does not generate from within their division, their company. So it would be any material basically coming through the door in any way.

Q Okay. And what did Ms. Malone respond?

MR. LAGE: Objection. Hearsay.

MR. KABA: It's effect on listener, Your Honor.

THE COURT: Overruled.

THE WITNESS: She said, no, they did not accept outside submissions.

Q BY MR. KABA: What happened next?

A I told her, thank you, and I hung up the phone.

1    Q Did you ask Ms. Malone any other questions?

2    A No.

3    (Trial Tr. 932:17-934:4.)

4    Plaintiff contends the Court did not give a limiting instruction to the jury

5    that Marchick's hearsay testimony regarding what Malone purportedly said to

6    Marchick could not be considered for the truth of the matter asserted as required

7    when hearsay is admitted as non-hearsay for the purported effect on the listener.

8    However, Fed. R. Civ. P. 51(c) provides:  "A party who objects to . . . the failure

9    to give an instruction must do so on the record, stating distinctly the matter

10    objected to and the grounds for the objection."  Fed. R. Civ. P. 51(d) provides:  "A

11    party may assign as error . . . a failure to give an instruction, if that party properly

12    requested it and--unless the court rejected the request in a definitive ruling on the

13    record--also properly objected."  Plaintiff did not timely request a limiting

14    instruction be given nor make an objection on the record regarding the Court's

15    failure to give such a limiting instruction.  Plaintiff is therefore precluded from

16    assigning error to the Court for failure to give a limiting instruction under Fed. R.

17    Civ. P. 51.  *See Lucero v. Stewart*, 892 F.2d 52, 56 (9th Cir. 1989); *Brocklesby v.*

18    *United States*, 767 F.2d 1288, 1293 (9th Cir. 1985), *cert. denied*, 474 U.S. 1101,

19    106 S.Ct. 882, 88 L.Ed.2d 918 (1986); *United States v. Multi–Mgmt., Inc.,* 743

20    F.2d 1359, 1364 (9th Cir. 1984); *United States v. Brown-Kimble*, 89 F.3d 846 (9th

21    Cir. 1996); *Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1037 (9th Cir.

22    2003); *Behne v. 3M Microtouch Sys., Inc.*, 11 F. App'x 856, 859 (9th Cir. 2001).

23    Plaintiff also contends even if the Court had given a limiting instruction, the

24    admission of such testimony was more prejudicial than probative because the jury

25    "may take them for the truth of the matter asserted" irrespective of any limiting

26    instruction and the hearsay evidence was used for the truth of the matter asserted

27    during defense counsel's closing arguments.  During closing arguments, defense

28    counsel argued:

7

1
2
3
4
5
6

> So the first question you are going to be asked to answer is whether
> or not the creators of Moana had access to plaintiff's works. . . .
> Theory number 3, Maggie Malone. . . . But what happened with
> Maggie Malone? It's clear, Ms. Marchick testified to it, unrebutted
> testimony. She called Ms. Malone specifically to ask her a question.
> The question was, "Does Disney Feature Animation take outside
> submissions?" The answer emphatically definitively, "No." That was
> the end of the conversation. And that is consistent with what Ms.
> Julius told you. Disney Feature Animation does not take outside
> submissions. We also showed you the employee policy manual,
> Exhibit 1346. They respectfully declined outside submissions.

7   (Trial Tr. 1879:11-13, 1883:5, 13-22.)  Because Malone's statement to Marchick

8   was used to demonstrate why Marchick did not send Plaintiff's *Bucky* materials to

9   Disney Feature Animation for purposes of showing no access, it was not an out-

10  of-court statement used for the truth of the matter asserted.  *See, e.g., U.S. v.*

11  *Connelly*, 395 Fed. App'x 407, 408 (9th Cir. 2010); *Cedeno-Cedeno*, 2016 WL

12  4376845, at *8 (S.D. Cal. Aug. 17, 2016).

13      Plaintiff also argues Marchick's trial testimony regarding what Malone told

14  her was refuted by Malone's pretrial admission that "this policy did not apply to

15  an 'agent' other person 'with whom we have an established industry relationship'"

16  and that "Mandeville representatives were that and more."  However, Malone's

17  deposition testimony cited by Plaintiff (*see* Malone Depo. 122:18-23) does not

18  address the conversation between Malone and Marchick and therefore does not

19  refute Marchick's trial testimony that Malone told Marchick "no, they did not

20  accept outside submissions."

21      Therefore, Plaintiff does not demonstrate a new trial is warranted based on

22  the admission of testimony at trial regarding what Malone told Marchick without a

23  limiting instruction, which Plaintiff never requested and did not properly object on

24  the record that the Court failed to give such a limiting instruction.

25      **(3)    Key Witnesses Evading Service**

26      Third, Plaintiff contends a new trial is warranted because key witnesses

27  evaded service which prejudiced Plaintiff, and Plaintiff was "effectively precluded

28  from calling key witnesses such as Malone and Doc Kane."  Plaintiff submits

8

declarations from process servers who attempted to serve Malone and Doc Kane (Plaintiff's Exs. 1, 2), and argues "Defendant should have volunteered making Malone and Kane available, via Zoom or otherwise" given Plaintiff's attempts at service and the LA fires natural catastrophe. However, Plaintiff waited until the eve of trial to attempt to serve trial subpoenas on Malone and Kane. Malone and Kane were not named parties in this action, Plaintiff fails to demonstrate BVHE had any control over Malone or Kane to make them available to testify at trial, and Plaintiff fails to establish Malone and/or Kane were actively evading service.

Plaintiff also argues the Court should have permitted Plaintiff to play Malone and Kane's deposition testimony at trial. However, on February 25, 2025, the Court denied Plaintiff's motion to allow Plaintiff to use deposition designations for Kane and Malone at trial, reasoning as follows:

> Fed. R. Civ. P. 32(a)(4)(D) provides "[a] party may use for any purpose the deposition of a witness, whether or not a party, if the court finds ... that the party offering the deposition could not procure the witness's attendance by subpoena." For purposes of Fed. R. Civ. P. 32(a)(4)(D), Plaintiff must demonstrate reasonable diligence in his effort to procure the witness's attendance by subpoena. *See Forbes v. Cnty. of Orange*, 633 F. App'x 417, 418 (9th Cir. 2016). Fed. R. Civ. P. 32(a)(4)(E) provides "[a] party may use for any purpose the deposition of a witness, whether or not a party, if the court finds ... on motion and notice, that exceptional circumstances make it desirable—in the interest of justice and with due regard to the importance of live testimony in open court—to permit the deposition to be used. . . .

> [T]he record before the Court does not demonstrate Plaintiff was reasonably diligent in attempting to procure Kane, Malone, Hoberman, or Benjamin Woodall's attendance at trial by subpoena as required under Fed. R. Civ. P. 32(a)(4)(D). The Court set the February 25, 2025 trial date on November 6, 2024. (Dkt. No. 561.) However, it appears based on unauthenticated emails attached as Exhibit 1 to Plaintiff's Motion that Plaintiff did not attempt to serve subpoenas on Kane, Malone, Hoberman, or Benjamin Woodall until the first or second week of February 2025. (Dkt. No. 719, Ex. 1.) Despite receiving notice of the February 25, 2025 trial date in November 2024, Plaintiff waited until the eve of trial to attempt to procure these witnesses' testimony by subpoena. Moreover, there is no evidence demonstrating Plaintiff made other efforts to locate these witnesses and serve them other than at a single address for each witness. For the same reasons, Plaintiff fails to show "'exceptional circumstances' that justify use of the deposition in lieu of live testimony" for Kane, Malone, Hoberman, or Benjamin Woodall

9

1    because Plaintiff "failed to do as much as he should have done to
     ensure [these witnesses'] attendance at trial."

2    (Dkt. No. 735 (the "February 25, 2025 Order") (citing Fed. R. Civ. P. 32(a)(4)(D);

3    *Forbes v. Cnty. of Orange*, 633 F. App'x 417, 418 (9th Cir. 2016)).)  Plaintiff does

4    not submit evidence warranting reconsideration of the Court's February 25, 2025

5    Order wherein the Court found Plaintiff failed to demonstrate he was reasonably

6    diligent in attempting to procure Kane and Malone's attendance at trial.  The

7    Court set the February 24, 2025 trial date on November 6, 2024.  (Dkt. No. 561.)

8    Consistent with the evidence presented to the Court in connection with Plaintiff's

9    motion to allow use of deposition designations for Kane and Malone at trial, the

10   declarations of non-service from the process servers filed by Plaintiff in support of

11   the instant Motion for New Trial demonstrate Plaintiff did not attempt to serve

12   trial subpoenas on Malone and Kane until the eve of trial in February 2025, and

13   Plaintiff did not exercise reasonable means to secure their testimony at trial.

14   Plaintiff thus fails to demonstrate he was reasonably diligent in attempting to

15   procure Malone and Kane's attendance at trial by subpoena.  *See* Dkt. No. 735;

16   *see also Big Lagoon Rancheria v. California*, 789 F.3d 947, 955 (9th Cir. 2015).

17        Moreover, Plaintiff did not timely designate deposition testimony for

18   Malone and Kane at least 40 days prior to the January 14, 2025 pretrial conference

19   as required under L.R. 16-2.  (See Dkt. Nos. 679, 680.)  Furthermore, on February

20   13, 2025, Plaintiff stipulated and agreed to withdraw his untimely deposition

21   designations for Malone and Kane in exchange for Defendant not objecting to

22   Plaintiff's late deposition designations as to Peter Heckmann, Osnat Shurer and

23   Katherine Speirs, and Defendant's ability to file objections and counter-

24   designations thereto.  (Dkt. No. 688.)  The Court approved the stipulation on

25   February 15, 2025, and deemed Plaintiff's deposition designations for Malone and

26   Kane withdrawn.  (Dkt. No. 690.)  The record before the Court also demonstrates

27   as of February 23, 2025 (i.e., two days before trial commenced), Plaintiff had not

28   served copies of the deposition transcripts of Malone and Kane with Plaintiff's

1   proposed designations marked in accordance with L.R. 16-2.7 (*see* Dkt. No. 735,

2   Klieger Decl. ¶ 9), which precluded Defendant from having the opportunity to

3   review, object to, and counter-designate deposition testimony for Plaintiff's

4   untimely deposition designations as to witnesses Malone and Kane.  (*See* Dkt. No.

5   735 at 3.)  Therefore, a new trial is not warranted based on Defendant's failure to

6   make Malone and Kane available to testify at trial and the Court's denial of

7   Plaintiff's motion to use Malone and Kane's deposition testimony at trial.

8          **(4)    Defense Counsel's Misleading Representations re: Plaintiff's**

9                 **Burden on Access**

10         Fourth, Plaintiff contends a new trial is warranted because Plaintiff's burden

11  re: access was "to prove a reasonable opportunity for Walt Disney Animation

12  Studios' team to have viewed *Bucky* materials, such as via a chain of events, a

13  sufficiently close relationship with an intermediatory [sic], or an overlap in subject

14  matter," but "Defense counsel zoomed in on the 15 words stated in question 1 of

15  the verdict form during closing argument" and BVHE's "pervasive inference,

16  from opening to closing statements, that the *only* way Plaintiff can prove access is

17  if Musker and Clements had access to Plaintiff's copyrighted works was

18  misleading and prejudicial."  Question 1 on the verdict form asked:  "Did Plaintiff

19  prove the creators of *Moana* had access to Plaintiff's copyrighted works identified

20  below?" (Dkt. No. 787.)  The jury was instructed regarding Plaintiff's burden of

21  proof re: access in the Court's Instruction No. 24.  (*See* Dkt. No. 780 at 28.)  To

22  the extent Plaintiff contends BVHE's opening statement and closing arguments

23  were misleading because Plaintiff's burden was to show access to Plaintiff's

24  copyrighted works by anyone at Walt Disney Studios Animation, the Ninth

25  Circuit's Model Instruction No. 17.18 and numerous district court decisions

26  demonstrate Plaintiff was required to prove the creators of *Moana* had access to

27  Plaintiff's copyrighted works.  *See* 9th Cir. Model Inst. 17.18; *Changing World*

28  *Films*, 2025 WL 466443, at *3; *Bernal*, 788 F. Supp. 2d at 1056-57; *Panton*, 2018

1    WL 5099666, at *2; *Wilson*, 123 F. Supp. 3d at 1173-74; *Straughter*, 2011 WL

2    13176750, at *4; *Gable*, 727 F. Supp. 2d at 826.  Therefore, any representations

3    by Defendant during trial that Plaintiff's burden was to show the creators of

4    *Moana* had access to Plaintiff's copyrighted works do not warrant a new trial.

5    **C.    No Jury Instruction Given re: Broad Copyright Protection**

6         Plaintiff also contends a new trial is warranted because the Court was

7    required to instruct the jury about broad copyright protection but failed to do so.

8    Plaintiff filed six sets of proposed jury instructions, none of which included a

9    proposed jury instruction re: broad copyright protection.  (*See* Dkt. Nos. 707, 708,

10   729, 730, 738, 766.)  Moreover, at the Court's settlement conference with the

11   parties re: jury instructions and the verdict form, Plaintiff did not request a jury

12   instruction re broad copyright protection.  Plaintiff contends he raised the issue of

13   the scope of copyright protection in his trial brief wherein Plaintiff stated "aside

14   from instructing the jury on the extrinsic and intrinsic tests, the only task for the

15   Court at this juncture as to the extrinsic test is to decide whether 'broad' or

16   'narrow' copyright protection applies." (Dkt. No. 767 at 2.)  Even if the Court

17   could construe the statement in Plaintiff's trial brief identified by Plaintiff as a

18   request for the Court to instruct the jury on broad copyright protection, Plaintiff

19   did not make an objection on the record regarding the failure of the Court to

20   instruct the jury re: broad copyright protection as required under Fed. R. Civ. P.

21   51.  Therefore, Plaintiff is precluded from assigning error to the Court for a failure

22   to give an instruction regarding broad copyright protection under Fed. R. Civ. P.

23   51.  *See* Fed. R. Civ. P. 51; *Zhang*, 339 F.3d at 1037; *Behne v. 3M Microtouch*

24   *Sys., Inc.*, 11 F. App'x 856, 859 (9th Cir. 2001)); *Prendeville v. Singer*, 155 F.

25   App'x 303, 306 (9th Cir. 2005).  Accordingly, any purported failure to instruct the

26   jury regarding broad copyright protection is not a proper basis for a new trial.

27   **D.    Misconduct by Defense Counsel re: the Extrinsic Test**

28         Plaintiff also argues in the instant Motion that Defendant "worked hard to

turn the extrinsic test on its head, focusing on *ideas* and specifically *not* their
expressions or nuances thereof," and "questioned virtually every fact witness
about alleged tropes and scenes-à-faire, despite never having designated these fact
witnesses for this purpose, which ambushed Plaintiff but also served to skew the
facts at such a rate that it could not have been reasonably prevented or refuted by
Plaintiff" during trial.  Plaintiff contends Defendant wrongly "focused on the idea
and not its expression, its context, or the material differences between *Bucky* and
the Disney films they repeatedly highlighted."  Plaintiff contends Defendant's
position at trial that experts in this case had to be experts in a dozen Disney films
which was an issue that "clearly impacted the jury" conflicted with Defendant's
earlier position at summary judgment that expert testimony was not needed to
conduct the extrinsic test, and "whether jurors had viewed the referenced Disney
films or any other animated films was not a part of Defendant's proposed voir
dire."  However, the jury did not reach question of substantial similarity under the
extrinsic test in rendering its verdict because the jury found Plaintiff failed to
demonstrate access.  Plaintiff therefore fails to demonstrate any alleged
misconduct by Defendant or defense counsel with respect to the extrinsic test
affected the jury's verdict.  Accordingly, defense counsel's purported misconduct
relating to the extrinsic test is not a basis for a new trial.  *See Macar v. Hubbard*,
85 F. App'x 638, 639 (9th Cir. 2004); *Union Pac. R.R. Co. v. Winecup Gamble,
Inc.*, 2023 WL 4053479, at *8 (D. Nev. June 16, 2023).

**E.    Juror No. 2**

Plaintiff also contends a new trial is warranted because Juror No. 2 was a
longtime acquaintance to Mark Mancina, a key creative person involved in
*Moana*, and the presence of Juror No. 2 on the panel was inherently prejudicial
because she was too closely connected to some aspect of the litigation such that it
is highly unlikely that the average person could remain impartial in his
deliberations under the circumstances.  During voir dire, prospective Juror No. 2

1    stated she and her husband were "good friends" with Mark Mancina who "[d]id

2    the music on" *Moana*, she has known him for 40 years, and her husband and

3    brother-in-law were in Mancina's band.  (Trial Tr. 120:25-121:17, 122:17-

4    123:13.)  Following the Court's questioning, the Court inquired whether either

5    party had follow-up questions for prospective Juror No. 2.  Plaintiff's counsel

6    asked three follow up questions, none of which inquired about prospective Juror

7    No. 2's relationship with Mark Mancina.  (Trial Tr. 125:12-126:12.)  Plaintiff's

8    counsel did not challenge prospective Juror No. 2 for cause, nor exercise a

9    peremptory challenge as to prospective Juror No. 2, and therefore prospective

10   Juror No. 2 was a member of the jury that deliberated and rendered a verdict in

11   favor of Defendant BVHE during the trial.  Plaintiff contends an order striking

12   Juror No. 2 *sua sponte* would have been warranted based on implied bias.

13        "[W]here as here, no motion was made during jury selection to dismiss the

14   juror in question for cause, [Plaintiff] assumes a greater burden: he must show that

15   the evidence of partiality before the district court was so indicative of

16   impermissible juror bias that the court was obliged to strike [the juror] from the

17   jury, even though neither counsel made the request."  *Mitchell*, 568 F.3d at 1151.

18   "We have analyzed juror bias under two theories-actual bias and implied bias."

19   *Id.* (citing *Estrada v. Scribner*, 512 F.3d 1227, 1240 (9th Cir. 2008)).  "Actual bias

20   is, in essence, bias in fact—the existence of a state of mind that leads to an

21   inference that the person will not act with entire impartiality," which "is found

22   where a prospective juror states that he can not be impartial, or expresses a view

23   adverse to one party's position and responds equivocally as to whether he could be

24   fair and impartial despite that view."  *Id.* (internal quotations and citations

25   omitted).  "Implied bias is bias conclusively presumed as a matter of law."  *Id.*

26   (internal quotations and citations omitted).  The inquiry for implied juror bias is

27   "whether an average person in the position of the juror in controversy would be

28   prejudiced," and "a challenged juror's [implied] bias" has been "presumed . . .

                                            14

where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Id.* (internal quotations and citations omitted).  The Ninth Circuit "ha[s] cautioned, however, that bias should be presumed only in extreme or extraordinary cases." *Id.* (internal quotations and citations omitted).

Plaintiff does not argue Juror No. 2 had actual bias, and nothing in the record demonstrates Juror No. 2 had actual bias.  As to implied bias, Plaintiff argues Juror No. 2 and her family are long-time acquaintances to Mancina, and her husband and brother-in-law worked closely with him in the same field of music, and her brother-in-law was in Mancina's band.  However, Plaintiff fails to demonstrate this is an extreme or extraordinary case for presuming juror bias as to Juror No. 2.  Mancina was not a witness at trial, Plaintiff's copyright claim against BVHE tried to the jury was not based on infringement in connection with *Moana*'s music, and Plaintiff does not cite to evidence demonstrating Mancina had any involvement in the development of the story, characters or any allegedly infringing elements of *Moana*.  Plaintiff thus fails to demonstrate "the relationship between [Juror No. 2] and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances" as required to presume implied juror bias.  *Mitchell*, 568 F.3d at 1151.[3]  Plaintiff thus fails to demonstrate this is an extreme or extraordinary circumstance warranting a finding of implied juror bias as a matter of law with respect to Juror No. 2 based on her disclosed relationship with non-witness and

---

[3] Courts have recognized implied juror bias based on "extreme situations" unlike those presented here.  *See, e.g., Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring).  Moreover, the Fifth and Eleventh Circuits have found no implied juror bias based on closer relationships than the relationship between Juror No. 2 and non-witness and non-party Mark Mancina at issue here.  *See, e.g., Andrews v. Collins*, 21 F.3d 612, 620-21 (5th Cir. 1994); *Howard v. Davis*, 815 F.2d 1429, 1431 (11th Cir. 1987); *Jones v. Butler*, 864 F.2d 348, 362 (5th Cir. 1988).

1  non-party Mancina.

2  **F.    Defense Misconduct During Opening and Closing Arguments**

3         Plaintiff also argues defense counsel made "litanies of misstatements during

4  opening and closing argument" which "infected the trial."  Plaintiff did not make

5  any objections to Defendant's opening or closing statements during trial.  "The

6  federal courts erect a 'high threshold' to claims of improper closing arguments in

7  civil cases raised for the first time after trial."  *Hemmings v. Tidyman's Inc.*, 285

8  F.3d 1174, 1193 (9th Cir. 2002) (citing *Kaiser Steel Corp. v. Frank Coluccio*

9  *Constr. Co.*, 785 F.2d 656, 658 (9th Cir. 1986)).  "The rationale for this high

10  threshold is two-fold":  (1) "the trial judge is in a superior position to evaluate the

11  likely effect of the alleged misconduct and to fashion an appropriate remedy" and

12  therefore "raising an objection after the closing argument and before the jury

13  begins deliberations 'permit[s] the judge to examine the alleged prejudice and to

14  admonish ... counsel or issue a curative instruction, if warranted.'"; and (2)

15  "allowing a party to wait to raise the error until after the negative verdict

16  encourages that party to sit silent in the face of claimed error." *Id.*  Review of

17  openings and closings "absent a contemporaneous objection" is for "[p]lain error"

18  "where the integrity or fundamental fairness of the proceedings in the trial court is

19  called into serious question." *Id.* (citing *Bird v. Glacier Electric Coop. Inc.,* 255

20  F.3d 1136, 1148 (9th Cir. 2001)).  "Plain error review requires:  (1) an error, (2)

21  the error is plain or obvious, (3) the error was prejudicial or effects substantial

22  rights, and (4) review is necessary to prevent a miscarriage of justice." *Id.*

23  (citation omitted).  "Plain error is a rare species in civil litigation, encompassing

24  only those errors that reach the pinnacle of fault envisioned by the standard set

25  forth above." *Id.* (citation omitted).

26         As a preliminary matter, the Court instructed the jury that counsel's

27  statements during opening statement and closing arguments were not evidence.

28  *See Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000); *Soy v. Asuncion*, 2018

WL 2392157, at *14 (C.D. Cal. May 7, 2018), *report and recommendation adopted*, 2018 WL 2392145 (C.D. Cal. May 24, 2018).  Notwithstanding this instruction to the jury, the Court addresses in this Order each of the purported misstatements identified by Plaintiff in Defendant's closing argument and opening statement below.

Plaintiff contends defense counsel "misleadingly stated during opening statement that the Defense 'just learned' Plaintiff has six access theories" (Trial Tr. 282:22-23) when those theories had been presented in connection with the parties' summary judgment motions.  However, Plaintiff raised more than six theories regarding access at the summary judgment stage (*see* Dkt. No. 432 at 7-16), and Plaintiff fails to demonstrate defense counsel's statement regarding learning about Plaintiff's six access theories for purposes of trial was false, misleading or prejudicial.

Plaintiff also argues defense counsel "misleadingly suggested that 'the centerpiece of his complaint was a confidentiality agreement'" in order to set up Defendant's forgery theme which is "simply unsupportable," and "Defense counsel's false and injurious accusation at trial that Plaintiff was a criminal by way of a forgery" was highly prejudicial to Plaintiff.  Plaintiff contends the crime of forgery cannot be established without the essential element of intent to defraud.  This was a civil copyright action and Defendant was not required to prove Plaintiff's intent to defraud.  Moreover, Plaintiff himself used the word forgery during his testimony at trial while being examined by his own counsel.  (*See* Trial Tr. 739:10-18.)  Furthermore, Plaintiff testified at trial that he wrote Marchick's name on and dated the confidentiality agreement he claimed Marchick signed (*see* Trial Tr. 699:24-700:22, 700:3-23), and Plaintiff believed the signature on the confidentiality agreement was Pearl Young's signature rather than Marchick's signature as Plaintiff had alleged in his complaints (*see* Trial Tr. 707:7-11).  Defendant did not state Plaintiff was a criminal or had committed a crime during

opening statements, and defense counsel's statements that Plaintiff wrote

Marchick's name and the date on the confidentiality agreement were consistent

with Plaintiff's testimony at trial.

Plaintiff also contends Defendant "set up its unsupportable key defenses

during opening, such as that [Walt Disney Animation Studios] never considered

materials form [sic] outside sources." Plaintiff argues defense counsel

"misleadingly suggested that Marchick 'put the [Bucky] binder to the side of her

desk and went back to her 80-hour-a-week job" despite Marchick admitting she

tried to help Plaintiff while she worked at Mandeville, had Plaintiff sign a

Mandeville submission waiver, and made more than one attempt to pitch it to

people at Disney (citing Trial Tr. 285:20-22). Plaintiff thus argues Defendant's

"inference that she could not care less about Bucky next to her desk reflects upon

its agenda to show a complete lack of respect for Plaintiff and his work."

Contrary to Plaintiff's contention, defense counsel did not state Marchick did

nothing after she received the Bucky materials from Plaintiff. (*See* Trial Tr.

285:12-286:13.) Moreover, defense counsel's opening statement referred to what

Malone told Marchick regarding whether Walt Disney Feature Animation

accepted "outside ideas" (not outside materials), which was consistent with

Marchick's testimony at trial. (*See* Trial Tr. 932:20-933:25.)[4]

Plaintiff argues defense counsel made other improper arguments that

damaged Plaintiff from the outset, such as arguing Plaintiff could not find a single

document that supports his case in the document production (citing Trial Tr.

281:25-282:1) despite evidence regarding the *Fish Out of Ocean* pitch. However,

defense counsel stated the following during opening statements:

> We produced the entirety of that development file to the plaintiff and
> the plaintiff's counsel during the nearly five years this litigation has

---

[4] Consistent with Marchick's testimony, Jessica Julius testified at trial that Walt
Disney Animation Studios came up with their own ideas internally. (*See* Trial Tr.
1517:6-21.)

been pending. The plaintiff's counsel got to review more two-and-a-half million e-mails, more than six-and-a-half million files, and more than 20 terabytes of data, basically a running transcript of every step in the filmmaking process, from the conception of the original idea for Moana to the completion of the final film. Every storyline, every character, every setting is sourced in the development file. ***Plaintiff's counsel did everything they could to find something that would trace Moana to Bucky, and they didn't find a single document to do so.*** There's no mention of the plaintiff, there is no mention of Bucky, and there is nothing whatsoever to suggest that Mr. Musker, Ron Clements or anyone involved in the development of Moana had ever even heard of the plaintiff or his works.

(Trial Tr. 281:24-282:5 (emphasis added).)  Contrary to Plaintiff's contention, defense counsel did not state there was not a single document in support of Plaintiff's case.  Moreover, John Musker testified that the "Fish Out of Ocean" pitch was a separate pitch from *Moana*, among four alternative pitches presented to John Lasseter, which was not based on Plaintiff's works, and which was never made.  (Trial Tr. 1169:10-1180:2.)  Furthermore, Plaintiff's counsel had the opportunity to argue, and did argue during closing statements that the *Fish Out of Ocean* pitch was evidence of copying.  (*See* Trial Tr. 1868:10-15.)

Plaintiff also argues during closing argument, "Defense counsel made the inflammatory accusation against Plaintiff that he asked Marchick to lie for him based on her equally unsupportable and clearly rehearsed testimony of the same accusation."  During closing arguments, defense counsel argued:

And what happened in April of 2016? And I want you to keep something in mind. Moana isn't even released until November of 2016. So just by looking at the poster of Moana, without seeing the story, without seeing the movie, without seeing any of the things that plaintiff's counsel just described to you, in April of 2016, Mr. Woodall writes to Ms. Marchick in this long email exchange and says, "Listen, whether you're working for Disney or somebody else is irrelevant. You need to help me because Moana is a copy of Bucky." He hasn't seen Moana. He has no idea what the plot is or the mood or the pace or the dialogue. And he's saying to her, "Come on, I can use your help. We are family." And Ms. Marchick told you exactly what she understood that email to mean. He wanted her to lie for him.

(Trial Tr. 1876:8-22.)  Defense counsel's statement during closing arguments referred to Marchick's testimony about what she understood an email from Plaintiff to mean—that he wanted her to lie for him.  This statement is consistent

19

with Marchick's testimony at trial.  (*See* Trial Tr. 967:25-968:16.)  To the extent

Plaintiff believed Marchick was lying while testifying at trial, Plaintiff had the

opportunity to cross-examine her during trial on this issue.

Plaintiff argues defense counsel also stated during closing that "Mr. Bird

had nothing, nothing whatsoever, to do with Moana" (citing Trial Tr. 1886:1-2)

when defense counsel knew that one of the directors of Moana previously testified

otherwise and Defendants do not dispute Bird told Musker and Clements to get

out of their "comfort zone" and make Moana (citing Clements Depo. 124:24-

125:6).  However, Clements testified at trial:

> Q You're friends with Mr. Bird?
>
> A I have been, yes, for --
>
> Q And you're aware that he was the director of The Incredibles?
>
> A Yes.
>
> Q You spoke to Mr. Bird during the development of *Moana*; correct?
>
> A I don't remember speaking to him during the development of *Moana*.
>
> Q Do you ever recall Mr. Bird encouraging you and Mr. Musker to go out – I'm sorry -- Mr. Musker to go outside your comfort zone?
>
> A I definitely remember that. But that was not during Moana. That was during, I believe, our second pitch of *The Princess and the Frog* at Pixar, and that was where Brad asked us to come out of our comfort zone. And I remembered that, but definitely it was -- it was during *The Princess and the Frog*.

(Trial Tr. 1411:16-1412:8.)

Plaintiff also argues defense counsel "mischaracterized *Bucky* on numerous

occasions, such as in stating that the 2003 Bucky materials involve no whirlpool

portal and no aerial scene at the beginning, and that it was not truly Bucky's

calling to save the land and its people" (citing Trial Tr. 1891:25, 1892:2-3,

1895:4-7).  However, such references relate to the issue of substantial similarity—

an issue which was not reached by the jury in its verdict.

Plaintiff also contends defense counsel "insisted" that "*Fish Out of Ocean*

originated with Clements when he previously testified he did not remember what its source is" (citing Trial Tr. 1901:8-10). However, Clements testified at his deposition that he could not recall between him and Musker who came up with the Fish Out of Ocean idea. (*See* Clements Depo. 140:2-15.) During closing arguments, defense counsel argued:

> So then where do they go to? Well, they go to Fish Out of Ocean. They know Moana and Bucky are not similar, so they have to rely on a story that wasn't made. Remember, Fish Out of Ocean was one of four different scripts that were -- four different ideas presented in 2012. Fish Out of Ocean was not made. But even if it was made, where did the idea come from? It came from Ron Clements. ***These are his notes.*** He talks about taking a modern-day islander and thrusting him back in time. The same idea repeated by Jeff Ranjo, again, internal to Disney Feature Animation. That's what ends up in Fish Out of Ocean. It's their own ideas.

(Trial Tr. 1901:4-14 (emphasis added).) Defense counsel's statement during closing arguments that Fish Out of Ocean came from Clements was based on reference to "his notes" (Trial Ex. 1017)—and does not contradict Clements' deposition testimony identified above. Moreover, Clements testified at trial that notes from his presentation after the research trip he and Musker took in December of 2011 included a quote from "RC" which referred to himself (Ron Clements) where he was relaying an idea of the time-traveling boy from a storyboard artist named Jeff Ranjo who worked for Disney Feature Animation. (Trial Tr. 1434:18-1435:18.) John Musker also testified during trial regarding notes from his presentation after Musker and Clements' research trip in 2011 regarding a comment from "RC" which Musker testified referred Ron Clements who was noting during the meeting that Clements said "Jeff Ranjo brought up a time travel idea. A kid from modern-day Tahiti doesn't know and respect the culture and he is transported back to the time of his ancestors and literally connects with them." (Trial Tr. 1177:16-1178:20.) Musker further testified at trial that the idea for Fish Out of Ocean was not based in any way on Plaintiff's works. (Trial Tr. 1171:15-17.) Therefore, Plaintiff fails to demonstrate defense

1    counsel's references to the Fish Out of Water in his closing arguments was

2    prejudicial or effected Plaintiff's substantial rights. *Hemmings*, 285 F.3d at 1193.

3         Plaintiff also argues defense counsel "improperly criticized David Roman's

4    credentials, claiming he is not credible for not knowing what independent creation

5    is and for not having digested 'millions of pages' of production materials to

6    support his opinions" (Trial Tr. 1902:15-16, 18-20), "when these were neither his

7    tasks nor that of Defendant's expert." David Roman was Plaintiff's substantial

8    similarity expert. Therefore, any alleged misconduct regarding comments about

9    his credentials and credibility would not be a basis for a new trial since the jury

10   did not reach the issue of substantial similarity in its verdict.

11        Lastly, Plaintiff contends it would have been "inherently prejudicial to

12   object to these many statements during closing and opening argument." However,

13   Plaintiff fails to show these issues raised by Plaintiff in the instant Motion

14   regarding Defendant's opening and closing arguments either independently or

15   collectively were prejudicial to Plaintiff or effected Plaintiff's substantial rights.

16   *Hemmings*, 285 F.3d at 1193. Therefore, Plaintiff fails to demonstrate a new trial

17   is warranted based on statements made by defense counsel during opening and

18   closing arguments.

19   **G.    Experts**

20        Plaintiff argues that during trial, defense counsel "improperly inferred that it

21   was Dr. Hunt's burden to interview Defendants' agents to render his opinions"

22   (Trial Tr. 358:19-20, 359:16-20), and defense expert Jeff Rovin testified about

23   matters he was not qualified to opine on and which exceeded the scope of his

24   expert reports (Trial Tr. 1766:17-1770:9). However, the matters Plaintiff

25   complains of regarding experts Dr. Hunt and Jeff Rovin relate to the extrinsic test

26   for substantial similarity which the jury did not reach (and is in fact an issue to be

27   determined by the Court), and therefore are not a proper basis for a new trial.

28   **H.    Prejudicial Exclusion of Evidence**

Plaintiff also contends the Court's exclusion of the following evidence was prejudicial and thus warrants a new trial.  In effect, Plaintiff seeks reconsideration of the Court's prior rulings excluding certain evidence which is not a proper basis for a motion for a new trial.  *San Diego Comic Convention v. Dan Farr Prods.*, 2018 WL 4091734, at *1, *7 (S.D. Cal. Aug. 23, 2018).  Notwithstanding the above, the Court addresses the excluded evidence identified by Plaintiff below.

**Exhibit 39**:  Purported cover letter from Plaintiff to Jenny Marchick. Plaintiff contends during her deposition, Marchick admitted under oath she received the letter and recognized the letter as the one she received, and her prior admission was admissible as an admission of a party opponent and for impeachment purposes to the extent she now denies having received it.  Fed. R. Evid. 801(d) provides that a statement "offered against an opposing party" and which meets certain specified "conditions" is not hearsay.  Based on the Court's summary judgment rulings, the only claim tried to the jury in this action was Plaintiff's copyright claim against Defendant BVHE.  (Dkt. No. 558.)  Although Plaintiff previously named Marchick as a defendant, Marchick was not a party to the copyright claim tried to the jury and therefore was not a party opponent at the time of trial.  Plaintiff cites to no authority applying Fed. R. Evid. 801(d) to a former party.  Accordingly, the admission of a party opponent exception did not apply to Marchick at trial, and Exhibit 39 is inadmissible hearsay.  *See Tuan Anh Le v. Bank of New York Mellon*, 152 F. Supp. 3d 1200, 1217 (N.D. Cal. 2015); *United States v. Smith*, 746 F.2d 1183, 1185 (6th Cir. 1984); *Powell v. Collier Const., L.L.C. KA,* 2005 WL 2429245, at *2 n.2 (W.D. La. Sept. 30, 2005).

Plaintiff also argues the letter was readily admissible for its effect on the listener or for impeachment purposes.  However, Marchick did not testify during her deposition that she received Ex. 39 or that she recognized Exhibit 39 as the letter she had received.  (*See* Marchick Depo. 274:3-7 ("Q. Now, you said that this document looks familiar. Is that because you recall receiving it in 2004?  A. I

23

1    recall receiving something like this. I don't know if it was exactly this

2    document.").)  Thus, Exhibit 39 could not be used for its effect on Marchick as the

3    listener or for impeachment of Marchick because Plaintiff failed to establish

4    Marchick received Exhibit 39.

5        **Exhibits 58, 188, 243, 244**:  Purported resumes for Jenny Marchick.

6    Plaintiff contends these resumes are impeachment evidence because Marchick

7    "attempted to downplay her history with Disney entities and her responsibilities at

8    various positions" which are uniquely important to this case.  However, Plaintiff

9    did not seek to use the resumes for impeachment purposes.  As the Court held, the

10   resumes were inadmissible hearsay (Dkt. No. 749), and Plaintiff does not address

11   why the resumes are not hearsay.  *See McArthur v. Alameda Cnty. Pub. Def.'s*

12   *Off.*, 2023 WL 8101952, at *1 (N.D. Cal. Nov. 21, 2023).  Moreover, the Court

13   stated at trial: "So if there were several questions about résumé, so the ruling

14   doesn't preclude counsel from asking about the résumé but may not offer the

15   résumé into evidence." (Trial Tr. 1003:11-14.)  Plaintiff contends he was

16   precluded from presenting the resumes and therefore could not have used them for

17   impeachment purposes.  However, Plaintiff's counsel did in fact examine

18   Marchick at trial regarding her work history, including the work described on her

19   resumes.  (*See, e.g.,* Trial Tr. 978:4-981:18, 987:3-989:20, 993:25-998:23.)

20   Therefore, Plaintiff fails to demonstrate that the non-admission of Marchick's

21   resumes warrants a new trial.

22       **Exhibit 62**:  Bucky trailer.  Plaintiff contends his unregistered Bucky trailer

23   registered in 2024 is relevant to access.  However, the Court excluded the trailer as

24   irrelevant and more prejudicial than probative.  (Dkt. No. 749.)  Plaintiff's

25   copyright claim against BVHE was not based on the trailer, and Plaintiff fails to

26   demonstrate the trailer is relevant for purposes of access.  Moreover, Plaintiff

27   sought to admit the trailer to show *Moana* was substantially similar to the trailer,

28   not for purposes of access.  Plaintiff thus fails to demonstrate the non-admission of

24

1   the trailer warrants a new trial.

2        **Exhibit 242**:  "ten fun facts" article.  Plaintiff contends this article contains

3   quotes from *Moana*'s directors constituting double hearsay but the directors did

4   not ultimately dispute that a prior storyline parallels the storyline about a time-

5   traveling modern boy.  Plaintiff contends the purpose of this article was to

6   highlight that while defense witnesses spent considerable time testifying to how

7   *Moana* "came to life" and *Moana* was never a modern-day boy, this early

8   storyline was at least significant enough to be mentioned during an interview, and

9   would have served to impeach witness testimony (Trial Tr. 1407:1-14), and

10  provided additional context for the jury rather than the witness imply stating he

11  did not previously testify accurately.  The Court excluded the article as hearsay.

12  (Dkt. No. 749.)  Plaintiff did not offer the article for impeachment or any non-

13  hearsay purpose.

14       **Exhibits 290, 291**:  books titled *Moana the Wage Rider* and *Moana's New*

15  *Friend*.  Plaintiff contends these books are "extension stories to *Moana*" created in

16  part by Osnat Shurer and contain striking similarity with some of the *Bucky*

17  materials and are relevant to access.  As the Court ruled for Defendant BVHE's

18  Motion in Limine No. 4, Plaintiff's copyright claim against BVHE at trial was

19  based on distribution of *Moana* after April 24, 2017—not on derivative works.

20  (Dkt. Nos. 558, 662.)  Plaintiff fails to demonstrate these derivative works are

21  relevant to the claim tried to the jury against BVHE based on distribution of

22  *Moana*.

23       **Exhibit 296**:  Purported Map of Disney's Burbank Lot.  Plaintiff contends

24  Defendant used a similar map at trial and that Plaintiff intended to show a similar

25  map of Disney's Burbank studio lot that is most likely Disney's property to

26  demonstrate the location of Mandeville Films and its proximity to Disney's

27  animation studio.  The Court excluded the map as unauthenticated.  (Dkt. No.

28  749.)  Plaintiff does not argue the map was properly authenticated nor address

1    where he obtained the map.

2    Therefore, the Court's exclusion of the exhibits identified above does not

3    warrant a new trial.

4    **I.    Other Prejudicial Rulings**

5    Plaintiff contends the following six mid-trial rulings by the Court

6    prejudiced Plaintiff and warrant a new trial.

7    First, Plaintiff contends the Court's striking of testimony as to what

8    Marchick told Plaintiff was prejudicial because statements by a party opponent are

9    admissible (citing Trial Tr. 545:22-546:3).  The only claim tried to the jury was

10   Plaintiff's copyright claim against Defendant BVHE.  Although Plaintiff

11   previously named Marchick as a defendant, the Court granted summary judgment

12   in favor of Marchick on the claims asserted against her.  (Dkt. No. 558.)  Thus,

13   Marchick was not a party at trial with respect to the copyright claim against

14   BVHE, and therefore not a party opponent at the time of trial.  Accordingly, the

15   statement "at the request of Jenny Marchick" was inadmissible hearsay.  *See Tuan*

16   *Anh Le*, 152 F. Supp. 3d at 1217; *Smith*, 746 F.2d at 1185; *Powell*, 2005 WL

17   2429245, at *2 n.2.  Therefore, the hearsay objection was properly sustained by

18   the Court.

19   Plaintiff also contends the Court's repeated striking of testimony of

20   Plaintiff's experts opining that *Moana* "borrowed" from *Bucky* was prejudicial.

21   Plaintiff identifies a single instance where the Court struck Plaintiff's expert Terry

22   Hunt's testimony that *Moana* "borrowed" from *Bucky*.  Moreover, the Court

23   struck such testimony following side bar with counsel on the basis it was outside

24   the scope of the expert's expertise, which Plaintiff fails to demonstrate was error.

25   (*See* Trial Tr. 337:22-342:21.)

26   Plaintiff also contends the Court's sustaining of Defendant's narrative

27   objections to "highly relevant testimony" (citing Trial Tr. 307:21-23, 445:2-16)

28   was prejudicial.  However, the portions of trial testimony cited by Plaintiff were

26

narratives, and Plaintiff's counsel could have asked follow-up questions to elicit

such testimony in a non-narrative form after defense counsel's objections were

sustained.  Moreover, Plaintiff's counsel stated on the record he would ask such

questions after the narrative objection was sustained, and did in fact do so.

Therefore, Plaintiff fails to demonstrate prejudice from the Court sustaining two of

Defendant's narrative objections.

Plaintiff also argues he was prejudiced based on the Court declining to rule

on an objection by Plaintiff's counsel as to facts not in evidence "attempted to be

adduced by a leading question" (Motion at 21 (citing Trial Tr. 390:15-391:4)).

The portion of the trial transcript relied on by Plaintiff is set forth below:

> Q Okay. Are you aware that The Princess and the Frog, another Musker/Clements movie, there is a necklace?
>
> A No. I don't know anything about it.
>
> Q Okay. Have you seen the movie Treasure Planet?
>
> A No, I have not.
>
> Q Okay. Are you aware that Treasure Planet, another Musker/Clements movie also has a special necklace?
>
> MR. LAGE: Objection. Facts not in evidence, Your Honor.
>
> MR. KABA: It's if he's aware.
>
> THE COURT: State the question again, please.
>
> Q BY MR. KABA: Are you aware that Treasure Planet also had a special necklace?
>
> A I'm not aware. I don't know the movie at all. I've never seen it.

(Trial Tr. 390:15-391:4.)  Defense counsel restated the question in response to

Plaintiff's objection, and Plaintiff's counsel did not object to the question as

restated.  Moreover, Treasure Planet was Trial Ex. 1416 to which Plaintiff had no

objections (Dkt. No. 781), and which was admitted prior to trial on February 24,

2025 (Dkt. No. 733).  Therefore, Treasure Planet was in evidence and thus

Plaintiff's objection would have been overruled.

1    Plaintiff also argues preventing him from attempting to impeach witnesses

2    when Defendant was "routinely permitted to do so" was prejudicial (citing Trial

3    Tr. 357:13-358:12). However, the portion of the trial transcript cited by Plaintiff

4    is the examination of Dr. Hunt by defense counsel—it is not an instance where

5    Plaintiff's counsel attempted to impeach a witness and was denied. Plaintiff

6    identifies no specific instances where the Court did not permit Plaintiff to impeach

7    a witness during trial.

8    Plaintiff further contends he was prejudiced because the Court permitted

9    Defendant to use demonstrative exhibits which violated L.R. 16-3 because they

10   were not on the trial exhibit list, they had to be disclosed and filed at least 11 days

11   prior to trial, and they "contained volumes of evidence not previously disclosed to

12   Plaintiff" "which ambushed Plaintiff and made it impossible for his trial team to

13   reasonably address the evidence." However, the parties "agreed that

14   demonstratives to be used in openings statements will be exchanged 48 hours

15   before the start of trial, so that the parties may raise any objections to those

16   demonstratives at the conference on February 24, and that witness demonstratives

17   will be exchanged 24 hours in advance of their use at trial." (Dkt. No. 710.)

18   Plaintiff did not object to Defendant's demonstratives as untimely during trial.

19   Accordingly, these mid-trial rulings identified by Plaintiff do not warrant a

20   new trial.

21   **J.    Cumulative Effect of Trial Errors**

22   Plaintiff argues while each of the errors identified above warrants a new

23   trial when considered separately, their cumulative effect was especially prejudicial

24   because each issue impacts the question of access and "hamstrung Plaintiff's

25   ability to fairly present his case to an impartial jury." The Court finds Plaintiff

26   fails to demonstrate the alleged "errors" either independently or collectively

27   prejudiced Plaintiff and precluded him from being able to fairly present his case to

28   an impartial jury.

**K.    Jury Verdict Against the Greater Weight of the Evidence**

Alternatively, Plaintiff contends the jury's verdict is against the greater weight of the evidence.  Plaintiff argues Defendant does not dispute *Bucky* materials were received at least by Disney TV Animation twice—through Marchick's direct efforts and during Plaintiff's separate meeting with Disney TV Animation on Disney's studio lot (citing Trial Tr. 1033:10-11).  Plaintiff contends Defendant argues in order to prove access, Plaintiff was required to remember the names and genders of the persons who received the materials (citing Trial Tr. 1883:1-2) but Defendant provides no support for this proposition.  Plaintiff further argues Marchick "conceded that these events occurred with 'somebody who worked in animation'" (citing Trial Tr. 1022:13-14), and meeting with somebody who worked in animation took place on the same lot as Walt Disney Animation Studios (the creator of *Moana*), which "creates a more than sufficient overlap in subject matter to infer access."  However, the submission of Plaintiff's Bucky materials to someone at Disney TV Animation constitutes "bare corporate receipt" which is not sufficient to prove the creators of *Moana* had access to Plaintiff's work.  *See Loomis*, 836 F.3d at 995; 9th Cir. Model Inst. 17.18; *Changing World Films*, 2025 WL 466443, at *3; *Bernal*, 788 F. Supp. 2d at 1056-57; *Panton*, 2018 WL 5099666, at *2; *Wilson*, 123 F. Supp. 3d at 1173-74; *Straughter*, 2011 WL 13176750, at *4; *Gable*, 727 F. Supp. 2d at 826.

Plaintiff also argues he presented striking similarity which would permit an inference of access in combination with bare corporate receipt.  Plaintiff contends it is also undisputed that the *Fish Out of Ocean* pitch (Trial Ex. 64) was an "early" pitch (citing Trial Tr. 1409:9-15) as defense witnesses repeatedly testified, and "strikingly mirrors the *Bucky* story in ways that cannot be explained by coincidence."  Plaintiff contends Defendant does not dispute elements from the early story made it into *Moana* (citing Trial Ex. 200; Trial Tr. 1434:7-12).  However, Defendant offered evidence at trial that the Fish Out of Ocean pitch was

29

developed internally at Disney Feature Animation (Trial Tr. 1171:4-1179:19; *id.*
1434:18-1435:18), was a separate idea from *Moana* which was one separate pitch
from four alternative pitches presented to John Lasseter which was never made
(Trial Tr. 1169:10-1180:2), and was not based on Plaintiff's works (Trial Tr.
1171:15-17).

Plaintiff also argues Osnat Shurer did not dispute "she was at the Kauai
studio when Craig T. Nelson's voice for *The Incredibles* was recorded," "*Bucky*
was displayed all over the studio, who sponsored the project," and "everyone who
appeared for *The Incredibles* received a Bucky brochure." Plaintiff thus contends
he has proven the producer of *Moana* had a "reasonable opportunity to view"
Plaintiff's work. However, Plaintiff cites to no evidence offered at trial
demonstrating Plaintiff's copyrighted *Bucky* work—which is the basis for the
copyright claim tried to the jury—was available at the studio and that Shurer had a
reasonable opportunity to view it at the studio.

Plaintiff further argues "once the taint of Defendant's misleading mantras is
removed from the trial record, such as the representation that WDAS never
considered materials from outside sources, and considering Marchick and
Malone's growing friendship, and upon realization that Plaintiff's girlfriend had
Doc Kane's personal information and FedEx account number because she was
unlikely charged with shipping Disney's property from Hanalei Bay to Disney,
Defendants' stories no longer hold up." However, Plaintiff fails to show the jury's
verdict goes against the greater weight of the evidence at trial.

## IV.    CONCLUSION

Accordingly, the Court **DENIES** Plaintiff's Motion for a New Trial.

**IT IS SO ORDERED.**

DATED:  December 10, 2025.

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE