# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Buck G. Woodall, a.k.a. Buck Woodall, an individual, <br><br> Plaintiff, <br><br> v. <br><br> The Walt Disney Company *et al.*, <br><br> Defendants. | Case No.:  2:20-cv-3772-CBM-E <br><br> **ORDER RE: DEFENDANTS' MOTION FOR SANCTIONS AGAINST PLAINTIFF'S ATTORNEYS** |

The matter before the Court is Defendants The Walt Disney Company, Walt Disney Pictures, Walt Disney Animation Studios, Disney Enterprises, Inc., Disney Consumer Products, Inc., Disney Consumer Products & Interactive Media, Inc., Walt Disney Direct-to-Consumer & International, Disney Interactive Studios, Inc., Disney Store USA, LLC, Disney Shopping, Inc., Buena Vista Home Entertainment, Inc., Buena Vista Books, Inc., Mandeville Films, Inc., Jenny Marchick, and Pamela Ribon's (collectively, "Defendants'") Motion for Sanctions Against Plaintiff's Attorneys.  (Dkt. No. 829.)[1]

---

[1] Plaintiff's counsel Gustavo D. Lage, James Wesley Christian, Elad D. Botwin, and Gerard P. Fox (collectively, "LCBF") filed an opposition collectively (Dkt. No. 847), but Plaintiff's counsel Gerard Fox subsequently filed a separate opposition on his own behalf (Dkt. No. 849).  Plaintiff's counsel Luis E. Suarez and Patricia Melville Suarez (collectively, "Suarezes") filed an opposition collectively (Dkt. No. 850), and are separately represented by counsel for purposes of the instant Motion.

1

## I.    BACKGROUND

On April 24, 2020, Plaintiff filed this action asserting two causes of action against The Walt Disney Company, Walt Disney Pictures, Walt Disney Animation Studios, Mandeville Films, Inc., Jenny Marchick, and Pamela Ribon:  (1) copyright infringement, 17 U.S.C. §§ 101 *et seq*.; and (2) accounting.  (Dkt. No. 1.)

On July 22, 2020, Plaintiff filed the First Amended Complaint ("FAC") as a matter of right, naming The Walt Disney Company, Walt Disney Pictures, Walt Disney Animation Studios, Disney Enterprises, Inc., Disney Consumer Products, Inc., Disney Consumer Products & Interactive Media, Inc., Walt Disney Direct-to-Consumer & International, Disney Book Group, Disney Interactive Studios, Inc., Disney Store USA, LLC, Disney Shopping, Inc., Buena Vista Home Entertainment, Inc., Buena Vista Books, Inc., Mandeville Films, Inc., Jenny Marchick, and Pamela Ribon as Defendants, and asserting eight causes of action: (1) copyright infringement, 17 U.S.C. § 501 *et seq*.; (2) violations of Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836; (3) violations of the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code §§ 3426 *et seq*.; (4) fraud; (5) fraudulent concealment; (6) false promises; (7) tortious interference with contractual relations; and (8) accounting.  (Dkt. No. 18.)  On April 14, 2021, the Court granted in part and denied in part Defendants' Motion to Dismiss the FAC. (Dkt. No. 91.)  On May 28, 2021, Plaintiff filed the Second Amended Complaint ("SAC") asserting five causes of action:[2]  (1) copyright infringement, 17 U.S.C. § 501 *et seq*. (2) violations of DTSA, 18 U.S.C. § 1836; (3) violations of CUTSA,

---

[2] The SAC named the following Defendants:  Defendants The Walt Disney Company, Walt Disney Pictures, Walt Disney Animation Studios, Disney Enterprises, Inc., Disney Consumer Products, Inc., Disney Consumer Products & Interactive Media, Inc., Walt Disney Direct-To-Consumer & International, Disney Book Group, LLC, Disney Interactive Studios, Inc., Disney Store USA, LLC, Disney Shopping, Inc., Buena Vista Home Entertainment, Inc., Buena Vista Books, Inc., Mandeville Films, Inc., Jenny Marchick, Pamela Ribon (collectively, "Defendants").

Cal. Civ. Code §§ 3426 *et seq.*; (4) fraud; and (5) false promises. (Dkt. No. 94.) On August 5, 2021, the Court denied Defendants' motion to dismiss the SAC. (Dkt. No. 101.) Defendants filed answers to the SAC. (Dkt. Nos. 102, 103, 104.)

On November 1, 2024, the Court granted Defendants' Motion for Summary Judgment on Plaintiff's copyright claim except as to Defendant Buena Vista Home Entertainment ("BVHE"), and Plaintiff's trade secrets misappropriation, fraud, false promises, and conspiracy claims, on the ground those claims were time-barred. (Dkt. No. 558.) On November 1, 2024, the Court denied Defendants' Motion for Summary Judgment on the issues of access, substantial similarity, and independent creation. (*Id.*)[3] Based on the Court's summary judgment rulings, the sole remaining claim for trial was Plaintiff's copyright infringement claim based on distribution of *Moana* by BVHE after April 24, 2017. (*Id.*) Following a 10-day trial, a jury reached a verdict in favor of Defendant BVHE on Plaintiff's remaining copyright claim upon finding Plaintiff did not prove the creators of *Moana* had access to Plaintiff's copyrighted works. (Dkt. No. 787.) Judgment was entered in favor of Defendants and against Plaintiff, and the action was dismissed with prejudice. (Dkt. No. 807.) Defendants now move for sanctions against certain attorneys for Plaintiff.

## II.    STATEMENT OF THE LAW

28 U.S.C. § 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

"Courts wishing to impose sanctions under § 1927 must make a finding that the attorney to be sanctioned acted with 'subjective bad faith.'" *Caputo v. Tungsten Heavy Powder, Inc.*, 96 F.4th 1111, 1153 (9th Cir. 2024) (citing *New Alaska Dev.*

---

[3] The Court granted in part and denied in part Plaintiff's motion for partial summary judgment on certain issues. (Dkt. No. 558.)

*Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989)). "[A] finding that the attorneys recklessly raised a *frivolous* argument which resulted in the multiplication of the proceedings justifies § 1927 sanctions." *Id*. at 1154-55 (emphasis in original) (internal quotations omitted) (citing *In re Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010); *B.K.B. v. Maui Police Dep't*, 246 F.3d 1091, 1107 (9th Cir. 2002); *In re Keegan Mgmt. Co., Secs. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996)). Moreover, "recklessly or intentionally misrepresenting facts constitutes 'the requisite bad faith and intentional misconduct for which sanctions under § 1927 are appropriate.'" *In re Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010) (quoting *Malhiot v. S. Calif. Retail Clerks Union*, 735 F.2d 1133, 1138 (9th Cir. 1984)). "Section 1927 is the chief statutory tool by which a court can hold individual attorneys liable for misconduct. It does not apply to law firms, clients, corporations, or other entities." *Caputo*, 96 F.4th at 1153. "Likewise, a party's attorney who reviews and approves motions, applications, and briefs filed in a case is responsible for the resulting multiplication of proceedings even when he does not sign his name to those filings or personally argue them before the court." *Id*. at 1154.

## III. DISCUSSION

Defendants move for sanctions in the total amount of $532,815.60 against current and former attorneys of record for Plaintiff as follows:

1. Gustavo D. Lage, in the amount of $532,815.60, jointly and severally with Plaintiff's other attorneys of record to the extent set forth below;

2. James Wesley Christian, jointly and severally with Gustavo D. Lage, in the amount of $421,268.60;

3. Elad D. Botwin, jointly and severally with Gustavo D. Lage and James Wesley Christian, in the amount of $376,969.60;

4. Luis E. Suarez and Patricia Melville Suarez, jointly and severally with Gustavo D. Lage, James Wesley Christian, and Elad D. Botwin, in the amount of $190,252.70; and

5. Gerard P. Fox, jointly and severally with Gustavo D. Lage,

James Wesley Christian, and Elad D. Botwin, in the amount of $198,546.05.

## A.    Sanctionable Conduct

Defendants contend Plaintiff's counsel engaged in three categories of sanctionable misconduct:  (1) pursuing claims based on a falsified confidentiality agreement; (2) pursuing trade secrets claims based on publicly available materials; and (3) pursuing time-barred claims.

### (1)    Falsified Confidentiality Agreement

Defendants contend Plaintiff's counsel unreasonably and vexatiously multiple proceedings by pursuing trade secret and fraud claims based on a falsified confidentiality agreement Plaintiff alleged was signed by Defendant Jenny Marchick and that other Defendants allegedly had agreed to be bound, and did not withdraw those claims even after Plaintiff's counsel admitted Plaintiff had written Marchick's name on the confidentiality agreement and backdated the agreement by 17 years before filing this lawsuit.

In the FAC and SAC, Plaintiff falsely alleged the confidentiality agreement attached thereto was a true and correct copy of the agreement signed by Marchick and which Plaintiff alleges other Defendants acknowledged they were bound to. (*See* FAC ¶¶ 29, 61, Ex. C; SAC ¶¶ 29, 67, Ex. C.)  Plaintiff's trade secrets and fraud claims asserted in the FAC and SAC were based on the confidentiality agreement attached thereto.  (*See, e.g.,* FAC ¶¶ 29, 35, 60-61, 72-73, 83, 87, 92, 100-01, Ex. C; SAC ¶¶ 56, 58, 67, 79, Ex. C.)  Moreover, Plaintiff's former counsel the Suarezes state in their opposition to the instant Motion that the "confidentiality agreement *central* to Plaintiff's claims (the "Confidentiality Agreement") had been altered by Plaintiff."  (Dkt. No. 850 at 3 (emphasis added).)  Thus, contrary to LCBF's contention, Plaintiff's trade secret and fraud claims asserted in the FAC and SAC were based on the confidentiality agreement.

However, Plaintiff testified at his deposition on October 5, 2022 regarding the confidentiality agreement as follows:

Q. Had you ever seen a copy of Exhibit 2 with only the signature, only the signature and the date or some other partial combination of handwriting, prior to 2020?

A. Yes, when I first found the document in my files because my attorneys asked me to look for a confidentiality form or any - - I'm sorry.

MR. SUAREZ: Don't reveal communications between the attorney and you.

THE WITNESS: Okay, so not supposed to reveal anything between me and my attorneys. But when I found the document, it just had the signature.

BY MR. KLIEGER:

Q. Where did you find the document?

A. In my files where I kept all my Bucky documents.

Q. Was it in that plastic trunk that had come from the storage unit?

A. Yes.

Q. At the time you retrieved this document from the trunk in 2020, did it have any handwriting on it other than the signature itself?

A. No.

. . .

Q. On Exhibit 2, the writing October 22nd, 2003, that is your handwriting, not Ms. Marchick's, correct?

A. Yes, correct.

Q. The handwritten name Jenny Marchick is your handwriting, not Ms. Marchick's, correct?

A. Yes.

. . .

Q. And if we had looked at this exact same document at sometime in 2019, there would have been no date and no name, correct?

A. Yes.

Q. What makes you believe it was October 22nd as opposed to October 21st or October 23rd?

A. I don't know. I just – that's when I thought it was signed. Right around that day and I didn't think it was so important which day it was as long as it was within the month or the year that it was executed or within two, three months, which is what I thought was

6

correct.

(Plaintiff's Depo. 161:1-24, 163:19-164:1, 169:7-24.)  Plaintiff further testified at his deposition as follows:

Q. Did you disclose to anybody that the date and name had been written by you in 2020 as opposed to by whoever signed the document at some point in the past?

A. Yes.

Q. Who did you disclose what to?

A. Multiple attorneys I believe.

Q. When?

A. When? I think prior to the time we filed –

. . .

Q. You recognize that this confidentiality agreement was attached to your first amended complaint, correct?

A. Yes.

Q. It was attached to your second amended complaint?

A. I don't remember that but if it was it was.

Q. To the best of your recollection -- well, strike that.

Did you review the amended complaints before they were filed?

A. Yes.

Q. Do you recall whether those complaints indicated that this a true-and-correct copy of a confidentiality agreement except that you, Buck Woodall, had added the date and handwritten name?

A. No, I don't recall that.

Q. Do you recall it simply said it was a true-and-correct copy without disclosing that information?

A. I believe so.

Q. And is that because you believe it's immaterial that you wrote the date and you wrote the name on this agreement?

MR. SUAREZ: Object to the form of the question.

THE WITNESS: I'm not an attorney. That's my attorneys' jobs to make those calls. I have no idea.

(Plaintiff's Depo. 170:1-9, 172:13-173:16.) Plaintiff also testified at trial that he found an unaltered version of a confidentiality agreement in his files in the Spring of 2020 when he was preparing to file this lawsuit (Trial Transcript 701:10-12), that unaltered version of the confidentiality agreement had a signature but no name and no date (*id*. 701:13-17), and Plaintiff handwrote Marchick's name and backdated the agreement which Plaintiff alleged Marchick signed and which Plaintiff attached to the FAC and SAC. (Trial Transcript 699:24-700:22, 700:3-23.) Plaintiff further testified at trial that Plaintiff did not believe the signature on the confidentiality agreement was Marchick's signature, but instead Pearl Young's signature. (Trial Transcript 707:7-11.)

In denying Defendants' motion to dismiss Plaintiff's trade secret claims asserted in the SAC, the Court relied on the purported confidentiality agreement Plaintiff alleged was signed by Jenny Marchick and to which Defendants allegedly acknowledged that they were bound, noting: "Courts have found trade secret claims fail as a matter of law where the trade secret owner fails to obtain a non-disclosure agreement from persons receiving the purported trade secret information." (Dkt. No. 101 at 9.) The Court found although Defendants argued "Plaintiff does not and cannot dispute that he never asked any Disney entity to execute a confidentiality agreement," "here, the SAC alleges Plaintiff "has taken reasonable measures to keep secret including, without limitation, assuring that all persons gaining access to the trade secrets identified in paragraphs 56 through 59 of this Complaint, and the Woodall Trade Secrets, execute confidentiality agreements or otherwise clearly articulate their covenant not to disclose any of the Woodall Trade Secrets to the general public, directly or indirectly," and "Defendants all acknowledged that they were bound by the Confidentiality Agreement executed in favor of Woodall, which forbade any such use of these trade secrets that the Defendants had access to from and after 2003." (*Id*. at 9-10 (citing SAC ¶¶ 66, 67).) The Court thus concluded, "[b]ecause the Court must

8

accept as true factual allegations in the complaint for purposes of a motion to dismiss, the Court must accept as true the SAC's allegation that 'Defendants all acknowledged that they were bound by the Confidentiality Agreement'" (SAC ¶ 67), "Defendants' contention that Plaintiff failed to take reasonable measures to keep the information secret and obtain confidentiality agreements is not a basis for dismissing Plaintiff's trade secret claims at the pleading stage." (Dkt. No. 101 at 10.) The Court thus relied on Plaintiff's false allegations that the confidentiality agreement attached to his complaints were signed by Marchick and to which the remaining Defendants acknowledged they were bound in not dismissing Plaintiff's trade secret claims at the pleading stage, which warrants sanctions under 28 U.S.C. § 1927. *See Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1222 (9th Cir. 2010).

LCBF contends Plaintiff's counsel undertook "diligent investigatory efforts" in connection with the confidentiality agreement which refutes Defendants' claims of bad faith. However, the record before the Court contradicts LCBF's contention they were diligent in investigating the confidentiality agreement. In September 2020 (less than two months after Plaintiff filed the FAC), defense counsel notified Plaintiff's counsel Gustavo D. Lage regarding Defendants' belief that the confidentiality agreement attached to the FAC which Plaintiff alleged was a true and correct copy signed by Marchick was a forgery. (Dkt. No. 829-1, Shimamoto Decl. ¶ 2.) Even if Plaintiff's counsel was not already aware that Plaintiff had falsified the confidentiality agreement attached to the FAC, Plaintiff's counsel should have inquired about the authenticity of the confidentiality agreement when defense counsel advised Plaintiff's counsel the document was a forgery September 2020. Instead, Plaintiff's counsel Lage wrote a letter dated September 9, 2020 to defense counsel stating: "On a final note, you have suggested that either some or all of your clients will ultimately claim the Marchick confidentiality agreement is a forgery and we appreciate your advising

9

us of same; however, your clients may wish to note that easily disproven facts or perjurious comments about the veracity of certain documents is likely something they should think carefully about before introducing them into the fray." (Shimamoto Decl. Ex. A.) On May 28, 2021, despite Defendants giving notice to Plaintiff's counsel Lage that they believed the confidentiality agreement attached to the FAC was a forgery, Plaintiff's counsel Lage filed the SAC which attached the same confidentiality agreement Plaintiff alleged Marchick signed in October 2003. (Dkt. No. 94, SAC ¶ 29, Ex. C.)

Defense counsel Shimamoto also declares on October 29, 2021 during the parties' Rule 26(f) meet and confer conference, he advised Plaintiff's counsel Lage that Defendants wanted to examine the original Confidentiality Agreement. (Shimamoto Decl. ¶ 4.) Moreover, in Defendants' requests for production served on Plaintiff dated November 5, 2021, Defendants requested Plaintiff to produce "[t]he original of the Confidentiality Agreement attached as Exhibit C to the SAC" (Shimamoto Decl. Ex. E). In Plaintiff's response to Defendants' requests for production which was signed by Plaintiff's counsel Lage, Plaintiff stated "Plaintiff is not withholding responsive materials [to Defendants' document request for the original of the Confidentiality Agreement] on the basis of these objections. *Subject to and without waiving or otherwise impeding application of the foregoing objections, Plaintiff will produce all non-privileged, responsive documents currently in its possession, custody and control, if any, located after a diligent search*." (Shimamoto Decl. Ex. G (emphasis in original)). In an email dated November 17, 2021 from defense counsel Shimamoto to Plaintiff's counsel Lage and James W. Christian, defense counsel Shimamoto wrote: "As I have mentioned several times to you and Gus Lage, we would like to examinate the original of the Confidentiality Agreement attached as Exhibit C to the Second Amended Complaint. Please provide some proposed dates and location for such an examination at your earliest convenience." (*Id.* ¶ 5, Ex. B.) In response,

Plaintiff's counsel Elad Botwin sent an email to defense counsel on November 19, 2021, wherein Botwin wrote:

> With respect to what you call 'the original confidentiality agreement' … we cannot tell you when you can examine the original because the files we are aware of are electronic and we believe our client is still searching for the original. Again, as we have told you, our client is neither The Walt Disney Company nor Mandeville Studios. Rather, he is a man who has spent the better part of his life fighting with limited resources against such stalwarts. The moment we locate 'the original confidentiality agreement' (if in fact it is located), I will inform you immediately.

(*Id*. Ex. D.)  Moreover, in Defendants' requests for admissions to Plaintiff dated November 23, 2021, Defendants requested that Plaintiff "[a]dmit that Defendant Jenny Marchick's handwriting is not contained anywhere on the Confidentiality Agreement attached as Exhibit C to the Second Amended Complaint."  (*Id*. Ex. F.) In Plaintiff's response to Defendants' requests for admissions signed by Plaintiff's counsel Lage, Plaintiff stated:

> Plaintiff objects to this interrogatory on the ground that the term "handwriting" is vague and ambiguous as to what Defendants mean by their undefined phrase "handwriting." Plaintiff is unable to determine whether Defendants meant the term "handwriting" to mean strictly the dictionary definition of "handwriting" (i.e., often defined as "something written by hand") or whether Defendants meant the term "handwriting" to mean any words, letters, numbers, symbols and/or signatures, regardless of the kind of markings, emanating from or intended to be placed by the subject identified by the Defendants. For purposes of this response, Plaintiff will assume that Defendants intended to use the term "handwriting" to mean any words, letters, numbers, symbols, signatures or other apparent marks, spots or traces intended to be placed on Exhibit C by Jenny Marchick. Plaintiff further objects to this Requests on the ground that it is burdensome, oppressive, and harassing because it may call for an expert opinion on a matter that appears to now be at issue between the parties as a result of the Defendants placing it at issue. Subject to and without waiving the foregoing objections, Plaintiff denies, generally and specifically, this particular Request.

(*Id.* Ex. H.)  Defense counsel declares:  "Plaintiff's initial document production did not include the original Confidentiality Agreement, but it did include a photograph of the original, which was produced as a JPEG file. The metadata associated with that file reflected a creation date of April 8, 2020."  (*Id.* ¶ 12.)

This lawsuit was filed by Plaintiff on April 24, 2020, which thereby demonstrates Plaintiff had a copy of the original of the confidentiality agreement two weeks prior to filing this action but failed to produce it to Defendants in a timely manner.  Defendants served additional requests for admission on Plaintiff dated May 27, 2022 wherein Defendants requested Plaintiff to admit that he either did or did not still possess the original Confidentiality Agreement (*id*. Ex. I), but in Plaintiff's response thereto signed by Plaintiff's counsel Lage, Plaintiff objected to the requests as "vague and ambiguous with respect to the word 'original'" and refused to respond based on that objection (*id*. Ex. J).  However, Plaintiff's counsel Lage had previously responded to Defendants' document requests asking for the "original of the Confidentiality Agreement" without objection, and agreed to produce such document in Plaintiff's possession, custody and control (*see id*. Ex G)—thus demonstrating Plaintiff's counsel Lage understood what the term "original of the Confidentiality Agreement" meant prior to the time when he made his objection to Defendants' requests for admission ("RFAs") and refused to answer the RFAs on the basis the word "original" was vague and ambiguous.

Moreover, in a meet and confer letter dated August 5, 2022 from defense counsel to Plaintiff's counsel Elad Botwin (and cc'd to all of Plaintiff's counsel of record) regarding Plaintiff's objections and responses to discovery, defense counsel wrote:

**Defendants' Second Set of Requests for Admission**

**Requests [for admissions] 3 through 12**

These requests ask Plaintiff to admit or deny that he has the original of the Confidentiality Agreement attached as Exhibit C to the Second

12

Amended Complaint, as well as other Confidentiality Agreements that were contained in Plaintiff's document production. Plaintiff objected to all of these requests on the ground that the word "original" is purportedly vague and ambiguous. Plaintiff's objection is baseless. The term "original" as used in this context means the version that was physically signed by the person whose handwriting appears on the document, as opposed to a copy of the document, which is the only version Plaintiff has produced to date. The term "original" could not possibly have any other meaning in the context of these requests. Plaintiff should either admit or deny these requests.

(*Id*. Ex. K.)  Defendants state they did not receive a response to their August 5, 2022 letter.

Defense counsel Klieger also declares that on August 15, 2022, he sent Plaintiff's counsel Botwin a letter regarding the Confidentiality Agreement, wherein defense counsel wrote:

I am writing with respect to the Confidentiality Agreement dated October 22, 2003 purportedly signed by Defendant Jenny Marchick (the "Confidentiality Agreement"), a copy of which is attached as Exhibit C to the operative Second Amended Complaint. Notwithstanding Plaintiff's refusal thus far to produce the original Confidentiality Agreement, a leading forensic document analyst has determined to a high degree of probability that none of the handwriting on the Confidentiality Agreement is Ms. Marchick's, and that much (if not all) of the handwriting is instead that of Plaintiff. In other words, the Confidentiality Agreement upon which Plaintiff's trade secret and fraud claims are predicated is a forgery. Once the original has finally been produced, we expect that further examination, including ink dating analysis, will further confirm that the Confidentiality Agreement is a complete sham.

(Klieger Decl. ¶ 2, Ex. A.)  In an August 16, 2022 letter from Plaintiff's counsel Lage and Botwin to defense counsel in response to Klieger's August 15, 2022 letter,[4] Plaintiff's counsel Botwin wrote:

*First*, you repeatedly attempt to make hay about some alleged failure

---

[4] The letter was signed by Plaintiff's counsel Botwin on behalf of Plaintiff's counsel Botwin and Lage.  (*See* Klieger Decl. Ex. B.)

13

on Plaintiff's part to produce what you call "the original of the Confidentiality Agreement attached as Exhibit C to the SAC" (the "Confidentiality Agreement"), but you should be well aware that Fed. R. Civ. P. 34(b)(2)(B) does not require the production of any paper-original document to anybody. . . .

*Second*, we find it odd that you are complaining so vociferously even though no lawyer for your clients has ever before in more than two years asked for the inspection of such a paper-original of the Confidentiality Agreement. . . .

*Third*, we are sure that you will never deny that your Aug. 15 Letter is the very first time the Defendants have made the bold claim of ***forgery*** with respect to the Confidentiality Agreement: to our recollection, such a claim appears nowhere in any pleading, email or letter exchanged among the lawyers for both sides in this vigorously contested litigation.

*Fourth*, with specific respect to what appears to be the Defendants' first request to inspect the paper-original version of the Confidentiality Agreement, we have no problem with you doing such an inspection since you have now for the first time expressly raised the claim of forgery with respect to that document.  Naturally, we are not going to instruct our client to mail you the only such paper-original of the Confidentiality Agreement because then you will have it and we will not. . . .

*Fifth*, you postulate all sorts of scenarios where "it is inconceivable that the original no longer exists" (Letter, p. 2), but Plaintiff disclosed to your clients a while ago in verified interrogatory responses that the paper-original of the Confidentiality Agreement was sent by Marchick to Plaintiff in the overnight mail way back in the 2000s. See Plaintiff's Responses to Defendant Jenny Marchick's Second Set of Interrogatories to Plaintiff Buck G. Woodall, Response to Interrogatory No. 13, at pp. 4-5. It is therefore difficult to understand your machinations and gymnastics about this concocted issue inasmuch as you were told the truthful facts from the start.

Counsel are permitted to make claims in demand letters, but such claims by counsel are neither established facts nor are otherwise particularly significant from an evidentiary standpoint.. For the record, we disagree with all of your claims about the Confidentiality Agreement, particularly the one where you reference an expert's

14

analysis that you fail to provide to us, directly or indirectly. We look forward to showing the Court your Letter's outlandish claim that the "ink dating analysis" will show anything other than that the referenced Confidentiality Agreement was created in the 2000s and not, to use your words, "more than 17 years" later. . . . Your Letter is the very first time the Defendants have demanded an inspection of the paper-original of the Confidentiality Agreement; the very first time the Defendants have claimed forgery . . . .[5]

(*Id*. Ex. B.) Klieger declares: "Following receipt of Mr. Botwin's August 16, 2022 letter, I continued to insist in email correspondence and telephone calls with Mr. Botwin and his co-counsel at the time, Luis E. Suarez, Esq., that Plaintiff make the original of the Confidentiality Agreement that had been attached as Exhibit C to the Second Amended Complaint available for examination by Defendants' forensic document examiner, and further advised them of Defendants' intention to file a motion before the Magistrate Judge absent their agreement." (*Id*. ¶ 4.)

In a letter dated September 17, 2022 from Plaintiff's counsel Luis Suarez addressed to defense counsel, Suarez wrote:

> Consistent with the Joint Stipulation laid out in DE 193, par. 4, we will make the paper original of the Confidentiality Agreement, BUCK0007091, available for inspection on Wednesday, September 21, 2022, in Tampa Florida at 3:00 p.m.

---

[5] While Plaintiff's counsel's August 16, 2022 letter stated that defense counsel Klieger's August 15, 2022 letter was the first time Defendants claimed the confidentiality agreement was a forgery, Defendants submit evidence that defense counsel notified Plaintiff's counsel in September 2020 that Defendants believed the Confidentiality Agreement was a forgery (Shimamoto Decl. ¶ 4), and a September 9, 2020 letter from Plaintiff's counsel Lage acknowledging Defendants' contention that the confidentiality agreement was a forgery (*id*. Ex. A (Lage wrote "you have suggested that either some or all of your clients will ultimately claim the Marchick confidentiality agreement is a forgery and we appreciate your advising us of same.")). Furthermore, while Plaintiff's counsel's August 16, 2022 letter stated defense counsel Klieger's August 15, 2022 letter was the first time Defendants requested inspection of the paper-original of the Confidentiality Agreement, Defendants submitted evidence that they requested examination of the original confidentiality agreement on numerous occasions beginning in October 2021. (*Id*. ¶ 4, Ex. E.)

15

We believe this review, however, is a waste of time.  Your clients, particularly Ms. Marchick, have never denied that Woodall provided in confidence extremely large quantities of intellectual property and trade secrets associated with Bucky. Indeed, Ms. Marchick claims she lacks knowledge or information sufficient to form a belief as to whether Woodall provided in confidence extremely large quantities of intellectual property and trade secrets associated with Bucky. This response was and is wholly surprising, and made in bad faith, because she should know whether she did receive materials from Mr. Woodall "in confidence." Thus, to avoid further motion practice on this discrete issue, please let us know within 5 days whether Ms. Marchick received and agreed to keep information related to Bucky confidential.

***Our examination of the facts reveals that Plaintiff printed the name of the signor below the signature line when he retrieved this document from his files. Our understanding is that he did so to make things easy and identify one of the many signors of all confidentiality agreements. To be sure, as to the signor of the document, it is, at this point, unknown to us who signed the document in 2003.***

(Shimamoto Decl. Ex. L (emphasis added).)

LCBF contends as part of their investigation, Plaintiff's counsel sought out the opinion of two forensic handwriting and document analysis experts based on the fact Plaintiff was unconvinced the confidentiality agreement attached to the FAC and SAC was not signed by Marchick.  LCBF contends the first handwriting expert Larry Stewart "found no reason to suggest" that the Confidentiality Agreement "was recently created" (Dkt. No. 221-1), and the second forensic document examiner Jim Blanco concluded Plaintiff "did not disguise his hand printing features" in the confidentiality agreement and could not confirm or deny that Marchick had signed the document (Dkt. No. 221-2).  LCBF contends Plaintiff's counsel were justified in relying on the experts' unrebutted findings at the time.  On October 25, 2022, Plaintiff filed a declaration from Larry Stewart dated October 22, 2022, in support of Plaintiff's opposition to Defendants' motion for terminating sanctions, wherein Stewart declared:

I have been retained as an expert for plaintiffs in the above-captioned case. ***Beginning in September 10, 2022,*** I began my own independent examination of the questioned document related to this matter. . . . ***The following 'questioned document was received for analysis on September 10, 2022***: . . . One (1) original Confidentiality Agreement between Buck Creations Multimedia/Raining Heart Productions and Jenny Marchick, dated October 22, 2003, and signed Jenny Marchick. This document is filed as Bates Number: BUCK0003150. . . . The questioned Confidentiality Agreement (Exhibit Q) is at issue in this matter. The forensic role was to determine if the questioned Confidentiality Agreement is legitimate or fraudulent.  I first examined the original of the Agreement on September 10, 2022 in Tampa, Florida. I conducted further laboratory testing of the document on October 20, 2022 in San Luis Obispo, California. On both occasions the document remained in the custody of Plaintiff's attorney Jason Ross. . . .

After exhausting the available forensic testing approaches, I found no indication that the questioned Agreement (Exhibit Q) was fabricated. Instead, I found numerous indications of legitimacy when compared against other non-questioned comparisons. . . .  Based upon the physical and chemical examinations conducted on the questioned Confidentiality Agreement (Exhibit Q), I found no reason to suggest it was recently created. Likewise, I found no indication that it was anything other than legitimate with respect to creation and date."

(Dkt. No. 221-1, Stewart Decl. ¶¶ 12-15, 23-24, 56, 61 (emphasis added).)  On October 25, 2022, Plaintiff also filed a declaration from Jim Blanco dated October 21, 2022 in support of Plaintiff's opposition to Defendants' motion for terminating sanctions, wherein Blanco declared:

> ***On September 30th, 2022,*** I was engaged by Counsel for Plaintiff to examine a one-page Confidentiality Agreement dated October 22nd, 2003 bearing the questioned "Jenny Marchick" signature and hand printed name and date, a copy of which is attached hereto as EXHIBIT 3. . . .
>
> Assignment and Opinion number 1:
>
> I was asked to determine if Buck G. Woodall hand printed the "Jenny Marchick" and "October 22nd, 2003" entries on the EXHIBIT 3

17

document.  My opinion is that Buck G. Wood *is identified* as the writer of the EXHIBIT 3 hand printed entries "Jenny Marchick" and "October 22nd, 2003."

Assignment and Opinion number 2:

If I had determined that Buck G. Woodall was the author of the entries under Assignment number 1, I was asked to then determine whether or not Buck G. Woodall disguised his hand printing features when he wrote them.  My opinion is that Buck G. Woodall did not disguise his hand printing features when he wrote the EXHIBIT 3 questioned entries "Jenny Marchick" and "October 22nd, 2003."

There are indications that Buck Woodall did not write the questioned "Jenny Marchick" signature on Exhibit 3."

. . .

Assignment and Opinion number 4:

I was asked to determine whether or not Buck Woodall wrote the questioned "Jenny Marchick" signature on EXHIBIT 3.  My opinion in this regard is that there are indications that Buck Woodall did not write the questioned "Jenny Marchick" signature on EXHIBIT 3."

Assignment and Opinion number 5:

I weas asked to compare two known signatures by Jenny Marchick to the "Jenny Marchick" questioned signature appearing on EXHIBIT 3 in order to determine whether or not Jenny Marchick wrote that signature and to determine, if able, if Jenny Marchick wrote that signature having injected elements of self disguise.  On the basis of present evidence, I cannot offer an opinion as to whether or not Jenny Marchick wrote the questioned signature on EXHIBIT 3, nor can I determine from present evidence whether or not she wrote her signature on EXHIBIT 3 and injected elements of self disguise in order to later be able to deny having written the Exhibit 3 signature.

(Dkt. No. 221-2, Blanco Decl. ¶¶ 2-4, 6-7 (emphasis added).)

Therefore, the evidence submitted by Plaintiff shows Plaintiff's counsel did not retain and provide the confidentiality agreement to Plaintiff's handwriting/forensic experts until September 2022, despite Defendants notifying

18

Plaintiff's counsel approximately two years earlier in September 2020 (*see* Shimamoto Decl. ¶ 4, Ex. A) that Defendants believed the confidentiality agreement was a forgery. Thus, Plaintiff's counsel delayed for two years after receiving notice of Defendants' contention that the confidentiality agreement was a forgery before Plaintiff's counsel hired and provided the confidentiality agreement to experts for analysis. Accordingly, the record demonstrates Plaintiff's counsel acted in bad faith and recklessly argued the confidentiality agreement was authentic and signed by Marchick for at least two years after receiving notice from Defendants questioning the authenticity of the agreement which justifies § 1927 sanctions. *See Caputo*, 96 F.4th at 1154-55; *see also Williams v. Mt. Diablo Unified Sch. Dist.*, 284 F. App'x 513, 514 (9th Cir. 2008) (citing *Fink,* 239 F.3d at 993); *Caputo*, 96 F.4th at 1157); *Blixseth v. Yellowstone Mountain Club, LLC*, 796 F.3d 1004, 1007 (9th Cir. 2015); *Edwards v. Vemma Nutrition*, 835 F. App'x 174, 176 (9th Cir. 2020) (citing *Estate of Blas v. Winkler*, 792 F.2d 858, 860 (9th Cir. 1986)); *Williams*, 284 F. App'x at 514; *In re Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010).

As to LCBF's contention that the Court cannot make a post-trial finding as to whether the confidentiality agreement is a forgery, Plaintiff testified at trial that Plaintiff wrote Marchick's name on the Confidentiality Agreement, Plaintiff backdated the agreement to October 22, 2003 shortly before filing this lawsuit in 2020, and Plaintiff did not believe the signature on the confidentiality agreement was Marchick's signature but instead believed it is Pearl Young's signature. (Trial Transcript 699:24-700:23, 701:10-17, 707:7-11.) Plaintiff also testified at trial that "a couple years ago" his attorneys were concerned that the signature on the Confidentiality Agreement looked like Pearl Young's signature:

> Q When did you first acknowledge that the signature is not Ms. Marchick's?
>
> A Actually, *my attorneys had questioned me about it at -- a long*

*time ago, a  couple years ago at least*. And we looked at another document, and *they were concerned because it looked like the signature of Pearl Young*.

(Trial Transcript 706:5-10 (emphasis added).)  Thus, the evidence before the Court demonstrates the confidentiality agreement was not signed by Marchick as alleged by Plaintiff and as represented by Plaintiff's counsel throughout the litigation, even though Plaintiff's counsel themselves questioned the authenticity of the document and were "concerned" the signature looked like Pearl Young's signature rather than Jenny Marchick's signature.  Moreover, Plaintiff's own handwriting expert confirmed that the handprinted name "Jenny Marchick" and date "October 22nd, 2003" on the confidentiality agreement was in Plaintiff's handwriting (Blanco Decl. ¶ 3), and Plaintiff's expert declared although he was asked to opine on whether the signature in the Confidentiality Agreement was Marchick's signature, he could not offer an opinion as to whether Marchick signed the Confidentiality Agreement (*id*. ¶ 7).  Therefore, Plaintiff's counsel was not justified in relying on Plaintiff's expert in arguing the confidentiality agreement attached to the FAC and SAC was a true and correct copy of the agreement signed by Marchick in October 2003.

The Court must make a finding as to which individual attorneys for Plaintiff acted in bad faith and recklessly in multiplying proceedings by arguing the confidentiality agreement was authentic.  *See Caputo*, 96 F.4th at 1153.  The FAC and SAC, Plaintiff's opposition to Defendants' motion to dismiss the FAC and SAC, Plaintiff's opposition to Defendants' Rule 11 motion, Plaintiff's discovery responses, and Plaintiff's summary judgment motion and opposition to Defendants' Motion for Summary Judgment were signed by Plaintiff's counsel Lage.  The evidence discussed above demonstrates Lage had notice of Defendants' contention the confidentiality agreement was not authentic but acted recklessly in multiplying the proceedings by making frivolous arguments and assertions about the confidentiality agreement, and failing to timely investigate the

20

authenticity of the confidentiality agreement.

"[A] party's attorney who reviews and approves motions, applications, and briefs filed in a case is responsible for the resulting multiplication of proceedings even when he does not sign his name to those filings or personally argue them before the court." *Caputo*, 96 F.4th at 1154. Here, nothing in the record before the Court demonstrates Plaintiff's counsel Elad Botwin, James Wesley Christian or Gerard Fox was responsible for reviewing and approving pleadings, motions, or applications wherein Plaintiff's counsel took the position that the confidentiality agreement was authentic and signed by Marchick in 2003. Therefore, the Court cannot find based on the record that Plaintiff's counsel Elad Botwin, James Wesley Christian, or Gerard Fox acted in bad faith or recklessly in connection with the confidentiality agreement as required for an award of sanctions under § 1927.

As to former Plaintiff's counsel the Suarezes, the Suarezes first appeared in this case on July 27, 2022 (*see* Dkt. Nos. 163, 164)—over two years after the action was filed (*see* Dkt. No. 1), over two years after the FAC was filed (*see* Dkt. No. 18), and over one year after the SAC was filed (*see* Dkt. No. 94). The Suarezes contend they played no role in the initial factual investigation by Plaintiff's counsel or in the formulation of any of the operative pleadings, played no role in discovery efforts before July 27, 2022, and their "focus was largely targeted on the taking and defending of depositions." Luis Suarez declares:

> I entered my Notice of Appearance on behalf of the Plaintiff on August 4, 2022. I was not involved in the initial factual investigation or in the formulation of the pleadings or amended pleadings. Discovery had begun before my involvement. Given my short tenure on the case, my role at the time was to assist my co-counsels with ongoing discovery, particularly taking and defending depositions.

(Luis Suarez Decl. ¶ 6.) Mr. Suarez further declares: "At all times during my appearance and representation of Plaintiff Buck G. Woodall in this case, I acted in

good faith with no intention to harass either Defendants or Defendants' counsel." (*Id.* ¶ 15.)  Patricia Melville Suarez declares:

> I entered my Notice of Appearance on behalf of the Plaintiff on August 4, 2022. I was not involved in the initial factual investigation or in the formulation of the pleadings or amended pleadings in this case. Discovery had begun before my involvement. Given my limited tenure on the case, my role at the time was to assist my co-counsels with ongoing discovery, particularly taking and defending depositions.

(Melville Suarez Decl. ¶ 8.)  Ms. Suarez further declares:  "At all times during my appearance and representation of Plaintiff Buck G. Woodall in this case, I acted in good faith with no intention to harass either Defendants or Defendants' counsel." (*Id.* ¶ 16.)  Moreover, the record before the Court demonstrates Luis Suarez advised defense counsel shortly after Mr. Suarez made his first appearance in the case that the confidentiality agreement had been altered by Plaintiff.  Luis Suarez declares:

> On September 17, 2022, I advised Defendants' counsel that Plaintiff had altered aspects of the Confidentiality Agreement which was attached to Plaintiff's Second Amended Complaint.  As I highlighted in the letter, Plaintiff's counsel conducted an independent investigation which revealed Plaintiff had altered aspects of the Confidentiality Agreement.  Whether Mrs. Marchick originally affixed her signature to the Confidentiality Agreement at issue, however, remained unclear.
>
> . . .
>
> During my involvement in this case there was considerable debate surrounding this draft of a Confidentiality Agreement and, as I understood it, there were ongoing efforts to locate the original of the document. I was not involved in those efforts, but I knew they were underway.

(Luis Suarez Decl. ¶¶ 7, 12.)  Luis Suarez deposed Pearl Young on December 27, 2022 during which Young testified that she recalled signing a confidentiality agreement with Plaintiff, and that the signature on the Confidentiality Agreement

Plaintiff alleged was signed by Marchick appeared similar to her signature. (Dkt. No. 479-24, Young Depo 10:1-4, 12:2-4.) Luis Suarez further declares:

> In late winter of 2022 and early spring of 2023, significant issues and differences emerged among Plaintiff's counsel as to certain aspects of the case. Those differences could not be reconciled. Accordingly, our role was terminated. We withdrew from the case on July 11, 2023. At the time of our withdrawal, discovery in this case, including discovery and fact investigation relating to the Confidentiality Agreement . . . remained ongoing and had not yet concluded. It was an open, if disputed, issue.

(Luis Suarez Decl. ¶¶ 13-14.) Patricia Melville Suarez declares:

> On April 23, 2023, I took the deposition of Defendant Jenny Marchick, the Defendant who allegedly signed the Confidentiality Agreement attached to the Second Amended Complaint.
>
> Mrs. Marchick testified that she did not remember agreeing to keep Plaintiff's *Bucky* materials confidential. Mrs. Marchick then modified that position by asserting that she would have never agreed to keep Plaintiff's *Bucky* materials confidential.
>
> During my involvement in this case there was considerable debate surrounding the draft of a Confidentiality Agreement and, as I understood it, there were ongoing efforts to locate the original of the document. I was not involved in those efforts, but I knew they were underway.

(Melville Suarez Decl. ¶¶ 11-13.) Ms. Suarez further declares:

> In late winter of 2022 and early spring of 2023, significant issues and differences emerged among Plaintiff's counsel as to certain aspects of the case. Those differences could not be reconciled. Accordingly, our role was terminated. We withdrew from the case on July 11, 2023.[6] At the time of our withdrawal, discovery in this case, including discovery and fact investigation relating to the Confidentiality Agreement . . . remained ongoing and had not yet concluded. It was an open, if disputed, issue.

---

[6] On July 12, 2023, the Court granted the Suarezes' request to withdraw as attorneys for Plaintiff. (Dkt. No. 274.)

(*Id*. ¶¶ 14-15.)  A month after the Suarezes made their appearance in the case in August 2022, Luis Suarez disclosed that the handwriting on the confidentiality agreement was Plaintiff's handwriting and the investigation into the authenticity of the agreement had begun.  Therefore, the evidence before the Court demonstrates former Plaintiff's counsel the Suarezes were not involved in the underlying initial factual investigation of Plaintiff's claims and facts as alleged in the FAC and SAC, where not involved with Plaintiff's FAC and SAC signed by Lage which falsely alleged the confidentiality agreement attached thereto was a true and correct copy of the agreement signed by Marchick in October 2003, and did not recklessly fail to investigate Defendants' contention that the confidentiality agreement attached to Plaintiff's FAC and SAC was a forgery.  Accordingly, the Court finds § 1927 sanctions against former Plaintiff's counsel Luis Suarez and Patricia Melville Suarez with respect to the confidentiality agreement are not warranted because the Suarezes did not recklessly multiply the proceedings by making frivolous arguments and assertions about the confidentiality agreement and did not fail to timely investigate the authenticity of the confidentiality agreement.

**(2)   Trade Secrets Claims Based on Publicly Available Materials**

Defendants also contend Plaintiff's counsel unreasonably and vexatiously multiple the proceedings by maintaining trade secrets claims based on publicly available materials.

In Defendants' motion to dismiss the FAC, Defendants argued Plaintiff's trade secret claims failed because Plaintiff had made his purported trade secrets public through Copyright Office deposits or by posting them on Plaintiff's website.  (Dkt. No. 68 at 21-22.)  In Plaintiff's opposition to the motion to dismiss the FAC signed by Plaintiff's counsel Lage, Plaintiff did not argue that he had posted some of his trade secret materials to his website, but instead argued his purported trade secrets were protected because Plaintiff "prominently posted a

confidentiality agreement to restrict use of information posted on his websites." (Dkt. No. 72 at 19.) On April 14, 2021, the Court issued its order on Defendants' motion to dismiss the FAC, noting "the Confidentiality Agreement on the website is not signed, the agreement does not provide that any visitors viewing Plaintiff's website are bound by the agreement, and Plaintiff does not argue nor demonstrate that third parties viewing Plaintiff's website actually executed the Confidentiality Agreement." (Dkt. No. 90 at 19.) Accordingly, the Court held "the fact that Plaintiff's Confidentiality Agreement was posted on his website does not demonstrate Plaintiff kept information secret that was publicly available on his website," and concluded "the information regarding the Bucky Works publicly available on Plaintiff's website are not trade secrets." (*Id*. at 19-20 (citing *KEMA, Inc. v. Koperwhats*, 2010 WL 3464708, at *4 (N.D. Cal. Sept. 1, 2010)).) The Court further stated:

> As noted by Defendants, only a 'portion' of Plaintiff's alleged trade secrets was deposited with the Copyright Office in connection with Plaintiff's copyright registrations and posted on Plaintiff's website. While materials publicly deposited with the Copyright Office and made available on Plaintiff's website cannot constitute a trade secret, this Order grants Plaintiff leave to amend to allege facts regarding information that was not made publicly available by Plaintiff which may form the basis for Plaintiff's trade secrets claim.

(*Id*. at 22.) Because the FAC did not specify what information was made publicly available by Plaintiff in connection with Plaintiff's deposit of materials with the Copyright Office or on Plaintiff's website, the Court could not determine what trade secrets were alleged to have been misappropriated by Defendants based on the allegations in the FAC. (*Id*. at 20.) Accordingly, the Court held Plaintiff failed to allege sufficient facts that he had any protectable trade secrets to state a claim under the DTSA and CUTSA, and dismissed Plaintiff's federal and state trade secret claims with leave to amend. (*Id*. at 21.)

On May 28, 2021, Plaintiff filed the SAC signed by Plaintiff's counsel Lage (Dkt. No. 94), which asserted trade secrets claims under state and federal law.

Defendants moved to dismiss Plaintiff's trade secret claims asserted in the SAC on the ground the "trade secrets" as defined in the SAC still includes material Plaintiff has claimed is copyrighted or material that was publicly available on Plaintiff's websites, and argued "neither the Court nor Defendants can determine what trade secrets are alleged to have been misappropriated by Defendants based on the allegations in the [SAC]." (Dkt. No. 95 at 5.)  Defendants also argued the SAC did not specify what purported trade secret information was made publicly available on Plaintiff's website. (*Id*. at 4-5.)  In Plaintiff's opposition to Defendants' motion to dismiss the SAC which was signed by Plaintiff's counsel Lage, Plaintiff argued because the SAC alleged Plaintiff's trailer was part of his trade secrets and the trailer was never submitted to the Copyright Office, Plaintiff pled sufficient facts to state a claim for trade secrets. (Dkt. No. 96 at 3.)  On August 5, 2021, the Court denied Defendants' motion to dismiss the SAC as to Plaintiff's trade secret claims, holding "Plaintiff has alleged the trailer and the 2011 script are trade secrets which were not copyrighted" and "there is nothing before the Court demonstrating Plaintiff's entire trailer was publicly available" on Plaintiff's website. (Dkt. No. 101 at 7-9.)

Despite the Court's orders on Defendants' motions to dismiss the FAC and SAC, in Plaintiff's motion for summary judgment signed and filed by Plaintiff's counsel Lage on May 7, 2024, Plaintiff argued "Defendants are expected to argue that Plaintiff displayed his trade secrets on his website, but the website expressly prompted each visitor to sign a Confidentiality Agreement." (Dkt. No. 432 at 28-29.)  Plaintiff's argument on summary judgment had already been rejected by the Court over four years earlier on April 14, 2021 in the Court's order granting Defendants' motion to dismiss the FAC as to Plaintiff's trade secret claims. (Dkt. No. 90 at 19-20.)[7]  Plaintiff's counsel Lage conduct wherein he continued to raise

_____

[7] Moreover, Defendants submit evidence that at trial, Plaintiff's counsel Lage sought to introduce the trailer into evidence during trial through the webpage from which the trailer could be publicly viewed at least as far back as 2009. (Klieger

the same frivolous argument which had already been rejected by the Court demonstrates Lage's bad faith which warrants § 1927 sanctions. *See Caputo*, 96 F.4th at 1154-55; *In re Keegan Mgmt. Co., Secs. Litig.*, 78 F.3d at 436.[8]

As to the Suarezes, as discussed above, the Suarezes submit evidence that their "role" in the case was to take and defend depositions, and that they were involved in defending Plaintiff's deposition and taking Marchick's deposition. (Luis Suarez Decl. ¶¶ 6, 9; Melville Suarez Decl. ¶¶ 8, 11-12.) The Suarezes withdrew from their representation of Plaintiff in this action in July 2023. (Dkt. No. 271.) The parties' cross-motions for summary judgment were filed in May 2024—nearly a year after the Suarezes had withdrawn from the case. (*See* Dkt. Nos. 403, 432.) Therefore, the record before the Court demonstrates the Suarezes withdrew from the case nearly a year prior to the time when Lage frivolously argued in connection with the summary judgment motions that Plaintiff's trade secrets which were available on Plaintiff's website were protected—a theory which this Court had rejected four years prior in its order re: Defendants' motion to dismiss the FAC. Accordingly, the Court finds the record does not demonstrate the Suarezes acted recklessly or in bad faith in connection with Lage's arguments on summary judgment regarding Plaintiff's trade secrets which were on Plaintiff's website.

Nothing in the record demonstrates Plaintiff's counsel Botwin, Fox, or Christian were involved in connection with Lage's argument on summary

---

Decl. Ex. C; Tr. Ex. 1379 at 4:28-4:44; Klieger Decl. Ex. D.)

[8] Moreover, Plaintiff's allegation in the SAC filed and signed by Plaintiff's counsel Lage that Plaintiff's 2011 script was a trade secret and "was in no way available to the public" (SAC ¶¶ 59, 61) was misleading because the 2011 script was virtually identical in all but formatting to the script that Plaintiff had deposited with the Copyright Office. Plaintiff's counsel Lage's continued prosecution of Plaintiff's trade secrets claims based on a 2011 script which he knew or should have known contained all the same information and content as the script Plaintiff had registered with the Copyright Office further demonstrates Plaintiff counsel Lage's bad faith. *See Caputo*, 96 F.4th at 1154-55; *In re Girardi*, 611 F.3d at 1061; *Blixseth*, 796 F.3d at 1007.

judgment regarding Plaintiff's trade secrets which were posted on Plaintiff's website.  Therefore, the Court finds the record does not demonstrate Plaintiffs' counsel Botwin, Fox, or Christian acted recklessly or in bad faith in connection with Lage's arguments on summary judgment regarding Plaintiff's trade secrets which were available on Plaintiff's website.

### (3)     Time-Barred Claims

Defendants also contend Plaintiff's counsel unreasonably and vexatiously multiplied the proceeding by maintaining claims that were plainly barred by the statute of limitations.  The FAC and SAC—which were both signed by Plaintiff's counsel Lage—falsely alleged Plaintiff "could not and did not see the *Moana* film until its release on DVD at the place of his then current foreign residence in or about late June of 2017."  (FAC ¶ 36, SAC ¶ 36.)  However, Plaintiff testified during his deposition and at trial that he saw *Moana* in the theater in December 2016 and suspected that it had been copied from his Bucky project.  (Plaintiff's Depo. 243:14-247:25; Trial Transcript 560:24-561:2.)

As the Court ruled in its November 1, 2024 order re: the parties' cross-motions for summary judgment (Dkt. No. 558), a three-year statute of limitations was applicable to Plaintiff's trade secret, fraud and false promises, and copyright infringement claims (*see id*. at 3, 6, 11).  As to the trade secrets claims, the Court found Plaintiff's trade secret claims were time-barred under the applicable three-year statute of limitations because the trade secrets misappropriation claims began to run in December 2016 when Plaintiff suspected misappropriation when he saw *Moana* in the theater, but Plaintiff did not file this lawsuit until April 24, 2020. (*Id.* at 3-5.)  With respect to Plaintiff's fraud and false promises claims, the Court found those claims were time-barred under the applicable three-year statute of limitations because it was "undisputed Plaintiff suspected *Moana* used Plaintiff's allegedly confidential *Bucky* materials when he watched *Moana* in December 2016" and thus "the statute of limitations for Plaintiff's fraud and false promises

claims began to run in December 2016" but "Plaintiff did not file this lawsuit until April 2020." (*Id*. at 6-8.) As to Plaintiff's copyright infringement claim, the Court found the copyright claim against all Defendants except for Defendant BVHE was time-barred because it was "undisputed Plaintiff suspected *Moana* used Plaintiff's allegedly confidential *Bucky* materials when he watched *Moana* in the theater in December 2016" but "Plaintiff did not file this lawsuit until April 2020" and Plaintiff did not identify any evidence that Defendants The Walt Disney Company, Walt Disney Pictures, Walt Disney Animation Studios, Disney Enterprises, Inc., and Walt Disney Direct-To-Consumer & International "distributed *Moana* within the three years prior to Plaintiff filing this lawsuit." (*Id*. at 11-12.)

Even assuming Plaintiff had lied to Plaintiff's counsel about when Plaintiff first saw *Moana*, during Plaintiff's deposition October 5, 2022, Plaintiff testified he saw *Moana* in the theater in Cabo San Lucas, Mexico in December 2016 and that he had the *Moana* DVD in his possession by March 15, 2017. (Plaintiff Depo 243:6-22, 254:9-12.) Plaintiff's counsel Luis Suarez defended Plaintiff's deposition (*see* Plaintiff's Depo. 3:1-19) and Plaintiff's deposition transcript was available to all other Plaintiff's counsel. Moreover, during Plaintiff's deposition, defense counsel (as requested by Plaintiff's counsel Luis Suarez) marked as an exhibit the metadata for screenshots of *Moana* produced by Plaintiff in his document production in this case which showed the last date the file was modified was March 15, 2017—which demonstrated Plaintiff had watched *Moana* on DVD in English more than three years before he filed this lawsuit in April 2020. (Plaintiff's Depo. 249:22-251:1, 252:7-15; Klieger Decl. ¶ 11, Ex. H.)

Plaintiff's counsel Lage—who filed Plaintiff's FAC and SAC—had a professional and ethical duty to investigate the claims asserted and facts alleged in Plaintiff's FAC and SAC. The failure to dismiss the time-barred claims after Plaintiff's October 2022 deposition during which Plaintiff testified he had seen

29

*Moana* in theaters in 2016 and suspected they misappropriated or infringed on his works in direct contradiction to the allegations in the FAC and SAC which were signed by Lage demonstrates bad faith by Lage in continuing to pursue and litigate baseless claims which were time-barred. *See Goldmanis v. Insinger*, 679 F. App'x 605, 606 (9th Cir. 2017) (quoting *Moore v. Keegan Mgmt. Co. (In re Keegan Mgmt. Co., Sec. Litig.)*, 78 F.3d 431, 436 (9th Cir. 1996)); *In re Luxury Imports of Sacrament, Inc.*, 2012 WL 1608348, at *1 (E.D. Cal. May 8, 2012); *Swanson v. EMC Mortg. Corp.*, 2010 WL 1173089, at *6 (E.D. Cal. Mar. 23, 2010) (citing *Van Berkel v. Fox Farm & Road Machinery*, 581 F. Supp. 1248, 1251 (D. Minn. 1984)).[9] Accordingly, the Court finds Plaintiff's counsel Lage recklessly multiplied proceedings by continuing to pursue time-barred claims until the claims were dismissed as time-barred on summary judgment.

As to former Plaintiff's counsel the Suarezes, Luis Suarez declares he defended Plaintiff's deposition on October 5, 2022, during which "Plaintiff testified regarding his first viewing of *Moana* in December 2016 in Spanish, and in March of 2017, in English." (Luis Suarez Decl. ¶¶ 9-10.) Mr. Suarez further declares: "At the time of our withdrawal, discovery in this case, including discovery and fact investigation relating to . . . Defendants' statute of limitations defense, remained ongoing and had not yet concluded. It was an open, if disputed, issue." (*Id*. ¶ 14.) Patricia Melville Suarez declares: "At the time of our withdrawal, discovery in this case, including discovery and fact investigation relating to . . . Defendants' statute of limitations defense, remained ongoing and had not yet concluded. It was an open, if disputed, issue." (Melville Suarez Decl. ¶ 15.) The Suarezes also declare that their "role" in the litigation was limited to taking and defending depositions. (*See* Luis Suarez Decl. ¶¶ 6, 9; Melville Suarez

---

[9] *See also Davis v. Bowron*, 30 Fed. App'x. 373, 376 (6th Cir. 2002); *Williams v. White Castle Sys., Inc.*, 526 F. Supp. 2d 830, 847-48 (M.D. Tenn. 2007) (citing *Davis*, 30 Fed. Appx. at 376).

Decl. ¶¶ 8, 11-12.)  Furthermore, the Suarezes withdrew from their representation of Plaintiff in this action in July 2023 (*see* Dkt. No. 271), nearly a year before the parties' cross-summary judgment motions were filed (*see* Dkt. Nos. 403, 432). Accordingly, the Court finds the record before the Court does not demonstrate Luis Suarez or Patricia Melville Suarez acted in bad faith or recklessly multiplied proceedings by pursuing time-barred claims.

With respect to Plaintiff's counsel Botwin, Christian, and Fox, there is nothing in the record demonstrating they acted in bad faith or reckless in connection with asserting or pursuing time-barred claims.

**B.      Amount of Sanctions**

Having found Plaintiff's counsel Lage unreasonably and vexatiously multiplied proceedings warranting sanctions under 28 U.S.C. § 1927, the Court must determine reasonable excess fees incurred by Defendants as a result of Lage's sanctionable conduct.

The Court finds defense counsel's hourly rates requested are reasonable based on the prevailing rate in the community for lawyers of comparable skill and experience.  (*See* Klieger Decl. ¶¶ 13, 20-22, Ex. M; Shimamoto Decl. ¶¶ 19, 26, Exs. S-V.)[10]  *See Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008); *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 947 (9th Cir. 2007); *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).

Defendants seek $246,313 against Lage for excess fees incurred by defense counsel from Willenken LLP as a result of Lage's sanctionable conduct (Shimamoto Decl. ¶¶ 20-25, Ex. N), and seeks $286,502.60 against Lage for

_____

[10] Defense counsel declare the hourly rates requested are substantially discounted from their standard rates (Klieger Decl. ¶ 13; Shimamoto Decl. 19), which further demonstrates the hourly rates requested are reasonable.  *See Carson v. Billings Police Dep't*, 470 F.3d 889, 892 (9th Cir. 2006); *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 840 (9th Cir. 1982); *Perfect 10, Inc. v. Giganews, Inc.*, 2015 WL 1746484, at *20 (C.D. Cal. Mar. 24, 2015), *aff'd*, 847 F.3d 657 (9th Cir. 2017).

excess fees incurred by defense counsel Robert Klieger from Hueston Hennigan LLP (Klieger Decl. ¶¶ 12-19, Ex. I), for a total of $532,815.60.  Defendants limit the excess fees they seek to the following:  (1) excess fees incurred in connection with researching and drafting portions of Defendants' motion to dismiss the FAC and reply directed at Plaintiff's trade secret, fraud and tortious interference claims and one-half of the fees incurred thereto that did not relate to specific claims; (2) excess fees incurred in connection with Defendants' Rule 11 motion directed at the trade secret claims; (3) excess fees incurred in connection with Defendant's motion to dismiss the SAC which was directed only at Plaintiff's trade secret and fraud claims; (4) one-half of excess fees incurred in connection with affirmative fact discovery and related discovery motions;[11] (5) excess fees incurred in connection with Defendants' motion for terminating sanctions based on Plaintiff's falsification of the confidentiality agreement, public disclosure of purported trade secrets, and misrepresentation regarding when he first saw *Moana*; (5) excess fees incurred with researching, drafting, preparing to argue, and arguing portions of the summary judgment motions pertaining to the trade secret and fraud claims or statute of limitations with respect to Plaintiff's trade secrets, fraud and copyright claims.[12]  Defense counsel Klieger submits time entries reflecting 210.20 hours expended by Klieger which he declares were incurred as result of Plaintiff's counsel Lage's sanctionable conduct.  (Klieger Decl. ¶ 13-19, Ex. I.)[13]  Defense

---

[11] Defendants do not seek excess fees or costs incurred in connection with defensive discovery, whether in the form of written discovery directed to Defendants, depositions of Defendants or of witnesses associated with Defendants, or discovery motions filed by Plaintiff, and do not seek excess fees and costs incurred in connection with expert discovery.

[12] Defendants do not seek excess fees or costs incurred after the Court's summary judgment ruling or in connection with trial preparation and trial.

[13] While more than one defense counsel for Hueston Hennigan LLP worked in this matter, Defendants only seek excess fees for one attorney (Klieger) from Hueston Hennigan LLP limited to the time period August 14, 2022 through September 27, 2024 (the date of the hearing on the summary judgment motions) (Klieger Decl. ¶ 13.)

counsel Shimamoto submits time entries reflecting 430.15 hours expended by defense counsel from Willenken LLP which Shimamoto declares were incurred as a result of Plaintiff's counsel Lage's sanctionable conduct.  (Shimamoto Decl. ¶¶ 20-25, Ex. N.)[14]  Defense counsel declares the fees for excess hours requested "significantly understates the excess fees attributable to Plaintiff's attorneys' misconduct."  (Suppl. Klieger Decl. ¶ 8.)

        Lage first appeared in this action on July 2, 2020 (Dkt. No. 11) and remained counsel of record for Plaintiff throughout the litigation, signed and filed the FAC on July 22, 2020 which attached the falsified confidentiality agreement and asserted trade secret, fraud and tortious interference claims based thereon (Dkt. No. 18), signed and filed the SAC on May 28, 2021 which attached the falsified confidentiality agreement and reasserted trade secrets and fraud claims based thereon (Dkt. No. 94), signed and filed Plaintiff's oppositions to Defendants' motions to dismiss (Dkt. Nos. 72, 96), signed and filed Plaintiff's opposition to Defendants' Rule 11 motion (Dkt. No. 75), signed Plaintiff's discovery responses regarding the confidentiality agreement, signed and filed Plaintiff's opposition to Defendants' motion for terminating sanctions (Dkt. No. 221), signed and filed Plaintiff's motion for summary judgment (Dkt. No. 432) and Plaintiff's opposition to Defendants' motion for summary judgment (Dkt. No. 747).   Therefore, the Court finds the categories of excess fees identified by Defendants and hours expended in connection therewith were incurred as a result of Plaintiff's counsel Lage's sanctionable conduct including failing to timely investigate the authenticity of the confidentiality agreement, asserting and continuing to prosecute untimely claims based on Plaintiff's false representation regarding when Plaintiff saw *Moana*, and asserting and continuing to prosecution

---

[14] The record reflects defense counsel allocated hours expended to seek only the portion of excess time expended as a result of Plaintiff's counsel's sanctionable conduct.  (*See* Shimamoto Decl. ¶¶ 20-24, Ex. N; Klieger Decl. ¶¶ 13-18, Ex. I; Suppl. Klieger Decl. ¶¶ 7, 8.)

trade secret claims based on materials Plaintiff had publicly disclosed, which unreasonably multiplied proceedings.

However, certain Plaintiff's counsel challenge the reasonableness of defense counsel's Klieger's block-billed time entries. "While block billing creates some impediments to the analysis of attorney fee bills, the Supreme Court has indicated that it is not a basis for refusing to award attorneys' fees." *Trulock v. Hotel Victorville*, 92 F. App'x 433, 434 (9th Cir. 2004) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 n.12 (1983)). Therefore, the Court applies a 20% reduction for block billing only as to time entries for defense counsel Klieger that are block-billed. *See Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007); *Lindsay v. Dadigan*, 2017 WL 11635471, at *4 (C.D. Cal. Aug. 1, 2017). After applying the 20% reduction to Klieger's time entries for block billing, the Court finds the remainder of the hours expended by defense counsel identified in the Motion are reasonable.

Accordingly, the Court awards sanctions against Lage pursuant to 28 U.S.C. § 1927 in the amount of $229,202.08[15] for reasonable excess fees incurred by defense counsel Klieger of Hueston Hennigan LLP and $246,313 for reasonable excess fees incurred by defense counsel of Willenken LLP, for a total of $475,515.08.

**C.     Double Recovery**

Plaintiff's counsel argued awarding sanctions would constitute double recovery based on any attorneys' fees awarded to Defendants. The Court granted Defendants' motion for attorneys' fees in the amount of $1,555,518.10 as to Plaintiff's trade secrets claims, but denied Defendants' motion for attorneys' fees as to Plaintiff's copyright infringement claim. However, Defendants do not seek double recovery and contend any attorneys' fee award would be joint and several

---

[15] The $229,202.08 amount reflects a 20% reduction for Klieger's block billing from the original $286,502.60 amount requested for Klieger's fees.

34

between Plaintiff and Plaintiff's counsel up to the amount of the sanctions awarded for the same work, and Plaintiff would be solely responsible for the remainder of attorneys' fees exceeding the sanctions amount.  Therefore, the Court finds imposing sanctions here would not result in double recovery for Defendants.  To the extent the Court has awarded Defendants attorneys' fees for the same work for which the Court has imposed sanctions, Defendants shall not seek double recovery for the same work.

## IV.   CONCLUSION

Accordingly, the Court **GRANTS** Defendants' Motion for Sanctions against Plaintiff's attorney Gustavo D. Lage in the amount of **$475,515.08**.  The Court **DENIES** Defendants' Motion for Sanctions against Plaintiff's attorneys James Wesley Christian, Elad D. Botwin, Gerard P. Fox, Luis E. Suarez, and Patricia Melville Suarez.

**IT IS SO ORDERED.**

DATED: May 14, 2026.

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE